# EXHIBIT 4

Computation of Harm for Fraud Committed by
Morse Diesel International, Inc. (now known as Amec Construction Management, Inc.)

This document presents an analysis of the harm to the Government as a result of fraud committed by Morse Diesel International, Inc. (MDI) on four Government construction contracts. The four contracts are: phases I and II of the construction of the U.S. Courthouse in St. Louis, MO (St. Louis phase I and II), the construction of the U.S. courthouse in Sacramento, CA (Sacramento), and the renovation and seismic upgrade of the U.S. Customs House in San Francisco, CA (San Francisco).

## Section 1 – Harm Computation Under the False Claims Act, Using Young-Montenay

The False Claims Act (FCA) provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval to the Government, is liable for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages to the Government. However, the Government is only entitled to treble damages if it can establish actual damages.

This analysis is based in part on the Young-Montenay case. In Young-Montenay, Inc. v. United States, 15 F.3d 1040,1042 (Fed. Cir. 1994), the court ruled that a contractor harmed the Government when the contractor (Young-Montenay, Inc.) submitted a false invoice for payment to the Government in order to front-load contract costs. The Court found the Government's damages were the total front-loaded amount ($49,000) and did not base damages on an interest calculation. The Court found that due to Young-Montenay's fraudulent activity, the Government was denied the use of the funds and was further harmed because the contractor had less incentive to finish the project in a timely and satisfactory manner.

Some of the fraud items addressed in this section did not result from front-loading issues and as a result, Young-Montenay was not used in the computation of harm for these items.

No interest calculations are included in this analysis because this cost is normally covered by treble damages under the FCA. However, an interest analysis is included as a separate section of this report.

A summary of the computation of harm related to MDI's fraudulent activities is as follows:

| Damage Item | Single Damages | Treble Damages | Penalties | Total |
|---|---|---|---|---|
| Bonds | $2,324,672 | $ 6,974,016 | $ 110,000 | $ 7,084,016 |
| Commission Sharing on Bonds | 12,975 | 38,925 | 5,040,000 | 5,078,925 |
| Failure to Timely Pay Subs | 3,643,633 | 10,930,899 | 360,000 | 11,290,899 |
| Defective Doorframes | 993,160 | 2,979,480 | 20,000 | 2,999,480 |
| Overcharges on Changes | 7,735 | 23,205 | 200,000 | 223,205 |
| Total Damages | $6,982,175 | $20,946,525 | $5,730,000 | **$26,676,525** |

## Bond Damages and Penalties

The harm related to the fraudulent bond invoices submitted to GSA by MDI and the fraudulent indemnity billed to GSA by MDI was computed as follows:

| Project | Single Damages | Treble Damages | Notes |
|---|---|---|---|
| St. Louis phase I | $ 237,814 | $ 713,442 | (1) |
| St. Louis phase II | 923,900 | 2,771,700 | (2) |
| Sacramento | 1,087,712 | 3,263,136 | (3) |
| San Francisco | 75,246 | 225,738 | (4) |
| Totals | $2,324,672 | $6,974,016 | |

Notes:

(1) The single damages for St. Louis phase I include $118,907 for the phase I bond amount that MDI billed to GSA prior to MDI's payment of this amount to its bond broker and the $118,907 amount that MDI billed to GSA for MDI's alleged payment to AMEC Holdings, Inc., for "indemnity to surety." (MDI did not pay the billed indemnity payment amount.)

(2) The single damages for St. Louis phase II are the bond amount of $923,900 that MDI billed to GSA prior to MDI's payment of this amount to its bond broker.

(3) The single damages for Sacramento include $517,941 for the bond amount that MDI billed to GSA prior to MDI's payment of this amount to its bond broker and the $569,771 amount that MDI billed to GSA for a claimed payment for indemnity to AMEC, plc. (MDI did not pay the billed indemnity payment amount.)

(4) The single damages for San Francisco represent the bond amount of $75,246 that MDI billed to GSA prior to MDI's payment of this amount to its bond broker.

False Statements Related to the Bond Payment Issues

The FCA provides for a civil penalty (in addition to damages) of not less than $5,000 and not more than $10,000 per false statement. As a result, penalties under the FCA total **$110,000** on the following 11 false statements related to the fraudulent bond issues:

St. Louis phase I

1. MDI's certified pay application number 1 to GSA, approved for payment by GSA on September 14, 1994.

2. July 14, 1994 invoice from Willis Corroon Construction Services Corporation for the St. Louis phase I bond, that was stamped "Paid" as of August 19, 1994.

3. July 21, 1994 letter from AMEC Holdings to MDI that states that MDI must pay $118,907 to AMEC Holdings. This letter was provided by MDI to GSA to support its first pay application for St. Louis phase I.

4. August 24, 1994 letter from AMEC Holdings to MDI stating that MDI has paid for AMEC Holdings' "Indemnity to Surety" in the amount of $118,907. This letter was provided by MDI to GSA in support of its second pay application for St. Louis phase I.

5. MDI's certified pay application number 2 to GSA, approved for payment by GSA on September 23, 1994.

St. Louis phase II

6. MDI's certified pay application number 1 to GSA, which GSA paid on December 18, 1995.

7. Invoices from Rollins Hudig Hall to MDI dated 10/26/95 with "Paid" stamp dated 11/21/95. MDI provided these invoices to GSA in support of MDI's first pay application.

Sacramento

8. MDI's certified pay application number 1 to GSA, which GSA paid on October 5, 1995.

9. September 5, 1995 letter from AMEC Holdings to MDI stating that MDI must pay $569,771 to AMEC Holdings for "indemnity to surety." MDI provided this letter to GSA in support of MDI's first pay application for Sacramento.

San Francisco

10. MDI's certified pay application number 1 to GSA that GSA paid on June 5, 1995.

11. February 23, 1995 bond invoice from Willis Corroon to MDI with "Paid" stamp dated May 12, 1995. MDI provided this invoice to GSA to support MDI's first pay application for San Francisco.

**Damages and Penalties for Commission Sharing on Bonds**

The issue of commission sharing is that MDI's bond broker paid a portion of its commission on MDI's bonds to MDI's parent company, Amec, plc (Amec) and MDI knowingly submitted claims to GSA for bond amounts that included the commission amounts that MDI's bond broker paid to Amec. Although we have yet to receive complete information on this issue, limiting this issue to the four contracts that are the subject of this analysis yields the following damages:

| Project | Commission-Sharing Amount | Treble Damages | Notes |
|---|---|---|---|
| St. Louis phase I | $ 14,156 | $ 42,468 | (1) |
| St. Louis phase II | 49,194 | 147,582 | (2) |
| Sacramento | 37,427 | 112,281 | (1) |
| San Francisco | 8,952 | 26,856 | (3) |
| Change Orders | 12,975 | 38,925 | (4) |
| Totals | $122,704 | $368,112 | (5) |

Notes:

(1) The commission-sharing amounts for St. Louis phase I and Sacramento represent the amounts paid to Amec reflected in accounting information obtained from Willis (fka Willis Corroon) during discovery.

(2) The commission-sharing amount for St. Louis phase II is the documented amount of $49,194 that MDI's bond broker paid to Amec, as reflected in the records provided by Michael Bardsley of Amec.

(3) The commission-sharing amount for San Francisco is the documented amount of $8,952 that MDI's bond broker paid to Amec, as reflected in the records provided by Michael Bardsley. In addition, Willis provided documentation that confirmed this amount.

(4) In addition to the fact that the initial cost of the bond was overstated as a result of MDI's commission-sharing arrangement, the bond premium paid by the Government on change order work was also overstated. The process to compute the change order harm to the Government due to MDI's commission-sharing arrangement included the following steps:

(a) The first step required is to compute the amount paid or deducted by GSA for change order work subject to bond adjustment. To accomplish this, we reviewed the schedules of change orders for the latest pay applications on each of the four projects. Change orders with an amount paid of $0 were excluded from our computation. In addition, for the St. Louis projects (phase I and phase II), we eliminated change orders for retainage, liquidated damages, and engineering work charged by GSA to MDI. These modifications were excluded from the computation because these change orders did not specifically include bond costs. The total net amount paid by GSA to MDI for change orders for each of the projects was: $5,477,120 for San Francisco, $13,277,632 for Sacramento, $2,879,988 for St. Louis phase I, and $7,523,198 for St. Louis phase II.

(b) We then estimated the total bond premium paid by GSA on the change order work for each project based on bond rates of .54% for St. Louis phase I, .55% for St. Louis phase II, and .56% for Sacramento and San Francisco. These bond rates were used because these were the rates generally used by MDI to price change order work for the respective projects. The estimated total bond premium paid by GSA on contract modifications for each of the projects was $30,501 for San Francisco, $73,941 for Sacramento, $15,468 for St. Louis phase I, and $41,151 for St. Louis phase II.

(c) After computing the amount of bond premium GSA paid to MDI on change order work, we then computed the amount of commission payable to Amec. To compute the commission-sharing amounts, we

applied the commission-sharing rates[1] for each of the four projects (11.9% for St. Louis phase I and San Francisco, 7.2% for Sacramento, and 5.3% for St. Louis phase II) to the computed change order bond premiums GSA paid to MDI on each project. This computation produced the total commission-sharing amount related to bond premiums paid by GSA on change order work of $12,975 ($3,629 for San Francisco, $5,324 for Sacramento, $1,841 for St. Louis phase I, and $2,181 for St. Louis phase II).

(5) The total computations were based on harm under the FCA. Computations under the Anti-Kickback Act (AKA) were not included here since the FCA computations exceed the amounts calculated under the AKA. (The AKA provides for damages of double the amount of the kickback.) In addition, the commission-sharing harm amounts related to the initial bond premiums paid by MDI are duplicative of amounts computed in the bond damages section above. Therefore, these amounts were not carried forward to the overall harm computations shown on the first page of this analysis. Accordingly, the commission-sharing computation for change order work of $12,975 is the only item in this section that is included in the total harm computation on page one.

False Statements Related to the Commission Sharing

The total applicable change orders for the four projects totaled 504 (115 for San Francisco, 139 for Sacramento, 33 for St. Louis phase I, and 217 for St. Louis phase II) and at $10,000 per false statement, the change order penalties total **$5,040,000**.

**Damages and Penalties for Failure to Timely Pay Subcontractors**

On a regular and continuing basis, MDI failed to timely pay its subcontractors for work performed by the subcontractors and paid for by GSA. The file documentation demonstrates that MDI fully understood the provisions of the Government contracts and failed to comply with the provisions despite certifying with each pay application that it did comply and that payments to subcontractors had been made from previous payments received from GSA.

This computation is limited to MDI subcontractors for St. Louis phases I and II. In addition, due to time constraints, this computation does not include every instance of MDI's failure to pay a subcontractor as required under the terms of MDI's contracts with GSA.
In accordance with Young-Montenay, the damages calculation for this aspect of the fraud committed by MDI is the amount that MDI certified that it had paid or would pay within seven days from the receipt of payment from GSA. The following subcontractors were not paid (1) within seven days of MDI's receipt of funds from GSA, and (2) before MDI's submission of a subsequent pay application to GSA:

[1] The commission-sharing rates represent the commission-sharing amounts that MDI's bond broker paid to Amec for the initial bond premium on each of the projects, divided by the total initial bond premium MDI billed to GSA.

| Subcontractor | Contract/Pay App # | Amount | Notes |
|---|---|---|---|
| Pafco | phase I, PA 16 | $145,002 | (1) |
| Morrow Equipment Co. | phase I, PA 14 | 5,311 | (2) |
| Morrow Equipment Co. | phase I, PA 17 | 30,733 | (2) |
| Morrow Equipment Co. | phase I, PA 18 | 30,339 | (2) |
| Morrow Equipment Co. | phase I, PA 19 | 27,982 | (2) |
| Morrow Equipment Co. | phase I, PA 20 | 75,653 | (2) |
| Morrow Equipment Co. | phase I, PA 21 | 8,964 | (2) |
| | | | |
| Gate Bluegrass | phase II, PA 3 | 33,984 | (3) |
| Gate Bluegrass | phase II, PA 4 | 66,016 | (3) |
| Cupples Products | phase II, PA 4 | 69,000 | (3) |
| Hausman | phase II, PA 4 | 2,187 | (3) |
| Gate Bluegrass | phase II, PA 5 | 120,569 | (3) |
| Cupples Products | phase II, PA 5 | 105,320 | (3),(4) |
| Hausman | phase II, PA 5 | 3,282 | (3),(4) |
| Sachs Electric | phase II, PA 5 | 356,463 | (3),(4) |
| Gate Bluegrass | phase II, PA 6 | 79,922 | (3) |
| Fabri-Tech Sheet | phase II, PA 6 | 4,500 | (3) |
| Cupples Products | phase II, PA 6 | 87,050 | (3) |
| Sachs Electric | phase II, PA 6 | 36,150 | (3) |
| Gate Bluegrass | phase II, PA 7 | 176,936 | (3) |
| Cupples Products | phase II, PA 7 | 96,490 | (3) |
| Five Star Concrete | phase II, PA 7 | 45,123 | (3) |
| Hausman | phase II, PA 7 | 63,691 | (3) |
| Millar Elevator | phase II, PA 7 | 6,480 | (3) |
| Rod Busters | phase II, PA 7 | 125,279 | (3) |
| Morrow Equipment Co. | phase II, PA 7 | 31,572 | (3),(4) |
| | | | |
| Leonard Masonry | phase II, PA 10 | 20,600 | (5) |
| Peter DeLuca Plumbing | phase II, PA 10 | 38,519 | (5) |
| Five Star Concrete | phase II, PA 11 | 11,548 | (5) |
| Ebenisterie Beaubois | phase II, PA 12 | 7,416 | (5) |
| Cupples Products | phase II, PA 12 | 127,970 | (5) |
| DHP Systems | phase II, PA 12 | 48,767 | (5) |
| Five Star Concrete | phase II, PA 12 | 7,792 | (5) |
| Gate Concrete | phase II, PA 12 | 157,000 | (5) |
| Servco | phase II, PA 12 | 2,970 | (5) |
| Transcon | phase II, PA 12 | 114,746 | (5) |
| Fabri-Tech Sheet | phase II, PA 13 | 7,213 | (5) |
| Servco | phase II, PA 13 | 61,916 | (5) |
| Midwest Steel | phase II, PA 13 | 59,575 | (5) |
| Gateway Elevator | phase II, PA 14 | 3,431 | (5) |
| Midwest Steel | phase II, PA 14 | 513,596 | (5) |
| Williams Scotsman | phase II, PA 14 | 1,640 | (5) |
| Midwest Steel | phase II, PA 15 | 141,545 | (5) |
| Gateway Elevator | phase II, PA 15 | 2,870 | (5) |
| Concrete Coring | phase II, PA 15 | 1,831 | (5) |

| Subcontractor | Contract/Pay App # | Amount | Notes |
|---|---|---|---|
| Adam's Landscaping | phase II, PA 29 | 2,000 | (6) |
| Adam's Landscaping | phase II, PA 30 | 250 | (6) |
| Bulte Company | phase II, PA 33 | 44,292 | (6) |
| Cells Correctional | phase II, PA 17 | 75,000 | (6) |
| Cells Correctional | phase II, PA 27 | 485 | (6) |
| Circle B Company | phase II, PA 9 | 5,000 | (6) |
| Circle B Company | phase II, PA 10 | 13,000 | (6) |
| Circle B Company | phase II, PA 11 | 2,000 | (6) |
| Circle B Company | phase II, PA 12 | 88,836 | (6) |
| Circle B Company | phase II, PA 13 | 21,549 | (6) |
| Midwest Steel | phase II, PA 22 | 40,772 | (6) |
| Midwest Steel | phase II, PA 23 | 9,040 | (6) |
| Midwest Steel | phase II, PA 24 | 17,300 | (6) |
| Midwest Steel | phase II, PA 25 | 5,500 | (6) |
| Midwest Steel | phase II, PA 26 | 2,683 | (6) |
| Midwest Steel | phase II, PA 29 | 84,283 | (6) |
| Midwest Steel | phase II, PA 30 | 26,875 | (6) |
| Midwest Steel | phase II, PA 31 | 14,825 | (6) |
| Midwest Steel | phase II, PA 32 | 10,500 | (6) |
| Midwest Steel | phase II, PA 35 | 2,250 | (6) |
| Midwest Steel | phase II, PA 37 | 11,500 | (6) |
| Midwest Steel | phase II, PA 38 | 250 | (6) |
| Midwest Steel | phase II, PA 39 | 500 | (6) |
| Total Harm | | $3,643,633 | |

Notes:

(1) The amount of harm for the failure of MDI to timely pay Pafco is the unpaid balance on Pafco's contract in November 1995.

(2) The harm amounts for the failure of MDI to pay Morrow represent the amounts invoiced by Morrow to CMR/MDI during the period covered by the pay applications cited in the Government's counterclaim. Generally, payments to Morrow were 60 to 90 days after the invoice date and the harm computation includes paid Morrow invoices to CMR/MDI for the period July 1995 through March 1996. Morrow invoice amounts were used instead of the amounts billed to GSA because file documentation indicates that the amounts billed to GSA for the tower crane may have included some work not performed by Morrow.

(3) The harm amounts related to MDI's failure to timely pay numerous subcontractors in pay application numbers 3 through 7 represent the actual amounts that MDI billed to GSA for work specifically performed by each subcontractor. During the period of these pay applications, MDI billed GSA for specific costs of subcontract work performed because MDI had not yet completed its cost-loaded schedule of values.

(4) The amounts for these billings by MDI to GSA for work performed by MDI subcontractors are not currently pleaded before the court.

(5) The harm amounts for MDI's failure to timely pay subcontractors in pay application numbers 10 through 15 represent the amounts determined to be owed to each subcontractor from payments received from GSA, as documented in memos prepared by MDI's project accountant. These memos indicated that the subcontractors listed were not paid within seven days from the date MDI received funds from GSA for the work performed by the subcontractors. These memos were distributed to various officials within MDI.

(6) The harm amounts for these subcontractors consist of the amounts that MDI billed to GSA for work performed by each subcontractor as reflected in MDI's schedule of values. The total amount billed was used because had MDI informed GSA that it was not going to pay these subcontractors in a timely manner, GSA would not have allowed MDI to bill for this work and would not have paid MDI for this work. As a result, the harm is the total amount billed.

False Statements Related to MDI's failure to Timely Pay Subcontractors

At $10,000 per false statement, the following 36 false statements total **$360,000** in FCA penalties:

St. Louis phase I

1. MDI pay application numbers 14, 16 - 21 (7 false claims/certifications).
2. October 20, 1995 letter from MDI to CRSS.

St Louis phase II

3. MDI pay application numbers 3 - 7, 9 - 15, 17, 22 – 27, 29 - 33, 35, 37 - 39 (28 false claims/certifications).

**Defective Doorframe Damages and Penalties**

The harm computation for MDI's fraudulent installation of doorframes that did not meet the contract specifications is based on the entire amount paid by GSA for these doorframes prior to the time that GSA received information that defective frames were being installed under the St. Louis phase II contract. This analysis included work through phase II pay application number 29, which MDI submitted to GSA on or about June 4, 1998. Pay application number 29 included work performed through April 30, 1998.

This computation used information provided by CRSS related to MDI billings to GSA for doorframes. This computation includes MDI's billings to GSA for the doorframes and doorframe installation through pay application number 29. Based on the payment information for the pay applications that included doorframe work through pay application number 29, the total harm related to the installation of defective doorframes was computed to be **$993,160**, as follows:

| | |
|---|---|
| Total door, doorframes, and installation payments through pay app 29 | $1,190,739 |
| Less: | |
| Payments for doors/door hardware | (197,079) |
| Withholding on doors | (500) |
| Total payments for doorframes/installation through pay app 29 | $ 993,160 |

In MDI pay applications subsequent to pay application number 29, GSA increased the withholding on doors and doorframes to over $1 million and then reduced the withholding on doors and doorframes to $350,500 in pay application number 38. In addition, MDI pay applications to GSA subsequent to pay application number 29 included in excess of $250,000 of billings for door and doorframe work.

False Statements Related to MDI's Installation of Defective Doorframes

The false statements related to MDI's installation of defective doorframes include pay application numbers 12, 15, and 18 – 29. However, because some of these pay applications were included in the analysis of MDI's failure to timely pay subcontractors, only pay application numbers 20 and 21 are included here. At $10,000 per false statement, this totals **$20,000.**

**Damages and Penalties for Overcharges on Change Order Work**

MDI overcharged GSA for certain alleged costs on change orders to the St. Louis phase I contract. These cost items involved bond and core form rental costs. The total computed harm is:

| Change Order | Harm | Treble Harm | Pay Application(s) | Notes |
|---|---|---|---|---|
| P-1 | $ 170 | $ 510 | 2,3,6 | (1) |
| P-2 | 13 | 39 | 3 | (1) |
| P-6 | 147 | 441 | 4,5,7 | (1) |
| P-8 | 45 | 135 | 7 | (1) |
| P12 | 62 | 186 | 9 | (1) |
| P-13 | 404 | 1,212 | 7,14 | (1) |
| P-14 | 200 | 600 | 15 | (1) |
| P-16 | 416 | 1,248 | 11,15,16,17 | (2) |
| P-17 | 37 | 111 | 9,18,20,21,22,23 | (1) |
| P-19 | 2,081 | 6,243 | 10,15 – 24 | (2) |
| P-34 | 4,160 | 12,480 | 21 | (2) |
| Totals | $7,735 | $23,205 | | |

Notes:

(1) These amounts represent the differences between the amounts GSA paid to MDI for bond using the overstated bond rate (based on the fraudulent indemnity charge) and the

amounts which would have been paid had MDI used the bond rate of .54% (which MDI agreed to and subsequently used on all phase I change orders). This computation does not include an adjustment for MDI's commission-sharing arrangement amounts discussed above.

(2) These amounts represent the total amount paid by GSA to MDI for Pafco form rental under the applicable change orders.

False Statements Related to MDI's False Claims on Change Orders

The 11 change orders listed above represent false statements. In addition, each of the pay applications in which MDI billed GSA for the change orders represents a false claim. This would include the following 9 St. Louis phase I pay applications that are not already included as a false claim in a previous section (3 – 7, 9 – 11, and 15). At $10,000 per false claim, this totals **$200,000** (20 x $10,000) in penalties.

## Section 2 – Harm Computation Under the False Claims and Anti-Kickback Acts, Using Interest Analysis

This section of the report presents an alternative analysis of damages under the FCA for the fraud committed by MDI. This analysis will compute the interest damages on those items related to the front-loading of costs by MDI. For purposes of this computation, the interest was calculated from the date GSA paid MDI to the earliest date that MDI could have received payment had it not committed fraud.

The computation of harm related to commission sharing on bonds, defective doorframes, and overcharges on change order work shown in Section 1 were not based on front-loading issues, and as a result, are generally unchanged in this section.

A summary of the computation of harm related to MDI's fraudulent activities is as follows:

| Damage Item | Single Damages | Multiplied Damages | Penalties | Total |
|---|---|---|---|---|
| Bonds | $397,852 | $1,193,556 | $ 110,000 | $1,303,556 |
| Commission Sharing on Bonds | 122,704 | 245,408 | 5,040,000 | 5,285,408 |
| Failure to Timely Pay Subs | 29,910 | 89,730 | 360,000 | 449,730 |
| Defective Doorframes | 993,160 | 2,979,480 | 20,000 | 2,999,480 |
| Overcharges on Changes | 7,735 | 23,205 | 200,000 | 223,205 |
| Total Damages | $1,551,361 | $4,531,379 | $5,730,000 | $10,261,379 |

### Bond Damages and Penalties

The interest calculation for MDI's fraudulent charges for bond costs on the four projects is as follows:

| Project/Charge Type | Single Damages (1) | Treble Damages | Notes |
|---|---|---|---|
| St. Louis – phase I Bond | $ 2,166 | $ 6,498 | (2) |
| St. Louis – phase I Indemnity | 75,648 | 226,944 | (3) |
| St. Louis – phase II Bond | 16,387 | 49,161 | (4) |
| Sacramento Bond | 7,780 | 23,340 | (5) |
| Sacramento Indemnity | 294,660 | 883,980 | (6) |
| San Francisco Bond | 1,211 | 3,633 | (7) |
| Totals | $397,852 | $1,193,556 | |

Notes:

(1) The interest rates used in the calculation of interest due from MDI were the rates prescribed under the Prompt Payment Act. These rates are established by the Secretary of Treasury and change on the first day of January and July each year. The computed interest amounts were compounded semiannually, on the date of the change in the Prompt Payment Act rates.

The interest amounts on bonds were computed for the period from the date when GSA paid MDI for the billed bond amount to the payment date of MDI's first fully processed pay application after MDI remitted that bond amount to its bond broker.

The interest amounts for the indemnity charges were computed from the date GSA paid MDI for the billed indemnity amount through June 30, 2002, the current expiration date of the Prompt Payment Act interest rate. This date was used because both of the subject contracts in which MDI billed for indemnity have not been closed out and still have uncompleted work. As a result, the amounts billed by MDI for indemnity remain overpayments to MDI through the current date.

(2) The interest damages for the phase I bond represent interest on the $118,907 amount that MDI billed to GSA prior to MDI's payment of this amount to its bond broker. The dates used in this computation were GSA's September 19, 1994 payment date of the $118,907 amount and December 22, 1994. December 22, 1994 is GSA's payment date of MDI's first fully processed pay application after MDI's payment to its bond broker of the $118,907 amount. The interest rate used in this computation was 7%.

(3) The interest damages for the phase I indemnity were based on the $118,907 payment made by GSA to MDI on September 26, 1994, and, as noted above, calculated through June 30, 2002. The interest rates used were:

| Period | Rate |
|---|---|
| Jan 2002 – Jun 2002 | 5.500% |
| Jul 2001 – Dec 2001 | 5.875% |
| Jan 2001 – Jun 2001 | 6.375% |
| Jul 2000 – Dec 2000 | 7.250% |
| Jan 2000 – Jun 2000 | 6.750% |

| Period | Rate |
|---|---|
| Jul 1999 – Dec 1999 | 6.500% |
| Jan 1999 – Jun 1999 | 5.000% |
| Jul 1998 – Dec 1998 | 6.000% |
| Jan 1998 – Jun 1998 | 6.250% |
| Jul 1997 – Dec 1997 | 6.750% |
| Jan 1997 – Jun 1997 | 6.375% |
| Jul 1996 – Dec 1996 | 7.000% |
| Jan 1996 – Jun 1996 | 5.875% |
| Jul 1995 – Dec 1995 | 6.375% |
| Jan 1995 – Jun 1995 | 8.125% |
| Jul 1994 – Dec 1994 | 7.000% |

(4) The interest damages for the phase II bond represent interest on the $923,900 amount that MDI billed to the Government prior to MDI's payment of this amount to its bond broker. The dates used in this computation were GSA's December 18, 1995, payment date of the $923,900 amount and April 5, 1996. April 5, 1996 is GSA's payment date of MDI's first fully processed pay application after MDI's payment to its bond broker of the $923,900 amount. The interest rates used were 6.375% and 5.875%.

(5) The interest damages for the Sacramento bond represent interest on the $517,941 amount that MDI billed to the Government prior to MDI's payment of this amount to its bond broker. The dates used in this computation were GSA's October 4, 1995 payment date of the $517,941 amount and December 29, 1995. December 29, 1995 is GSA's payment date of MDI's first fully processed pay application after MDI's payment to its bond broker of the $517,941 amount. The interest rate used was 6.375%.

(6) The interest damages for the Sacramento indemnity were based on the $569,771 payment made by GSA to MDI on October 4, 1995, and, as noted above, calculated through June 30, 2002. The interest rates used were as shown above for the period October 4, 1995 through June 30, 2002.

(7) The interest damages for the San Francisco bond are the interest on the $75,246 amount that MDI billed to the Government prior to MDI's payment of this amount to its bond broker. The dates used in this computation were GSA's June 5, 1995 payment date of the $75,246 amount, and the August 28, 1995 payment date of MDI's first fully processed pay application after MDI's payment to its bond broker of the $75,246 amount. The interest rates used were 8.125% and 6.375%.

<u>False Statements Related to the Bond Payment Issues</u>

This computation remains unchanged from the **$110,000** included in the first analysis.

## Damages and Penalties for Commission Sharing on Bonds

The commission-sharing issue is as described in the previous analysis and could be calculated as shown in that analysis. This interest analysis does not change that calculation and as a result, the total single damages for MDI's commission-sharing arrangement are **$122,704**.

However, 41 U.S.C., Chapter 1, Sections 51 – 58, referred to as the Anti-Kickback Act, provide civil penalties of double the amount of each kickback and $10,000 per occurrence of prohibited conduct. Accordingly, an analysis under the Anti-Kickback statue would result in total penalties of $245,408, based on the commission-sharing computations and **$5,040,000** based on each occurrence of prohibited conduct. (The penalty amount of $5,040,000 did not change because the 4 occurrences related to the initial bond premium on each project are included in the interest analysis and, therefore, have already been included at $10,000 each.)

For the purpose of this alternative calculation of harm (interest analysis), the penalties under the Anti-Kickback Act will be used.

## Damages and Penalties for Failure to Timely Pay Subcontractors

This computation uses the same subcontractors and same factual issues of late payment as was included in the subcontractor section of the first analysis in this report. However, damages in this alternative computation are based on the interest owed under the Prompt Payment clause of MDI's contract, as follows:

| Subcontractor | Contract/ Pay App # | Amount | Days Late | Int. Rate | Harm |
|---|---|---|---|---|---|
| Pafco | phase I, PA 16 | $145,002 | 132 | 6.375/ 5.875 | $ 3,144 |
| Morrow Equipment Co. | phase I, PA 14 | 5,311 | 90 | 6.375/ 5.875 | 84 |
| Morrow Equipment Co. | phase I, PA 17 | 30,733 | 63 | 5.875 | 312 |
| Morrow Equipment Co. | phase I, PA 18 | 30,339 | 41 | 5.875 | 200 |
| Morrow Equipment Co. | phase I, PA 19 | 27,982 | 8 | 5.875 | 36 |
| Morrow Equipment Co. | phase I, PA 20 | 75,653 | 4 | 5.875 | 49 |
| Morrow Equipment Co. | phase I, PA 21 | 8,964 | 23 | 5.875 | 33 |
| Gate Bluegrass | phase II, PA 3 | 33,984 | 79 | 5.875 | 432 |
| Gate Bluegrass | phase II, PA 4 | 66,016 | 7 | 5.875 | 74 |
| Cupples Products | phase II, PA 4 | 69,000 | 23 | 5.875/ 7.000 | 290 |
| Hausman | phase II, PA 4 | 2,187 | 126 | 5.875/ 7.000 | 52 |
| Gate Bluegrass | phase II, PA 5 | 120,569 | 66 | 7.000 | 1,526 |
| Cupples Products | phase II, PA 5 | 105,320 | 13 | 7.000 | 263 |
| Hausman | phase II, PA 5 | 3,282 | 100 | 7.000 | 63 |

| Subcontractor | Contract/ Pay App # | Amount | Days Late | Int. Rate | Harm |
|---|---|---|---|---|---|
| Sachs Electric | phase II, PA 5 | 356,463 | 13 | 7.000 | 889 |
| Gate Bluegrass | phase II, PA 6 | 79,922 | 71 | 7.000 | 1,088 |
| Fabri-Tech Sheet | phase II, PA 6 | 4,500 | 76 | 7.000 | 66 |
| Cupples Products | phase II, PA 6 | 87,050 | 21 | 7.000 | 351 |
| Sachs Electric | phase II, PA 6 | 36,150 | 34 | 7.000 | 236 |
| Gate Bluegrass | phase II, PA 7 | 176,936 | 41 | 7.000 | 1,391 |
| Cupples Products | phase II, PA 7 | 96,490 | 19 | 7.000 | 352 |
| Five Star Concrete | phase II, PA 7 | 45,123 | 46 | 7.000 | 398 |
| Hausman | phase II, PA 7 | 63,691 | 46 | 7.000 | 562 |
| Millar Elevator | phase II, PA 7 | 6,480 | 41 | 7.000 | 51 |
| Rod Busters | phase II, PA 7 | 125,279 | 21 | 7.000 | 505 |
| Morrow Equipment Co. | phase II, PA 7 | 31,572 | 25 | 7.000 | 151 |
| Leonard Masonry | phase II, PA 10 | 20,600 | 67 | 7.000/ 6.375 | 250 |
| Peter DeLuca Plumbing | phase II, PA 10 | 38,519 | 37 | 7.000/ 6.375 | 266 |
| Five Star Concrete | phase II, PA 11 | 11,548 | 38 | 6.375 | 77 |
| Ebenisterie Beaubois | phase II, PA 12 | 7,416 | 12 | 6.375 | 16 |
| Cupples Products | phase II, PA 12 | 127,970 | 12 | 6.375 | 268 |
| DHP Systems | phase II, PA 12 | 48,767 | 12 | 6.375 | 102 |
| Five Star Concrete | phase II, PA 12 | 7,792 | 15 | 6.375 | 20 |
| Gate Concrete | phase II, PA 12 | 157,000 | 8 | 6.375 | 219 |
| Servco | phase II, PA 12 | 2,970 | 49 | 6.375 | 25 |
| Transcon | phase II, PA 12 | 114,746 | 8 | 6.375 | 160 |
| Fabri-Tech Sheet | phase II, PA 13 | 7,213 | 19 | 6.375 | 24 |
| Servco | phase II, PA 13 | 61,916 | 19 | 6.375 | 205 |
| Midwest Steel | phase II, PA 13 | 59,575 | 65 | 6.375 | 676 |
| Gateway Elevator | phase II, PA 14 | 3,431 | 49 | 6.375 | 29 |
| Midwest Steel | phase II, PA 14 | 513,596 | 14 | 6.375 | 1,256 |
| Williams Scotsman | phase II, PA 14 | 1,640 | 56 | 6.375 | 16 |
| Midwest Steel | phase II, PA 15 | 141,545 | 27 | 6.375 | 667 |
| Gateway Elevator | phase II, PA 15 | 2,870 | 27 | 6.375 | 14 |
| Concrete Coring | phase II, PA 15 | 1,831 | 27 | 6.375 | 9 |
| Adam's Landscaping | phase II, PA 29 | 2,000 | 323 | 6.000/ 5.000 | 98 |
| Adam's Landscaping | phase II, PA 30 | 250 | 289 | 6.000/ 5.000 | 11 |
| Bulte Company | phase II, PA 33 | 44,292 | 134 | 6.000/ 5.000 | 885 |
| Cells Correctional | phase II, PA 17 | 75,000 | 524 | 6.750/ 6.250/ 6.000 | 6,831 |
| Cells Correctional | phase II, PA 27 | 485 | 125 | 6.250/ 6.000 | 18 |

| Subcontractor | Contract/ Pay App # | Amount | Days Late | Int. Rate | Harm |
|---|---|---|---|---|---|
| Circle B Company | phase II, PA 9 | 5,000 | 92 | 7.000/ 6.375 | 84 |
| Circle B Company | phase II, PA 10 | 13,000 | 75 | 7.000/ 6.375 | 176 |
| Circle B Company | phase II, PA 11 | 2,000 | 37 | 6.375 | 13 |
| Circle B Company | phase II, PA 12 | 88,836 | 74 | 6.375 | 1,148 |
| Circle B Company | phase II, PA 13 | 21,549 | 44 | 6.375 | 166 |
| Midwest Steel | phase II, PA 22 | 40,772 | 134 | 6.750/ 6.250 | 948 |
| Midwest Steel | phase II, PA 23 | 9,040 | 105 | 6.250 | 163 |
| Midwest Steel | phase II, PA 24 | 17,300 | 78 | 6.250 | 231 |
| Midwest Steel | phase II, PA 25 | 5,500 | 47 | 6.250 | 44 |
| Midwest Steel | phase II, PA 26 | 2,683 | 25 | 6.250 | 11 |
| Midwest Steel | phase II, PA 29 | 84,283 | 112 | 6.000 | 1,552 |
| Midwest Steel | phase II, PA 30 | 26,875 | 78 | 6.000 | 345 |
| Midwest Steel | phase II, PA 31 | 14,825 | 43 | 6.000 | 105 |
| Midwest Steel | phase II, PA 32 | 10,500 | 18 | 6.000 | 31 |
| Midwest Steel | phase II, PA 35 | 2,250 | 128 | 5.000 | 39 |
| Midwest Steel | phase II, PA 37 | 11,500 | 71 | 5.000 | 112 |
| Midwest Steel | phase II, PA 38 | 250 | 40 | 5.000 | 1 |
| Midwest Steel | phase II, PA 39 | 500 | 11 | 5.000 | 1 |
| Total Harm | | | | | $29,910 |

The harm amounts in this table were computed by multiplying the amount of late payment by the applicable interest rate by the number of days late divided by 365. The interest rates were the Prompt Payment Act rates, which are set by the Secretary of Treasury every six months on January 1 and July 1. This computation does not include any interest amounts MDI owes to its subcontractors in accordance with MDI's contracts with GSA.

False Statements Related to MDI's failure to Timely Pay Subcontractors

This computation remains unchanged from the **$360,000** included in the first analysis.

**Defective Doorframe Damages and Penalties**

This computation is unchanged under an interest analysis because the harm computation was based on defective work only. Accordingly, the single damages were **$993,160**, treble damages were **$2,979,480**, and penalties were **$20,000**, as described in the first harm analysis.

**Damages and Penalties for Overcharges on Change Order Work**

This computation is unchanged under an interest analysis because the harm computation was based on additional charges on change order work. Accordingly, the single damages were **$7,735**, treble damages were **$23,205**, and penalties were **$200,000**, as described in the first harm analysis.

I will supplement my report, as necessary, based on further review of information.

John F. Walsh 5/24/02

John F. Walsh

List of Information Reviewed in Preparing This Report

1. GSA contract files for the contracts listed in this report.
2. MDI contract files for the contracts listed in this report.
3. MDI pay application files for the contracts listed in this report.
4. GSA pay application files for the contracts listed in this report.
5. CRSS pay application files related to the St. Louis Courthouse projects.
6. CMR applications to MDI for the Phase I St. Louis project.
7. Information provided by the subcontractors listed in this report.
8. MDI subcontractor history reports.
9. MDI electronic invoice history reports.
10. MDI correspondence files.
11. GSA correspondence files.
12. Federal Acquisition Regulations, laws, and various court cases.
13. Agreements between CMR and MDI.
14. MDI subcontractor files.
15. Deposition transcripts and exhibits of witnesses deposed in this case.
16. Discussions with MDI, GSA, and CRSS personnel.
17. Report of Investigation number I-95-0509.

# JOHN F. WALSH

## EXPERIENCE

2000-Current GSA, OIG, Office of Audits Kansas City, MO

*GS-14 Audit Manager*

- Supervising audit staff conducting both internal and external audits of GSA operations and contracts. This includes training new auditors and providing advice and input for experienced auditors. I ensures that audits are conducted properly and in accordance with GAGAS.

1992–2000 GSA, OIG, Office of Audits Kansas City, MO

*GS-13 Auditor*

- Conducted numerous audits of GSA construction contracts including change orders, claims, and value engineering proposals with values from several hundred thousand to several million dollars. These audits included work on courthouse projects in St. Louis, MO; Kansas City, MO; Minneapolis, MN; Omaha, NE; Des Moines, IA; and Pensacola, FL as well as other federal construction projects.
- Audited many multiple award schedule contracts including furniture companies, computer manufacturers, and firms supplying numerous other commodities for purchase by Government agencies.
- Audited telecommunication companies such as Sprint and Southwestern Bell.
- Conducted internal audits of GSA operational programs and processes, including audits of procurement programs, reviews of project funding, and responses to congressional inquiries.
- Worked with the Office of Investigations, the Department of Justice, and other federal agencies on cases involving both civil and criminal issues.

1987–1992 GSA, OIG, Office of Audits Kansas City, MO

*GS-7 to GS-12 Auditor*

- Performed many internal audits of GSA leases.
- Audited several multiple award schedule contractors including West Publishing Company, Calgon Vestal Laboratories, and American Recreation Products, Inc.
- Performed numerous audits of GSA construction contractors.
- Performed numerous audits of GSA leases.
- Participated in and conducted internal audits of GSA operations.
- Worked with the Office of Investigations, the Department of Justice, and other federal agencies on cases involving both civil and criminal issues.

## EDUCATION

1986 Loras College Dubuque, IA

- Bachelor of Arts in Accounting
- Dean's List Student

## CERTIFICATIONS

- Certified Public Accountant, August 1987; Licensed in Missouri since 1991

## PUBLICATIONS

- *Advice from the Trenches; An Auditor's Perspective*, printed in Multiple Award Schedule Contracting, April 2002.

Correction Sheet to the Expert Report of John Walsh titled "Computation of Harm for Fraud Committed by Morse Diesel International, Inc." dated May 24, 2002.

Page 4 – Under note (4)(b), the report states that .56% was used for the cost of bond billed by MDI on change orders for Sacramento and San Francisco. This rate has been changed to .54% for Sacramento (based on a September 9, 1996 letter from MDI to LMB) and 1% for San Francisco (based on review of change order documents).

This refinement of the change order bond rates for these two projects affected my computation of the net amounts paid by GSA to MDI for bond cost related to change order work for these two projects. For the San Francisco project, the change order bond amount paid by GSA to MDI changed to $54,229 from $30,501 and for the Sacramento project, the change order bond amount paid by GSA to MDI changed to $71,314 from $73,941. Although minor, these changes had a ripple effect on several computations included in my report, as follows:

Page 1 - $5,078,925 changed to $5,086,830.
Page 1 - $6,982,175 changed to $6,984,810.
Page 1 - $20,946,525 changed to $20,954,430.
Page 1 - $26,676,525 changed to $26,684,430.
Pages 1 and 3 - $38,925 changed to $46,830.
Pages 1, 3 and 5 - $12,975 changed to $15,610.
Pages 3, 10 and 13 - $122,704 changed to $125,339.
Page 3 - $368,112 changed to $376,017.
Page 5 - $3,629 changed to $6,453.
Page 5 - $5,324 changed to $5,135.
Page 10 and 13 - $245,408 changed to $250,678.
Page 10 - $5,285,408 changed to $5,290,678.
Page 10 - $1,551,361 changed to $1,553,996.
Page 10 - $4,531,379 changed to $4,536,649.
Page 10 - $10,261,379 changed to $10,266,649.

John F. Walsh (signature) — 10/17/02

John F. Walsh — Date

**U. S. Department of Justice**

154-99-279C

Civil Division
(202) 307-0290
Fax:
(202) 514-8624

*Washington, D.C. 20530*

October 17, 2002

Rick Webber, Esq.
Arent Fox Kintner Plotkin & Kahn, PLLC
1050 Connecticut Ave. N.W.
Washington, DC 20036-5339
By facsimile and regular mail

Re: Morse Diesel International v. United States,
Fed. Cl. Nos. 99-279C, 99-529C, 99-530C, 00-531

Dear Mr. Webber:

I am enclosing a correction sheet to John Walsh's May 24, 2002 expert report on damages.

Very truly yours,

Domenique Kirchner
Trial Attorney
Commercial Litigation Branch

Correction Sheet to the Expert Report of John Walsh titled "Computation of Harm for Fraud Committed by Morse Diesel International, Inc." dated May 24, 2002.

Page 4 – Under note (4)(b), the report states that .56% was used for the cost of bond billed by MDI on change orders for Sacramento and San Francisco. This rate has been changed to .54% for Sacramento (based on a September 9, 1996 letter from MDI to LMB) and 1% for San Francisco (based on review of change order documents).

This refinement of the change order bond rates for these two projects affected my computation of the net amounts paid by GSA to MDI for bond cost related to change order work for these two projects. For the San Francisco project, the change order bond amount paid by GSA to MDI changed to $54,229 from $30,501 and for the Sacramento project, the change order bond amount paid by GSA to MDI changed to $71,314 from $73,941. Although minor, these changes had a ripple effect on several computations included in my report, as follows:

Page 1 - $5,078,925 changed to $5,086,830.
Page 1 - $6,982,175 changed to $6,984,810.
Page 1 - $20,946,525 changed to $20,954,430.
Page 1 - $26,676,525 changed to $26,684,430.
Pages 1 and 3 - $38,925 changed to $46,830.
Pages 1, 3 and 5 - $12,975 changed to $15,610.
Pages 3, 10 and 13 - $122,704 changed to $125,339.
Page 3 - $368,112 changed to $376,017.
Page 5 - $3,629 changed to $6,453.
Page 5 - $5,324 changed to $5,135.
Page 10 and 13 - $245,408 changed to $250,678.
Page 10 - $5,285,408 changed to $5,290,678.
Page 10 - $1,551,361 changed to $1,553,996.
Page 10 - $4,531,379 changed to $4,536,649.
Page 10 - $10,261,379 changed to $10,266,649.

John F. Walsh (signature)
John F. Walsh

10/17/02
Date