# EXHIBIT 6

Computation of Damages and Penalties for Fraud Committed by
Morse Diesel International, Inc. (d/b/a Amec Construction Management, Inc.) (ACMI)
Limited to Summary Judgment Issues Only
March 28, 2007

This document presents an analysis of the damages and penalties related to fraud committed by Morse Diesel International, Inc. (d/b/a Amec Construction Management, Inc.) (ACMI) on four Government construction contracts. The four contracts are: Phases I and II of the construction of the U.S. Courthouse in St. Louis, MO (St. Louis Phase I and II), the construction of the U.S. Courthouse in Sacramento, CA (Sacramento), and the renovation and seismic upgrade of the U.S. Customs House in San Francisco, CA (San Francisco).

A summary of the computation of damages and penalties for ACMI's fraudulent activities related to the Government's summary judgment motions is as follows:

| Fraud Item | Single Damages | Treble Damages | Penalties | Total |
|---|---|---|---|---|
| Requests for Bond Reimbursements | $1,635,994 | $4,907,982 | $ 40,000 | $4,947,982 |
| False "Indemnity" Amounts | 688,678 | 2,066,034 | 10,000 | 2,076,034 |
| Anti-Kickback Violations | Included above | Included above | Included above | Included above |
| Total Damages | $2,324,672 | $6,974,016 | $50,000 | $7,024,016 |

This summary does not include damages and penalties related to frauds committed by ACMI that were not included in the January 26, 2007, decision by the Court of Federal Claims. In addition, the damages and penalties for ACMI's violations of the Anti-Kickback Act (except for the effect of ACMI's illegal kickbacks on change orders and claims) as found by the Court of Federal Claims are included in this summary calculation.

## FALSE CLAIMS ACT DAMAGES AND PENALTIES FOR FRAUD FOUND BY THE COURT OF FEDERAL CLAIMS

The False Claims Act (FCA) provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval to the Government, is liable for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages to the Government.

The following analysis is based in part on the Young-Montenay case. In Young-Montenay, Inc. v. United States, 15 F.3d 1040,1042 (Fed. Cir. 1994), the court ruled that a contractor harmed the Government when the contractor (Young-Montenay, Inc.) submitted a false invoice for payment to the Government in order to front-load billings on a fixed price contract. The Court found the Government's damages were the total front-loaded amount ($49,000) and did not base damages on an interest calculation. The Court found that due to Young-Montenay's fraudulent activity, the Government was

denied the use of the funds and was further harmed because the contractor had less incentive to finish the project in a timely and satisfactory manner.

Damages and Penalties for Fraudulent Requests for Bond Reimbursements

The damages and penalties for ACMI's fraudulent requests for bond reimbursements relate to ACMI actions in certifying and submitting requests to GSA for reimbursement of bond premiums before it had actually paid such costs, and providing false documentation to support its reimbursement requests. The damages are computed as follows:

| Project | Single Damages | Treble Damages | Notes |
|---|---|---|---|
| St. Louis Phase I | $ 118,907 | $ 356,721 | (1) |
| St. Louis Phase II | 923,900 | 2,771,700 | (2) |
| Sacramento | 517,941 | 1,553,823 | (3) |
| San Francisco | 75,246 | 225,738 | (4) |
| Totals | $1,635,994 | $4,907,982 | |

Notes:

(1) The single damage amount for St. Louis Phase I is the $118,907 bond amount that ACMI certified and billed to GSA in its first pay application on the project prior to ACMI's payment of this amount to its bond broker. This is the amount that ACMI fraudulently frontloaded.

(2) The single damage amount for St. Louis Phase II is the bond amount of $923,900 that ACMI certified and billed to GSA in its first pay application on the project prior to ACMI's payment of this amount to its bond broker. This is the amount that ACMI fraudulently frontloaded.

(3) The single damage amount for Sacramento is the $517,941 bond amount that ACMI certified and billed to GSA in its first pay application on the project prior to ACMI's payment of this amount to its bond broker. This is the amount that ACMI fraudulently frontloaded.

(4) The single damage amount for San Francisco is the $75,246 bond amount that ACMI certified and billed to GSA in its first pay application on the project prior to ACMI's payment of this amount to its bond broker. This is the amount that ACMI fraudulently frontloaded.

For the purposes of this computation, penalties are not computed for each ACMI false statement but are computed for the pay applications that included ACMI's initial bond charges for each project. As a result, based on the ACMI's false bond reimbursement claims made on the first pay application for each of the four projects, penalties under the FCA total $40,000. The primary false certifications and documents used by ACMI to perpetuate the bond reimbursement fraud are:

St. Louis Phase I

- ACMI's certified pay application number 1 to GSA that GSA paid by check dated September 21, 1994. ACMI's certification included a statement that, "The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract;"
- July 14, 1994 invoice from Willis Corroon Construction Services Corporation for the St. Louis Phase I bond, that was stamped "Paid" as of August 19, 1994. ACMI provided this invoice to GSA to support its first pay application.

St. Louis Phase II

- ACMI's certified pay application number 1 to GSA that GSA paid by electronic funds transfer (EFT) on December 18, 1995. ACMI's certification included a statement that, "The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract;"
- Invoices from Rollins Hudig Hall to ACMI dated 10/26/95 with "Paid" stamp dated 11/21/95. ACMI provided these invoices to GSA to support its first pay application.

Sacramento

- ACMI's certified pay application number 1 to GSA that GSA paid by EFT on October 5, 1995. ACMI's certification included a statement that, "The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract;"
- September 5, 1995 letter from AMEC Holdings to ACMI stating that ACMI must pay $569,771 to AMEC Holdings for "indemnity rendered to the sureties by AMEC, plc" and $517,491 to Willis Corroon for Seaboard Surety/St. Paul American Home premiums. ACMI provided this letter to GSA to support its first pay application.

San Francisco

- ACMI's certified pay application number 1 to GSA that GSA paid by check dated June 5, 1995. ACMI's certification included a statement that, "The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract;"

- February 23, 1995 bond invoice from Willis Corroon to ACMI with "Paid" stamp dated May 12, 1995. ACMI provided this invoice to GSA to support its first pay application.

Damages and Penalties for Fraudulent Requests for "AMEC Indemnity" Amounts

On two of the projects, St. Louis Phase I and Sacramento, ACMI provided false certifications and documents to support that it had paid amounts to AMEC Holdings, Inc., and AMEC, plc for "indemnity to surety." ACMI provided these false certifications and documents to fraudulently obtain payment from GSA for these fictitious amounts and based on these false statements, GSA did pay ACMI for the claimed "indemnity" amounts. ACMI never paid these fictitious amounts. The amount of the false "indemnity" charged to GSA for the St. Louis Phase I project was $118,907 and the amount for the Sacramento project was $569,771. These amounts total $688,678 of fraudulent "indemnity" charges to GSA.

ACMI was paid for fraudulent "indemnity" amounts on the second pay application for the St. Louis Phase I project and the first pay application on the Sacramento project. Because a $10,000 penalty for the first pay application of the Sacramento project was included in the section above for fraudulent requests for bond reimbursements, the computation of penalties for the false "indemnity" is limited to $10,000 for the second pay application for the St. Louis Phase I project. The primary false certifications and documents used by ACMI to perpetuate the "indemnity" fraud are:

St. Louis Phase I

- ACMI's certified pay application number 1 to GSA included a statement that, "The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract;"

- July 21, 1994 letter from AMEC Holdings to ACMI that states that ACMI must pay $118,907 to AMEC Holdings. This letter was provided by ACMI to GSA to support its first pay application.

- ACMI's certified pay application number 2 to GSA that GSA paid by check dated September 30, 1994. ACMI's certification included a statement that, "The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract;"

- August 24, 1994 letter from AMEC Holdings to ACMI stating that ACMI has paid for AMEC Holdings' "Indemnity to Surety" in the amount of $118,907. This letter was provided by ACMI to GSA to support its second pay application.

Sacramento

- ACMI's certified pay application number 1 to GSA that GSA paid by EFT on October 5, 1995. ACMI's certification included a statement that, "The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract;"
- September 5, 1995 letter from AMEC Holdings to ACMI stating that ACMI must pay $569,771 to AMEC Holdings for "indemnity rendered to the sureties by AMEC, plc" and $517,491 to Willis Corroon for Seaboard Surety/St. Paul American Home premiums. ACMI provided this letter to GSA to support its first pay application.

## ANTI-KICKBACK ACT DAMAGES AND PENALTIES FOR FRAUD FOUND BY THE COURT OF FEDERAL CLAIMS

Damages and Penalties for ACMI's Violation of the Anti-Kickback Act

The Anti-Kickback Act prohibits kickbacks and provides for the collection of twice the kickback amount plus not more than $10,000 per each occurrence. As noted above, the False Claims Act provides for treble damages and up to $10,000 per occurrence. In its January 26, 2007, decision, the Court ruled that ACMI's violations of the Anti-Kickback Act are also violations of the False Claims Act. As a result, the damages related to ACMI's violations of the Anti-Kickback Act are computed using the damages and penalties allowed under the False Claims Act.

ACMI's bond broker paid a portion of its commission on ACMI's bonds to ACMI's parent company, Amec, plc (Amec) and ACMI submitted claims to GSA for bond amounts that included the commission amounts that ACMI's bond broker paid to Amec. The total amount for damages and penalties under the Anti-Kickback and False Claims Acts is $369,187 ($329,187 for treble damages and $40,000 for penalties at $10,000 per occurrence), computed as follows:

| Project | Commission-Sharing Amount | Treble Damages | Notes |
|---|---|---|---|
| St. Louis Phase I | $ 14,156 | $ 42,468 | (1) |
| St. Louis Phase II | 49,194 | 147,582 | (2) |
| Sacramento | 37,427 | 112,281 | (1) |
| San Francisco | 8,952 | 26,856 | (3) |
| Totals | $125,339 | $329,187 | |

Notes:

(1) The kickback amounts for St. Louis Phase I and Sacramento represent the amounts paid to Amec reflected in accounting information obtained from Willis (fka Willis Corroon) during discovery.

(2) The kickback amount for St. Louis Phase II is the amount that ACMI's bond broker paid to Amec, as reflected in the records provided by Michael Bardsley of Amec.

(3) The kickback amount for San Francisco is the amount that ACMI's bond broker paid to Amec, as reflected in the records provided by Michael Bardsley. In addition, Willis provided documentation that confirmed this amount.

The false documents and certification related to the kickback issue include the first pay applications for each project because these pay applications include the kickback for the initial bond payment request that was certified by ACMI and paid by GSA. At $10,000 per occurrence, the pay application penalties total $40,000.

All of the $369,187 ($329,187 + $40,000) for damages and penalties that resulted from ACMI's commission sharing plan is included in the computation of damages and penalties for ACMI's bond reimbursement fraud.

I will supplement my report, as necessary, based on further review of information.

John F. Walsh

John F. Walsh

## List of Information Reviewed In Preparing This Report

1. GSA contract files for the contracts listed in this report.
2. ACMI contract files for the contracts listed in this report.
3. ACMI pay application files for the contracts listed in this report.
4. GSA pay application files for the contracts listed in this report.
5. CRSS pay application files related to the St. Louis Courthouse projects.
6. ACMI correspondence files.
7. GSA correspondence files.
8. Federal Acquisition Regulations, laws, and various court cases.
9. Deposition transcripts and exhibits of witnesses deposed in this case.
10. Decisions from the Court of Federal Claims dated July 15, 2005, and January 26, 2007.