IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| AMEC CONSTRUCTION MANAGEMENT, INC., f/k/a Morse Diesel International, Inc. | ) | |
| Plaintiff, | ) | |
| v. | ) | Nos. 99-279C and consolidated cases |
| | ) | (Judge Braden) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON ITS CLAIM FOR DAMAGES PURSUANT THE COURT'S JANUARY 26, 2007 RULING**

Plaintiff, AMEC Construction Management, Inc., f/k/a Morse Diesel International, Inc. ("ACMI"), respectfully submits this response to Defendant's Proposed Findings of Uncontroverted Fact in Support of its Motion for Summary Judgment on its Claim for Damages Pursuant to the Court's January 26, 2007 Ruling. ACMI respectfully disagrees with the Court's decision granting summary judgment on liability to the Government and does not, by providing this response, waive any of its objections and positions with respect to that ruling. As set out below, there are numerous issues of fact in this complex matter that preclude the requested summary judgment.

## I. BACKGROUND

**DOJ Proposed Finding:**

1. AMEC Construction Management, Inc., f/k/a Morse Diesel International, Inc. and its' predecessor company Morse Diesel International (collectively, "ACMI") were awarded four Federal construction contracts by the General Services Administration ("GSA"): (1) Phase I of the Thomas F. Eagleton Federal Courthouse in St. Louis (the "Phase I contract"), awarded on or about July 5, 1994; (2) Phase II of the Eagleton Courthouse in St. Louis, awarded on or about September 28, 1995 (the "Phase II contract"); (3) the U.S. Customs House in San Francisco, awarded on or about February 15, 1995 (the "San Francisco contract"); and (4) the Federal Courthouse in Sacramento, awarded on or about July 19, 1995 (the "Sacramento contract") (collectively, the "four GSA contracts"). Morse Diesel III, 74 Fed. Cl. at 605-07.

**Response:**

1. Disputed as incomplete. The "predecessor company" referenced in this proposed finding was actually a joint venture formed on January 1, 1990 between AMEC Projects, Inc. and Morse Diesel, Inc. On January 31, 1995, AMEC acquired the remaining 50% interest in the joint venture, retroactive to January 1, 1995. Thus, of the four GSA contracts, only the first was awarded to the joint venture, while the latter three were awarded to Morse Diesel International, Inc., owned 100% by AMEC. A1033-1025 (KPMG Report, pp. 1-3).

**DOJ Proposed Finding:**

2. Each of the four GSA contracts permitted ACMI to seek reimbursement for the actual cost of its payment and performance bonds required for each contract upon supplying evidence that the bonds had been paid in accordance with 48 C.F.R. § 52.232-5(g). A453; Morse Diesel III, 74 Fed. Cl. at 606, 607, 619, 620, 623-24.[1] Specifically, the contracts each stated:

[1] "A__" references refer to pages of the original appendices to the summary judgment papers that were filed by the parties in 2003. For the Court's convenience, copies of the pages cited from the original appendices are included in the Government's Appendix of Excerpts from Summary

> In making these progress payments, the Government shall, upon request, reimburse the Contractor for the amount of premiums paid for performance, and payment bonds (including coinsurance and reinsurance agreements, when applicable) after the Contractor has furnished evidence of full payment to the surety. The retainage provisions of paragraph (e) of this, clause shall not apply to that portion of progress payments attributed to bond premiums.

48 C.F.R. § 52.232-5(g). Id.

**Response:**

2. ACMI respectfully disagrees with some of the findings that this Court has made. ACMI does not abandon its disagreements, but for brevity's sake, those arguments are not repeated here.

## II. FALSE CLAIMS FOR "REIMBURSEMENT" OF BOND PREMIUMS

### A. Phase I Contract

**DOJ Proposed Finding:**

3. On August 23, 1994, ACMI submitted to CRSS - the GSA's construction manager for the Phase I contract - its first pay application for the Phase I contract, seeking reimbursement for bond in the amount of $118,907. A272 (Haddock Dec. ¶ 9). A true and correct copy of the August 23, 1994 pay application is included at A298-314. The pay application sought $118,907 for "bond." A301, 306.

**Response:**

3. Not disputed

**DOJ Proposed Finding:**

4. ACMI supported its request for payment of the bond premium amount included in its first application for payment on the Phase I contract with two certifications signed by William

---

Judgment Appendices and Additional Documents Regarding Kickbacks. "SA" references are to additional documents regarding purported kickbacks also filed in the Government's appendix.

Lyons, a ACMI Vice-President. A299, 300; Morse Diesel III, 74 Fed. Cl. at 610. A299 is a true and correct copy of the first certification, which provided as follows:

> The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.
>
> CONTRACTOR: MORSE DIESEL INTERNATIONAL
>
> By: /s/ William T. Lyons Date: 8/16/94
> William T. Lyons, Vice President

A299. On behalf of ACMI, Mr. Lyons also signed a certification, on GSA Form 2419, of ACMI's first payment application on the Phase I contract. A300; Morse Diesel III, 74 Fed. Cl. at 610. A300 is a true and correct copy of the GSA Form 2419 signed by Mr. Lyons. By signing as the "Certifying Officer" for ACMI, Mr. Lyon attested to ACMI's knowledge and belief that "[t]he amounts requested are only for performance in accordance with the specifications, terms and conditions of the contract." Id.

**Response:**

4. Disputed in part. Lyons signed the certifications in good faith, not knowing that the stamped "paid" invoice was false. A1507-08, 1510-11 (Lyons Dep., pp. 62, 63-64, 70).

**DOJ Proposed Finding:**

5. By letter dated August 25, 1994, Mr. Harwood, ACMI's contract administrator, transmitted to GSA Contracting Officer Anderson the bond broker's invoice, dated July 14, 1994, showing a total premium of $118,907 due for the Phase I contract bonds. A272-73 (Haddock .Dec. ¶ 10)1 A315-16 (Aug. 25, 1994 letter); Morse Diesel III, 74 Fed. Cl. at 611. The invoice was falsely stamped "Paid" as of August 19, 1994. Morse Diesel III, 74. Fed. Cl. at 611;

A316. Mr. Harwood's letter explained that the "paid" invoice was "[i]n support of the billing currently for payment submitted," i.e., ACMI's first payment application on the Phase I contract. Morse Diesel III, 74 Fed. Cl. at 611; A315. A316 is a true and correct copy of the falsely stamped "Paid" invoice, and A315 is a true and correct copy of Mr. Harwood's letter transmitting the false "Paid" invoice to the GSA for payment.

**Response:**

5. Not disputed.

**DOJ Proposed Finding:**

5.[2] GSA contracting officer, Anne Anderson, approved the first payment application for the Phase I contract, including the $118,907 amount requested for the bond cost. A317; Morse Diesel III, 74 Fed. Cl. at 611.

**Response:**

5. Not disputed.

**DOJ Proposed Finding:**

6. The Court granted the Government's motion for summary judgment under the FCA upon the grounds that ACMI's certifications in the first Phase I pay application and the stamped "paid" bond invoice constituted a false or fraudulent claims for payment of $118,907 that was not yet due to ACMI. Morse Diesel III, 74 Fed. Cl. at 609-12, 624-25, 636.

**Response:**

6. Disputed. The January 2007 decision speaks for itself and should not be restated as a new proposed finding. Moreover, ACMI respectfully disagrees with some of the findings

---

[2] The Government's numbering of its proposed findings was incorrect, but ACMI is using the same numbering to avoid unnecessary confusion.

that this Court has made. ACMI does not abandon its disagreement, but for brevity's sake, those arguments are not repeated here.

**DOJ Proposed Finding:**

7. The Government was damaged in the amount of $118,907 by ACMI's false claim for payment.

**Response:**

7. Disputed. The Government's own internal report, which ACMI does not accept in its entirety, states that the damage to the Government was only "the loss of the use of the funds and interest on the funds" ("time-value of money"). IG Report prepared by Steven Anderson, Case File Number I-95-0509, February 18, 1999, at 7 (Exh. 5 to ACMI Opp.). It is currently unclear what interest rate should apply; the Government used a 6% simple interest in the report referenced above, but GSA OIG auditor John Walsh used the prompt payment interest rate prescribed by the Department of the Treasury when he calculated the time-value of money in his 2002 Damages report on this issue. Walsh Damages Calculation, May 24, 2002 (Exh. 4 to ACMI Opp.).

**B. San Francisco Contract Bond Payment Request**

**DOJ Proposed Finding:**

8. On April 27, 1995, ACMI Vice-President and San Francisco Territory Manager Anthony Cooney signed a certification as ACMI's representative. A538; Morse Diesel III, 74 Fed. Cl. at 614. That certification - on page 2 of ACMI's pay application dated April 25, 1995 provided as follows:

> The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered

> by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.
>
> CONTRACTOR
>
> By: /s/ Anthony Cooney Date: 4/27/95

A538; Morse Diesel III, 74 Fed. Cl. at 620. A537-52 is a true and correct copy of the first pay application submitted by ACMI to the GSA on the San Francisco contract.

**Response:**

8. Not disputed.

**DOJ Proposed Finding:**

9. On May 19, 1995, Anthony Cooney signed another certification in support of ACMI's first application to the GSA for payment on the San Francisco contract that stated:

> I hereby certify, to the best of my knowledge and belief, that this Request for Payment is true, accurate and in accordance with the specifications, terms and conditions of the contract.

A559; Morse Diesel III, 74 Fed. Cl. at 614. A559 is a true and correct copy of the certification signed by Mr. Cooney on behalf of ACMI on May 19, 1995.

**Response:**

9. Not disputed.

**DOJ Proposed Finding:**

10. On May 21, 1995, Joel Josehart, ACMI's Project Manager for the San Francisco contract, signed a certification upon behalf of ACMI in support of the first payment application for the San Francisco contract, and stated: .

> In accordance with the clause at FAR 52.232-5, Payments Under Fixed-Price Construction Contracts, I hereby certify, to the best of my knowledge and belief, that—

> (1) The amounts requested are only for performance in accordance with the specifications, terms and conditions of the contract....

A534; Morse Diesel III, 74 Fed. Cl. at 614. A534 is a true and correct copy of the certification signed by Mr. Josehart on GSA Form 2419 as the "Certifying Officer" for ACMI.

**Response:**

10. Not disputed.

**DOJ Proposed Finding:**

11. On November 20, 2001, ACMI entered a guilty plea in the U. S. District Court for the Eastern District of California in the matter United States v. Amec Construction Management Inc., f/k/a Morse Diesel International, Inc., CR S 01-0502 (LKK) (the "E.D. Cal. plea"). A125; Morse Diesel III, 74 Fed. Cl. at 619-20. Final judgment was entered in the matter on March 27, 2002. A122. In entering the guilty plea, ACMI admitted to the following pertinent facts:

(a) Employees of ACMI knowingly executed a scheme to defraud the United States, and obtain money by means of material false, or fraudulent pretenses, representations and promises under the contract. A140; Morse Diesel III, 74 Fed. Cl. at 614-15.

(b) On February 23, 1995, bond broker Willis Corroon issued its invoice for the prime contract bond premium in the amount of $75,246. A140. On April 25, 1995, an employee of ACMI (Anthony Cooney) certified to the GSA that the contract bond costs were $75,246. A140; A537-39 (pay application); Morse Diesel III, 74 Fed. Cl. at 614. Around that time, the risk manager of ACMI (Kirwin Ford) telephoned the bond broker and directed the broker to stamp an invoice for the bond premium as "paid" as of the date of May 12, 1995. A140; Morse Diesel III, 74 Fed. Cl. at 614, 620. Mr. Ford knew that the bond premium had not been paid up to that date. A140; Morse Diesel III, 74 Fed. *Cl. at 614, 620. Mr. Ford then

instructed the bond broker to deliver the invoice falsely stamped paid to the corporation's office. A140-41; Morse Diesel III, 74 Fed. Cl. at 614, 620.

(c) On or about May 23, 1995, Joel Josehart supplemented the first pay application to the government and included the invoice to a Progress Payment Voucher. A141. The invoice on the bond premium was falsely stamped "Paid 5/12/95 Dennis M. O'Brien, EVP." Id. Mr. Josehart certified the accuracy of the invoice upon behalf of ACMI, and ACMI made a claim upon the United State pursuant to contract through the GSA for payment in the amount of $75,246 from the United States to ACMI for the bond premium. Id. The falsely stamped invoice was used by ACMI as proof that the bond cost had been incurred, as required by the terms of the contract. Id.; A534-36 is a true and correct copy of the falsely stamped "Paid" invoice and certification with fax cover sheet.

(d) Based upon the invoice and the certification, the GSA paid ACMI the amount of the invoice. A141; Morse Diesel III, 74 Fed. Cl. at 614, 620. ACMI received payment from the GSA on or about June 9, 1995. Id. In fact, the investigation established that the requested bond cost had not been paid until on or about July 27, 1995. Id.

**Response:**

11. Not disputed.

**DOJ Proposed Finding:**

12. The Court granted the Government's motion for summary judgment under the FCA on the grounds that ACMI's certifications in the first San Francisco pay application and the stamped "paid" bond invoice constituted false or fraudulent claims for payment of $75,246 that was not yet due to ACMI. Morse Diesel III, 74 Fed. Cl. at 614-15, 625, 636.

**Response:**

12. Disputed. The January 2007 decision speaks for itself and should not be restated as a new proposed finding. Moreover, ACMI respectfully disagrees with some of the findings that this Court has made. ACMI does not abandon its disagreement, but for brevity's sake, those arguments are not repeated here.

**DOJ Proposed Finding**:

13. The Government was damaged in the amount of $75,246 by ACMI's false claim for payment.

**Response:**

13. Disputed. The Government's own internal report, which ACMI does not accept in its entirety, states that the damage to the Government was only the time-value of money. IG Report prepared by Steven Anderson, Case File Number I-95-0509, February 18, 1999, at 7 (Exh. 5 to ACMI Opp.). It is currently unclear what interest rate should apply; the Government used a 6% simple interest in the report referenced above, but GSA OIG auditor John Walsh used the prompt payment interest rate prescribed by the Department of the Treasury when he calculated the time-value of money in his 2002 Damages report on this issue. Walsh Damages Calculation, May 24, 2002 (Exh. 4 to ACMI Opp.).

**C. Sacramento Contract Bond Payment Request**

**DOJ Proposed Finding**:

14. On September 21, 1995, ACMI submitted its revised first pay application on the Sacramento contract to the GSA. A151-55 is a true and correct copy of the first pay application on the Sacramento contract. The pay application included a schedule of values form which requested $1,087,262 for bond (A154) and a total amount of $4,190,808. A151,155; Morse Diesel III, 74 Fed. Cl. at 617. ACMI's payment application did not contain a bond invoice. Id.

**Response:**

14. Disputed in part. While ACMI's payment application did not include a bond invoice, it included the bond itself (with the premium amount stated) that had been submitted previously on July 24, 1995. A-195-189 (Cooney 7/24/95 letter) (the bond premium amount is set out on A187).

**DOJ Proposed Finding**:

15. Upon behalf of ACMI, ACMI Vice President and Project Manager Bennett Reinholtz signed the September 21, 1995 certification for payment application number one on GSA Form 2419 as ACMI's Certifying Officer. A152; Morse Diesel III, 74 Fed. Cl. at 616. By signing as the "Certifying Officer;" Mr. Reinholtz attested to ACMI's knowledge and belief that "[t]he amounts requested are only for performance in accordance with the specifications, terms and conditions of the contract." Id.

**Response:**

15. Disputed in part. The bond information for payment application number one was provided to Reinholtz by ACMI's New York office. A1588-89, 1592 (Reinholtz Dep., pp. 33, 34, 106).

**DOJ Proposed Finding**:

16. The bond documents showed a premium of $517,491. A187; Morse Diesel III, 74 Fed. Cl. at 615. A185-89 is a true and correct copy of the Sacramento contract bond documents supplied by ACMI to GSA Contracting Officer Beverly Chin, and the cover letter dated July 24, 1995 from Mr. Cooney of ACMI to Ms. Chin transmitting the bond documents. Ms. Chin declined to approve the application because ACMI had not submitted a paid invoice for bonds and there was a discrepancy between bond premium stated on thee bonds and the amount

requested by ACMI in the pay application. Morse Diesel III, 74 Fed. Cl. at 616. In fact, Morse Diesel had not paid any portion of its bond- premiums on the Sacramento contract before November 21, 1995. A384, 396 (Meltzer Dec. ¶¶ 7, 8 & Ex. 3);A893-94 (Ford 12/22/00 Dep.. 121:21-123:13); Morse Diesel III, 74 Fed. Cl. at 617. Ronni Meltzer, Morse Diesel's comptroller, stated: "Any statement that MDI had paid its surety broker $517,491 for the payment and performance bonds on the Sacramento Courthouse project prior to November 21, 1995, is false." A384 (Meltzer Dec. ¶ 8); Morse Diesel III, 74 Fed. Cl.-at 617, 625.

**Response:**

16. Disputed in part. ACMI disputes only that portion dealing with Beverly Chin. ACMI respectfully disagrees with some of the findings that this Court has made with respect to the credibility of her assertions. ACMI does not abandon its position on this now, but for brevity's sake, that argument is not repeated here.

**DOJ Proposed Finding**:

17. GSA Contracting Officer Beverly Chin approved payment of the full amount requested by ACMI for bonds in the September 21, 1995 pay application. A151, 384; Morse Diesel III, 74 Fed. Cl. at 616.

**Response:**

17. Not disputed.

**DOJ Proposed Finding**:

18. The Court granted the Government's motion for summary judgment under the FCA on the grounds that ACMI's certifications in the first Sacramento pay application constituted a false or fraudulent claim for payment of bond premiums of $517,491 that were not yet due to ACMI. Morse Diesel III, 74 Fed. Cl. at 615-17, 625, 636.

**Response:**

18. Disputed. The January 2007 decision speaks for itself and should not be restated as a new proposed finding. Moreover, ACMI respectfully disagrees with some of the findings that this Court has made. ACMI does not abandon its disagreement, but for brevity's sake, those arguments are not repeated here.

**DOJ Proposed Finding:**

19. The Government was damaged in the amount of $517,491 by ACMI's false claim for payment.

**Response:**

19. Disputed. The Government's own internal report, which ACMI does not accept in its entirety, states that the damage to the Government was only the time-value of money. IG Report prepared by Steven Anderson, Case File Number I-95-0509, February 18, 1999, at 7 (Exh. 5 to ACMI Opp.). It is currently unclear what interest rate should apply; the Government used a 6% simple interest in the report referenced above, but GSA OIG auditor John Walsh used the prompt payment interest rate prescribed by the Department of the Treasury when he calculated the time-value of money in his 2002 Damages report on this issue. Walsh Damages Calculation, May 24, 2002 (Exh. 4 to ACMI Opp.).

**D. Phase II Contract Bond Payment Request**

**DOJ Proposed Finding:**

20. On about November 29, 1995, ACMI submitted its first application for payment (dated November 28, 1995) on the Phase II contract to the GSA. A276-77 (Haddock Dec. 115); Morse Diesel III, 74 Fed. Cl. at 613. A374-80 is a true and correct copy of ACMI' first pay

application on the Phase .II contract. The pay application included a request for payment of $923,900 for bond premiums. A377; Morse Diesel III, 74 Fed. Cl. at 613. The pay application was accompanied by stamped "Paid" bond invoices. A379-30; Morse Diesel III, 74 Fed. Cl. at 613. A379 and A380 are true and correct copies of the stamped "Paid" invoices submitted by ACMI with its first pay application on the Phase II contract.

**Response**:

20. Disputed as incomplete. Mr. Haddock of CRSS was an agent of the GSA. Haddock Declaration (A268-69). At the time that Haddock received the stamped "paid" bond invoice for Phase II, he was fully aware that on the Phase I project the stamped "paid" invoice was false. Despite his knowledge of a prior incident of false stamping, he did not question ACMI about the Phase II invoice. A1468-71 (Haddock Dep. 70-73). Mr. Haddock's testimony establishes the Government's knowledge (through its agent Haddock) of the prior incident of false stamping during the Phase I project.

**DOJ Proposed Finding**:

21. Upon behalf of Morse Diesel, Morse Diesel Senior Vice President, William Lyons, signed the two certifications – one dated November 27, 1995, the other dated November 28, 1995 – in support of Morse Diesel's first pay application on the Phase II contract. A375-76; Morse Diesel III, 74 Fed. Cl. at 613. The first certification provided as follows:

> The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in. accordance. with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due;
>
> CONTRACTOR: MORSE DIESEL INTERNATIONAL

By: /s/ William T. Lyons Date: 11/27/95
William T. Lyons, Vice President

A375; Morse Diesel III, 74 Fed. Cl. at 613. Upon behalf of Morse Diesel, Mr. Lyons also signed a certification, dated November 28, 1995, on GSA Form 2419. A376; Morse Diesel III, 74 Fed. Cl. at 613.

**Response**:

21. Not disputed. Lyons signed the two certifications without knowledge of the falsely stamped "paid" invoice. Because no one from GSA or CRSS – including Haddock – had advised of the false invoice from Phase I, Lyons was not alerted to the need to verify the accuracy of the stamped "paid" invoice on this Phase II invoice. A1515-18 (Lyons Dep., pp. 137-38, 148-149); *see also* ACMI Response 20.

**DOJ Proposed Finding**:

22. On December 12, 2000, Morse Diesel entered a guilty plea in U.S. District Court for the Eastern District of Missouri in the matter United States v. Morse Diesel International, Inc., No. 4:000R00552 (E.D. Mo.) ("the E.D. Mo. plea"). Al10; Morse Diesel III, 74 Fed. Cl. at 614, 618-19, 627. The factual basis for the E.D. Mo. plea, in pertinent part, is as follows:

(a) On or about November 21, 1995, an employee of ACMI in the insurance and bonding department of ACMI's New York Office, called a representative of Rollins, Hudig, Hall, ACMI's bonding and insurance agent, and asked that representative to stamp an invoice for the Phase II bond premium as paid when, in fact, the bond premium had not been paid up to that date, and to deliver the invoice stamped "paid" to ACMI's office. A118 (Guilty plea at 7 ¶ 1); Morse Diesel III, 74 Fed. Cl. at 613.

(b) Thereafter, on or about November 28, 1995, another employee of ACMI in St. Louis attached the falsely stamped "paid" invoice to a Progress Payment Voucher

and certified the accuracy of the "paid" invoice and made a claim upon the United States pursuant to contract number GS06P95G2C0501, through the GSA, for payment from the United States to ACMI for this "paid" bond-premium. Al18 (Guilty plea at 7 ¶ 2); Morse Diesel III, 74 Fed. Cl. at 613.

(c) Based upon the "paid" bond invoice and the certification (which were material to the GSA in its determination to pay), GSA paid ACMI the amount of the "paid" invoice on or about December 18, 1995. Al 19 (Guilty plea at 8 ¶ 3); Morse Diesel III, 74 Fed. Cl. at 614.

(d) ACMI, in fact, paid the Rollins, Hudig, Hall invoice for the Phase II bond premium on or about February 6, 1996, and was not entitled to be reimbursed by the Government for this amount under the contract until after the premium was in fact paid. Al19 (Guilty plea at 8 14); Morse Diesel III, 74 Fed. Cl. at 613.

**Response:**

22. Not disputed, subject to the proviso that in the Plea Agreement, Morse Diesel reserved its position "that the specific acts were performed by non-management, non-principal employees . . . without knowledge, approval or direct authorization by senior management." A117-19 (Plea Agreement).

**DOJ Proposed Finding**:

23. The Court granted the Government's motion for summary judgment under the FCA on the grounds that ACMI's certifications in the first Phase II pay application and the stamped "paid" bond invoices constituted a false or fraudulent claim for payment of bond premiums of $923,900 that were not yet due to ACMI. Morse Diesel III, 74 Fed. Cl. at 612-14, 625, 627, 636.

**Response:**

23. Disputed. The January 2007 decision speaks for itself and should not be restated as a new proposed finding. Moreover, ACMI respectfully disagrees with some of the findings that this Court has made. ACMI does not abandon its disagreement, but for brevity's sake, those arguments are not repeated here.

**DOJ Proposed Finding**:

24. The Government was damaged in the amount of $923,900 by ACMI's false claim for payment.

**Response:**

24. Disputed. The Government's own internal report, which ACMI does not accept in its entirety, states that the damage to the Government was only the time-value of money. IG Report prepared by Steven Anderson, Case File Number I-95-0509, February 18, 1999, at 7 (Exh. 5 to ACMI Opp.). It is currently unclear what interest rate should apply; the Government used a 6% simple interest in the report referenced above, but GSA OIG auditor John Walsh used the prompt payment interest rate prescribed by the Department of the Treasury when he calculated the time-value of money in his 2002 Damages report on this issue. Walsh Damages Calculation, May 24, 2002 (Exh. 4 to ACMI Opp.).

### E. Total Damages And Penalties To The Government From False Claims For Reimbursement of Bond Premiums

**DOJ Proposed Finding**:

25. The damages caused the Government by ACMI's false claims for "reimbursement" of bond premiums on the four GSA contracts totals $1,635,544.

**Response:**

25. Disputed. This figure is based on the full amount invoiced to the Government for the surety bonds. However, the Government's own internal report, which ACMI does not accept in its entirety, states that the damage to the Government was only the time-value of money. IG Report prepared by Steven Anderson, Case File Number I-95-0509, February 18, 1999, at 7 (Exh. 5 to ACMI Opp.). It is currently unclear what interest rate should apply; the Government used a 6% simple interest in the report referenced above, but GSA OIG auditor John Walsh used the prompt payment interest rate prescribed by the Department of the Treasury when he calculated the time-value of money in his 2002 Damages report on this issue. Walsh Damages Calculation, May 24, 2002 (Exh. 4 to ACMI Opp.).

**DOJ Proposed Finding**:

26. The United States is entitled to four penalties for the inclusion of the false claims for bond "reimbursement" in the first pay application for each of the four GSA contracts.

**Response:**

26. Disputed. Penalties in addition to other damages are not always awarded. *See United States v. Kruse*, 101 F.Supp.2d 410, 414 (E.D. Va. 2000).

## III. False "AMEC Indemnity" Charges

### A. Phase I Contract

**DOJ Proposed Finding**:

27. On September 14, 1994, ACMI submitted its second pay application on the Phase I contract. A273-74 (Haddock Dec. ¶ 12); Morse Diesel III, 74 Fed. Cl. at 611. A323-41 is a true and correct copy of ACMI's second Phase I pay application. In its second pay application on the Phase I contract, Morse Diesel included a cover letter and two certifications all signed by Morse

Diesel Vice President, William Lyons. A323-25; Morse Diesel III, 74 Fed. Cl. at 611. One certification stated as follows:

> The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.
>
> CONTRACTOR: MORSE DIESEL INTERNATIONAL
>
> By: Is/ William T. Lyons Date: 9/12/94
> William T. Lyons, Vice President

A325. On GSA Form 2419, Mr. Lyons, the "Certifying Officer" for Morse Diesel, certified that its request for payment of the bond premium amounts included in its second application for payment on the Phase I contract was "only for performance in .accordance with the specifications, terms and conditions of the contract." A324.

**Response:**

27. Disputed in part. The date shown underlined above does not appear on the document, although ACMI disputes the date of signature.

**DOJ Proposed Finding:**

28. ACMI's second payment application on the Phase I contract sought $118,907 for "bonds," although GSA had already paid the $118,907 for "bonds" sought by the first payment application. A323-41; Morse Diesel III, 74 Fed. Cl. at 611.

**Response:**

28. Not disputed.

**DOJ Proposed Finding:**

29. In seeking the second payment of $118,907 from GSA for the "AMEC indemnity," ACMI told Mr. Haddock, the CRSS construction manager, that the second payment

of $118,907 constituted "the second half of the payment for the performance bond." A934 (Haddock Dep. 31:7-33:8); A273 (Haddock Dec. ¶ 11).

**Response:**

29. Disputed. Mr. Haddock evinces confusion as to what exactly he was told with respect to this charge. Haddock seems to have believed that the AMEC indemnity was just another payment to a surety. A1464-65 (Haddock Dep., pp. 32-33). His confusion continued even at the time of his deposition in which he said, with reference to the AMEC indemnity, "it seemed to be pretty much a no brainer that Morse Diesel just had to pay the surety the performance bond, and we could move ahead." A1464 (Haddock Dep., pp. 33).

**DOJ Proposed Finding:**

30. In its second payment application, Morse Diesel submitted to GSA a Morse Diesel "Cost. Control Activity Report," which indicated, among other things, an "actual [amount] this period" of "$118,907" for "bond," and a total of "$237,814" for the bond cost. A329; A273-74 (Haddock Dec. ¶ 12).

**Response:**

30. Disputed as misleading. The "Cost Control Activity Report" is not a listing of costs only, but rather a schedule of values in which the total contract price of $20,376,987 (*see* A334) is allocated among the work activities. This allocation includes the appropriate amounts for general conditions and for fee (home office overhead and profit). The amount shown on the "bond" line item for that period was $118,907, the amount of the AMEC indemnity. This amount was a fee, not a cost. A1201, 1205-07 (Barsalona 5/24/02 Report, pp. 1, 5-7).

**DOJ Proposed Finding:**

31. In its second payment application, Morse Diesel also submitted to GSA the August 24, 1994 letter to David Hoffinan, Morse Diesel Executive Vice-President, signed by Norman Critchlow, senior executive of AMEC Holdings, Inc., one of Morse Diesel's intermediate parent companies. A273-74 (Haddock Dec. ¶ 12); A326 (pay application); Morse Diesel III, 74 Fed. Cl. at 611. The August 24, 1994 Critchlow letter stated:

> Further to Amec Holdings letter dated July 21, 1994, we would confirm that AMEC Holdings Indemnity to Surety in the sum of $118,907 has been paid by Morse Diesel International.

A326; Morse Diesel III, 74 Fed. Cl. at 610, 611. A326 is a true and correct copy of the August 24, 1994 Critchlow letter.

**Response:**

31. Disputed as incomplete. Critchlow testified that he signed the August 24, 1994 letter, but that the letter itself was prepared by someone else and presented to him for signature. He testified that he had no first-hand knowledge of the payment mechanism. A1423-30 (Critchlow Dep., pp. 111-18). The letter was irrelevant to GSA's obligation to pay ACMI for the value of the AMEC indemnity, as the AMEC indemnity was a proper charge to GSA, and there was no contract provision requiring that there be a payment by ACMI to AMEC in order for GSA to make payment to Morse Diesel. A1206-07 (Barsalona 5/24/02 Report, pp. 6-7); A1223-24 (Barsalona 8/20/02 Report, pp. 3-4); A1213-16, 1219-21, 1230 (Barsalona Dep., pp. 98-99, 117-23, 217-18, 309-10).

**DOJ Proposed Finding:**

32. The July 21, 1994 Critchlow letter, referenced by the August 24, 1994 Critchlow letter, also was addressed to David Hoffinan, and it stated:

> Per agreement between MDI and AMEC Holdings, the cost for AMEC's indemnity support to the sureties for MDI's surety

> program is $118,907. Please consider this letter as our invoice and remit this amount to my attention at your earliest convenience.
> A summary of the bond costs are illustrated below:

| | |
|---|---|
| Seaboard Performance and Payment Bond” | $62,299 |
| American Home - Performance and Payment Bond | 56,608 |
| AMEC Holdings - Indemnity to Surety | 118 907 |
| Total Bond Cost | $237,814 |

A290; Morse Diesel III, 74 Fed. Cl. at 610. A290 is a true and accurate copy of the July 21, 1994 Critchlow letter.

**Response:**

32. Disputed as incomplete. Critchlow testified that for this letter, too, he signed but was not the author. He could not remember who the author was. A1419-20 (Critchlow Dep., pp. 102-103). Again, with respect to the AMEC indemnity, this letter was irrelevant to GSA’s obligation to pay the AMEC indemnity amount, and there was no contractual requirement that the AMEC indemnity be paid by ACMI to AMEC in order for ACMI to properly charge the government for this AMEC indemnity amount. *See* response to proposed finding 31 above.

**DOJ Proposed Finding:**

33. The GSA approved ACMI’s second pay application, including the amount of $118,907 for “parent company indemnity.” Morse Diesel III, 74 Fed. Cl. at 611.

**Response:**

33. Disputed as misleading. Neither ACMI’s second pay application, nor the supporting documentation, included a line item labeled “parent company indemnity.”

**DOJ Proposed Finding:**

34. The Court granted the Government’s motion for summary judgment under the FCA on the grounds that ACMI’s certifications in the second Phase I pay application and the

Critchlow letters constituted a false or fraudulent claim for payment of $118,907 that was never paid to ACMI's parent company. Morse Diesel III, 74 Fed. Cl. at 609-12, 619 n.15, 625, 636.

**Response:**

34. Disputed. The January 2007 decision speaks for itself and should not be restated as a new proposed finding. Moreover, ACMI respectfully disagrees with some of the findings that this Court has made. ACMI does not abandon its disagreement, but for brevity's sake, those arguments are not repeated here.

**DOJ Proposed Finding**:

35. The Government was damaged in the amount of $118,907 by ACMI's false claim for payment.

**Response:**

35. Disputed. The Government's own internal report, which ACMI does not accept in its entirety, states that the damage to the Government was only the time-value of money. IG Report prepared by Steven Anderson, Case File Number I-95-0509, February 18, 1999, at 7 (Exh. 5 to ACMI Opp.). It is currently unclear what interest rate should apply; the Government used a 6% simple interest accruing until the last substantial payment to AMEC under this contract, on February 20, 1997, in the report referenced above, but GSA OIG auditor John Walsh used the prompt payment interest rate prescribed by the Department of the Treasury when he calculated the time-value of money in his 2002 Damages report on this issue. Walsh Damages Calculation, May 24, 2002 (Exh. 4 to ACMI Opp.).

**B. Sacramento Contract**

**DOJ Proposed Finding**:

36. By letter dated July 24, 1995, Anthony Cooney, ACMI's San Francisco Territory Manager, submitted to GSA contracting officer Beverly Chin ACMI's performance and payment bonds for the Sacramento contract, which indicated a total bond premium amount of $517,491. A185-89. A185-89 is a true and correct copy of the bond documents and covet sheet submitted by ACMI to Ms. Chin for the Sacramento contract.

**Response:**

36. Not disputed.

**DOJ Proposed Finding**:

37. On September 21, 1995, ACMI submitted its revised payment application number one on the Sacramento contract to Lehrer McGovern and Bovis. The payment application included a schedule of values which requested the same amount for bond ($1,087,262), and a total amount of $4,190,808. Of the total of $1,087,262 requested by Morse Diesel for "bond;" only $517,491 represented the amount for Morse Diesel's bond brokers. Morse Diesel claimed that the remaining amount - $569,771 - was for "AMEC Indemnity." Morse Diesel III, 74 Fed. Cl. at 616.

**Response:**

37. Disputed as worded. ACMI agrees that the $1,087,262 amount on the "bond" line item in the payment application was broken into $517,491 for the bond premium, and $569,771 for the AMEC indemnity.

**DOJ Proposed Finding**:

38. As noted in Paragraph 15, above, upon behalf of ACMI, ACMI Vice President and Project Manager Bennett Reinholtz signed the September 21, 1995 certification for payment application number one on GSA Form 2419 as ACMI's Certifying Officer. A152; Morse Diesel

III, 74 Fed. Cl. at 616. By signing as the "Certifying Officer," Mr. Reinholtz attested to ACMI's knowledge and belief that "[t]he amounts requested are only for performance in accordance with the specifications, terms and conditions of the contract." Id.

**Response:**

38. Disputed in part. The bond information for payment application number one was provided to Reinholtz by ACMI's New York office. A1588-89, 1592 (Reinholtz Dep., pp. 33, 34, 106).

**DOJ Proposed Finding:**

39. On or about September 26, 1995, Roberta Ozanich, Mr. Cooney's office manager and the acting project accountant for the Sacramento contract, faxed to Ms. Chin a cover sheet and a letter dated September 5, 1995 on "AMEC Holdings" letterhead ostensibly signed by Norman Critchlow (a senior executive of AMEC Holdings) that stated as follows:

> Per the agreement between Morse Diesel International, Inc. and AMEC, plc, the premiums for the above-referenced bonds are noted below. Please remit AMEC's portion to my attention and remit the surety portion to Willis Corroon. As you know, the remittance to AMEC is payment for the indemnity rendered to the sureties by AMEC, plc in support of the noted bond amount.

| | |
|---|---|
| AMEC Indemnity | $ 569,771 |
| Seaboard Surety/St. Paul American Home | $ 517,491 |
| | $1,087,262 |

A240-41; Morse Diesel III, 74 Fed. Cl. at 612-13, 616. In her cover sheet, Ms. Ozanich stated:

> Attached is the information on the bond rate which MDI, Inc.'s bond department sent to me.
> I hope this explains the charges. If you have any questions, please let me know.

A240. A240 is a true and correct copy of the cover sheet faxed by Ms. Ozanich to Ms. Chin on September 26, 1995. A241 is a true and correct copy of the September 5, 1995 letter that Ms. Ozanich included with the cover sheet faxed to Ms. Chin on September 26, 1995.

**Response:**

39. Not disputed.

**DOJ Proposed Finding:**

40. Ms. Chin approved the payment of the entire amount requested including the full $1,087,262 sought by Morse Diesel for "bonds" in its September 21, 1995 payment application number one for the Sacramento contract. A180 (Chin Dec. ¶¶13-14); Morse Diesel III; 74 Fed. Cl. at 616. On October 5, 1995, GSA paid Morse Diesel the total amount requested in its September 21, 1995 payment application number one for the Sacramento contract," including the "AMEC Indemnity" amount of $569,771. A151, 384. Morse Diesel III, 74 Fed. Cl. at 616.

**Response:**

40. Not disputed.

**DOJ Proposed Finding:**

41. The Court granted the Government's motion for summary judgment under the FCA on the grounds that ACMI's certification in the first Sacramento pay application constituted a false or fraudulent claim for payment of $569,771 that was never paid to ACMI's parent company. Morse Diesel III, 74 Fed. Cl. at 615-17, 625, 636.

**Response:**

41. Disputed. The January 2007 decision speaks for itself and should not be restated as a new proposed finding. Moreover, ACMI respectfully disagrees with some of the findings that this Court has made. ACMI does not abandon its disagreement, but for brevity's sake, those arguments are not repeated here.

**DOJ Proposed Finding:**

42. The Government was damaged in the amount of $569,771 by ACMI's false claim for payment.

**Response:**

42. Disputed. The Government's own internal report, which ACMI does not accept in its entirety, states that the damage to the Government was only the time-value of money. IG Report prepared by Steven Anderson, Case File Number I-95-0509, February 18, 1999, at 7 (Exh. 5 to ACMI Opp.). It is currently unclear what interest rate should apply; the Government used a 6% simple interest, and contemplated that interest should stop accruing once the last substantial payment has occurred in the report referenced above, but GSA OIG auditor John Walsh used the prompt payment interest rate prescribed by the Department of the Treasury when he calculated the time-value of money in his 2002 Damages report on this issue. Walsh Damages Calculation, May 24, 2002 (Exh. 4 to ACMI Opp.).

**C. Total Damages And Penalties Due To The United States From False Claims For Payment of "AMEC Indemnity" Amounts**

**DOJ Proposed Finding:**

43. The damages caused to the Government by ACMI's false claims for payment of an" AMEC indemnity" amount total $688,678.

**Response:**

43. Disputed. This figure is based on the full amount charged to the Government. However, the Government's own internal report, which ACMI does not accept in its entirety, states that the damage to the Government was only the time-value of money. *See* ACMI response at 35.

**DOJ Proposed Finding:**

44. The United States is entitled to two penalties for the inclusion of the false claim for payment of the "AMEC Indemnity" amount in the second pay application on the Phase I contract and in the first pay application of the Sacramento contract.

**Response:**

44. Disputed. Penalties in addition to other damages are not always awarded. *See United States v. Kruse*, 101 F.Supp.2d 410, 414 (E.D. Va. 2000). Moreover, in the event that penalties are awarded, there should be no multiple penalties for any of the pay applications.

## IV. Commission-Splitting Kickbacks and Falsely Inflated Bond Premium Claims

**DOJ Proposed Finding:**

45. The Court determined in its July 15, 2005 decision "as a matter of law, that the fee commission splitting arrangement was for the purpose of improperly obtaining or rewarding favorable treatment,"' in violation of the AKA. Morse Diesel Int'l, Inc. v. United States, 66 Fed. Cl. 788, 800-01 (2005) (Morse Diesel I).

**Response:**

45. Not disputed. However, the decision speaks for itself and should not be restated as a new proposed finding. Moreover, ACMI respectfully disagrees with some of the findings that this Court has made. ACMI does not abandon its disagreement, but for brevity's sake, those arguments are not repeated here. Moreover, the arrangement between AMEC plc, the parent of ACMI, and the surety brokers, labeled here as "commission splitting" is nothing more than a discount, promotional allowance or rebate given to the parent with the knowledge of both the parent and the subsidiary.

**DOJ Proposed Finding:**

46. The Court determined in its January 26, 2007 decision that "the amounts requested for reimbursement [for bonds on each of the four GSA contracts] were not only for performance of each of the contract at issue; but were inflated to include the 'rebate' amount that by prearrangement the bond brokers subsequently paid to [ACMI's] parent, AMEC," in violation of the FCA. Morse Diesel III, 74 Fed. Cl. at 625 (emphasis in original).

**Response:**

46. Not disputed. However, the January 2007 decision speaks for itself and should not be restated as a new proposed finding. Moreover, ACMI respectfully disagrees with some of the findings that this Court has made. ACMI does not abandon its disagreement, but for brevity's sake, those arguments are not repeated here.

**A. St. Louis Phase I Bond Commission Amount**

**DOJ Proposed Finding:**

47. A414 is a true and correct copy of an invoice submitted by Willis Corroon Construction Services Corp. ("Willis-US"), ACMI's bond broker, to ACMI for the bonds issued on the St. Louis Phase I contract. The invoice shows a total amount of $62,299 due for Bond No. 285750, and a total amount of $56,608 due for Bond No. 128491.

**Response:**

47. Disputed in part. The invoice referred to is located at A416.

**DOJ Proposed Finding:**

48. The amount of bond commission paid by Willis-US to AMEC, plc, ACMI's parent company, on the premium amount charged to the Government in the first pay application for the Phase I contract was $14,155.78 – the sum of $7,787.38 for Bond No. 285750 and $6,368.40 for Bond No.128491. SA18-19. SA18-19 is a true and correct copy of the statements

on which Willis-US itemized its transmission of the Phase I bond commission kickback to its United Kingdom parent company, Willis Corroon Ltd. ("Willis-UK"), for further transmission to AMEC, plc. Willis-UK did in fact transmit to AMEC, plc a check for $23,837.94, which included the $14,155.78 attributable to the Phase I bond commission. SA2 at 33:13-41:10. AMEC, plc received that amount on or about January 11, 1995. SA28 at 53:8-54:2.

**Response:**

48. Disputed in part. The arrangement between AMEC plc, the parent of ACMI, and the surety brokers, that resulted in payments that the defendant is referring to as "bond commission" actually consisted of nothing more than a discount, promotional allowance or rebate given to the parent with the knowledge of both the parent and the subsidiary.

**DOJ Proposed Finding:**

49. The kickback on the commission for the Phase I bond included in the first Phase I pay application was $14,155.78.

**Response:**

49. Disputed. The arrangement between AMEC plc, the parent of ACMI, and the surety brokers, that resulted in payments that the defendant is referring to as "kickback" actually consisted of nothing more than a discount, promotional allowance or rebate given to the parent with the knowledge of both the parent and the subsidiary.

**DOJ Proposed Finding:**

50. The United States was damaged in the amount of $14,155.78 by ACMI's false claim for payment of an inflated bond premium amount.

**Response:**

50. Disputed. The Government's own internal report, which ACMI does not accept in its entirety, generally describes damages to the Government of only the time-value of money. IG Report prepared by Steven Anderson, Case File Number I-95-0509, February 18, 1999, at 7 (Exh. 5 to ACMI Opp.). It is currently unclear what interest rate should apply, but the Government used a 6% simple interest, and contemplated that interest should stop accruing once the last substantial payment has occurred in the report referenced above. Walsh Damages Calculation, May 24, 2002 (Exh. 4 to ACMI Opp.).

**B. San Francisco Bond Commission Amount**

**DOJ Proposed Finding:**

51. A407 is a true and correct copy of an invoice submitted by Willis-US to ACMI for the bonds issued on the San Francisco contract. The invoice shows a total amount of $38,946 due for Bond No. 285760, and a total amount of $36,300 due for Bond No. 148374.

**Response:**

51. Not disputed.

**DOJ Proposed Finding:**

52. The amount of bond commission paid by Willis-US to AMEC, plc on the premium amount charged to the Government in the first pay application for the San Francisco contract was $8,952 – the sum of $4,868.25 for Bond No. 285760 and $4,083.75 for Bond No. 148374. SA43-44. SA43-44 is a true and correct copy from AMEC, plc's files of the statements on which Willis-UK for further transmission to AMEC, plc. The statements include commission amounts from the San Francisco contract bonds that were in fact transmitted to AMEC, plc. SA28 at 55:13-56:25.

**Response:**

52. Disputed in part. The arrangement between AMEC plc, the parent of ACMI, and the surety brokers, that resulted in payments that the defendant is referring to as "bond commission" actually consisted of nothing more than a discount, promotional allowance or rebate given to the parent with the knowledge of both the parent and the subsidiary.

**DOJ Proposed Finding:**

53. The kickback on the commission for the San Francisco bond included in the first San Francisco pay application was $8,952.

**Response:**

53. Disputed. The arrangement between AMEC plc, the parent of ACMI, and the surety brokers, that resulted in payments that the defendant is referring to as "kickback" actually consisted of nothing more than a discount, promotional allowance or rebate given to the parent with the knowledge of both the parent and the subsidiary.

**DOJ Proposed Finding:**

54. The United States was damaged in the amount of $8,952 by ACMI's false claim for payment of an inflated bond premium amount.

**Response:**

54. Disputed. The Government's own internal report, which ACMI does not accept in its entirety, generally describes damages to the Government of only the time-value of money. IG Report prepared by Steven Anderson, Case File Number I-95-0509, February 18, 1999, at 7 (Exh. 5 to ACMI Opp.). It is currently unclear what interest rate should apply, but the Government used a 6% simple interest, and contemplated that interest should stop accruing once

the last substantial payment has occurred in the report referenced above. Walsh Damages Calculation, May 24, 2002 (Exh. 4 to ACMI Opp.).

**C. Sacramento Bond Commission Amount**

**DOJ Proposed Finding:**

55. A397 is a true and correct copy of an invoice submitted by Willis-US to ACMI for the bonds issued on the Sacramento contract. The invoice shows a total amount of $275,469 due for Bond No. 320294 and a total of $242,022 due for Bond No. 154950. Id.

**Response:**

55. Not disputed.

**DOJ Proposed Finding:**

56. The amount of bond commission paid by Willis-US to AMEC, plc on the premium amount charged to the Government in the first pay application for the Sacramento contract was $37,426.74 – the sum of $21,938 for Bond No. 320294 and $15,488.74 for Bond No. 154950. SA4 at 41:11-44:8; SA9, Item 8A; SA24-25. SA 24-25 is a true and correct copy of the statements on which Willis-US itemized its transmission of the Sacramento bond commission kickback to Willis-UK for further transmission to AMEC, plc. SA22 is a true and correct copy of a payment requisition form for a check from Willis-UK payable to AMEC, plc. that included the shared commission amounts on the Sacramento contract. SA4 at 44:4-8. AMEC, plc received that amount on or about March 19, 1996. SA29 at 62:13-64:4; SA32, Item 10, and SA 47-49.

**Response:**

56. Disputed in part. The arrangement between AMEC plc, the parent of ACMI, and the surety brokers, that resulted in payments that the defendant is referring to as "bond

commission kickback" actually consisted of nothing more than a discount, promotional allowance or rebate given to the parent with the knowledge of both the parent and the subsidiary.

**<u>DOJ Proposed Finding</u>:**

57. The kickback on the commission for the San Francisco bond included in the first San Francisco pay application was $8,952.

**<u>Response</u>:**

57. Disputed. The arrangement between AMEC plc, the parent of ACMI, and the surety brokers, that resulted in payments that the defendant is referring to as "kickback" actually consisted of nothing more than a discount, promotional allowance or rebate given to the parent with the knowledge of both the parent and the subsidiary.

**<u>DOJ Proposed Finding</u>:**

58. The United States was damaged in the amount of $37,426.74 by ACMI's false claim for payment of an inflated bond premium amount.

**<u>Response</u>:**

58. Disputed. The Government's own internal report, which ACMI does not accept in its entirety, generally describes damages to the Government of only the time-value of money. IG Report prepared by Steven Anderson, Case File Number I-95-0509, February 18, 1999, at 7 (Exh. 5 to ACMI Opp.). It is currently unclear what interest rate should apply, but the Government used a 6% simple interest, and contemplated that interest should stop accruing once the last substantial payment has occurred in the report referenced above. Walsh Damages Calculation, May 24, 2002 (Exh. 4 to ACMI Opp.).

**D. St. Louis Phase II Bond Commission Amount**

**DOJ Proposed Finding:**

59. The falsely stamped "paid" bond invoices submitted by ACMI to the GSA for the Phase II contract show a total of $492,838 for Policy No. 320442-95, and $431,062 for Policy No. 16-07-23. A379, A380.

**Response:**

59. Not disputed.

**DOJ Proposed Finding:**

60. SA50-51 is a true and correct copy of a February 26, 1996 letter from Anthony Romano of Rollins, Hudig, Hall (ACMI's bond brokers for the Phase II contract) to Michael Bardsley, Group Secretary of AMEC, plc, transmitting an itemized report of the commissions to be shared with AMEC, plc and a true and correct copy of the itemized report. Mr. Romano's itemized report shows that the amount of bond commission paid by ACMI's bond broker to AMEC, plc on the premium amount charged to the Government in the first pay application for the Phase II contract was $49,194 - the sum of $27,525.00 for Policy No. 320442 and $21,669 for Policy No. 16-07-23.

**Response:**

61. Disputed in part. The arrangement between AMEC plc, the parent of ACMI, and the surety brokers, that resulted in payments that the defendant is referring to as "bond commission" actually consisted of nothing more than a discount, promotional allowance or rebate given to the parent with the knowledge of both the parent and the subsidiary.

**DOJ Proposed Finding:**

61. The kickback on the commission for the Phase II bonds included in the first Phase II pay application was $49,194.

**Response**:

61. Disputed. The arrangement between AMEC plc, the parent of ACMI, and the surety brokers, that resulted in payments that the defendant is referring to as "kickback" actually consisted of nothing more than a discount, promotional allowance or rebate given to the parent with the knowledge of both the parent and the subsidiary.

**DOJ Proposed Finding**:

62. The United States was damaged in the amount of $49,194.00 by ACMI's false claim for payment of an inflated bond premium amount.

**Response**:

62. Disputed. The Government's own internal report, which ACMI does not accept in its entirety, generally describes damages to the Government of only the time-value of money. IG Report prepared by Steven Anderson, Case File Number I-95-0509, February 18, 1999, at 7 (Exh. 5 to ACMI Opp.). It is currently unclear what interest rate should apply, but the Government used a 6% simple interest, and contemplated that interest should stop accruing once the last substantial payment has occurred in the report referenced above. Walsh Damages Calculation, May 24, 2002 (Exh. 4 to ACMI Opp.).

**E. Total Damages And Penalties Due To The United States For Commission-Splitting Kickbacks And Falsely Inflated Bond Premium Claims**

**DOJ Proposed Finding**:

63. The total amount of kickbacks on commissions for bonds included in the first pay applications for each of the four GSA contracts is $109,728.52.

**<u>Response</u>:**

63. Disputed. *See* ACMI responses to 49, 53, 57, and 61 above.

**<u>DOJ Proposed Finding</u>:**

64. The United States has been damaged in the amount of $109,728.52 by ACMI's false claims for payment of inflated bond premium amounts in the first pay applications of the four GSA contracts.

**<u>Response</u>:**

64. Disputed. *See* ACMI responses to 50, 54, 58, and 62 above.

**<u>DOJ Proposed Finding</u>:**

65. The United States is entitled to four penalties under the AKA for ACMI's inclusion of kickbacks on each of the four GSA contracts.

**<u>Response</u>:**

65. Disputed. Penalties in addition to other damages are not always awarded. *See United States v. Kruse*, 101 F.Supp.2d 410, 414 (E.D. Va. 2000). Moreover, in the event that penalties are awarded, there should be no multiple penalties for any of the pay applications.

**<u>DOJ Proposed Finding</u>:**

66. The United States is entitled to four penalties under the FCA for the inclusion of falsely inflated bond premium amounts in the first pay application for each of the four GSA contracts.

**<u>Response</u>:**

66. Disputed. Penalties in addition to other damages are not always awarded. *See United States v. Kruse*, 101 F.Supp.2d 410, 414 (E.D. Va. 2000).

## V. TOTAL AMOUNT OF DAMAGES AND PENALTIES DUE TO THE UNITED STATES UNDER THE JANUARY 2007 DECISION

**<u>DOJ Proposed Finding</u>:**

67. Excluding duplicative damages and penalties, the United States' claim for damages and penalties is $7,022,666.00, summarized in the following. chart:

| **Fraud Item** | **Single Damages** | **Treble Damages** | **Penalties** | **Total** |
|---|---|---|---|---|
| False Claims for Bond "Reimbursements" | $1,635,544 | $4,906,632 | $40,000 | $4,946,632 |
| False "AMEC Indemnity" Amounts | $ 688,678 | $2,066,034 | $10,000 | $2,076.034 |
| Commission-Sharing Kickbacks on Bonds | Included above | Included above | Included above | Included above |
| **TOTALS** | **$2,324,222** | **$6,972,666** | **$50,000** | **$7,022,666** |

**<u>Response</u>:**

67. Not disputed that the table summarizes the Government's calculations. However, the Government is not entitled to the amounts that it is claiming. *See* prior ACMI responses above.

Respectfully submitted,

s/ James D. Wareham

James D. Wareham
Attorney of Record for Plaintiff
Kirby D. Behre
Danielle W. Pierce
Paul, Hastings, Janofsky & Walker LLP
875 Fifteenth Street, N.W.
Washington, D.C. 20005
Tel: 202-551-1728
Fax: 202-551-0128

Date: June 15, 2006

LEGAL_US_E # 75412527.4