# In the United States Court of Federal Claims

No. 99-279C
(With Which Nos. 99-529C, 99-530C, 00-531C, 03-1537C, 05-804C, 06-173C, 06-174C, 06-175C, 06-176C, 06-177C, 06-178C, 06-179C, 06-180C, and 06-181C Are Consolidated)
Filed January 26, 2007[*]
Revised and Filed June 29, 2007
**TO BE PUBLISHED**

*****************************************

| | | |
|---|---|---|
| | * | Anti-Kickback Act of 1986, |
| | * | 41 U.S.C. §§ 51-58; |
| MORSE DIESEL INTERNATIONAL, INC., | * | False Claims Act, |
| d/b/a AMEC CONSTRUCTION | * | 31 U.S.C. § 3729(a)(1), (a)(2); |
| MANAGEMENT, INC., | * | Forfeiture of Fraudulent Claims Act, |
| | * | 28 U.S.C. § 2514; |
| Plaintiff, | * | Major Fraud Against the United |
| | * | States, 18 U.S.C. §§ 2, 1031(a); |
| | * | Tucker Act, 28 U.S.C. § 1491; |
| v. | * | 18 U.S.C. § 287 (criminal false, |
| | * | fictitious or fraudulent claims); |
| | * | 31 U.S.C. § 3905(a), (b); |
| THE UNITED STATES, | * | FAR 52.232-5, Payments Under |
| | * | Fixed-Price Construction |
| Defendant. | * | Contracts; |
| | * | FAR 52.232-27, Prompt Payment |
| | * | for Construction Contracts; |
| | * | RCFC 12(b)(6), Motion to Dismiss; |
| | * | RCFC 56(c), Motion for Partial |
| | * | Summary Judgment. |

*****************************************

**James D. Wareham**, Paul, Hastings, Janofsky & Walker LLP, Washington, D.C., counsel for Plaintiff.[**]

**Domenique Grace Kirchner**, United States Department of Justice, Washington, D.C., counsel for Defendant.

---

[*] The court wishes to take this occasion to recognize the significant contribution of Mr. David M. Cohen, Director of the Commercial Litigation Branch, Civil Division of the United States Department of Justice in this case. On this date, Mr. Cohen is retiring after thirty-five years of public service. His skill as an advocate and stewardship of the United States Department of Justice will be missed by the court.

[**] On November 7, 2005, Paul, Hastings, Janofsky & Walker, LLP, was substituted as counsel for Plaintiff. The record in this case, however, was made by prior counsel: Pecar & Abramson, P.C.; McManus, Schor, Asmar & Darden, L.L.P.; Arent Fox, PLLC; and Greensfelder, Hemker & Gale.

**MEMORANDUM OPINION AND ORDER REGARDING COUNTERCLAIMS.**

**BRADEN, *Judge***

This Memorandum Opinion and Order holds that the defendant ("Government") is entitled to summary judgment, as a matter of law, on counterclaims asserted under: the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51-58 and the False Claims Act, 31 U.S.C. § 3729(a)(1), (a)(2). In addition, the court herein, holds that Plaintiff violated the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514, and thereby has forfeited claims in the amount of $54,314,299.16 asserted in this case, as consolidated. A trial on the amount of damages due for violations of 41 U.S.C. §§ 51-58 and 31 U.S.C. § 3729 (a)(1), (a)(2) will be set during a conference call to be scheduled on February 8, 2007.

An outline of this Memorandum Opinion and Order follows:


**I. Factual Background.**

**A. Plaintiff's Corporate History.**

**B. The Government Contracts At Issue.**

**1. The St. Louis Federal Courthouse.**

**a. Phase I – Contract No. GS06P94GYC0037.**

**b. Phase II – Contract No. GS06P95GZC0501.**

**2. The San Francisco Customs House – Contract No. GS09P95KTC0010.**

**3. The Sacramento Courthouse And Federal Building – Contract No. GS09P95KTC0032.**

**C. Facts Relevant To Government's Motion For Partial Summary Judgment.**

**1. Overview.**

**2. Plaintiff's Specific Conduct Regarding The Government Contracts At Issue.**

**a. The St. Louis Federal Courthouse.**

**i. Phase I Contract No. GS06P94GYC0037.**

ii. Phase II Contract No. GS06P95GZC0501.

b. The San Francisco Customs House Contract No. GS09P95KTC0010.

c. The Sacramento Courthouse And Federal Building Contract No. GS09P95KTC0032.

II. Proceedings In The United States Court Of Federal Claims.

III. Proceedings In United States District Courts.

A. In The United States District Court For The Eastern District Of Missouri.

B. In The United States District Court For The Eastern District Of California.

IV. Discussion.

A. Jurisdiction.

B. Standing.

C. Standard Of Review On Cross-Motions For Partial Summary Judgment – RCFC 56(c).

D. The Court's Resolution Of The Government's Motion For Partial Summary Judgment.

1. Regarding The Anti-Kickback Act Of 1986 – Seventh Counterclaim.

2. Regarding The False Claims Act Counterclaim – First And Second Counterclaims.

a. The False Claims Act.

b. The Parties' Arguments.

i. The Government's Contentions.

ii. Plaintiff's Response.

c. **The Court Has Determined That Plaintiff's Progress Payment Application For Performance And Payment Bonds Premiums And Certifications Violated The False Claims Act.**

3. **Regarding The Forfeiture Of Fraudulent Claims Act – Sixth Counterclaim.**

a. **The Forfeiture Of Fraudulent Claims Act.**

b. **The Parties' Arguments.**

i. **The Government's Contentions.**

ii. **Plaintiff's Response.**

c. **The Court Has Determined That Plaintiff Practiced Or Attempted To Practice Fraud Against The United States In Violation Of The Forfeiture Of Fraud Act.**

i. **Case No. 99-279C**

ii. **Case No. 99-529C**

iii. **Case No. 99-530C**

iv. **Case No. 00-531C**

v. **Case No. 03-1537C**

vi. **Case No. 05-804C**

vii. **Case No. 06-173C**

viii. **Case No. 06-174C**

vix. **Case No. 06-175C**

x. **Case No. 06-176C**

xi. **Case No. 06-177C**

xii. **Case No. 06-178C**

**xiii. Case No. 06-179C**

**xiv. Case No. 06-180C**

**xv. Case No. 06-181C**

**d. The Court Has Determined That The Forfeitures Of Plaintiff's Claims In This Case, As Consolidated, Do Not Violate The Eighth Amendment To The United States Constitution.**

**5. Regarding The Breach Of Contract – Fifth Counterclaim.**

**a. Breach of Contract.**

**b. The Parties' Arguments.**

**i. The Government's Contentions.**

**ii. Plaintiff's Response.**

**c. The Court Does Not Have Jurisdiction Over The Government's Breach Of Contract Counterclaim.**

**V. Conclusion.**

* * *

## I. Factual Background.[1]

[1] The facts discussed herein were derived from the: May 5, 1999 Complaint filed in No. 99-279C; United States ("the Government")'s July 23, 1999 Answer; the Government's November 8, 1999 Affirmative Defenses and Counterclaims ("Gov't First Counterclaims"); the Government's May 5, 2000 Additional Counterclaims (involving doorframes) and Special Plea in Fraud; Plaintiff's January 10, 2001 Answer to May 5, 2000 Government's Counterclaims; the Government's May 10, 2001 (First) Amended Counterclaims; Plaintiff's November 1, 2001 Motion to Dismiss the Government's Seventh Counterclaim ("Nov. 1, 2001 Pl. Mot. to Dismiss"); the Government's November 20, 2001 (Second) Amended Counterclaims ("Sec. Am. Counterclaims");the Government's December 7, 2001 Opposition to Plaintiff's November 1, 2001 Motion to Dismiss Regarding the Seventh Counterclaim ("Gov't Opp.") and Motion for Partial Summary Judgment ("Gov't M.S.J. I."), together with the Exhibits 1-19 thereto ("Gov't Ex. __"); the Government's December 7, 2001 Proposed Findings of Uncontroverted Fact ("Gov't PF"); Plaintiff's February 27, 2002 Reply to Government's Opposition and Response to Partial Summary Judgment ("Pl. Reply and Opp."), together with Plaintiff's Response to Government's Proposed Findings ("Pl. R. to Gov't

**A. Plaintiff's Corporate History.**

Plaintiff's Corporate history is complex, but important in this case. On January 10, 1990, AMEC Projects, Inc.[2] and Morse Diesel, Inc. entered into a joint venture, known as Morse Diesel

---

PF") and Plaintiff's Proposed Findings of Uncontroverted and Controverted Facts Precluding Summary Judgment ("Pl. PF"); Plaintiff's March 18, 2002 Answer to Government's Second Amended Counterclaims; the Government's July 9, 2002 Reply to Plaintiff's February 27, 2002 Opposition (Gov't Reply I"), together with Appendix Exhibits 20-38 ("Gov't Reply Ex. ___") and the Government's July 9, 2002 Response to Plaintiff's February 27, 2002 Statement of Genuine Issues ("7/9/02 Gov't Resp.") and Proposed Findings of Uncontroverted Fact ("7/9/02 Gov't PF"); Plaintiff's June 12, 2002 Amended and Supplemental Answers to Government's Request for Admissions and Third Set of Interrogatories; Plaintiff's August 14, 2002 Responses to the Government's Second Request for Admissions, Fourth Set of Interrogatories, and Request for Production of Documents; Plaintiff's August 21, 2002 Surreply ("Pl. Surreply") and Exhibit A ("Pl. Ex. A"); the Government's October 7, 2002 Sur-Rebuttal and Opposition to Plaintiff's Motion for Summary Judgment Regarding the Seventh Counterclaim ("Gov't S.R. and Opp."), together with Exhibits 39-51 ("Gov't S.R. Ex. ___"); the Government's October 23, 2002 Third Amended Counterclaims ("Third Am. Counterclaims"); Plaintiff's November 27, 2002 Amended Answer to the Government's October 23, 2002 Amended Counterclaim ("Pl. Am. Answer"); the Government's April 29, 2003 Motion for Partial Summary Judgment ("Gov't M.S.J. II"); May 8, 2003 Government Appendix - 1-3 Volumes ("A1-1047"); Plaintiff's August 29, 2003 Opposition to the Government's April 29, 2003 Motion for Partial Summary Judgment ("Pl. S.J. Opp. II"); Plaintiff's August 29, 2003 Appendix - Volumes 4-6 ("A1048-1950"); Plaintiff's September 5, 2003 Opposition to Government's Motion for Partial Summary Judgment ("Pl. S.J. Op.") and Response to Government's Proposed Findings of Uncontroverted Fact ("Pl. Add'l PF"), together with three volumes of Exhibits ("Pl. Ex. ___"); the Government's November 21, 2003 Answer and Counterclaim in Case No. 03-1537C; Plaintiff's January 12, 2004 Answer to Government's November 21, 2003 Counterclaims; the Government's January 16, 2004 Reply ("Gov't Reply II) and Appendix - Volume 7 ("A1951-2249");the Government's January 20, 2004 Rebuttal to Plaintiff's Response to Government's Proposed Findings of Uncontroverted Facts ("1/20/04 Gov't Rebuttal to Pl. Add'l PF");the Government's January 23, 2004 Reply Memorandum ("Gov't Reply II"); Plaintiff's January 23, 2004 Response to the Government's Proposed Findings of Uncontroverted Fact ("Pl. Resp. to Gov't PF"); February 20, 2004 Transcript of Oral Argument; March 1, 2004 Supplemental Declaration of James Brogan ("Brogan Decl."); Plaintiff's August 30, 2004 Submission In Opposition ("Pl. Supp. Opp."); the Government's October 1, 2004 Response ("Gov't Supp. Resp."); Plaintiff's August 12, 2005 Memorandum and Exhibits ("Pl. Aug. 12, 2005 Mem."); the Government's August 15, 2005 (Fourth) Amended Counterclaims ("Fourth Am. Counterclaims"); and Plaintiff's August 30, 2005 Answer to Fourth Am. Counterclaims.

[2] AMEC, p.l.c. is an international project management and engineering services company, traded on the London Stock Exchange, with 2005 revenues of £4,942.5 million and an adjusted pre-tax profit of £124.1 million. *See* AMEC, p.l.c. 2005 ANNUAL REPORT at 1. AMEC Holdings, Inc.

International, Inc., a New York partnership. *See* A420, 720, 845, 847, 874, 2041. This joint venture was "primarily engaged in the construction of commercial, industrial, municipal, airport, and health care facilities, as well as consulting services for various aspects of construction activities, with locations throughout the United States." A2057. According to Plaintiff's prior counsel, this joint venture resulted from a search by Morse Diesel, Inc., "for a partner that had a large asset base and would pledge those assets on [Morse Diesel, Inc.'s] behalf to enable the company to obtain bonds on larger and more jobs, and obtain them at favorable rates." A420; *see also* A873, 889, 1451-52. AMEC, p.l.c., "a key part of the joint venture . . . agreed to provide indemnities to sureties on behalf of the joint venture." *Id.*; *see also* A846. (AMEC, p.l.c. contributed bonding capacity), 1416-17. In addition, AMEC, p.l.c., through unknown subsidiaries, contributed $5 million in cash to the joint venture. *See* A873, 1417. Apparently pleased with the performance and business prospects of the joint venture, on January 31, 1995, retroactive to January 1, 1995, AMEC Construction Services, Inc.[3] acquired Morse Diesel, Inc.'s 50% ownership in the joint venture and Morse Diesel International, Inc., became a wholly-owned subsidiary of AMEC Holdings, Inc.,[4] which was a wholly-owned subsidiary of AMEC Property & Overseas Investments, Ltd.,[5] which was a wholly-owned subsidiary of AMEC, p.l.c. *Id.*; *see also* A874, 1033-35, 2066, 2075.

As of January 1, 1995, AMEC, p.l.c. was entitled to all of Morse Diesel International, Inc.'s profits for fiscal year 1995. *See* A1033-35. On April 20, 2000, the President and CEO of AMEC, Inc.,[6] an "indirect subsidiary of AMEC Property & Overseas Investments, Ltd.," became Chairman of Morse Diesel International, Inc. *See* A421. By August 2001, Morse Diesel International, Inc. also was doing business as AMEC Construction Management, Inc. ("ACMI"), with principal offices located in New York City. *See* A122, 125, 762-67.

---

was an indirectly-owned subsidiary of AMEC, p.l.c. and a "holding company for business ventures in the United States[.]" A420; *see also* A847. AMEC, p.l.c. was a 100% owner of the following companies: The Fisk Group; Worsham Sprinkler Co., Inc., Matthew Hall & Co., Inc.; Barnard and Burk Group, Inc.; and Fire Protection Industries, Inc. *See* A721. AMEC, p.l.c. also owned 20% of Power Corp. *Id.* Another company, AMEC Patson was an investment subsidiary of AMEC p.l.c.. *Id.*

[3] Sometime before January 31, 1995, AMEC Projects, Inc. and AMEC Engineering, Inc. were merged into AMEC Construction Services, Inc. *See* A721.

[4] AMEC Projects, Inc. was a subsidiary of AMEC Holdings, Inc. *See* A847. Both companies shared offices and employees. *See* A721

[5] AMEC Property & Overseas Investments, Ltd., is a "United Kingdom" corporation and "holding company for business ventures in the United States, Canada and elsewhere." A420.

[6] AMEC, Inc. is the "successor corporation to Agra, Inc., a global engineering design, environmental, technology based construction company that merged with AMEC, p.l.c. in April 2000. *See* A421.

On or about May 6, 2004, ACMI sold certain assets of ACMI's southeastern operations to Facchina-McGaughan LLC, a joint venture formed by Mr. Paul V. Facchina, Sr. of LaPlata, Maryland, the owner of Facchina Construction Company, Inc., and Mr. A.S. McGaughan, Jr., the former head of ACMI's Southeastern Division. *See* http://www.amec.com/news/mediareleasedetails.asp?pageid=34&mediaID= 881 at 1-2; *see also* http://www.southeast.construction.com/news/florida/archive/0407.asp (last visited Jan. 25, 2007). AMEC p.l.c., however, apparently continues to own ACMI which is an ongoing business, although it has had a negative net worth position since 2002. *See* Pl. Aug. 12, 2005 Mem. at 2.

Since, Morse Diesel International, Inc., d/b/a AMEC Construction Management, Inc. has been incorporated and/or conducted business and/or invoked the jurisdiction of several federal forums under the following names: Morse Diesel, Inc.; Morse Diesel International, Inc., a New York general partnership; Morse Diesel International, Inc. associated with CMR Construction, Inc. (A 298, 769, 1520-21); AMEC Construction Management, Inc. (A122, 842); and Huber, T.D.S., P&D, Morse Diesel Joint Venture (A737-60), hereinafter, the court will refer to the aforementioned entities as "Plaintiff."

**B. The Government Contracts At Issue.**

**1. The St. Louis Federal Courthouse.**

**a. Phase I – Contract No. GS06P94GYC0037.**

On July 15, 1994, the General Services Administration ("GSA") awarded the joint venture, Plaintiff Contract No. GS06P94GYC0037 to excavate the building site and construct the foundation and core wall for the Thomas F. Eagleton Federal Courthouse in St. Louis, Missouri ("St. Louis Federal Courthouse"). *See* A2-3; *see also* Fourth Am. Counterclaims ¶ 6;[7] Pl. R. to Gov't PF ¶ 1. The contract was awarded on a fixed-price basis for $20,343,186 ("Phase I Contract"). *Id.*; *see also* A1057. (Laskowske Dec. ¶ 5). On or about July 19, 1994, the Seaboard Surety Company of Bedminster, New Jersey, St. Paul Fire and Marine Insurance Company of New York, and American Home Assurance Company of New York collectively issued a performance bond for Contract No. GS06P94GYC0037 in the amount of $118,907.00. *See* A1922-23.

---

[7] The August 16, 1994 GSA Form 2419 Certification states that the Contract No. GS06P94GYC0037 was awarded to "Morse Diesel International in association with CMR Construction, Inc." The record provides no information about CMR Construction, Inc. or its "association" with Plaintiff.

**b. Phase II – Contract No. GS06P95GZC0501.**

The Bid Package for Contract No. GS06P95GZC0501 to complete construction of the St. Louis Federal Courthouse at a fixed-price of $165,102,792 ("Phase II Contract") included the text of Federal Acquisition Regulation ("FAR") 52.232-5 (Payments Under Fixed Price Construction Contracts) and FAR 52.232-27 (Prompt Payment For Construction Contracts). *See* A522-24. On September 28, 1995, GSA awarded the contract to Plaintiff. *See* A1057.

The Invitation for Bid on Phase II included Option 8 for the build-out of Level II, with a separate price of $1,900,000. *See* Compl. ¶ 4 at 2. On October 18, 1995, GSA issued a Notice to Proceed with Phase II to Plaintiff but since the site would not be available until March 8, 1996, preliminary work was to be undertaken offsite. *Id.* ¶ 6 at 2. In June 1996, however, GSA informed Plaintiff of the decision to delete the Option 8 build-out and revised plans for Phase II. *Id.* ¶ 7 at 2-3. In July 1996, GSA issued a Request for Change Proposal P-24 and Price to Be Determined Later Notice for P-24, with a $0 designation. *Id.* ¶ 9 at 3. GSA advised Plaintiff that the $1,900,000 amount included in Option 8 for the Phase I Contract price should be deleted from the $165,102,792 fixed-price for Phase II and that the reduction would be treated as a "partial termination for convenience of the Government." *Id.*; *see also* Pl. R. to Gov't PF ¶ 1 (admitting the Phase II Contract was for $165,102,792).

In November 1996, Plaintiff sent GSA a proposal, pursuant to the Changes Clause of the Phase II Contract, proposing to reduce the contract price by $1,397,305, an amount that was "equal to the costs [Plaintiff] would have incurred to perform the work deleted by P-24," but which compensated Plaintiff for preliminary work done on Option 8 for the period October 18, 1995 and July 1996, when the Request for Change Proposal was issued. *Id.* ¶ 10 at 3. On November 26, 1996, GSA requested that Plaintiff submit a revised price proposal. *See* Compl. ¶ 11 at 3. In December 1996, Plaintiff resubmitted the "original price proposal with an explanation and justification for calculating the adjustment under the Changes Clause." *Id.* ¶ 12 at 3. On February 13, 1997, GSA issued a Notice of Partial Termination regarding the Option 8 Level II build-out and announced GSA's intent to deduct $1,900,000 from the $165,102,792 Phase II fixed-price contract. *Id.* ¶¶ 13-14 at 4. On February 21, 1997, Plaintiff rejected GSA's Notice of Partial Termination. *Id.* ¶ 15 at 4.

Although Plaintiff apparently thought there was an apparent agreement on a "deduction less than the bid Option 8," on July 25, 1997, GSA rejected the "negotiated credit amount, reaffirmed the February 13, 1997 Notice of Partial Termination, and advised Plaintiff to submit a price proposal, pursuant to the Termination for Convenience Clause. *Id.* ¶ 16 at 4. On July 28, 1997, GSA issued a Change Proposal P-98 reinstating Option 8, but for a different configuration. *Id.* ¶ 17 at 4. In response, Plaintiff submitted a proposed price for the reconfigured work. *Id.*

On January 30, 1998, Plaintiff informed GSA that the $1,397,305 proposed price reduction was Plaintiff's Termination of Convenience proposal, if GSA decided to proceed in this manner, rather than treating the situation as a "work scope" change. *Id.* ¶ 18 at 4-5. GSA appears to have ignored Plaintiff's proposal and issued a unilateral modification of PCG8 on March 10, 1998 to

decrease the Phase II Contract price by $1,900,000. *Id.* ¶ 19 at 5. On April 9, 1998, Plaintiff submitted a certified claim to GSA in the amount of $467,659. *Id.* ¶ 20 at 5; *see also* A825-26. On May 12, 1998, a GSA Contracting Officer issued a Final Decision denying Plaintiff's claim and request to consider the deduction as a change of work, rather than a partial Termination for Convenience. *Id.* at ¶ 21 at 5; *see also* A821-23. On June 16, 1999, GSA sent Plaintiff a Notice of Termination for default, pursuant to FAR 52.249-10 Default (Fixed Price Construction). *See* A828-31, 1190-92.

**2. The San Francisco Customs House – Contract No. GS09P95KTC0010.**

The GSA Notice Concerning Solicitation Contract No. GS09P95KTC0010 also included the text of FAR 52.232-5 (Payments Under Fixed-Price Construction Contracts). On February 15, 1995, GSA awarded Plaintiff Contract No. GS09P95KTC0010 to conduct seismic and electrical upgrades at the United States Customs House in San Francisco at a fixed price of $12,220,188. *See* A140, 529-31, 543.

In addition, the May 23, 1995 GSA Form Construction Contract Payment Voucher referenced FAR 52.232-5 (Payments Under Fixed-Price Construction Contracts) and FAR 52.232-27 (Prompt Payment for Construction Contracts). *See* A525-28.

**3. The Sacramento Courthouse And Federal Building – Contract No. GS09P95KTC0032.**

On July 19, 1995, GSA awarded Plaintiff Contract No. GS09P95KTC0032 to construct the core and shell of the United States Courthouse and Federal Building in Sacramento at a fixed price of $92,609,000. *See* A182-84, 580.

**C. Facts Relevant To Government's Motion For Partial Summary Judgment.**

**1. Overview.**

From approximately 1990 to January 1995, Plaintiff was a joint venture: 50% of which was owned by AMEC Holdings, Inc., a wholly owned United States subsidiary of a United Kingdom corporation known as AMEC, p.l.c. *See* Fourth Am. Counterclaims ¶ 111; *see also* Gov't PF ¶ 8 at 3. AMEC, p.l.c.'s contribution to the joint venture was to provide indemnification to sureties for any losses that Plaintiff might incur for performance and payment bonds issued to Plaintiff. *See* A846, 884, 889. AMEC, p.l.c.'s indemnification appeared to be provided at a cost:

> [P]art of the partnership agreement . . . was that when [Plaintiff] issued bonds, [Plaintiff] would charge double the premium for the bond, the sureties portion would be paid to them, and the other portion was to be collected as payment . . . for the indemnity that AMEC gave to the general partnership.

A889; *see also* A119 (AMEC's indemnification was an "additional cost that was charged into [MDI's] job"); A1014 (Morse Diesel paid a fee to AMEC for the bonds), A1019, 2185 ("[T]wice the cost of the payment and performance bonds . . . [was included] because 'they wanted use to support the cost of it and we provided the support backup to the project team.'"). Initially, AMEC, p.l.c. negotiated with Seaboard Surety Company, also known as Saint Paul Fire and Marine Insurance Company ("Seaboard/St.Paul"), to obtain a multimillion dollar bond line of credit that could be drawn down by Plaintiff but, in fact, was indemnified by AMEC, p.l.c. and "certain deep pocket AMEC subsidiaries." A846. Before bidding on any contract requiring a bond, however, Plaintiff was required to seek prior approval of AMEC, p.l.c. or one of its affiliates. *See* A847, 873, 884; *see also* Gov't Opp. Ex. 4. Without AMEC, p.l.c.'s approval, Plaintiff could not have obtained a bond. *See* A874. AMEC, p.l.c. had the right to approve Plaintiff's choice of bond broker. *See* Gov't Opp. Ex. 2 at 79-80. Plaintiff's Director of Risk Management testified that: "In order for AMEC to provide approval to the bond or provide the surety program that Morse Diesel needed, AMEC asked Morse Diesel . . . to bill bond costs at twice the normal amount. So that half the amount . . . would be what was paid to the sureties, and the other half was an amount collected in order to pay AMEC . . . for the use of its equity . . . ([MDI's] Executive Vice President and . . . the [C]hariman of the Company . . . Those two guys would have been ultimate decision-makers - - . . . [they] would have their marching orders prior to that with AMEC."); A1448, 1450; *see also* Pl. R. to Gov't PF ¶ 9 (MDI contends that the bond brokers were not MDI's brokers, but "AMEC's brokers.").

At a February 17, 1993 AMEC, p.l.c. Board of Directors' meeting, it was decided that Plaintiff would cease doing business with Seaboard/Saint Paul and instead deal exclusively with and split future fee commissions earned on Plaintiff's bonding with Willis Corroon, Construction Services Company ("Willis Corroon"), which had a prior business relationship with Morse Diesel, Inc. *See* A79, 848 (Bardsley Dep. at 78-82); *see also* Gov't Opp. Ex. 6. Thereafter, AMEC, p.l.c. was to be paid 50% of the fee commissions earned by Willis Corroon on Plaintiff's contracts in exchange for an exclusive arrangement for Plaintiff's bond business, including at least the bonds required in connection with Phase I of the St. Louis Federal Courthouse, San Francisco Customs House, and Sacramento Courthouse projects. *See* Gov't Opp. Ex. 2 at 183-84, 101-02; Gov't Opp. Ex. 5 at 79-80, 92-94; *but see* Pl. R. to Gov't PF ¶ 10 ("From 1990 to 1998 Willis Corroon was not the exclusive broker for surety business. Willis Corroon was a co-broker with a UK broker for AMEC . . . which received 50% of the income from the brokerage services.") (citing Ex. 2 Bardsley Dep. at 75-77; Ex. 5 Romano Dep. at 79-80). Willis Corroon did not require advance payment from MDI to provide payment and performance bonds. *See* A2184.

This initial commission-splitting agreement was in force until mid-1995, when Plaintiff obtained AMEC, p.l.c.'s approval to appoint RHH, subsequently known as AON, as Plaintiff's new exclusive bond dealer. *See* Gov't PF ¶¶ 18-19; *see also* Gov't Opp. Ex. 2 (Bardsley at 131); Second Am. Counterclaims ¶ 116 at 37. Many of the RHH/AON employees previously worked at Willis Corroon and participated in the prior fee commission-splitting agreement that was continued by RHH/AON. *See* A1004; *see also* Gov't Opp. Ex. 2 at 86, 112-13; Second Am. Counterclaims ¶ 17 at 37. As Plaintiff's Director of Risk Management testified: "That was a business practice for Morse

Diesel. We always obtained payment from our clients for our bond premiums before we paid the surety."); *see* A384 at 27-28, 193-94; *see also* A903, 908, 917, 929, 969-70, 994, 1002 (Plaintiff typically "stretched payments [to sureties] out to four to six months.").

With Plaintiff's knowledge and approval, RHH and Willis Corroon split commissions on the bonds provided to Plaintiff with AMEC, p.l.c. at least with regard to: the July 5, 1994 Phase I Contract on the St. Louis Federal Courthouse; the September 28, 1985 Phase II Contract on the St. Louis Federal Courthouse; February 15, 1995 upgrades performed on the U.S. Customs House in San Francisco; and the July 19, 1995 construction of the United States Courthouse and Federal Building in Sacramento. *See* Gov't PF ¶ 19; *see also* Gov't Opp. Ex. 5 (Romano Dep. at 81); Gov't Opp. Ex. 12. These commission rebates were transferred by Willis Corroon "into the contract books by account of AMEC p.l.c." Ex. 2 at 104. MDI has admitted that "the AMEC Indemnity" amount was for AMEC p.l.c.'s assumption of the risk of exposing its balance sheet to the risks of performance on MDI contracts . . . the amount was appropriately included in revenue as profit." A104-104a (Request for Admissions). Plaintiff also characterized these payments as a "discounted or 'preferred fee' . . . because of AMEC's volume of business." Pl. R. to Gov't PF at ¶14 (citing Ex. 2 (Bardsley Dep. at 114-15)). Plaintiff conceded, however, that "[as a] result of the commercial partnership . . . [Plaintiff] received very good rates, and likely receive the lowest available rates in the industry[.]" *Id.* (citing Ex. 2 (Bardsley Dep. at 114-15)); *see also* Ex. 5 (Romano Dep. at 95) (referring to November 1, 1999 letter to William Keating at KPMG where Romano stated, "because of AMEC p.l.c.'s indemnity and surety relationships, MDI was able to obtain favorable rates.").

On February 18, 1999, GSA's Office of Investigations, Office of the Inspector General reported that "[Plaintiff] used falsified invoices and [made] false certifications to obtain payments for bonds. MDI was required to pay for the bonds prior to billing GSA. T[hey] also did not make an effort to pay for the bonds immediately after receiving payment from GSA. Plaintiff also billed for alleged surety cost to AMEC. No payments to AMEC were made, thus Plaintiff front-loaded the entire amount. Plaintiff used this ruse to obtain contract funds prior to the completion of the contract. The damage to GSA is the loss of the funds and interest on the funds." A1188.2.

### 2. Plaintiff's Specific Conduct Regarding The Government Contracts At Issue.

#### a. The St. Louis Federal Courthouse.

##### i. Phase I Contract No. GS06P94GYC0037.

On July 13, 1994, Willis Corroon advised Plaintiff's Director of Risk Assessment of the execution of a $20,343,186 performance bond and $2,500,000 payment bond on Phase I of the St. Louis Federal Courthouse. *See* A459, 1922. That letter also stated that Willis Corroon's "invoice for the premium of $118,907.00 will follow under separate cover." A459; *see also* A1421. On July 14, 1994, Willis Corroon invoiced Plaintiff for performance and payment bonds in the amount of $118,907 for Phase I of the St. Louis Courthouse. *See* A1548, 1924.

On July 15, 1994, Plaintiff's Vice President, forwarded a GSA Agenda for a pre-construction meeting entitled, Site & Foundation Package No. 1 Pre Construction Meeting Agenda, to Plaintiff's Executive Vice President and Contractor Administrator, among others, for their "perusal," that included the topic "Paid Bond Receipts (CRSS) A. Paid Bond Receipt for payment of bond must be submitted with first payment receipt or payment request will be rejected and returned to contractor." A460-63; *see also* A270, 272 at ¶ 9. On July 19, 1994, Plaintiff's Vice President and Contract Administrator attended a GSA pre-construction meeting where they were informed that receipts were required to be submitted with a payment application for bond payments made. *See* A270; *see also* Pl. Add'l PF ¶ 5 (not contesting A270); A281, 284, 937, 939.

On June 6, 1994, Plaintiff's Executive Vice President informed the Vice President that the bond premium would include an "AMEC surcharge" of 1.17% or $234,125 for one year or $262,230 for two years. *See* A458. Without the AMEC "surcharge," the rate would be 0.59% or $117,863 for one year or $131,110 for two years. *Id.* On July 26, 1994, at the request of Plaintiff's Director of Risk Finance, the Vice President/Comptroller processed a journal entry of $118,907.00 "to 2F02 for the bond cost of the St. Louis Courthouse project (#3262000). This cost is to be billed to the owner in the next requisition." A410-11; *see also* A924, 2186. In her affidavit, however, she admitted that she "never entered the 'AMEC Indemnity' on the Phase I St. Louis Courthouse project in my accounting system. There are no journal entries in any MDI accounting records for the $118,907 'indemnity' amount. I never saw an AMEC Indemnity Agreement or any documents concerning an AMEC Indemnity Agreement for the St. Louis Courthouse project." A386; *see also* A1194. On July 22, 1994, Plaintiff's Director of Risk Management forwarded correspondence to Plaintiff's Contract Administrator including a fax coversheet that requested: "Let me know when we've received payment for Bond Cost, so I can set-up Willis invoice for payment." A464; *see also* A900, 937, 939, 2186. The attached correspondence indicated that a July 21, 1994 letter from Norman Critchlow, was sent to Plaintiff's Executive Vice President, enclosing "Willis Corroon's invoice for the noted bonds." *See* A308, 465; *see also* A2184. On July 28, 1994, Plaintiff's Project Manager for the Phase I Contract and other Plaintiff representatives met with GSA to discuss the requirement for pay applications, including the need to evidence payment for any bond premiums requested. *See* A1009. On August 9, 1994, Plaintiff submitted a draft of a first pay application for Phase I requesting a payment of $237,814 for bond costs. *See* A270-71, 288-94.[8] The draft application included a July 21, 1994 letter from Norman Critchlow, a senior executive at AMEC Holdings, Inc., to Plaintiff's Executive Vice President, entitled "United States Courthouse Site and Foundation Package No. 1 Contract Value: $20,343,186 Performance and Payment Bond." A514. The letter advised that "Per agreement between MDI and AMEC Holdings, the cost for AMEC's indemnity support to the sureties for MDI's surety program is $118,907." *Id.* A summary of the "bond costs" was recited, as follows:

[8] A June 6, 1994, Plaintiff's Bond Rate Worksheet estimated the bond premium for the U.S. Courthouse, St. Louis "with AMEC surcharge 1.17%" would be $234,125 for the first year. *See* A458; see also A2188. The first year premium would be $117,063 "without AMEC surcharge .059%." *Id.*

| | | |
|---|---|---|
| Seaboard – Performance and Payment Bond | $ | 62,299 |
| American Home – Performance and Payment Bond | | 56,608 |
| AMEC Holdings – Indemnity to Surety | | 118,907 |
| Total bond cost | $ | 237,814 |

*Id*.

In addition, the July 21, 1994 letter enclosed Willis Corroon Invoice No. 0219908, dated July 14, 1994, in the amount of $118,907. *See* A291-92. As Plaintiff's Director of Risk Management testified: "I would have provided [the July 11, 1994 letter] at [Plaintiff's Contractor Administrator's] request." A2185. In fact, Plaintiff's Director of Risk Management was asked "for support documentation for the bond costs for the project," which is why [Plaintiff's Director of Risk Management] provided the surety invoices and "Norm[an Critchlow] provided the – what we call the indemnity letter." A2185. Plaintiff's Contract Administrator confirmed that the AMEC "indemnity support" was "another part of the bond cost." A1486-87. On August 12, 1994, GSA's Construction Manager met with Plaintiff's Contractor Administrator and Plaintiff's Project Manager for the Phase I contract to inform them that the documentation that Plaintiff provided with the draft payment application was insufficient, because no proof was provided that the bond costs actually were paid. *See* A271 at ¶8, A933 at 22-23, A1009-10 at 19-21, A1481 at 68, A1531-32 at 19-22.

On or about August 16-17, 1994, Plaintiff's Vice President, filed a progress pay application to GSA regarding the Phase I Contract, including a certification for a $237,814 bond claim alleged to have been paid by a July 14, 1994 Willis Corroon invoice. *See* A77, 281, 298-301, 460-63, 900, 1534, 1539, 1558.[9] The GSA Form 2419 Certification of Progress Payment Under Fixed-Price Construction Contracts, incorporating FAR 52.232-5, stated that the amounts requested "are *only* for performance in accordance with the specifications, terms, and conditions of the contract[.]" (emphasis added). Gov't Ex. 15 (GSA51001706). A paid bond receipt was not submitted with the final application. *See* A271-72, 308-10, 313-16. On August 17, 1994, Plaintiff's Risk Manager sent a fax to Willis Carroon requesting an "invoice [that states] that the bill has been paid[.] Naturally we will forward payment to Willis as promptly as possible upon receipt of payment from the GSA." A468 at 40; *see also* A900 at 168, A1001 at 58. The Willis Corroon invoice marked paid was forwarded to Plaintiff's Project Manager for the Phase I Contract. *See* A914. On August 19, 1994, Invoice No. 0219908 regarding the Phase I Contract was marked paid by the Executive Vice President of Willis Corroon, at the request of Plaintiff's Contract Administrator who then forwarded the invoice to GSA. *See* A1000-01. GSA, however, also considered this documentation to be inadequate. *See* A271, 913-14, 1011, 1168, 2187.

[9] Plaintiff admits that at least one employee read Paragraph 9 of the Phase I Contract before the August 16, 1994 progress payment application and certification were submitted to GSA. *See* A80 (Request for Admissions 35), A99 (Request for Admissions 2), A103 (Request for Admissions No. 16).

On August 23, 1994, Plaintiff submitted a revised payment application reflecting that the requested bond premium had been reduced from $237,814 to $118,907, together with two certifications that "all amounts have been paid by the Contractor[.]" *See* A272, ¶9; A298-314; *see also* A77 (Plaintiff's Vice President was authorized to sign the certificate on behalf of Plaintiff). On August 24, 1994, a senior executive at AMEX Holdings Inc. sent a letter to Plaintiff's Executive Vice President, stating: "Further to AMEC Holdings letter dated July 21, 1994, we confirm that AMEC Holdings Indemnity to Surety in the sum of $118,907.00 has been paid by Morse Diesel International." A471; *see also* A919-20 (discussing that the $118,907 was not intended as a third-party payable by Plaintiff); A 953-54. On August 25, 1994, Plaintiff's Contract Administrator sent a letter to GSA attaching an invoice, dated July 14, 1994, Reference No. 0219908 from Willis Corroon and stamped "paid." *See* A473 (attaching A474), A886-88 (Ford Dep. at 82-88) (Plaintiff's Director of Risk Management testifying that when he requested the invoice stamped as paid, he knew that the invoice in fact was not paid); *see also* A489. Based on additional representations by Plaintiff's Project Manager that the $118,907 had been paid to Willis Corroon on September 14, 1994,[10] on October 3, 1994, GSA paid Plaintiff for the $118,907 claim.[11] *See* A81, 272, 901, 1194. Plaintiff did not pay Willis Corroon until November 30, 1994. *Id*. During this period, Plaintiff also submitted a second progress pay application to GSA regarding the Phase I Contract, including another certification by Plaintiff's Vice President, dated September 12, 1994, that included an additional $118,907 in bonding costs, supported by two letters from Norman Critchlow, that this amount of "AMEC indemnity" was paid to AMEC. *Id.* ¶ 17; *see also* A78; A85 (Request for Admissions 57), A878. At his deposition, Mr. Critchlow was asked about the statement in one of

---

[10] A handwritten note from Plaintiff's Director of Risk Management to Willis Carron dated August 17, 1999, however, stated: "Please see copy of invoice from Willis for P&P bond premium. We are attempting to get paid. We've submitted the invoice to the owner (GSA) and they want to know that the bill had been paid. Could you provide a letter to [Plaintiff's Executive Vice President] of our Chicago office which references the project and this invoice and shows that the bill had been paid. Naturally, we will forward payment to Willis as promptly as possible upon receipt of payment from the GSA. Please advise if you can assist." An additional notation indicated: "Sent 'Pd.' Invoice to K. Ford." An August 20, 1994 note to Plaintiff's San Francisco Accounting Office from Plaintiff's Project Manager for Phase I stated "RE: GSA Courthouse Application For Payment. 1. Any signs of 'paid receipts' for bonds?" A469. On August 22, 1994, Plaintiff's Project Manager, edited a document listing items of "mobilization," "estimated total," and "end of July billing" for the "U.S. Courthouse Job." A1540. The "mobilization" item for the bond was estimated to be $237,814, of which $118,907 was to have been billed by the end of July. *Id*.; *see also* A1542. On August 22, 1994, Plaintiff's San Francisco Accounting Office responded to Plaintiff's Project Manager for Phase I: "Anticipate documentation for bonds to be received today or tomorrow." A470.

[11] *See* A511-13 (indicating that the "Surety Rates from Willis Corroon" included the "Total Seaboard [Surety Company] & AIU [American Home Assurance] Bond Premium for this Project: [was] $118,907." It is not clear from the record whether Willis Corroon and/or any of Plaintiff's parent entities had any corporate and/or other relationship with Seaboard and/or AIU.).

the letters that reported: "Per agreement between MDI and AMEC Holdings, Inc., the cost for AMEC's indemnity support to the surety for MDI surety is 118,907 dollars." A878; *see also* A465. He testified: "if one looks at the numbers, that indemnity to surety is exactly equal to the payment in performance bond sums to Seaboard in American Home, and I can only, with hindsight, relate it back to the fact that there was an earlier reference to doubling the bond premiums for the AMEC indemnity." A878 (referring to a "1990 board meeting."); A879-80. In fact, Plaintiff did not pay AMEC Holdings, Inc. for this bond. *Id.* In addition, Plaintiff admitted that, Plaintiff intended GSA to rely on this documentation as evidence that the bond premiums on the Phase I Contract were paid. *See* A81 (Request for Admissions No. 37), A164-65, 272 (Haddock Dec. ¶ 9); A295 (Haddock Ex. C), 308, 886-88, 906, 2187, 2197 at 83-85.

On September 14, 1994, Plaintiff submitted a second payment application for the Phase I Contract, again certified by Plaintiff's Vice President of Operations, that included $118,907 in bond costs. *See* A73, A320-28. The second application also included an August 24, 1994 letter from Norman Critchlow, AMEC Holdings, to David Hoffman, stating that the "AMEC Holdings indemnity to surety in the amount $118,907 had been paid." *See* A326. Based on this documentation, GSA paid Plaintiff the total $330,039.00 amount requested, including $118,907 for the bond premiums. *See* A275, 342-43. On September 12, 1994, Morse Diesel International/CMR Construction, Inc. advised GSA of a revised bond rate from 1.1% to .54%, together with other revisions. *See* A1520-21; *see also* A 612.

A handwritten note, dated November 16, 1994, on the July, 1994 Willis Corroon invoice, establishes that, in fact no payment was made by Plaintiff on August 24, 1994. *See* A1924.

On November 22, 1994, Plaintiff paid Willis Corroon $141,407, $118,907 of which represented the bond cost for Phase I of the St. Louis Courthouse project. *See* A387, 412, 1002; *but see* A1168 (GSA Form 9505-A Report of Inspector General stating that Willis Corroon was paid on November 30, 1994); *see also* A1924 (indicating that on 11/16/94 Willis Corroon had not been paid $118,907 for Invoice No. 0219908, dated July 14, 1994); A1927. Accordingly, Plaintiff's Controller for Project Accounting testified that: "[a]ny statement or invoice provided to indicate that MDI had paid its surety brokerage part of the premiums for performance and payment bonds on the St. Louis Courthouse Phase I project before November 22, 1994 is false. Any statement or invoice provided to indicate that MDI had paid its surety broker $118,907 for the premiums for performance and payment bonds on the St. Louis Courthouse Phase I project before November 22, 1994 is false." A387; *see also* A930.

On November 14, 2000, the head of Accounting in San Francisco received an Employee Reprimand for having knowledge that in Phase I of the St. Louis Courthouse, Plaintiff "submitted pay requisitions seeking reimbursement for payments . . . for a parent company indemnity." A930. On February 19, 2001, however, this individual took issue with the reprimand stating:

> At the time that AMEC costs were billed to GSA, I was instructed directly by a member of Senior Management . . . to invoice them. I therefore felt I had no one in

> Senior Management to approach and discuss the details of this transaction. The work place environment within the Accounting portion of [Plaintiff] during this period of time was not conducive to employee questioning their superior. On numerous occasions I questioned ethical business practices and/or/ transaction that were being done by [Plaintiff] to this same individual, and was told that if "I didn't want to do the job, he would find someone who would."

A931.

On November 14, 2000, the Audit Coordinator also received an Employee Reprimand for having submitted an invoice on Phase I "for [Plaintiff's] bond premium which had been stamped paid" and submitted as a supplement to [Plaintiff's] certified payment requisition for which Plaintiff "sought reimbursement for that bond premium in order to induce the GSA to make payment." A 518; *see also* A1509 at 67. This individual also took issue with the reprimand stating his [date] letter was "merely a 'transmittal' letter enclosing information received for New York corporate who controlled the payment of Insurance and Bond invoices." A579; *see also* A1509 at 67.

On November 14, 2000, Vice President, Operations Manager also received an Employee Reprimand regarding Phase I and II for having "signed the certificates with exercising the proper care and due diligence to ensure that the statements contained in them were true." A520-21. This individual also disagreed stating: "I signed certificates based on confirmation and information received and prepared by the [Plaintiff's] accounting staff that the input/billings enclosed with the Certificates were true and accurate." A521; *see also* A1508 at 64-65, A1516 at 138 (Vice President, Operations Manager testified that he did not review the invoices for the bonds).

**ii. Phase II Contract No. GS06P95GZC0501.**

On or about August 17, 1995, Plaintiff prepared a bid for the St. Louis Courthouse Phase II with a $845,824 bond premium, that did not include the AMEC surcharge. *See* A903 (Ford Dep. at 195); Contract No. GS06P95GZ0501; *but see* A1945 (noting that the bid included a bond amount of $923,900). On September 28, 1995, Plaintiff informed RHH that Plaintiff needed payment and performance bonds to issue by October 6, 1995. *See* A905 (Ford Dep. at 200).

On October 6, 1995, Seaboard Surety Company issued a performance and payment bond in the amount of $165,102,792 for the St. Louis Courthouse Phase II. *See* A1948. On October 18, 1995, GSA convened a pre-construction meeting for the St. Louis Courthouse Phase II at which Plaintiff's representatives attended, including the Vice President and Operations Manager, Gerald Parham, the MDI Project Executive for Phase II, and Paul Laskowske, the MDI Project Manager for Phase II. *See* A275, 344-54 (Haddock Decl. ¶ 14). At that meeting and a follow-up on October 31, 1995, Plaintiff's representatives again were informed that bond receipts evidencing payment must be received with payment applications. *Id.* On October 31, 1995, Plaintiff submitted a draft first Payment Application for the Phase II Contract for $1,400,146, of which $923,900 was for bond costs. *See* A275 (Haddock Decl. ¶ 15). The draft enclosed copies of invoices from Rollins Hudig

Hall, dated October 26, 1995, however, the invoices were not marked as paid. *See* 276 (Haddock Decl. ¶ 15), A356-58, 905. The Construction Manager informed Plaintiff that GSA required paid invoices to be submitted and advised GSA that Plaintiff would be submitting that back up documentation. *See* A276-77 (Haddock Decl. ¶ 15), 1169-70. On November 3, 1995, documents were forwarded to the GSA Contracting Officer by the site Project Manager with a note that stated: "1. Bond: Appears to be 0.56% of Contract Total, MDI is working on getting a stamped 'Paid' copy." A355; *see also* A276 (Haddock Decl. ¶ 15), 1939 (John Walsh, GSA Office of the Inspector General, testified that before he received a November 8, 1996, memo from Plaintiff's Director of Risk Management, Mr. Walsh did believe that the bond invoices stamped paid were accurate.). On November 29, 1995, Plaintiff submitted a first progress payment application for the Phase II Contract certified by Plaintiff's Vice President and Operations Manager, in the amount of $1,003,352.65, including $923,900 for bond premiums. *See* A276 (Haddock Decl. ¶ 15), 369-80. The payment request was accompanied by invoices from Rollins Hudig Hall stamped "Paid November 21, 1995." *Id.*; A379-380. On December 1, 1995, Plaintiff's first payment application for Phase II was forwarded to GSA, together with stamped "Paid" invoices. *See* A369-80. On December 6, 1995, GSA authorized payment to Plaintiff for $1,003,352.65, including $923,900.00 for bond premiums. *See* A381-82.

On or about November 21, 1995, one of Plaintiff's employees in the insurance and bonding office, located in New York, called a representative of Rollins Hudig Hall, Plaintiff's bonding and insurance agent, and asked that the representative stamp an invoice for the bond premium as paid when, in fact, it had not been paid to that date and deliver it to Plaintiff's office. *See* A118 (Stipulation of Facts ¶ 1), A907 (Ford Dep. at 244-46), A927 (Estock Dep. at 489-91) (no journal entry was made regarding the AMEC indemnification amount charged), A935 (Haddock Dep. at 70).

On November 28, 1995, Plaintiff's Vice President and Operations Manager submitted a first application to GSA for payment of $1,003,352.65 on the Phase II Contract, including $923,900 for bonds together with certifications of the accuracy of the "paid" invoice. *See* A78, 1169, 1171-80; *see also* A118 (Stipulation of Facts ¶ 2). The GSA Form 2419 Certification of Progress Payment Under Fixed-Price Construction Contracts, incorporating FAR 52.232-5, stated that the amounts requested "are *only* for performance in accordance with the specifications, terms, and conditions of the contract[.]" (emphasis added). Gov't Ex. 15 (MDI 9776530). Subsequently, Plaintiff admitted that as of November 28, 1995, at least one company employee knew that Plaintiff had not paid its surety bond premiums on the Phase I Contract. *See* A100 (Request for Admissions No. 9). In fact, Plaintiff did not pay Rollins Hudig Hall for the bond premium until February 6, 1996 and "was not entitled to be reimbursed by the Government for this amount under the contract until after the premium was in fact paid." A119 (Stipulation of Facts ¶ 4); A1948 (Rollins Hudig Hall Invoice No. 477707, dated 1/16/96, in the amount of $492,838 with note "OK KLL 1/31/96 . . . please pay ASAP"); *see also* A1949 (Rollins Hudig Hall Invoice No. 477708, dated 1/16/96 in the amount of $431,062 for performance and payment bond with note "Please Pay ASAP OK KLL 1/31/96"), A2134. On December 18, 1995, Plaintiff was paid "based on the 'paid' invoice and the certification (which were material to the [GSA] in its determination to pay)[.]" A119 (Stipulation of Facts ¶ 3). On January, 16 1996, RHH provided Plaintiff an invoice for a performance and payment bond in the amount of $492,838. *See* A1948. On January 16, 1996, RHH provided an invoice to Plaintiff for

a "Performance & Payment Bond" in the amount of $431,062, regarding the American Home Assurance Company 10/6/95 premium. *See* A1949.

On December 12, 2000, Plaintiff entered into a Plea Agreement and Stipulation of Facts to the effect that "[i]n exchange for a plea of guilty [to Major Fraud Against the United States, Aiding and Abetting, 180 U.S.C. §§ 1031(a) and 2] the United States Attorney for the Eastern District of Missouri agrees that it will not criminally prosecute within the Eastern District of Missouri this Defendant . . . for any criminal violations . . . as a result of the investigation into the Defendant's conduct during the period August 19, 1994 to date [December 12, 2000] related to the Defendant's contracts with the GSA designated GS06P94GYC0037 and GS06P95GZC0501[.]" A114.

**b. The San Francisco Customs House Contract No. GS09P95KTC0010.**

On April 25, 1995, Plaintiff submitted an Application and Certificate for Payment to GSA for $170,979, including $75,246 for "bond premiums." *See* A140, 533, 537-39, 547-48, 1406-07 (Cooney Dep. at 135-36). The Certification, dated April 27, 1995, was signed by Plaintiff's Vice President and Territory Manager, representing in effect that all amounts submitted had been paid by the contractor. *See* A538. Around this time, Plaintiff's Director of Risk Management telephoned Willis Corroon and directed that the broker stamp the bond invoice as paid, as of May 12, 1995, and send it to Plaintiff, although he knew that the bond payment in fact had not been made. *See* A140-41, A890-92 (Ford Dep. at 103-14).

On May 12, 1995, Plaintiff's Project Manager for the San Francisco contract, provided GSA with a February 23, 1995 invoice no. 0222719 for $75,246.00 marked "Paid 5/12/95 Dennis M. O'Brien, EVP [Willis Corroon]." *See* A140-41, 536, 553-61, 892 (Ford Dep. at 113-14), 903 (Ford Dep. at 192-93), 1005-06 (O'Brien Dep. at 75-81), 1411 (Cooney Dep. at 144-45). On May 19, 1995, Plaintiff's Vice President and Territory Manager signed another Certification in support of Plaintiff's first application to GSA for payment in the San Francisco contract. *See* A559; *see also* A78. On May 21, 1995, a GSA FAR 2419 certification, signed by Plaintiff's Project Manager for the San Francisco contract, was forwarded to GSA in support of the first payment application to the effect that Plaintiff complied with FAR 52.232-5 (Payments Under Fixed-Price Construction Contracts). *See* A534; *see also* A79. On May 24, 1995, GSA authorized payment for the entire amount requested, however, Plaintiff did not pay Willis Corroon until July 20, 1995. *See* A386, 562; *see also* A141 (Factual Basis for Plea Stating that MDI paid Willis Corroon on or about July 27, 1995); *but see* A2198 (Plaintiff's Director of Risk Management testified that Plaintiff was paid by GSA on 6/12/95), A141 (Factual Basis for Plea Stating that Plaintiff received payment on June 9, 1995); A561-62.[12]

---

[12] On February 2, 2001, Plaintiff's Vice President/Territory Manager was issued an Employee Reprimand Form, because he signed a requisition and certification that the invoice was paid, when it was not. *See* A563. Cooney did not believe the reprimand was appropriate, because " I followed company policy in ascertaining that the requisition had been properly submitted by the project manager and received and forwarded to me by the accounting office." *See* A564.

Plaintiff admitted that prior to April 25, 1995, when it submitted the first payment application in the San Francisco Customs House Contract, "certain company personnel" knew that the Phase I Contract GSA required evidence of payment of surety bond premiums prior to reimbursing Plaintiff for such premiums and that at least one company employee knew that Plaintiff had not paid surety bond premiums on the San Francisco Customs House Contract. *See* A101 (Request for Admissions Nos. 11-12); *see also* A103 (Request for Admissions No. 16), A577. In addition, Plaintiff's Controller for Project Accounting submitted an affidavit in this case to the effect that: "[a]ny statement that the $75,246 bond premium amount for the San Francisco Customs House project was paid prior to July 20, 1995 is false." A386 (Meltzer Decl. ¶ 26), 1939 (Walsh Dep. at 193).

**c. The Sacramento Courthouse And Federal Building Contract No. GS09P95KTC0032.**

On June 5, 1995, Plaintiff prepared a bid package breakout that reflected a final bond cost for the Sacramento Courthouse of $487,262. *See* A1732.

On June 16, 1995, the Plaintiff's head of Accounting for San Francisco, Plaintiff's Vice President/Controller and Senior Vice President were advised by Norman G. Farnella to "work closely with the project team in developing a cash flow schedule that maximizes the advance cash payments received by [Plaintiff] . . . More important is scheduling cash draws from the owner that have the maximum amount of justifiable costs front end loaded as possible." A579. On July 19, 1995, Plaintiff was advised that it was awarded the contract on the Sacramento Courthouse. *See* A1015 (Rau Dep. at 18).

On July 20, 1995, Willis Corroon also submitted a $92,610,500 a performance bond and $2,500,000 payment bond for the GS-09P-95-KTC-0032 contract. *See* A589. The transmittal note, forwarded to Plaintiff's Vice President/Territory Manager and Director of Risk Management, also stated that Willis Corroon would "invoice for the premium of $517,419.00 . . . under separate cover." *Id.*

On July 24, 1995, Plaintiff's Vice President/Territory Manager submitted performance and payment bond to GSA reflecting that the amount of the bond premium was $517,491. *See* A157-78, 185-89. The information about the bond costs initially were generated by Plaintiff's Director of Risk Management who communicated that information to Plaintiff's Vice President/Controller. *See* A383 (Meltzer Decl. ¶ 3), 389-92, 893 (Ford Dep. at 121-24). Subsequently on numerous occasions, the relevant GSA Contracting Officer advised at least Plaintiff's Project Manager, Operations Manager, and Vice President/Territory Manager that Plaintiff was required to have paid bond costs before requesting reimbursement from GSA. *See* A140-41, 178-179 (Chin Decl. ¶ 5-10), 190-216, 572, 611-15, 1021 (Reinholtz Dep. at 78-81), 1398-1402 (Cooney Dep. at 111-13, 126); *but see* A588 (memo from "T" to "Ben" advising "[w]hen we submit our first Progress payment to the GSA we need to include the Bond Surcharge for AMEC of 50%."); 2195 (Ford Dep. at 147-48). An August 9, 1995 Pre-Construction Conference Report, included an instruction regarding "Payments to Contractors." A591-609; *see also* A598 (requiring certification of payment to subcontractors and suppliers). Per an August 15, 1995 memo from Plaintiff's Vice President instructing the head of

Accounting in San Francisco to "have Tony [Cooney/Plaintiff's Vice President/Territory Manager] or Peter [Rau/Operation's Manager] sign the invoice." A618.

At the August 9, 1995, Pre-Construction Conference GSA informed Plaintiff it would review MDI's proposed first billing for "Bonds, Issuance, Mobilization . . . without a schedule of values." A613; *see also* A193, 196, 1021-22 (Reinholtz Dep.), 1025. On August 21, 1995, Plaintiff's internal memo regarding the Sacramento Courthouse reports that, "[MDI's Operations Manager] has reallocated approximately $5.4 million to trade codes that will be billed during the first 40% of the project. MDI will begin to accumulate advance billings with the first requisition of approximately $2.0 million. Included in the first requisition . . . is $600,000 in extra bond fee[.]" A1029. On August 31, 1995, Plaintiff's head of Accounting for San Francisco forwarded Plaintiff's Senior Vice President and Plaintiff's Operations Manager, a draft of the initial payment application for review. *See* A1657-58. On September 13, 1995, Plaintiff submitted a payment application and GSA Form 184A Schedule of Values to GSA. *See* A179, 217-236. The GSA Contracting Officer noticed a discrepancy in the bond cost listed as $1,087,262, was different from the $517,491 amount listed on the original bond premiums. *See* A179, 858 (Chin Dep. at 51-53); *compare* A185-89 *with* A217. The GSA Contracting Officer and Plaintiff's Construction Manager had several discussions about Plaintiff's lack of backup documentation for cost reimbursements claimed. *See* A179.

Plaintiff submitted similar certificates to GSA regarding the Sacramento Courthouse Contract. On September 5, 1995, Plaintiff submitted a Payment Request for the month of August 1995, including $1,087,262.00 for bond payments. *See* A640-41, 1400-01, 1631-32. This included remittance to AMEC for the "indemnity amount of $569,771" and payment to "Seaboard Surety/Saint Paul American Home [of] $517,491." *See* A671; A871 (Cooney Dep. at 124); *see also* A1456-57 (Ford. Dep.). On September 5, 1995, Norman Critchlow also advised Plaintiff's Vice President by letter that: "Per the agreement between Morse Diesel International, Inc. and AMEC, plc . . . Please remit AMEC's portion to my attention and remit the surety's portion to Willis Corroon." A671; *see also* A1398-99 (Cooney Dep. at 110-13), 2192-95 (Ford Dep at 130-33, 136).[13] On September 11, 1995, the Project Coordinator also asked for documentation for the $1,233,502 insurance amount claimed. *See* A646. On September 12, 1995, Plaintiff's Vice President faxed the head of Accounting in San Francisco the September 12, 1995 request and asked for advice on how to proceed. *See* A647. In response to a GSA request for further verification, a September 5, 1995 letter from AMEC Holdings, Inc. was provided indicating that although the actual cost of the bond was $517,491, the $569,771 remainder was for an unspecified indemnity paid to sureties by AMEC on MDI's behalf. *See* A145-46, 179-80, 240-41, 860 (Chin Dep, at 59-61, 69-73), 862, 895-97.

On September 14, 1995, a GSA Form 2419, Certification of Progress Payments, was prepared and signed by Plaintiff's Vice President to obtain reimbursement for a $1,087,262 bond payment made to AMEC Holdings, Inc. and $1,233,502 for insurance. *See* A150-55, 635-36, 666, 852, 1023. On September 21, 1995, Plaintiff's Vice President signed another GSA Form 2419 for submission to GSA, certifying that Plaintiff's application for payment of $4,190,808, including $1,087,202 for bond payments complied with FAR 52.232-5 Payments Under Fixed-Price

---

[13] Plaintiff's Director of Risk Management testified that he signed this letter on Mr. Critchlow's behalf. *See* A2192-94.

Construction Contracts. *See* A79, 140-41, 151-52, 154-55, 179-80, 245-49, 851, 854, 1257-61, *but compare* A1635 (GSA Form 2419 for Contract GS-09P-95-KTC-0032 dated September 14, 1995 and signed by Plaintiff's Vice President), *with* A1614 (GSA Form 2419 for Contract GS-09P-95-KTC-0032 dated September 21, 1995 and signed by Plaintiff's Vice President), 1668. The GSA Contracting Officer, however, declined to approve the application because Plaintiff did not submit a paid invoice for the bonds and there was a discrepancy in the bond costs. *See* A851-54; *see also* A857-58, A861-62. On September 26, 1995, Plaintiff faxed GSA a September 5, 1995 letter and invoices reflecting payment for the bonds and insurance. *See* A670, A853-54, A860-62; *see also* A1445-46 (Reinholtz Dep. at 489-90 confirming that Plaintiff submitted pay requisitions to GSA including an indemnity, although the indemnity was not paid).[14] Although payment of the $1,087,262 was authorized by GSA, there is no evidence in the record that Plaintiff ever reimbursed AMEC. *See* A145, 156 (September 5, 1995 letter from AMEC Holdings, Inc. requested payment of $569,771 for "AMEC Indemnity"); A385 (Meltzer Decl. ¶¶ 19-20 stating that the $569,771indemnity was never paid and this amount was not "an actual bond cost" on the Sacramento Courthouse project); A860 (GSA authorized payment on September 25, 1995), A895 (GSA made payment on October 5, 1995), A1255, 2169-70. Although the $517,491 bond was issued by Willis Corroon on July 27, 1995, payment was not made by Plaintiff until November 21, 1995. *See* A384-86, A894.

Plaintiff admits that one of its attorneys read Paragraph 93 of the Contract before MDI submitted the September 21, 1995 payment application to GSA. *See* A84 (Request for Admissions Nos. 51-52). In addition, Plaintiff admits that, as of September 21, 1995, at least one company employee knew that the surety bond premiums on the Sacramento Courthouse Contract had not been paid. *See* A103 (Request for Admissions No. 17).

On or about August 31, 1995, a Confidential Memorandum was provided to Plaintiff's Senior Vice President regarding the Sacramento Courthouse Project that stated "Peter [Rau/Operation's Manager] has reallocated approximately $5.4 million to trade codes that will be billed during the first 40% of the project." *See* A1029.

Plaintiff's Vice President/Controller for Project Accounts, provided an Affidavit on June 14, 2001 stating:

> To the extent that any other amounts were billed to [GSA] as bond costs, in addition to the $517,491 bond premium amount, the amount should have been treated, for accounting purposes, as advance billings. Payments received from [GSA] in excess of actual costs and profit were available to be invested.

A383; *see also* A396, A893-94 (Ford Dep. at 121-24).

---

[14] On March 14, 2000, Plaintiff's Vice President received an Employee Reprimand Form for failure to exercise "proper care and due diligence" regarding the certifications submitted to GSA on the Sacramento Courthouse. *See* A675. He disagreed with the reprimand claiming that the payment requisitions were prepared by the project accountant. *Id.*; *see also* A676.

In addition, the Vice President/Controller's affidavit stated that: "Any statement that [Plaintiff] had paid any part of the premiums for performance and payment bonds on the Sacramento Courthouse project prior to November 21, 1995 is false. Any statement that [Plaintiff] had paid its surety broker $517,491 for the payment and performance bonds on the Sacramento Courthouse project prior to November 21, 1995 is false." A384. In fact, payment was not authorized by Plaintiff until November 14, 1995 or made until November 21, 1995 by Plaintiff to Willis Corroon. *See* A396-401. In early November 1995, at the request of Plaintiff's Director of Risk Management, Plaintiff's Vice President/Controller forwarded a July 24, 1995 Memorandum regarding the status of this payment to Plaintiff's Project Accountant for the Sacramento Courthouse project. *See* A383-84. In response, information was returned confirming that GSA paid the invoice on October 5, 1995. *See* A384, 394.

Around the beginning of September 1996, Plaintiff's Vice President/Controller also learned that questions were being asked about the backup documents supporting the $1,087,262 bond costs. *See* A403-04. In response to learning about this issue Plaintiff's Senior Vice President, instructed Plaintiff's Director of Risk Management to "Get letter from AON." A404. In September 1995, $1,087,262 was billed to GSA as the bond cost, however, that amount included $517,491 for accrual bond costs and, according to Plaintiff's Vice President/Corporate, "an additional $569,771 which had never been processed as a bond cost [but] . . . represented either advance billings on the project or was used to pay other costs associated with the project." A385. Therefore, she testified that: "Any statement that the $569,771 (designated as the "AMEC Indemnity") represented an actual bond cost to [Plaintiff] on the Sacramento Courthouse project is false." A385. Likewise, "[a]ny statement that as of September 1995, [Plaintiff] had paid its bond broker $569,771 for the payment and performance bonds on the Sacramento Courthouse project is false." A386, *see also* A1195.

This fee commission-splitting or rebate agreement commenced in 1990 and continued at least until January 2000. *See* A1454 (Plaintiff did not charge AMEC indemnity costs to customers after 1995); *but see* Gov't Opp. Ex. 5 (Romano Dep. at 87), A678-719 (Plaintiff analysis showing differences between actual bond costs and amounts unpaid to surety for various dates between June 30, 1992 and July 30, 1999), A726 (list of Plaintiff Indemnity Premiums paid as of September 30, 1999); A727 (May 24, 1990 letter from Plaintiff regarding 101 Hudson Street and Chicago Title & Trust Center regarding indemnity); A728-32, A755 (April 18, 1994 letter regarding Plaintiff's Indemnity for Orange County Courthouse); A909, A384 (from at least 1987 through December 1996, Plaintiff's Senior Vice President acted pursuant to a company policy not to pay bond costs until they were paid in advance by the owner of the project).

## II. Proceedings In The United States Court Of Federal Claims.

The procedural history of Case No. 99-279C, Case No. 99-529C, Case No. 99-530C and Case No. 00-513C from May 5, 1999 to the reassignment of these cases to the undersigned judge on August 15, 2003, as well as proceedings from August 15, 2003 to the April 18, 2005 Government Response On Consolidation of Cases were addressed in the issuance of *Morse Diesel Int'l. Inc.* v. *United States*, 66 Fed. Cl. 788, 793-96 (2005) ("*Morse Diesel I*"). In *Morse Diesel I*, the court denied Plaintiff's Motion to Dismiss and Granted the Government's December 7, 2001 Motion

for Partial Summary Judgment Regarding the Seventh Counterclaim concerning Plaintiff's violation of the Anti-Kickback Act of 1946, 41 U.S.C. §§ 51-58.

On August 15, 2005, the Government filed Fourth Amended Counterclaims. On August 16, 2005, the court held a status conference and on August 18, 2005, entered a Scheduling Order. On September 6, 2005, the Government filed a Motion to Transfer and Consolidate GSBCA Docket Nos. 13486, 13491, 13492, 14372, 14755, 14893, 15103, 15158, and 15312 with United States Court of Federal Claims Case No. 99-279C, as consolidated. On September 12, 2005, the court held a status conference about the Government's motion. On September 19, 2005, Plaintiff filed a Response. On September 30, 2005, the Government filed a Reply.

On November 7, 2005, the Government filed a Status Report and on November 8, 2005 filed a Stipulation regarding Plaintiff's Financial Condition. On February 1, 2006, the court granted the Government's September 6, 2005 Motion to Transfer and Consolidate. Shortly thereafter, GSBCA Case Nos. 13486, 13491, 13492, 14372, 14755, 14893, 15158, 15312, and 15102 were transferred, pursuant to 41 U.S.C. § 609(d), and assigned United States Court of Federal Claims Docket Numbers 06-173C, 06-174C, 06-175C, 06-176C, 06-177C, 06-178C, 06-179C, 06-180C, and 06-181C, respectively. On March 13, 2006, the aforementioned 2006 docket numbers and Case No. 05-804C (formerly GSBCA No. 16503), were consolidated under Case No. 99-279C, as consolidated with 99-529C, 99-530C, 00-530C, and 03-1537C.

On April 14, 2006, the parties filed a Joint Status report to identify the pending motions ripe for resolution. On April 21, 2006, the court ordered that Plaintiff's submission of an Amended Consolidated Complaint be deferred pending the court's resolution of Defendant's December 7, 2001 and March 29, 2003 Motions for Partial Summary Judgment. On July 20, 2006, the court requested Plaintiff to provide Attachments to October 20, 2000 Letter to GSA, submitted by counsel for AMEC Construction Management, Inc. On August 30, 2005, Plaintiff filed an Answer to the Government's August 16, 2005 Fourth Amended Counterclaims.

On December 21, 2006, AMEC Construction Management, Inc. filed a Complaint docketed as No. 06-867C to appeal a March 21, 2006, as revised on May 1, 2006 and October 10, 2006 Final Decision by GSA assessing liquidated damages and reprocurement costs associated with Phase II of the construction of the U.S. Courthouse in St. Louis, Contract No. GS06P95GZC0501. After the Government files an Answer and/or Motion to Consolidate, the court will decide whether this new case needs to be consolidated with this case.

## III. Proceedings In United States District Courts.

### A. In The United States District Court For The Eastern District Of Missouri.

On December 12, 2000, the Government filed an Information alleging that on or about November 28, 1995, Morse Diesel International, Inc. presented a false claim to GSA on Contract No. GS06P95GZC0501, a violation of 18 U.S.C. § 287, *i.e.*, "the invoice attached to the claim for [a] bond premium was stamped paid when, in fact, Morse Diesel International, Inc. knew the bond premium had not been paid when presented for payment to [GSA]." A110-11 (*United*

*States* v. *Morse Diesel Int'l, Inc.* (4: No. 00CR 00552) (E.D. Missouri Dec. 12, 2000)).[15] This Information was submitted to the United States District Court for Eastern District of Missouri, together with a Plea Agreement and Stipulation of Facts. *See* A112-19. Therein, Morse Diesel International, Inc. stipulated that during the period August 19, 1994 to December 12, 2000, it was engaged in "criminally investigated conduct," regarding GSA Contract Nos. GS06P94GYC0037 (Phase I - St. Louis Federal Courthouse) and GS06P95GZC0501 (Phase II - St. Louis Federal Courthouse) for which a total fine of $500,200 was to be paid. *Id.* The Plea Agreement and Stipulation, however, specifically recognized:

> there are ongoing civil proceedings between the United States of America and Defendant, and other potential claims arising out of the contracts involved in the Criminally Investigated Conduct in the Eastern District of Missouri, including cases presently pending in the U[nited] S[tates] Court of Federal Claims and the General Services Board of Contract Appeals. Except to the extent that this "Agreement" admits the facts stated in the Information as a violation of Title 18, United States Code, Section 287, this Agreement shall not constitute a waiver or release of either party's claims, rights, contentions or defenses with respect to those other cases and potential claims and allegations.

A115-16.

---

[15] Sometime in 1994, the GSA's Office of the Inspector General ("OIG") conducted an investigation of alleged allegations of fraud by Morse Diesel International, Inc. *See* A142-44. On March 16, 1995, Plaintiff's employees advised GSA that the $118,907 bond costs for the St. Louise Phase I contract would be paid by Plaintiff to AMEC Holdings, Inc. when the project was finished. *See* A488-89. That did not happen. *See* A436, 720, 722, 727-32, 733, 754-57, 846, 874-76, 878-79, 885, 908-10, 962, 976, 1197-98, 1452, 1494, 1496, 2041, 2049, 2051, 2054, 2057, 2160-63, 2069, 2087, 2142-43, 2154, 2165-66, 2177, 2220-27. On March 17, 1995, a GSA OIG investigator filed a report concluding that Plaintiff falsified bond costs. *See* A1890; *see also* A488-90:

On June 29, 1995, GSA requested that the Inspector General audit Plaintiff's change under proposal P03 on Phase I of the St. Louis contract. *See* A487; *see also* A498-515, 1519, 2188. On February 18, 1999, the Inspector General found that Plaintiff engaged in Fraud Against the Government on Phase II of the St. Louis Courthouse Contract. *See* A2135.

On October 20, 2000, Plaintiff's counsel sent a letter to GSA's Special Assistant Contractor Integrity Office of Acquisition Policy requesting that "no action be taken that results in the Company being included on the List [of Parties Excluded from Federal Procurement and Nonprocurement Programs] (*i.e.*, no suspension, proposed debarment or debarment)." A418. This request was made in light of a plea agreement in which Morse Diesel International, Inc. would proffer a plea of *nolo contendre* to one count of a criminal information charging the entity with a violation of the False Claims Act, 18 U.S.C. § 287, and pay $500,000. *See* A417. In addition, counsel requested that GSA enter into an "administrative agreement" that would ensure that Morse Diesel International, Inc. would not be included in the aforementioned list. *See* A419.

In addition, Morse Diesel International, Inc. admitted that FAR 52.232(g) required that the cost of bonds be paid before reimbursement could be requested from the GSA. *See* A118-19. On December 12, 2000, the United States District Court for the Eastern District of Missouri entered a Judgment of Guilty in Case No. 4:00CR522RHK, incorporating the December 12, 2000 Information. *See* A107-09, 118.[16]

**B. In The United States District Court For The Eastern District Of California.**

On November 20, 2001, the Government filed an Information against AMEC Construction Management, Inc. f/k/a Morse Diesel International, Inc. in the United States District Court for the Eastern District of California alleging Major Fraud against the United States in violation of 18 U.S.C. §§ 2, 1031(a). *See* A125-27. The unlawful conduct concerned the February 15, 1995 Contract No. GS09P95KTC0010 for the U.S. Customs House in San Francisco. Specifically, from February 1995 until July 1995, AMEC Construction Management, Inc. f/k/a Morse Diesel International was alleged to have "devised a scheme and artifice to defraud the United States and to obtain money or property by means of material false and fraudulent pretenses, representations and promise." A126 ¶ 3. The underlying facts were that on April 25, 1995, [Plaintiff in this case] filed a certification with the payment application for total bond costs in the amount of $75,246. *Id.* at ¶ 4; *see also* A140, A537-39. Thereafter, AMEC Construction Management, Inc. f/k/a Morse Diesel International directed the bond broker to stamp an invoice for a bond premium, as paid as of May 12, 1995. *Id.* ¶ 5; *see also* A140-41; A534-36, A890-92, A2189 at 106-08, 11-15; A1005-06 at 75-80; Pl. Resp. to PFUF ¶¶ 30-32. In addition, on May 23, 1995, AMEC Construction Management, Inc. f/k/a Morse Diesel International supplemented the first payment application together with the May 12, 1995 invoice marked as paid, with knowledge that the bond premium had not been paid. *Id.* ¶¶ 6-7. Payment was not made, however, until July 27, 1995. *Id.* ¶¶ 6-7.

On November 20, 2001, a Plea Agreement also was entered in *United States* v. *Amec Construction Management, Inc. f/k/a Morse Diesel Int'l Inc.*, CR501-0502 (LKK) wherein AMEC Construction Management, Inc. f/k/a Morse Diesel International agreed to plead guilty to one count of Major Fraud Against the United States, 18 U.S.C. §§ 2, 1031(a) and to pay at $694,322.40 fine. *See* A128-41. The Plea Agreement further stated that:

> no promises have been made by the government concerning any other potential proceedings or any other matters or investigations, including but not limited to possible civil and/or administrative proceedings. The defendant understands that the United States Attorney's Office may not make promises of non-debarment, which is determined in a separate proceeding.

A137 (VII ¶ B).

In addition, Morse Diesel International, Inc. admitted that pursuant to "the progress payment section of the San Francisco contract, the defendant could only be reimbursed for the actual bond

[16] On October 9, 2001, GSA terminated proceedings to debar Plaintiff's Audit Coordinator, from participation in federal procurement and non-procurement programs. *See* A2139.

cost incurred after certifying and providing evidence that full payment had already been made to the surety." A140; *see also* Pl. Resp. to PFUF 2 (Plaintiff did not dispute that "Employees of Morse Diesel knowingly executed a scheme to defraud the United States, and obtain money by means of material false or fraudulent pretenses, representatives and promises under contract.") On March 27, 2002, the United States District Court for the Eastern District of California entered a Judgment of Guilty in Case No. 2:01 CR 00502-1, incorporating the November 20, 2001 Information.

## IV. Discussion.

### A. Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States* v. *Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States* v. *Testan*, 424 U.S. 392, 398 (1976)). Therefore, in order to come within the jurisdictional reach of the Tucker Act, a plaintiff must identify and plead a constitutional provision, federal statute, independent contractual relationship, and/or executive agency regulation that provides a substantive right to money damages. *See Todd* v. *United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *see also Roth* v. *United States*, 378 F.3d 1371, 1384 (Fed. Cir. 2004) ("Because the Tucker Act itself does not provide a substantive cause of action, . . . a plaintiff must find elsewhere a money-mandating source upon which to base a suit.").

For jurisdictional purposes, a statute or regulation is money-mandating if it "can fairly be interpreted as mandating compensation by the Federal Government for damages." *United States* v. *Mitchell*, 463 U.S. 206, 217-19 (1983). In *United States* v. *White Mountain Apache Tribe*, 537 U.S. 465 (2003), the United States Supreme Court explained that:

> [t]his "fair interpretation" rule demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity . . . . It is enough, then that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be "lightly inferred," . . . a *fair inference* will do.

*Id.* at 472-73 (emphasis added); *see also Fisher* v. *United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005) ("[In a single step] the trial court determines both the question of whether the statute provides the predicate for its jurisdiction, and lays to rest for purposes of the case before it the question of whether the statute on its merits provides a money-mandating remedy.").

Although the Tucker Act expressly prohibits the United States Court of Federal Claims from exercising jurisdiction over cases "sounding in tort," the United States Court of Appeals for the

Federal Circuit has held that "where a tort claim stems from a breach of contract, the cause of action is ultimately one arising in contract, and thus is properly within the exclusive jurisdiction of the [United States] Court of Federal Claims[.]" *Awad* v. *United States*, 301 F.3d 1367, 1372 (Fed. Cir. 2002); *see also Wood* v. *United States*, 961 F.2d 195, 198 (Fed. Cir. 1992) (quoting *San Carlos Irrigation and Drainage Dist.* v. *United States*, 877 F.2d 957, 960 (Fed. Cir. 1989)) ("If an action arises 'primarily from a contractual undertaking,' jurisdiction lies in the [United States] Claims Court 'regardless of the fact that the loss resulted from the negligent manner in which defendant performed its contract.'").

The United States Court of Federal Claims also has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under . . . the Contract Disputes Act of 1978 [42 U.S.C. § 609(a)], including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act." 28 U.S.C. § 1491(a)(2); *see Alliant Techsystems, Inc.* v. *United States*, 178 F.3d 1260, 1270 (Fed. Cir. 1999) (holding that "the Tucker Act grants the United States Court of Federal Claims jurisdiction to grant nonmonetary relief in connection with contractor claims, including claims requesting an interpretation of contract terms.").

In this case, the Complaint properly alleges the court's jurisdiction under 28 U.S.C. § 1491 and 42 U.S.C. § 609(a). *See* Compl. ¶ 3 at 2. The Government's May 10, 2001 First Amended Counterclaim and all subsequent Amended Counterclaims also properly invoke the court's jurisdiction to adjudicate claims under the False Claims Act, 31 U.S.C. §§ 3729(a)(1), (a)(2); the Forfeiture of Fraud Claims Act, 28 U.S.C. § 2514; the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51-58; and the Contract Dispute Act, 41 U.S.C. § 604. *See* Fourth Am. Counterclaims ¶ 3 at 2.

**B. Standing.**

Plaintiff and the Government, as parties to Contract No. GS06P94GYC0037, Contract No. GS06P95GZC0501, Contract No. GS09P95KTC0010, and Contract No. GS09P95KTC0032, have standing to bring an action or counterclaim arising thereunder in the United States Court of Federal Claims.

**C. Standard Of Review On Cross-Motions For Partial Summary Judgment – RCFC 56(c).**

If there is no genuine issue as to any material fact, the moving party is entitled to summary judgment as a matter of law. *See Winstar Corp.* v. *United States*, 64 F.3d 1531, 1539 (Fed. Cir. 1995) (citing *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *see also* RCFC 56(c). A material fact is one that might significantly affect the outcome of the suit under applicable law. *See Anderson*, 477 U.S. at 247-48 ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. . . . That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts

are irrelevant that governs."). The existence of "*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* Where the non-moving party only proffers evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

The party moving for summary judgment has the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries its burden to demonstrate an absence of any genuine issue of material fact, then the burden of proof shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250; *see also Sweats Fashions, Inc.* v. *Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987). An issue is genuine only if it might prompt a reasonable fact-finder to resolve a factual matter in favor of the nonmoving party. *Id.* at 1562-63. The court is required to resolve any doubts about factual issues in favor of the nonmoving party. *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1987). In doing so, all presumptions and inferences drawn from the evidence must be resolved in favor of the nonmoving party. *Id.*; *see also Jay* v. *Sec'y of Dept. of Health and Human Servs.*, 998 F.2d 979, 982 (Fed. Cir. 1993). Nevertheless, the court must weigh the persuasiveness and plausibility of such evidence and view it "through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

### D. The Court's Resolution Of The Government's Motion For Partial Summary Judgment.

#### 1. Regarding The Anti-Kickback Act Of 1986 – Seventh Counterclaim.

On July 15, 2005, the court issued a Memorandum Opinion that denied Plaintiff's November 1, 2001 Motion to Dismiss and granted the Government's December 7, 2001 Motion for Partial Summary Judgment Regarding the Seventh Counterclaim, determining that Plaintiff violated the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51-58. *See Morse Diesel, Int'l, Inc. d/b/a AMEC Construction Management, Inc.* v. *United States*, 66 Fed. Cl. 788, 801 (2005) ("*Morse Diesel I*"). The court did not issue an Order at that time, based on concerns about the corporate and financial viability of the named plaintiff.

Based on subsequent representations made by Plaintiff's August 12, 2005 Memorandum and Exhibits, the Government's August 16, 2005 Response, and an August 19, 2005 hearing, the Government's August 15, 2005 Fourth Amended Counterclaims ¶¶ 10-26, 111-120, and additional facts discussed herein, the court re-affirms and incorporates herein the July 15, 2005 Memorandum Opinion in *Morse Diesel I* and enters herewith an Order that the Government has established by clear and convincing evidence that from at least August 19, 1994 until at least December 12, 2000, Plaintiff engaged in actions that violated the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51-58. Accordingly, the Government is entitled to summary judgment as to Plaintiff's liability thereunder.

**2. Regarding The False Claims Act Counterclaim – First And Second Counterclaims.**

**a. The False Claims Act.**

The False Claims Act provides, in relevant part, that any person who:

> knowingly[17] presents . . . a false or fraudulent claim for payment or approval [to the United States Government] . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person[.]

31 U.S.C. § 3729(a)(1).

The False Claims Act also provides that any person who:

> knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government [also] . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person[.]

31 U.S.C. §§ 3729(a)(2).

To establish liability under Section 3729(a)(1), (2) the Government must prove by a preponderance of evidence, for each contract at issue, that: the contractor presented for payment a claim; the claim presented was asserted against the Government; the contractor knew that the claim was false; and the contractor intended to deceive the Government by submitting the claim. *See* 31 U.S.C. § 3731(c); *see also UMC Electronics Co.* v. *United States*, 249 F.3d 1337, 1338 (Fed. Cir. 2001); *Commercial Contractors, Inc*. v. *United States*, 154 F.3d 1357, 1362 (Fed. Cir. 1998) (same); *Young-Montenay, Inc.* v. *United States*, 15 F.3d 1040, 1042 (Fed. Cir. 1994).

**b. The Parties' Arguments.**

**i. The Government's Contentions.**

The Government asserts that Plaintiff knowingly submitted claims to GSA for each of the contracts at issue, "for reimbursement of bond 'costs' that included the undisclosed 'rebate' to Plaintiff's parent AMEC, p.l.c. of up to 12 percent of those supposed 'costs.'" Gov't M.S.J. at 16 (citing Gov't PF 12, 16; Gov't Exs. 6, 10, 11); *see also* Gov't Reply I at 29; Gov't S.R. & Opp. at

---

[17] "Knowingly" is defined to mean that "a person, with respect to information - . . . has actual knowledge of the information[.]" 31 U.S.C. § 3729(b)(1); *see also BMY-Combat Sys. Div. of Harsco Corp.*, 38 Fed. Cl. 109, 126 (1997) (citing 31 U.S.C. § 3729(b)) (where plaintiff "knew" of a false claim, specific intent to defraud is not required.).

27-28. Each claim for reimbursement of bond costs represented to GSA that the amount requested was made, pursuant to the terms and conditions of the contracts at issue, as required by 48 C.F.R. § 52.232-5(c). *Id.* (citing Gov't PF 3-6; Gov't Ex. 1). Each of these contracts provided that reimbursement could be obtained only in the actual amount of premiums paid for performance and payment bonds. *Id*. (citing 48 C.F.R. § 52.232-5(g)). Therefore, the Government argues that Plaintiff's certifications for progress payments on all of the contracts at issue for bond costs were false claims. *See* Gov't M.S.J. at 16-17; *see also* Gov't Reply I at 30. Moreover, none of these rebates were paid or credited to the Government in violation of FAR 31.201-5 (requiring that "[t]he applicable portion of any income, rebate, allowance, or other credit relating to any allowable cost and received by or accruing to the contractor shall be credited to the Government either as a cost reduction or by cash refund." 48 C.F.R. § 13.201-5.). *See* Gov't M.S.J. at 16-17; *see also* Reply I at 30.

Accordingly, the Government contends that all of the facts that support a motion for partial summary judgment of the Anti-Kickback Act also evidence a violation of the False Claims Act, 31 U.S.C. §§ 3279(a)(1), (2), *i.e.*, that Plaintiff knowingly presented, or caused to be presented, false or fraudulent claims to the United States. *See* Aug. 15, 2005 Gov't Fourth Am. Counterclaims ¶¶ 131-40.

**ii. Plaintiff's Response.**

First, Plaintiff responds to the Government's Motion for Partial Summary Judgment regarding the False Claims Act Counterclaim, arguing that 48 C.F.R. § 13.201-5's credit requirement is applicable only to cost-reimbursement contracts and only a narrow category of fixed-priced contracts, *i.e.*, "whenever (a) cost analysis is performed, or (b) a fixed-price contract clause requires the determination or negotiation of costs." *See* Pl. Reply & Opp. at 16 (quoting 48 C.F.R. § 13.201-5). Since the contracts at issue did not involve a cost analysis or negotiation of costs, Plaintiff asserts that 48 C.F.R. § 13.201-5 is inapplicable. *Id.* at 17; *see also* Pl. Sur-Reply at 11-16. In addition, Plaintiff argues that to require a prime contractor "to forego its profits on fixed price contracts by rebating any and all price concessions made by suppliers and subcontractors . . . would turn price competition on its head and in no way is required under applicable law." *Id.* Plaintiff reads the FAR to allow a contractor to request payment for the full amount of an invoice, subject to an obligation to pay the Government only if a rebate materializes. *Id.* Accordingly, Plaintiff appears to reason that a request for repayment from the Government *ipso facto* cannot be a false claim, because no rebate exists at that time. *Id.* Since Plaintiff's parent, AMEC p.l.c., in fact, received a rebate, the Government is not entitled to a refund since 48 C.F.R. § 13.201-5 requires that the contractor must actually receive or accrue the rebate as a prerequisite for the Government to be paid. *Id.* at 18. Accordingly, the Government would have to pierce the corporate veil to establish that Plaintiff had sufficient corporate control over AMEC p.l.c. to effectuate a refund of any rebate to the Government. *Id.*

Second, assuming *arguendo* that 48 C.F.R. § 13.201-5 applies, Plaintiff responds that the progress payment applications were not "a false or fraudulent claim," because, at the time the claim was made, Plaintiff had paid the entire bond amount claimed. *Id.* (citing 31 U.S.C. § 3729(a)(1)). The fact that AMEC p.l.c. subsequently may have received a rebate is irrelevant. *Id.* The record also

shows that the contracts at issue were entered after February 1993, when some of Plaintiff's employees knew of the rebate arrangement and that Morse Diesel International, the joint venture, did not exist at the time two of the payment requests were made. *Id.* at 19; *see also* Pl. Sur-Reply at 20-21.

Third, Plaintiff contends that "no evidence shows that any ["Plaintiff"] employee who signed the payment certifications in 1994 or 1995 knew about the existence of any commercial arrangement." Pl. Reply & Opp. at 20. Here, Plaintiff relies on the language of the certification requiring: "I hereby certify, *to the best of my knowledge and belief* that - (1) the amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract[.]" *Id.* (citing Ex. 15) (emphasis added). In support, Plaintiff urges the court to follow several non-precedential opinions by other courts, holding that it is inappropriate to aggregate "collective corporate knowledge" to satisfy the "knowledge" element of the False Claims Act. *Id.* at 20-21.

Fourth, Plaintiff challenges the Government's False Claims Act counterclaim, asserting that the record does not satisfy "materiality" and "reliance" elements that other and/or non-precedential decisions appear to have adopted. *See* Pl. Reply & Opp. at 21; *see also* Pl. Sur-Reply at 15-20. Therefore, Plaintiff concludes that the record "lacks evidence" that the Government would have acted differently had it known of the "commercial arrangement under which the bond brokers paid a portion of the commissions they earned on the bond premiums to AMEC." Pl. Reply & Opp. at 22.

In the alternative, Plaintiff states that summary judgment is premature because expert testimony is required on "technical accounting issues of whether any payments made by the brokers to AMEX ever accrued to MDI, and if so, when that accrual took place." *See* Pl. Reply & Opp. at 22.

#### c. The Court Has Determined That Plaintiff's Progress Payment Application For Performance And Payment Bonds Premiums And Certifications Violated The False Claims Act.

Each of the contracts at issue required the Government to make progress payments, however, reimbursement for performance and payment bond premiums were conditioned on "the Contractor . . . furnish[ing] evidence of *full payment to the surety*." 48 C.F.R. § 52.232-5(g) (Payments Under Fixed-Price Construction Contracts) (emphasis added). *See* A182 at GSA Form 3506 page 36. In addition, GSA Form 2419, required the contractor to represent that: "The amounts requested are *only* for performance in accordance with the specifications, terms, and conditions of the contract[.]" *Id.* (emphasis added).

On the following dates, Plaintiff presented GSA with Progress Payment Applications seeking reimbursement for Performance and Payment Bonds:

1. St. Louis Phase I, Initial Payment Application No. 1: dated August 16, 1994, received August 17, 1994. *See* A271, A298.

2. St. Louis Phase I, Revised Payment Application No. 1: dated August 23, 1994. *See* A272, A294-374.

3. St. Louis Phase I, Payment Application No. 2: dated September 12,1995, received September 14, 1995. *See* A273, A323-41.

4. San Francisco, Payment Application No. 1: dated April 25,1995, received May 1, 1995. *See* A126, A537-40.

5. Sacramento, Payment Application No. 1: dated September 21,1995, received September 22, 1995. *See* A148-56, A242-49.

6. St. Louis Phase II, Payment Application No. 1: dated November 28,1995, received November 29, 1995. *See* A110, A374-80.

*see also* Gov't Ex. 15 (St. Louis Courthouse Phase I, Contract No. GS06P94GYC0037), Gov't Ex. 16 (San Francisco Customs House, Contract GS09P95KTC0010), Gov't Ex. 17 (San Francisco Customs House, Contract No. Contract GS09P95KTC0010), Gov't Ex. 18 (Sacramento Courthouse Contract No. GS09P95KTC0032), Gov't Ex. 19 (St. Louis Courthouse Phase II, Contract No. GS06P95GZC0501). In this case, the amounts requested for reimbursement in each instance were not *only* for performance of each of the contracts at issue, but were inflated to include the "rebate" amount that by prearrangement the bond brokers subsequently paid to Plaintiff's parent, AMEC. *See* supra Parts I.C.2.c.

In addition, Plaintiff fails to mention that during the period August 19, 1994 to December 12, 2000, it was stipulated as being engaged in "criminally investigated conduct regarding GSA Contract Nos. GS06P94GYC0037 (Phase I - St. Louis Federal Courthouse) and GS06P95GZC0501 (Phase II - St. Louis Federal Courthouse). *See* A112-19.[18] In addition, Plaintiff fails to mention that based on this stipulation, the United States District Court for the Eastern District of Missouri entered a Judgment of Guilty in Case No. 4:00 CR 5222RHK. *See* A107-09. Overlooked also was the fact that on November 20, 2001, the Government filed an Information alleging Plaintiff engaged in Major Fraud Against the United States for activities relating to Contract GS09P95KTC0010 for the U.S Customs House in San Francisco. *See* A125-27. Nor was any mention made of the Judgment of Guilty in Case No. 2:01 CR 00502-1, incorporating the November 20, 2001 Information, entered in March 27, 2002, by the United States Court for the Eastern District of California.

---

[18] Plaintiff's Controller for Project Accounting testified that the "company practice was not to pay any bond premium until payment for the bond premium had been received from the [project] owner. This practice was in place in 1987 and continued through the Phase II St. Louis Courthouse project." A384.

As for the Sacramento Courthouse Contract No. GS09P95KTC0032, since a kickback, as defined by FAR 52.203-7(a) is an act of fraud,[19] and the court has determined that Plaintiff's activities regarding the Sacramento Courthouse Contract No. GS09P95KTC0032 violated the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51, 58, the same conduct also violates the False Claims Act. In addition, Plaintiff's Controller for Project Accounting testified in this case that: "[a]ny statement that [Plaintiff] had paid its surety broker $517,491 for the payment and performance bonds on the Sacramento Courthouse project prior to November 21, 1995 is false." A384.

Accordingly, the Government has established by a preponderance of evidence that Plaintiff's progress payment application for performance and payment bonds and certifications on each of the contracts at issue were false and knowingly used by Plaintiff to get a fraudulent claim paid by the Government in violation of the False Claims Act. *See Commercial Contractors, Inc.* v. *United States*, 154 F.3d 1357, 1362 (Fed. Cir. 1998) (citing 31 U.S.C. § 3731(c)).

**3. Regarding The Forfeiture Of Fraudulent Claims Act – Sixth Counterclaim.**

**a. The Forfeiture Of Fraudulent Claims Act.**

The Forfeiture Of Fraudulent Claims Act provides that:

> [*a*] *claim against the United States shall be forfeited . . . by any person who corruptly practices or attempts to practice any fraud* against the United States in the proof, statement, establishment, or allowance thereof. In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514 (emphasis added).

The United States Court of Appeals for the Federal Circuit has held that the Government has the burden of proof under the Forfeiture of Fraudulent Claims Act to establish by "clear and convincing" evidence that the contractor knew that submitted claims were false and that [the contractor] intended to defraud the government by their submission. *See e.g., Glendale Fed. Bank, FSB* v. *United States*, 239 F.3d 1374, 1379 (Fed. Cir. 2001) (holding that Section 2514 requires that the Government establish: "(1) that the plaintiff made a false statement to the government knowing that it was false; and (2) that this statement was intended to deceive the government."); *UMC Electronics Co.*, 249 F.3d at 1339-40 (same); *Commercial Contractors*, 154 F.3d at 1362 (same).

[19] *See* BLACK'S LAW DICTIONARY (8th ed. 2004) at 685 (Fraud is "concealment of a material fact to induce another to act to his or her detriment.")

**b. The Parties' Arguments.**

**i. The Government's Contentions.**

On October 23, 2002, the Government filed a Counterclaim under the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514, but did not move for partial summary judgment until April 29, 2003. *See* Gov't M.S.J. II at 18-37. The Government's core argument is that Plaintiff knowingly submitted false certifications to GSA in support of reimbursement claims for bond costs on all four contracts at issue in this case. *See* Gov't Reply II at 24-50; Gov't Supp. Resp. at 1-7; *see also* Fourth Am. Counterclaims ¶¶ 111-20, 131-40, 155-65.[20]

**ii. Plaintiff's Response.**

Plaintiff initially responded that the forfeitures sought by the Government violate the Eighth Amendment and the Fifth Amendment Due Process Clause to the United States Constitution and therefore, prohibit the court from granting summary judgment without a trial. *See* Pl. S. J. Opp. II at 19-31; *see also* Pl. Supp Op. at 4-8. Later, Plaintiff also challenged the court's jurisdiction arguing that a forfeiture under 28 U.S.C. § 2514 cannot be pled as a counterclaim, set off, or other demand under 28 U.S.C. § 2508, because forfeiture is a defense. *See* Pl. Supp. Op. at 1-4.

In the alternative, Plaintiff asserts that the court does not have jurisdiction to adjudicate a Special Plea in Fraud for Forfeiture on contracts not placed in issue in this case. *See* Pl. S.J. Opp. II 33-35; *see also* Pl. Supp. Op. at 3-4. In the alternative, Plaintiff argues that, assuming that the court has jurisdiction, the Government waived any right it may have had to forfeiture, by requiring Plaintiff to continue performance after Plaintiff knew of the alleged fraud. *See* Pl. S.J. Opp. II at 36-47.

**c. The Court Has Determined That Plaintiff Practiced Or Attempted To Practice Fraud Against The United States In Violation Of The Forfeiture Of Fraud Act.**

On August 15, 2003, at the time Case No. 99-529C case was reassigned from Senior Judge Smith to the undersigned judge, Case No. 99-530C and Case No. 00-513 had been consolidated under Case No. 99-279C. On February 1, 2006, the court issued an Order granting the Government's Motion to Transfer and Consolidate: GSBCA Docket Nos. 13486, 13491, 13492,

[20] Other allegations supporting the False Claims Act and the Forfeiture of Fraudulent Claims Act counterclaims concerning the St. Louis Courthouse Phase I Contract No. GS 06P94GYC0037 and Phase II Contract No. GS06P95GZC0501 were set forth in the Government's August 15, 2005 Fourth Amended Counterclaims. ¶¶ 27-82 (illegal retention of payments of subcontractors); ¶¶ 83-95 (false claims on change orders). Although the court believes that these claims are ripe for adjudication upon confirmation of the record citations, on January 3, 2007, the parties requested the opportunity separately to brief whether summary judgment is appropriate. Accordingly, the court's Memorandum Opinion and Order does not address these additional potential violations of these statutes.

14372, 14755, 14893, 15103, 15158, and 15312 with Case No. 99-279C, as previously was consolidated. Subsequently, the aforementioned proceedings pending before the GSA Board of Contracting Appeals were transferred to the United States Court of Federal Claims. Because each of the GSBCA actions stated a claim for relief, they are also subject to the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514. The court's resolution of the Government's Motion Seeking Judgment Under the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514 for each of the cases follows.

**i. Case No. 99-279C**

On May 5, 1999, Plaintiff filed a Complaint in the United States Court of Federal Claims, docketed as Case No. 99-279C, alleging a claim against the Government for breach of contract regarding the deletion of Level II build-out work on the St. Louis Courthouse Phase II Contract No. GS06P95GZC0501. *See* Compl. (Case No. 99-279C) ¶¶ 23-28. The Complaint requested that the court award damages of at least $467,659, plus interest. *Id*. at 6. In addition, the May 5, 1999 Complaint also asserted a claim characterized as: "Abuse of Discretion" *i.e.* "a breach of GSA's obligation of good faith and fair dealing to which the U.S. Government is bound to adhere in its dealings with its contractors. This breach entitles [Plaintiff] to an equitable adjustment of the Contract [No. GS06P95GZC0501] under the Changes clause and other applicable provisions." *Id*. ¶ 33; *see also id*. ¶¶ 29-33. For this claim, the court was requested to award Plaintiff $467,659, plus interest. *Id*. at 8.

On November 1, 1999, the Government filed a Motion for Leave, together with Affirmative Defenses and Counterclaims, including counterclaims asserted under the False Claims Act, 31 U.S.C. §§ 3729(a)(1), (a)(2). *See* Aff. Defenses and Counterclaims (No. 99-279C) ¶¶ 91-100. In addition, the Government asserted a counterclaim under the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514 for Plaintiff's alleged fraudulent claims arising out of the St. Louis Courthouse Phase I Contract No. GS06P94GYC0037 and Phase II Contract No. GS06P95GZC0501. *Id*. ¶¶ 115-20. On August 16, 2005, the Government also filed Fourth Amended Counterclaims, again asserting counterclaims under both of these statutes. *See* Fourth Am. Counterclaims ¶¶ 131-40, 155-61.

The Government has established by clear and convincing evidence that Plaintiff practiced or attempted to practice fraud against the United States concerning the St. Louis Courthouse Phase II Contract No. GS06P95GZC0501, including, but not limited to, Plaintiff's December 12, 2000 guilty plea as to all elements of 18 U.S.C. § 287 (criminal false, fictitious or fraudulent claims). *See* A112-19 (December 12, 2000 Plea Agreement and Stipulation of Facts Relevant to Sentencing, U.S. District Court, Eastern District of Missouri). Therefore, Plaintiff's claims in Case No. 99-279C are hereby forfeited, together with damages alleged in the amount of $467,659 plus interest. *See* 28 U.S.C. § 2514.

**ii. Case No. 99-529C**

On July 29, 1999, Plaintiff filed a Complaint in the United States Court of Federal Claims, docketed as Case No. 99-529C, alleging claims arising out of the St. Louis Courthouse Phase II,

Contract GS06P95GZC0501 for: breach of contract; excusable delay; impossibility/commercial impractability; waiver of the right to terminate for default; termination for default was procedurally defective; termination for default was arbitrary and capricious; and an abuse of discretion. *See* Compl. (No. 99-529C) ¶¶ 26-55. The relief request was for a declaratory judgment to convert termination for default to termination for convenience. *Id.* at 12. On October 28, 1999, the Government filed an Answer and Counterclaims under the False Claims Act in Case No. 99-529. Therein, the Government alleged that Plaintiff violated the False Claims Act, 31 U.S.C. § 3729(a)(1), (a)(2) by submitting false or fraudulent claims for payment or approval in requests for progress payments and changer orders on all four contracts at issue. *See* Answer and Counterclaims (No. 99-529C) ¶¶ 91-100. In addition, the Government asserted a counterclaim under the Forfeiture in Claims Act, 28 U.S.C. § 2514. *Id.* ¶¶ 115-20.

On May 4, 2000, the Government moved to consolidate Case No. 99-529C with Case No. 99-279C. On July 18, 2000, the court granted the Government's uncontested motion. On May 4, 2000, the Government also filed a Motion for Leave and an Amended Answer Asserting Counterclaims (Involving Doorframes [subject to the St. Louis Courthouse Phase II Contract No. GS06P95GZC0501]), including counterclaims under the False Claims Act, 31 U.S.C. § 3729(a)(2) and the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514. *See* Counterclaims Involving Doorframes (No. 99-529, as consolidated), ¶¶ 23-27, 42-47 and Exhibits A-D. On August 16, 2005, the Government filed Fourth Amended Counterclaims again asserting counterclaims under both of these statutes. *See* Fourth Am. Counterclaims ¶¶ 131-49, 155-61.

The Government has established by clear and convincing evidence that Plaintiff practiced or attempted to practice fraud against the United States concerning the St. Louis Courthouse Phase II Contract No. GS06P95GZC0501, including but not limited to, Plaintiff's December 12, 2000 guilty plea as to all the elements of 18 U.S.C. § 287 (criminal false, fictitious or fraudulent claims). *See* A112-19. Therefore, Plaintiff's claims in Case No. 99-529C for declaratory judgment are hereby forfeited. *See* 28 U.S.C. § 2514.

**iii. Case No. 99-530C**

On July 29, 1999, Plaintiff filed a Complaint in the United States Court of Federal Claims, docketed as Case No. 99-530C, alleging a claim against the Government for reimbursement of $189,527 for utilities costs incurred in connection with the construction of the St. Louis Courthouse Phase II Contract No. GS06P95GZC0501, for the periods April 1, 1998 through October 12, 1998 and March 2, 1999. *See* Complaint (No. 99-530). On October 28, 1999, the Government filed an Answer and Counterclaims under the False Claims Act, 31 U.S.C. § 3729(a)(1), (a)(2). *See* Answer and Counterclaim (No. 99-530C) ¶¶ 91-100. In addition, the Government asserted a counterclaim under the Forfeiture in Fraudulent Claims Act, 28 U.S.C. § 2514. *Id.* ¶¶ 115-20.

On May 20, 2000, the Government moved to consolidate Case No. 99-530C with Case No. 99-279C and Case No. 99-529C. On July 18, 2000, the court granted the Government's Uncontested Motion to Consolidate. On June 19, 2000, the Government filed, by leave, an Amended Answer and Counterclaims Asserting Counterclaims under the False Claims Act, and the Forfeiture in Fraud Act, 28 U.S.C. § 2514. On August 16, 2005, the Government filed Fourth

Amended Counterclaims again asserting counterclaims under both of these statutes. *See* Fourth Am. Counterclaims ¶¶ 131-40, 155-61.

The Government has established by clear and convincing evidence that Plaintiff practiced or attempted to practice fraud against the United States concerning the St. Louis Courthouse Phase II Contract No. GS06P95GZC0501, including, but not limited to, Plaintiff's December 12, 2000 guilty plea as to all the elements of 18 U.S.C. § 287 (criminal false, fictitious or fraudulent claims). Therefore, Plaintiff's claim in Case No. 99-530C is hereby forfeited, together with damages alleged in the amount of $189,527. *See* 28 U.S.C. § 2514.

**iv. Case No. 00-531C**

On September 1, 2000, Plaintiff filed a Complaint in the United States Court of Federal Claims, docketed as Case No. 00-531C, asserting a claim against the Government for a material breach of a May 2, 1996 Reimbursement Agreement that arose out of a dispute regarding Plaintiff's performance under the St. Louis Courthouse Phase II Contract No. GS06P95GZC0501. *See* Compl. (No. 00-531C) ¶¶ 13-17. The Complaint requested that the court award Plaintiff damages of $1,257,279. *Id*. at 4.

On December 18, 2000, the Government filed an Answer and Counterclaims asserting a counterclaim under the False Claims Act. *See* Answer and Counterclaims (No. 05-531C) ¶¶ 106-115. In addition, the Government asserted a counterclaim under the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514. *Id*. ¶¶ 130-35. On August 16, 2005, the Government filed Fourth Amended Counterclaims asserting counterclaims under both of these statutes. *See* Fourth Am. Counterclaims ¶¶ 131-49, 155-61.

The Government has established by clear and convincing evidence that Plaintiff practiced or attempted to practice fraud against the United States concerning the St. Louis Courthouse Phase II Contract No. GS06P95GZC0501, including, but not limited to, Plaintiff's December 12, 2000 guilty plea as to all the elements of 18 U.S.C. § 287 (criminal false, fictitious or fraudulent claims). Therefore, Plaintiff's claim in Case No. 00-531C, together with damages alleged in the amount of $1,257,279 is hereby forfeited. *See* 28 U.S.C. § 2514.

**v. Case No. 03-1537C**

On June 20, 2003, Plaintiff filed a Complaint in the United States Court of Federal Claims to appeal a June 24, 2002 Final Decision of a Contracting Officer denying Plaintiff's "claim to establish a total contract price as a first step to AMEC's proof of its convenience terminal costs under GSA Contract No. GS06P95GZC0501 for construction of Phase II of the . . . [St. Louis Courthouse]." *See* Complaint (No. 03-1537C) ¶ 1. The relief requested was for the court to:

> a. Determine the cost impacts of GSA's action on the Phase II Contract price;
> b. Adjust the contract terms by determining the appropriate contract time extension and establishing a total contract price

consistent with the conversion of the default terminal to a termination of convenience for the Government; and

c. Award such other relief as the Court deems just and proper.

*Id*. at 6. The Government asserted a counterclaim under the False Claims Act, 31 U.S.C. §§ 3729(a)(1), (a)(2), by submitting false or fraudulent claims for payment or approval in requests for progress payments and change orders on all four contracts at issue. *See* Answer and Counterclaims (No. 03-1537, as consolidated) ¶¶ 131-140. In addition, the Government asserted a counterclaim under the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514. *Id*. ¶¶ 155-61.

On July 31, 2003, Case No. 03-1537C was consolidated under Case No. 99-279C. On November 21, 2003, the Government filed an Answer and Counterclaims under the False Claims Act, 31 U.S.C. §§ 3729(a)(1), (a)(2). *see* Answer ¶¶ 121-40. In addition, the Government asserted a counterclaim under the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514. *Id*. ¶¶ 155-61. On August 16, 2005, the Government filed Fourth Amended Counterclaims asserting counterclaims under both of these statutes. *See* Fourth Am. Counterclaims ¶¶ 131-49, 155-61.

The Government has established by clear and convincing evidence that Plaintiff practiced or attempted to practice fraud against the United States concerning the St. Louis Courthouse Phase II Contract No. GS06P95GZC0501, including, but not limited to, Plaintiff's December 12, 2000 guilty plea as to all the elements of 18 U.S.C. § 287 (criminal false, fictitious or fraudulent claims). Therefore, Plaintiff's claim in Case No. 00-1537C, together with the relief requested, is hereby forfeited. *See* 28 U.S.C. § 2514.

**vi. Case No. 05-804C**

On March 7, 2003, Plaintiff filed a Notice of Appeal of a Final Decision of a Contracting Officer with the GSA Board of Appeals, docketed as GSBCA No. 16503.

Pursuant to a July 15, 2005 Memorandum Opinion and Order, the court determined that this matter should be transferred to the United States Court of Federal Claims, pursuant to the Contracts Dispute Act, 41 U.S.C. § 609(d). *See Morse Diesel Int'l.* v. *United States,* 66 Fed. Cl. 801, 803 (2005) ("*Morse Diesel II*"). On July 28, 2005, the Clerk of the GSA Board of Contract Appeals transferred GSBCA Docket No. 16503 to the United States Court of Federal Claims, which was docketed on August 1, 2005 as Case No. 05-0804C. On August 29, 2005 Plaintiff filed a Complaint in Case No. 05-0804C that was assigned to the undersigned judge. The claim in Case No. 05-0804C was an equitable adjustment, breach of contract, and violation of the Disputes Clause at FAR 52.231-1. The Complaint requested damages in the amount of $28 million in connection with the United States Courthouse and Federal Building in Sacramento Contract No. GS09P95KTC0032. *See* Complaint (No. 05-804C) ¶¶ 20, 67-84.

On November 4, 2005, the Government filed an Answer, including a counterclaim asserted under the False Claims Act, 31 U.S.C. §§ 3729(a)(1), (a)(2) by submitting false or fraudulent claims for payment or approval in requests for progress payments and change orders on all four contracts at issue. *See* Answer (No. 05-00804C) ¶¶ 131-40. In addition, the Government asserted a

counterclaim under the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514. *Id.* ¶¶ 155-61. The Government also asserts a counterclaim under the Anti-Kickback Act of 1986. *Id.* ¶¶ 162-65.

On November 4, 2005, Plaintiff also filed a Writ of Mandamus to the United States Court of Appeals for the Federal Circuit challenging the court's July 15, 2005 Order to Transfer. On November 14, 2005, the Government filed a Response. On January 9, 2006, the United States Court of Appeals for the Federal Circuit denied Plaintiff's writ. *See* Fed. Cir. Misc. No. 808 (Jan. 9, 2005). On March 14, 2006, the court issued an Order Consolidating Case No. 05-0804C under Case No. 99-279C.

The Government has established by clear and convincing evidence that Plaintiff practiced or attempted to practice fraud against the United States concerning the Federal Building in Sacramento Contract No. GS09P95KTC0032, including, but not limited to the court's determination herein that Plaintiff violated the Anti-Kickback Act and False Claims Act. *See supra* Parts I.C.2.c, IV.D.2.c. Therefore, Plaintiff's claim in Case No. 05-00804C is hereby forfeited, together with damages alleged in the amount of $28 million. *See* 28 U.S.C. § 2514.

**vii. Case No. 06-173C**

On December 8, 1995, Plaintiff filed a Notice of Appeal of a Final Decision of a Contracting Officer with the GSA Board of Contract Appeals, docketed as GSBCA Docket No. 13486, regarding a site and foundation package subject to St. Louis Courthouse Phase I Contract No. GS06P94GYC0037 and requesting 43 days of compensated schedule delays at $1,900 per day or $81,700 and reimbursement of $10,000 for standby equipment or a total of $91,700.

On August 16, 2005, the Government filed Fourth Amended Counterclaims in Case No. 99-279C asserting counterclaims under the False Claims Act, 31 U.S.C. § 3729(a)(1), (a)(2). *See* Fourth Am. Counterclaims (Nos. 99-279C, 99-529C, 99-530C, 99-531C, and 03-1537) ¶¶ 131-40. In addition, the Government asserted a counterclaim under the Forfeiture of Fraud Claims Act, 28 U.S.C. § 2514, specifically identified as arising out of all four contracts at issue, including claims then pending in GSBCA No. 13486. *Id.* ¶¶ 155-61.

On February 1, 2006, the court issued an Order to transfer GSBCA Docket No. 13486 to the United States Court of Federal Claims. *See Morse Diesel II*. On March 8, 2006, GSBCA Docket No. 13486 was transferred to the United States Court of Federal Claims and assigned Case No. 06-173C. On March 14, 2006, the court issued an Order consolidating Case No. 06-173C under Case No. 99-279C.

The Government has established by clear and convincing evidence that the Plaintiff practiced or attempted to practice fraud against the United States concerning the St. Louis Courthouse Phase I Contract No. GS06P94GYC0037, including, but not limited to, Plaintiff's December 12, 2000 guilty plea as to all the elements of 18 U.S.C. § 287 (criminal false, fictitious or fraudulent claims). Therefore, Plaintiff's claim in Case No. 06-173C is hereby forfeited, together with damages alleged in the amount of $91,700. *See* 28 U.S.C. § 2514.

**viii. Case No. 06-174C**

On December 14, 1995, Plaintiff filed a Notice of Appeal of the Final Decision of a Contracting Officer with the GSA Board of Contract Appeals, docketed as GSBCA Docket No. 13491, regarding a site and foundation package subject to the St. Louis Courthouse Phase I Contract No. GS06P94GYC0037 and requesting: $195,538 for the removal of certain obstructions; $26,600 for a 14 day calendar extension or $222,138; plus home office overhead; and other relief.

On August 16, 2005, the Government filed Fourth Amended Counterclaims in Case No. 99-279C. The Government asserted counterclaims under the False Claims Act, 31 U.S.C. § 3729(a)(1), (a)(2). *See* Fourth Am. Counterclaims (Nos. 99-279C, 99-529C, 99-530C, 99-531C, and 03-1537) ¶¶ 131-40. In addition, the Government asserted a counterclaim under the Forfeiture of Fraud Claims Act, 28 U.S.C. § 2514, specifically identified as arising out of all four contracts at issue including claims then pending in GSBCA No. 13491. *Id.* ¶¶ 155-61.

On February 1, 2006, the court issued a Memorandum Opinion and Order to transfer GSBCA Docket No. 13491 to the United States Court of Federal Claims. *See Morse Diesel II*. On March 8, 2006, GSBCA Docket No. 13491 was transferred and assigned Case No. 06-174C. On March 14, 2006, Case No. 06-174C was consolidated under Case No. 99-279C.

The Government has established by clear and convincing evidence that Plaintiff practiced or attempted to practice fraud against the United States concerning the St. Louis Courthouse Phase I Contract No. GS06P94GYC0037, including, but not limited to, Plaintiff's December 12, 2000 guilty plea as to all the elements of 18 U.S.C. § 287 (criminal false, fictitious or fraudulent claims). Therefore, Plaintiff's claim in Case No. 06-174C is hereby forfeited, together with damages alleged in the amount of $417,676. *See* 28 U.S.C. § 2514.

**vix. Case No. 06-175C**

On December 14, 1995, Plaintiff filed a Notice of Appeal of a Final Decision of a Contracting Office with the GSA Board of Contract Appeals, docketed as GSBCA No. 13492, regarding the removal of Special Waste and Stage I excavation at the site of the St. Louis Courthouse Phase I Contract No. GS06P94GYC0037 and requesting $21,486 in lieu of an unilateral deduction that "would be an adjustment of $112,244 from GSA's decision." 12/14/95 Notice of Appeal (GSBCA No. 13492).

On August 16, 2005, the Government filed Fourth Amended Counterclaims in Case No. 99-279C. The Government asserted counterclaims under the False Claims Act, 31 U.S.C. § 3729(a)(1), (a)(2). *See* Fourth Am. Counterclaim (Nos. 99-279C, 99-529C, 99-530C, 99-531C, and 03-1537) ¶¶ 131-40. In addition, the Government asserted a counterclaim under the Forfeiture of Fraud Claims Act, 28 U.S.C. § 2514, specifically identified as arising out of all four contracts at issue, including claims then pending in GSBCA No. 13492. *Id.* ¶¶ 155-161.

On February 1, 2006, the court issued a Memorandum Opinion and Order to transfer GSBCA Docket No. 13492 to the United States Court of Federal Claims. *See Morse Diesel II*. On

March 8, 2006, GSBCA Docket No. 13492 was transferred to the United States Court of Federal Claims and assigned Case No. 06-175C. On March 14, 2006, Case No. 06-175C was consolidated under Case No. 99-279C.

The Government has established by clear and convincing evidence that Plaintiff practiced or attempted to practice fraud against the United States concerning the St. Louis Courthouse Phase I Contract No. GS06P94GYC0037, including, but not limited to, Plaintiff's December 12, 2000 guilty plea as to all the elements of 18 U.S.C. § 287 (criminal false, fictitious or fraudulent claims). Therefore, Plaintiff's claim in Case No.06-175C is hereby forfeited, together with damages alleged in the amount of $112,244. *See* 28 U.S.C. § 2514.

**x. Case No. 06-176C**

On October 30, 1997, Plaintiff filed a Notice of Appeal of a Final Decision of a Contracting Office with the GSA Board of Contract Appeals, docketed as GSBCA No. 14372 concerning St. Louis Courthouse Phase I Contract No. GS06P94GYC0037 and requesting $13,329,355.16.

On August 16, 2005, the Government filed Fourth Amended Counterclaims in Case No. 99-279C. The Government asserted counterclaims under the False Claims Act, 31 U.S.C. § 3729(a)(1), (a)(2). *See* Fourth Am. Counterclaims (Nos. 99-279C, 99-529C, 99-530C, 99-531C, and 03-1537) ¶¶ 131-40. In addition, the Government asserted a counterclaim under the Forfeiture of Fraud Claims Act, 28 U.S.C. § 2514, specifically identified as arising out of all four contracts at issue, including claims then pending in GSBCA No. 14372. *Id.* ¶¶ 155-161.

On February 1, 2006, the court issued a Memorandum Opinion and Order to transfer GSBCA Docket No. 14372 to the United States Court of Federal Claims. *See Morse Diesel II*. On March 8, 2006, GSBCA Docket No. 14372 was transferred and assigned Case No. 06-176C. On March 14, 2006, Case No. 06-176C was consolidated under Case No. 99-279C.

The Government has established by clear and convincing evidence that the Plaintiff practiced or attempted to practice fraud against the United States concerning the St. Louis Courthouse Phase I Contract No. GS06P94GYC0037, including, but not limited to, Plaintiff's December 12, 2000 guilty plea as to all the elements of 18 U.S.C. § 287 (criminal false, fictitious or fraudulent claims). Therefore, Plaintiff's claim in Case No. 06-176C is hereby forfeited, together with damages alleged in the amount of $13,329,355.16. *See* 28 U.S.C. § 2514.

**xi. Case No. 06-177C**

On November 11, 1998, Plaintiff filed a Notice of Appeal of a Final Decision of a Contracting Officer with the GSA Board of Contract Appeals, docketed as GSBCA No. 14755, requesting an equitable adjustment arising under the St. Louis Courthouse Phase II Contract Nos. GS06P95GZC0501 and NM 037113, "estimated at less than $50,000 per change order." 11/11/98 Notice of Appeal (GSBCA 14755).

On August 16, 2005, the Government filed Fourth Amended Counterclaims in Case No. 99-279C. The Government asserted counterclaims under the False Claims Act, 31 U.S.C. § 3729(a)(1), (a)(2). *See* Fourth Am. Counterclaims (Nos. 99-279C, 99-529C, 99-530C, 99-531C, and 03-1537) ¶¶ 131-40. In addition, the Government asserted a counterclaim under the Forfeiture of Fraud Claims Act, 28 U.S.C. § 2514, specifically identifying them as arising out of all four contracts at issue, including claims pending in GSBCA No. 14755. *Id.* ¶¶ 155-61.

On February 1, 2006, the court issued a Memorandum Opinion and Order to transfer GSBCA Docket No. 14755 to the United States Court of Federal Claims. *See Morse Diesel II*. On March 7, 2006, GSBCA Docket No. 14755 was transferred to the United States Court of Federal Claims and assigned Case No. 06-177C. On March 14, 2006, Case No. 06-177C was consolidated under Case No. 99-279C.

The Government has established by clear and convincing evidence that Plaintiff practiced or attempted to practice fraud against the United States concerning the St. Louis Courthouse Phase II Contract No. GS06P95GZC0501, including, but not limited to, Plaintiff's December 12, 2000 guilty plea as to all the elements of 18 U.S.C. § 287 (criminal false, fictitious or fraudulent claims). Therefore, Plaintiff's claim in Case No. 06-177C is hereby forfeited, together with damages alleged in the amount not to exceed $50,000 per change order. *See* 28 U.S.C. § 2514.

**xii. Case No. 06-178C**

On February 2, 1999, Plaintiff filed a Notice of Appeal of a Final Decision of a Contracting Officer with the GSA Board of Contract Appeals, docketed as GSBCA 14893 requesting an equitable adjustment arising out of the St. Louis Courthouse Phase II Contract Nos. GS06P95GZC0501 and NM037113 in the amount of $ 81,611.00.

On August 16, 2005, the Government filed Fourth Amended Counterclaims in Case No. 99-279C. The Government asserted counterclaims under the False Claims Act, 31 U.S.C. § 3729(a)(1), (a)(2). *See* Fourth Am. Counterclaims (Nos. 99-279C, 99-529C, 99-530C, 99-531C, and 03-1537) ¶¶ 131-40. In addition, the Government asserted a counterclaim under the Forfeiture of Fraud Claims Act, 28 U.S.C. § 2514, specifically identifying them as arising out of the St. Louis Courthouse Phase II Contract No. GS06P95GZC0501, including claims pending in GSBCA No. 14893. *Id.* ¶¶ 155-61.

On February 1, 2006, the court issued a Memorandum Opinion and Order to transfer GSBCA Docket No. 14893 to the United States Court of Federal Claims. *See Morse Diesel II*. On March 8, 2006, GSBCA Docket No. 14893 was transferred to the United States Court of Federal Claims and assigned Case No. 06-178C. On March 14, 2006, Case No. 06-178C was consolidated under Case No. 99-279C.

The Government has established by clear and convincing evidence that Plaintiff practiced or attempted to practice fraud against the United States concerning the St. Louis Courthouse Phase II Contract No. GS06P95GZC0501, including, but not limited to, Plaintiff's December 12, 2000 guilty plea as to all the elements of 18 U.S.C. § 287 (criminal false, fictitious or fraudulent claims).

Therefore, Plaintiff's claim in Case No. 06-178C is hereby forfeited, together with damages alleged in the amount of $81,611.00. *See* 28 U.S.C. § 2514.

**xiii. Case No. 06-179C**

On December 4, 1998, Plaintiff filed a Complaint in the United States Court of Federal Claims docketed as Case No. 98-908C alleging superior knowledge/misrepresentation (Count I), negligence (Count II), mutual mistake (Count III). *See* Complaint (99-908C) ¶¶ 84-106. In addition, the Complaint requested that the court reform of the St. Louis Courthouse Phase I Contract No. GS06P94GYC0037 and award Plaintiff damages of $10,288,889, representing costs incurred to remove hazardous lead contamination at the site. *Id*. at 28. Case No. 98-908C was assigned to the Honorable James F. Merow. On January 22, 1999, the Government filed a Motion to Dismiss Counts II and III. On July 27, 1999, the Government filed an Answer. On August 19, 1999, Plaintiff filed a Response. On September 23, 1999, the court issued an Order granting the Government's Motion to Dismiss Counts II and III. On October 27, 1999, Judge Merow *sua sponte* transferred this case to the GSBCA. At that time, Plaintiff's claim for $10,288,889 also was pending before the GSBCA in Docket No. 14372. *Id*. at Exhibit 1 note. On November 1, 1999, the Government requested a reconsideration that was denied on November 4, 1999.

On April 28, 2000, Plaintiff filed a Notice of Appeal with the GSA Board of Contract Appeals, docketed as GSBCA Docket No. 15158 concerning the Final Decision of a Contracting Officer denying reformation of the St. Louis Phase I Contract Nos. GS06P94GYC0037 and NM 037112. *See* A815-16.

On August 16, 2005, the Government filed Fourth Amended Counterclaims in Case No. 99-279C. The Government asserted counterclaims under the False Claims Act, 31 U.S.C. § 3729(a)(1), (a)(2). *See* Fourth Am. Counterclaims (Nos. 99-279C, 99-529C, 99-530C, 99-531C, and 03-1537) ¶¶ 131-140. In addition, the Government asserted a counterclaim under the Forfeiture of Fraud Claims Act, 28 U.S.C. § 2514, specifically identified as arising out of the St. Louis Courthouse Phase I Contract No. GS06P94GYC0037, including claims pending in GSBCA No. 14372. *Id*. ¶¶ 155-61.

On February 1, 2006, the court issued an Order to transfer GSBCA Docket No. 15158 to the United States Court of Federal Claims. *See Morse Diesel II*. On March 8, 2006, GSBCA Docket No. 15158 was transferred to the United States Court of Federal Claims and assigned Docket No. 06-179C. On March 14, 2006, Docket No. 06-179C was consolidated under Docket No. 99-279C.

The Government has established by clear and convincing evidence that Plaintiff practiced or attempted to practice fraud against the United States concerning the St. Louis Courthouse Phase I Contract No. GS06P94GYC0037, including, but not limited to, Plaintiff's December 12, 2000 guilty plea as to all the elements of 18 U.S.C. § 287 (criminal false, fictitious or fraudulent claims). Therefore, Plaintiff's claim in Case No. 06-179C is hereby forfeited, together with damages alleged in the amount of $10,288,889 (subject to GSBCA Docket No. 14372 and Case No. 06-176C). *See* 28 U.S.C. § 2514.

**xiv. Case No. 06-180C**

On April 28, 2000, Plaintiff filed a Notice of Appeal with the GSA Board of Contract Appeals, docketed as GSBCA 15312, concerning a Final Decision of a Contracting Officer denying reformation of the St. Louis Courthouse Phase I Contract No. GS06P94GYC0037 (NM037112) "based on two theories of recovery. MDI had previously submitted a properly certified claim for reformation which was denied by the Contracting Officer, appealed to the U.S Court of Federal Claims [Case No. 98-908C] and transferred to this Board, where it is now docketed as Appeal No. 15158." A815-16 (April 28, 2000 letter from McManus, Schor, Asmar & Darden, L.L.P to Clerk, GSA Board of Contract Appeals, re: Thomas F. Eagleton U.S. Courthouse - Phase I). Therein, consolidation of GSBCA No. 15312 with GSBCA No. 15158 was requested. *Id*.

On August 16, 2005, the Government filed Fourth Amended Counterclaims in Case No. 99-279C. Therein, the Government asserted counterclaims under the False Claims Act, 31 U.S.C. § 3729(a)(1), (a)(2). *See* Fourth Am. Counterclaims (Nos. 99-279C, 99-529C, 99-530C, 99-531C, and 03-1537) ¶¶ 131-40. In addition, the Government asserted a counterclaim under the Forfeiture of Fraud Claims Act, 28 U.S.C. § 2514, specifically identified as arising out of the St. Louis Courthouse Phase I Contract No. GS06P94GYC0037, including claims pending in GSBCA No. 15312. *Id*. ¶¶ 155-61.

On February 1, 2006, the court issued an Order to transfer GSBCA Docket No. 15312 to the United States Court of Federal Claims. *See Morse Diesel II*. On March 8, 2006, GSBCA Docket No. 15312 was transferred to the United States Court of Federal Claims and assigned Case No. 06-180C. On March 14, 2006, Case No. 06-180C was consolidated under Case No. 99-279C.

The Government has established by clear and convincing evidence that Plaintiff practiced or attempted to practice fraud against the United States concerning the St. Louis Courthouse Phase I Contract No. GS06P94GYC0037, including, but not limited to, Plaintiff's December 12, 2000 guilty plea as to all the elements of 18 U.S.C. § 287 (criminal false, fictitious or fraudulent claims). Therefore, Plaintiff's claim in Case No. 06-180C for reformation is hereby forfeited. *See* 28 U.S.C. § 2514.

**xv. Case No. 06-181C**

On August 6, 1999, Plaintiff filed a Notice of Appeal with the GSA Board of Contract Appeals, docketed as GSBCA 15102 concerning the appeal of a Final Decision of a Contracting Officer denying a subcontractor request for an equitable adjustment for TFO Conduit Labels and Pull Stings concerning the St. Louis Courthouse Phase II Contract No. GS06P95GZC0501 and requesting $28,359.

On August 16, 2005, the Government filed Fourth Amended Counterclaims in Case No. 99-279C. Therein, the Government asserted counterclaims under the False Claims Act, 31 U.S.C. § 3729(a)(1), (a)(2). *See* Fourth Am. Counterclaims (Nos. 99-279C, 99-529C, 99-530C, 99-531C, and 03-1537) ¶¶ 131-40. In addition, the Government asserted a counterclaim under the Forfeiture

of Fraud Claims Act, 28 U.S.C. § 2514, specifically identified as arising out of the St. Louis Courthouse Phase II Contract No. GS06P95GZC0501. *Id.* ¶¶ 155-61.

On February 1, 2006, the court issued an Order to transfer GSBCA Case No. 15102 to the United States Court of Federal Claims. *See Morse Diesel II*. On March 8, 2006, that appeal was transferred to the United States Court of Federal Claims and assigned Case No. 06-181C. On March 14, 2006, Case No. 06-181C was consolidated under Case No. 99-279C.

The Government has established by clear and convincing evidence that Plaintiff practiced or attempted to practice fraud against the United States concerning the St. Louis Courthouse Phase II Contract No. GS06P95GZC0501, including, but not limited to, Plaintiff's December 12, 2000 guilty plea as to all the elements of 18 U.S.C. § 287 (criminal false, fictitious or fraudulent claims). Therefore, Plaintiff's claim in Case No. 06-181C is hereby forfeited, together with damages alleged in the amount of $28,359. *See* 28 U.S.C. § 2514.

#### d. The Court Has Determined That The Forfeitures Of Plaintiff's Claims In This Case, As Consolidated, Do Not Violate The Eighth Amendment To The United States Constitution.

Plaintiff has challenged the relief required, if the Government's Motion for Summary Judgment as to Forfeiture of Fraudulent Act Counterclaims is granted, as violating the Excessive Fines Clause of the Eighth Amendment to the United States Constitution. Plaintiff also claims that the requested forfeitures "would be grossly excessive" as to violate the Due Process Clause of the United States Constitution. *See* Pl. Supp. Op. at 4-8.

As a threshold matter, forfeiture of Plaintiff's claims regarding the St. Louis Courthouse Phase I and II contracts does not violate the Eighth Amendment to the United States Constitution, because of the preclusive effect of Plaintiff's plea agreements. *See* A112-19.

Regarding the forfeiture of a $28 million claim asserted with reference to the Sacramento Courthouse Contract No.GS09P95KTC0032, Plaintiff fails to recognize that it has no right to sue the Government for breach of contract as a sovereign, except where the Government specifically has consented to suit. Therefore, as the predecessor court to the United States Court of Appeals for the Federal Circuit settled long ago in *Kamen Soap Products Co* v. *United States* 124 F.Supp. 608 (1954):

> [The Forfeiture of Fraudulent Claims Act] goes further than merely banning fraudulent claims. It provides for a forfeiture of the claim if any fraud is practiced or attempted to be practiced in proving, establishing or allowing a claim. This is one of the conditions on which the Government gives its consent to be sued and waives its otherwise sovereign immunity.

*Id*. at 620.

Accordingly, Plaintiff does not have an unrestricted right of recovery against the Government, but is limited by the statutory terms of the Forfeiture of Fraudulent Claims Act.

As the United States Court of Federal Claims recently explained in *America Heritage Bancorp.* v. *United States*, 61 Fed. Cl. 376 (2004):

> The use of the word "shall" [in 28 U.S.C. § 2514] makes the judgment of forfeiture obligatory on the court; the court has no discretion to turn a blind eye to an attempt, whether successful or not, to commit fraud in the statement of a claim against the United States. Therefore, once the court has found fraud sufficient to satisfy § 2514, the court must enter a judgment of forfeiture.

*Id*. at 385.

Of course, the Forfeiture of Fraudulent Claims Act must comply with the mandate of the United States Constitution. Indeed, no court has held otherwise. Again, however, Plaintiff fails to recognize that its claim is merely a demand for money not Plaintiff's property. *See Austin* v. *United States*, 509 U.S. 602, 604 (1993). Moreover, as the United States Supreme Court recognized in *United States* v. *Bajakajian*, 524 U.S. 321 (1998), courts must afford significant deference to Congress in the application of any punitive remedy: "[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Id*. at 337; *see also id*. (quoting *Gore* v *United States*, 357 U.S. 386, 393 (1958) ("Whatever views may be entertained regarding the severity of punishment, . . . these are peculiarly questions of the legislative policy.")). In this case, Congress has expressed its views by enacting the Forfeiture of Fraudulent Claims Act.

Finally, since the court has not determined the damages due the Government for violations of the Anti-Kickback Act and the Fraudulent Claims Act, Plaintiff's constitutional challenge under the Due Process Clause is not ripe.

**5. Regarding The Breach Of Contract – Fifth Counterclaim.**

**a. Breach of Contract.**

The United States Court of Appeals for the Federal Circuit has held that to prevail on a counterclaim for breach of contract, the Government must "prove the existence of a contract, performance by the government, breach of the contractor[.]" *BMY-Combat Systems Div. of Harsco Corp.* v. *United States*, 38 Fed. Cl. 109, 128 (Fed. Cir. 1997).

**b. The Parties' Arguments.**

**i. The Government's Contentions.**

The Government argues that because Plaintiffs engaged in acts of fraud against the United States regarding each of the contracts at issue, *ipso facto*, Plaintiff also breached each of the GSA contracts at issue. *See* Fourth Am. Counterclaims ¶¶ 151-54; *see also* Gov't M.S.J. II at 44-46;

Gov't Reply II at 59; Gov't Supp. Resp. at 6-7. In the alternative, the Government asserts that no material issue of fact precludes summary judgment for breach of contract by Plaintiff's misrepresentations. *See* Gov't M.S.J. II at 45.

**ii. Plaintiff's Response.**

First, Plaintiff opposes the Government's breach of contract counterclaim on jurisdictional grounds, arguing that the Contract Disputes Act requires that all government claims brought thereunder must first be submitted to a contracting officer. *See* Pl. Reply and Opp. at 23 (citing 41 U.S.C. § 605(a)). Since the contracting officer did not first receive a claim from the Government, Plaintiff contends that the Government's counterclaim for breach of contract must be dismissed. *See* Pl. Reply and Opp. at 23; *see also* Pl. S.J. Opp. II at 71-72.

In the alternative, Plaintiff argues that even if the court has jurisdiction and Plaintiff violated that Anti-Kickback Act, no case law supports "the position that a technical, non-knowing violation of the [Anti-Kickback Act] constitutes a material breach of contract." *See* Pl. Reply and Opp. at 24.

Second, Plaintiff contends that no contract provisions have been violated, because FAR 52.332-5(g) authorizes GSA to require proof of payment to the surety of the bond premium, before GSA pays the contractor and therefore imposes no obligation on the contractor, even if there are falsely stamped invoices and the contractor seeks payment of the bond payment before making payment to the surety. *See* Pl. S.J. Opp. II at 70. The Government's argument that "any fraud and any misrepresentation is automatically a breach . . . [is a] novel theory [that] has no merit [.]" Pl. S.J. Opp II at 71.

Third, Plaintiff asserts that the reference to Clause 15(c), FAR 52.203-7 ANTI-KICKBACK PROCEDURES (Oct 1988), provides only that "The Contractor shall have in place and follow reasonable *procedures* designed to permit and detect possible violations described in paragraph (b) of this clause in its own operations and direct business relationships[.]" *See* Pl. Reply and Op. at 23-24; Pl. PF ¶ 7 (citing Ex. 1).

**c. The Court Does Not Have Jurisdiction Over The Government's Breach Of Contract Counterclaim.**

Regarding the court's jurisdiction, the Contract Disputes Act specifically states: "All claims by the government against a contractor relating to a contract shall be the subject of a decision by the Contracting Officer." 41 U.S.C. § 605(a); *see also Joseph Morton Co.* v. *United States*, 757 F. 2d 1273, 1280-81 (Fed. Cir. 1985) (holding that the Government's counterclaims must first be raised before a Contracting Officer). Accordingly, the Government should advise the court within 30 days whether it wishes voluntarily to dismiss the Fifth Counterclaim or stay proceedings thereunder to afford the Government to obtain an initial decision from the relevant contracting officer. *See* 41 U.S.C. § 650(c)(5).

## V. Conclusion.

For these reasons, the Court grants the Government's Motion for Summary Judgment regarding the Government's First, Second, Sixth and Seventh Counterclaims.[21] In addition, the court denies the Government's Motion for Summary Judgment as to the Government's Fifth Counterclaim.

The court will convene a telephone conference with the parties on February 8, 2007 at 3:00 p.m. EST to discuss consolidation of Case No. 06-867C with Case No. 99-279C and set a date for an evidentiary hearing on damages.

**IT IS SO ORDERED.**

s/Susan Braden
**SUSAN G. BRADEN**
**Judge**

[21] The court has not ruled on the Government's Motion for Partial Summary Judgment to uphold the Government's default determination of the St. Louis Courthouse Phase II, Contract No. GS09P95GZC0501, because in the court's judgment Plaintiff's claim in Case No. 99-529C seeking to have GSA's termination of that contract for default converted to a termination for convenience is superfluous, if not moot, in light of the court's determination that Plaintiff forfeited that claim. The court also has not ruled on: the Government's Third Counterclaim for restitution, *see* Fourth Am. Counterclaims ¶¶ 141-44; the Government's Fourth Counterclaim for Payment under Mistake of Fact, *see id.* at ¶¶ 145-150; the Government's Eight Counterclaim for common law fraud, because, in the court's judgment, those claims also are superfluous, if not moot.