TABLE OF CONTENTS OF SUPPLEMENTAL APPENDIX

Page

Cover of May 16, 2002 Deposition of John Walsh . . . . . 1
Cover of May 17, 2002 Deposition of John Walsh . . . . . 2
Cover of May 29, 2002 Deposition of John Walsh . . . . . 3
Excerpts from the May 4, 2007 Deposition of John Walsh . . . . . 4
Errata sheet for deposition of John Walsh . . . . . 22
Excerpts from the May 31, 2002 Deposition of Joseph Barsolana, plaintiff's expert . . . . . 25
Excerpts from February 8, 2007 Status Telephonic Conference which was transcript on April 5, 2007 . . . . . 27

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MORSE DIESEL, INTERNATIONAL, )
INC., )
)
Plaintiff, )
)
-vs- ) Numbers 99-279-C
) 99-529-C
THE UNITED STATES, ) 99-530-C
) 00-531-C
Defendant. )

VOLUME I

DEPOSITION OF JOHN WALSH,

produced, sworn and examined on Thursday, May 16, 2002, at the offices of the General Services Administration, 1500 Bannister Road, Office of the Inspector General, in Kansas City, Jackson County, Missouri, before:

JAMES A. LEACOCK, RMR

a Notary Public within and for the State of Missouri.

Taken on behalf of the Plaintiff.

APPEARANCES:

For the Plaintiff.

PECKAR & ABRAMSON
By: Mr. Patrick J. Greene, Jr.
70 Grand Avenue
River Edge, New Jersey 07661
(201) 343-3434

For the Defendant:

U.S. DEPARTMENT OF JUSTICE
By: Ms. Domenique Kirchner
Commercial Litigation Branch, Civil Division
1100 L. Street, N.W.
Washington, D.C. 20530

and

(appearances continued)



email: info@veritextllc.com
... Serving You Locally and Nationally

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MORSE DIESEL, INTERNATIONAL, INC., Plaintiff,

-vs-

THE UNITED STATES, Defendant.

Numbers 99-279-C, 99-529-C, 99-530-C, 00-531-C

VOLUME II

DEPOSITION OF JOHN WALSH,

produced, sworn and examined on Friday, May 17, 2002, at the offices of the General Services Administration, 1500 Bannister Road, Office of the Inspector General, in Kansas City, Jackson County, Missouri, before:

JAMES A. LEACOCK, RMR

a Notary Public within and for the State of Missouri.

Taken on behalf of the Plaintiff.

APPEARANCES:

For the Plaintiff.

PECKAR & ABRAMSON
By: Mr. Patrick J. Greene, Jr.
70 Grand Avenue
River Edge, New Jersey 07661
(201) 343-3434

For the Defendant:

U.S. DEPARTMENT OF JUSTICE
By: Ms. Domenique Kirchner
Commercial Litigation Branch, Civil Division
1100 L. Street, N.W.
Washington, D.C. 20530

and

(appearances continued)



...Serving You Locally and Nationally email: info@veritextllc.com

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x

MORSE DIESEL INTERNATIONAL, INC., :
Plaintiff, : Nos. 99-279C, 99-529C, 99-530C, 00-531-C
v. :
UNITED STATES OF AMERICA, : (Senior Judge Smith)
Defendant. :

- - - - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, May 29, 2002

The deposition of JOHN F. WALSH, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to Notice, in the offices of Department of Justice, Commercial Litigation Branch, 1100 L Street, N.W., Washington, D.C., convened at 1:45 p.m., before Shawna Hum Browne, RPR, a Notary Public in and for the District of Columbia, when were present on behalf of the parties:

5-4-07



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------x

MORSE DIESEL INTERNATIONAL, INC., d/b/a AMEC CONSTRUCTION MANAGEMENT, INC.,

Plaintiff,

-against-

99-279C
99-529C
00-530C
00-531C
00-1537C
(Judge Braden)

UNITED STATES,

Defendant.

--------------------x

May 4, 2007
10:26 a.m.

Videotaped deposition of JOHN F. WALSH, taken by attorneys for Plaintiff, pursuant to notice, held at the offices of United States Department of Justice, 1100 L Street N.W., Washington, D.C., before Helen Mitchell, a Shorthand Reporter and Notary Public.



APPEARANCES:

PAUL HASTINGS JANOFSKY & WALKER, LLP
Attorneys for Plaintiff
875 15th Street N.W.
Washington, D.C. 20005

BY: KIRBY D. BEHRE, ESQ.
DANIELLE PIERCE, ESQ.

DOMENIQUE KIRCHNER, ESQ.
United States Department of Justice
Commercial Litigation Branch
Civil Division
Attorney for Defendant
1100 L Street N.W.
Eighth Floor
Washington, D.C. 20530
-and-
TRACY HILMER, ESQ.
United States Department of Justice
Commercial Litigation (Frauds)
Civil Division
601 D Street N.W.
Room 9018
Washington, D.C. 2004
-and-
ERIC MILLER, ESQ.
Assistant Counsel
Office of the Inspector General
General Services Administration
230 South Dearborn
Room 408
Chicago, Illinois 60604
(Morning session only)

ALSO PRESENT:
JAMES CHRISTE - Videographer



STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the Court.



(Walsh)
09:51:15 THE VIDEOGRAPHER: Good morning.
10:25:59 We're now recording on the record.
10:26:00 Here begins videotape number one
10:26:02 in the deposition of John F. Walsh, in
10:26:04 the matter of Morse Diesel
10:26:05 International, d/b/a AMEC Construction
10:26:11 Management Incorporated, plaintiff,
10:26:14 versus United States, in the United
10:26:17 States District Court of Federal Claims,
10:26:21 No. 99-279C, et al.
10:26:26 Today is May 4th, 2007, and the
10:26:29 time is 10:26 a.m.
10:26:31 This deposition is being taken at
10:26:33 1100 L Street in Washington, D.C. and
10:26:37 was made at the request of Kirby Behre,
10:26:38 of the law offices of Paul Hastings
10:26:41 Janofsky & Walker.
10:26:45 The videographer is James Christe,
10:26:47 and the court reporter is Helen
10:26:49 Mitchell.
10:26:51 Will counsel all present please
10:26:53 state your appearance, including whom
10:26:53 you represent, and then the court
10:26:53 reporter swear in the witness.

(Walsh)

10:44:15 sharing amounts. Those were the exhibits that I
10:44:22 focused on when I looked through to the entire
10:44:26 list of exhibits.
10:44:28 Q And why were you specifically
10:44:29 looking for commission sharing amount-related
10:44:32 documents?
10:44:33 A I was checking my report, again,
10:44:37 to make sure that the numbers were correct and
10:44:39 that the documents -- that I had a decent
10:44:43 recollection of where the numbers in my report
10:44:45 came from, what documents that I got those from.
10:44:54 Q And as part of your preparation,
10:44:56 did you actually read the motion for summary
10:44:58 judgment cover to cover?
10:45:00 A No, I did not.
10:45:02 Q Did you skim that as well?
10:45:06 MS. KIRCHNER: Objection,
10:45:07 ambiguous.
10:45:09 A I don't think that I reviewed the
10:45:10 summary judgment motion at all. I think I just
10:45:12 looked at the exhibits.
10:45:15 Q And then finally you mentioned
10:45:17 having reviewed the -- your workpapers relating
10:45:19 to the P-3 audit; is that correct?



(Walsh)

10:45:22 A I believe that they were parts of
10:45:26 an exhibit to a deposition, but I did not review
10:45:30 my -- the original workpapers, or an entire copy
10:45:34 of the workpapers.
10:45:36 Q So you saw portions of your
10:45:38 workpapers that had been made an exhibit to
10:45:42 other --
10:45:42 A My deposition, I believe.
(Workpapers relating to P-3 audit
previously marked Exhibit 6 for
identification.)
10:45:44 Q Your deposition personally, okay.
10:46:01 I'm showing you what we've marked
10:46:02 as Exhibit 6 -- premarked, I should say,
10:46:06 Exhibit 6.
10:46:08 Would you take a look at that
10:46:09 exhibit, please.
10:46:48 (Pause)
10:46:49 A Okay.
10:46:50 Q Have you had a chance to review
10:46:52 that exhibit?
10:46:52 A Yes.
10:46:52 Q Does that exhibit contain some or
10:46:55 all of your workpapers related to the so-called



(Walsh)

10:46:59 P-3 audit?
10:47:01 A It contains some of them, yes.
10:47:06 Q And you can see in this exhibit
10:47:08 that below the Exhibit 6 sticker is an exhibit
10:47:11 sticker from May 16, '02, and it says "Walsh,"
10:47:14 your name, as Exhibit No. 1.
10:47:18 Do you recall having reviewed this
10:47:19 exhibit, this specific compilation of your
10:47:23 workpapers, previously in this matter?
10:47:25 A Yes.
10:47:30 Q And other than the fact that in
10:47:32 the upper right-hand corner -- to give us all a
10:47:34 fighting chance of being able to direct people
10:47:37 to pages, so we put Bates numbers on them --
10:47:41 other than that addition, can you review these
10:47:43 materials closely and confirm for us that they
10:47:45 are, in fact, portions of your workpapers?
10:48:06 (Pause)
10:48:06 A Yes, they are.
10:48:07 Q And can you give us some idea --
10:48:09 you indicated this was not the complete set of
10:48:11 your workpapers relating to this particular
10:48:13 file; correct?
10:48:15 A That's correct.



(Walsh)

10:48:15 Q Can you tell us, for example, what
10:48:18 percentage of the workpapers you prepared are
10:48:23 contained in this exhibit?
10:48:32 MS. KIRCHNER: Objection,
10:48:32 ambiguous.
10:48:33 A This might be 10 to 15 percent of
10:48:34 the workpapers.
10:48:36 Q And were you responsible for
10:48:37 selecting these particular pages of your
10:48:41 workpaper?
10:48:41 A No.
10:48:46 Q Are there any other papers
10:48:50 contained in the remaining 80 to 90 percent of
10:48:53 your workpapers that you have reviewed in
10:48:57 preparation for your testimony?
10:48:58 A No.
10:49:01 Q When is the last time, other than
10:49:03 this compilation of Exhibit 6, that you looked
10:49:06 at the entirety of your workpapers?
10:49:13 A I don't -- I don't recall.
10:49:16 Q Do you believe you reviewed
10:49:17 those -- the entirety of the workpapers in
10:49:21 preparation for your 2002 depositions?
10:49:32 A I don't recall if I reviewed

(Walsh)

everything.

Q Where are the workpapers presently?

A They're in Kansas City.

Q When's the last time you saw them, not to read, but saw the boxes or what have you, to make sure they're still available?

A I can't recall.

Q Understandable.

Other than the exhibits to these other depositions which you noted, those of Mr. Bardsley and Mr. Holland, other than the court filing, I think singular; that is, the summary judgment motion by the government, and other than this select group of documents from your workpapers, are there any other documents, including e-mails, electronic information, that you reviewed in preparation for your testimony?

A I reviewed my e-mails to determine if there were any drafts of any of the reports. I also reviewed my electronic files to determine if there were any drafts of the reports.

Q And did you find any e-mails that were related to the draft reports?



(Walsh)

A I believe there was one e-mail message I forwarded, and that was it.

Q Do you recall who that e-mail was forwarded to?

A Domenique.

Q Do you recall the approximate time frame?

A This past week sometime.

Q Was that the -- was this past week the date of the original e-mail, or was that the date that you located it and then forwarded it to her?

A That was the date I located it and forwarded it.

Q Do you recall what the date was of the document, the e-mail that you sent to her this past week?

A I can't remember.

Q And did your search for electronic documents, including prior drafts, did that result in your finding anything?

A No, it did not.

Q And where were you able to look to locate e-mails from five years ago?



(Walsh)

A When we had our computers changed, they copied off archives from our old computers, and those archives went back right to about that time frame on CD, and it was anything I had archived in my e-mail at that point in time.

Q Are there any documents that you have brought with you to this deposition --

A No.

Q -- relating to this case?

A No.

(Damages report previously marked Exhibit 7 for identification.)

Q Showing you what's been marked, premarked, as Exhibit No. 7, could you take a look at that, please, and see if you can identify it.

A This is a damages report -- a copy of a damages report that I prepared.

Q And does this reflect the most recent final version of this report that you prepared?

A In substance it does. There is one more recent that has a different date on it because I had erroneously put "2006" on this



(Walsh)

report, and it's a 2007 report.

Q Other than the date change -- on page 1, I assume you're talking about?

A Correct.

Q Other than that date change from 2006 to 2007, is this document identical in every other way to the final?

A I believe it is, yes.

Q And is that your signature on page 6 of 7 of Exhibit 7?

A Yes.

Q Did you actually prepare this document?

A Yes, I did.

Q Did you personally write the prose that's contained in it?

A Yes, I did.

Q Was there anyone else that assisted in the drafting and the wording of this document, either in whole or in part?

A Yes.

Q And who would that be?

A Both Domenique and Tracy.

Q And by that -- those two

(Walsh)
11:00:12 they're not really part of this report,
11:00:16 particularly since the correction sheet has now
11:00:18 been attached to it.
11:00:19 A That's correct.
11:00:22 MS. KIRCHNER: Kirby, for the
11:00:23 record, this is the correction sheet
11:00:24 here that I faxed you. I can tell
11:00:26 because the fax is up there. That sheet
11:00:29 there --
11:00:32 MR. BEHRE: February '07.
11:00:33 MS. KIRCHNER: -- February 16,
11:00:34 2007 was the date I faxed you the sheet.
11:00:39 MR. BEHRE: So the second from the
11:00:40 back is the one that would be dated in
11:00:41 '02.
11:00:42 MS. KIRCHNER: I'm just telling
11:00:43 you that this fax sheet is the sheet I
11:00:45 faxed to you on that date.
11:00:48 MR. BEHRE: Right.
11:00:49 MS. KIRCHNER: February 16, 2007 I
11:00:51 faxed you that sheet.
11:00:52 BY MR. BEHRE:
11:00:53 Q But regardless of which correction
11:00:54 sheet we look in -- look at on this exhibit,



(Walsh)
11:00:56 since there are two versions of it, one a fax
11:00:58 version, and another apparently a fax copy,
11:01:00 those are identical; is that correct?
11:01:04 A That's correct.
11:01:10 Q Taking a look at your
11:01:12 February 2007 report, can you describe for me
11:01:14 how it was you came to prepare this report, and
11:01:18 what you did to prepare it?
11:01:22 A I was requested to prepare this
11:01:23 report by counsel after the judge's decision in
11:01:27 January of '07. I was requested to prepare a
11:01:32 report that dealt with only issues that were in
11:01:36 the judge's decision.
11:01:39 I went to my prior report, and
11:01:42 went through the process of extracting issues
11:01:45 that were not the subject of the -- directly the
11:01:49 subject of the judge's decision in January of
11:01:53 '07. After doing that, I submitted a draft of
11:01:58 the report to Domenique and Tracy for comment.
11:02:01 Q Okay. And so in doing that, did
11:02:03 you literally go into the 2002 report as a Word
11:02:09 or WordPerfect document --
11:02:11 A Yes.
11:02:11 Q -- and cut from that those



(Walsh)
11:02:13 portions that didn't relate to the judge's
11:02:15 decision?
11:02:15 A Yes.
11:02:17 Q And how did you determine which
11:02:19 topics did or did not relate to the judge's
11:02:22 decision?
11:02:25 A Based on reading the decision, and
11:02:29 in discussion with Domenique and Tracy, we
11:02:35 determined which issues were included in the
11:02:37 judge's decision.
11:02:41 Q Were you given specific
11:02:42 instructions as to which portions of Exhibit
11:02:45 8 -- that would be the 2002 report -- to delete
11:02:52 or eliminate from your revision?
11:03:05 A I don't remember getting a
11:03:06 specific instruction to delete the items. I
11:03:09 believe that I deleted the items and then
11:03:11 submitted it for comment.
11:03:19 Q And Exhibit No. 8, which is the
11:03:21 2002 version, is without the attachments, 17
11:03:29 pages; correct?
11:03:32 A That's correct.
11:03:33 Q And Exhibit 7, which is now at
11:03:35 issue in this case, the February 2007 final



(Walsh)
11:03:38 report, is seven pages, including the list of
11:03:40 information that you've attached at the back;
11:03:42 correct?
11:03:44 A That's correct, it is seven pages.
11:03:46 Q And the decision about which
11:03:47 particular sections of Exhibit 8, the 2002
11:03:52 report, to delete, to essentially remove ten
11:03:57 pages of text, was made by you; is that right?
11:03:59 A That's correct.
11:04:03 Q Can you tell us approximately how
11:04:05 many hours you spent preparing Exhibit 7; that
11:04:08 is, the 2007 report?
11:04:16 A I don't recall.
11:04:18 Q Would it be more than ten hours or
11:04:19 less than ten hours?
11:04:24 A More than ten hours.
11:04:28 Q Would it be more than 20 or less
11:04:31 than 20?
11:04:34 A That I can't really say.
11:04:40 Q And can you tell us what you did
11:04:42 during those more than ten hours to prepare this
11:04:45 report?
11:04:47 A I took the previous version of the
11:04:49 report, removed the sections that I believed

(Walsh)
11:16:00 several documents, and see if you recognize some
11:16:04 or all of them, okay.
11:17:12 A Yes, I recognize these documents.
(Pause)
11:17:14 Q Could you tell us what they are?
11:17:15 A They are hard copy printouts of
11:17:17 e-mails that I had sent to Domenique, and
11:17:23 possibly Tracy as well.
11:17:29 Q And in each instance does the
11:17:30 e-mail you sent to them contain a draft of
11:17:34 Exhibit No. 7?
11:17:38 A The last one, I believe, contains
11:17:40 a scanned copy of the final report.
11:17:50 Q And how about the remaining
11:17:52 exhibits -- the remaining documents contained in
11:17:54 this exhibit?
11:17:56 A So the last -- the last two are
11:18:01 copies of the final report, one with the date
11:18:04 change. The rest of the documents in the
11:18:05 exhibit appear to be drafts.
11:18:14 Q Looking now at Exhibit No. 10, the
11:18:21 first document contained therein, it's an e-mail
11:18:24 dated February 6, 2007 at 3:34 p.m. from you to
11:18:31 Miss Kirchner.



(Walsh)
11:18:33 Can you look at that, and in
11:18:35 particular the attachment to it, the document
11:18:37 that you sent with that e-mail.
11:18:39 A Yes.
11:18:39 Q And that's a draft of the 2007
11:18:40 report; is that correct?
11:18:42 A That's correct.
11:18:42 Q Looking at the fifth of five pages
11:18:45 of that draft exhibit, there's a list of
11:18:48 information reviewed.
11:18:50 Do you see that?
11:18:50 A Yes.
11:18:52 Q Can you explain to us what those
11:18:54 items are that are listed that were reviewed?
11:18:58 A I believe these are the items from
11:19:01 the 2002 list.
11:19:16 Looking to the -- on Exhibit 8 on
11:19:19 page 17, I believe this list on Exhibit 10 that
11:19:23 we just talked about, page 5 of 5, is the
11:19:27 identical list.
11:19:41 Q With regard to item number 17
11:19:44 that's listed there, the report of investigation
11:19:46 number -- it's either a one or an I -- dash
11:19:49 95-0509, can you tell us what that document is?



(Walsh)
11:19:55 A That is the report of
11:19:56 investigation prepared by Steve Anderson, and
11:19:59 all the exhibits associated with his report.
11:20:09 Q And in particular -- you said all
11:20:12 of the exhibits attached to it. What
11:20:14 generically are you talking about?
11:20:17 I'm not asking you to recall the
11:20:19 name of all those exhibits, obviously, but...
11:20:24 A He had a lot of invoices, memos of
11:20:26 interview, documentation letters; whatever he
11:20:33 felt was necessary to support his written report
11:20:35 was included as an attachment, an exhibit to his
11:20:41 investigation report, and it was all included in
11:20:44 one set of documents.
11:20:45 Q And can you describe for us what
11:20:47 his report was designed to address?
11:20:53 A It was designed to address his
11:20:55 conclusions from his fraud investigation of
11:21:02 Morse Diesel.
11:21:05 Q And do you recall the approximate
11:21:05 time period during which his report was
11:21:09 prepared?
11:21:12 A I believe from the number here
11:21:14 that would have been 1995, but I would have to



(Walsh)
11:21:17 look at the document to be sure. At least the
11:21:20 investigation may have been started in 1995, and
11:21:23 then, when he eventually completed it, I'm not
11:21:25 sure of that date.
(Narrative portion of Mr.
Anderson's report and attached list
previously marked Exhibit 3 for
identification.)
11:21:50 Q Showing you what we've premarked
11:21:52 as Exhibit No. 3, can you take a look at that
11:21:54 exhibit and see if you recognize it.
11:21:56 (Pause)
11:22:24 A Yes, I do recognize it.
11:22:25 Q Can you tell us what that exhibit
11:22:26 is; that is, Exhibit No. 3?
11:22:28 A It is the narrative portion of
11:22:30 Steve's report and the list of the exhibits.
11:22:33 Q And is that the report, minus the
11:22:35 exhibits, that you refer to in item number 17 in
11:22:37 Exhibit 10 on the seventh page of the exhibit
11:22:44 itself?
11:22:50 A The -- number ten refers to this
11:22:53 report plus all of the exhibits. So the
11:22:55 exhibits is included in -- in that reference to

(Walsh)
11:22:59 item number ten. So together with everything,
11:23:03 this report would have been part of what was
11:23:07 referred to in item number ten, yes.
11:23:09 Q And in addition to what's embodied
11:23:10 in Exhibit 3, you also reviewed the list of
11:23:14 exhibits that are contained -- or at least
11:23:16 listed in Exhibit 3 in the last two pages; that
11:23:21 would be pages 30 and 31; correct?
11:23:23 MS. KIRCHNER: Objection,
11:23:26 previous.
11:23:27 A I did review the list of exhibits
11:23:31 included in Exhibit 3, yes.
11:23:47 Q Now, in preparing the 2007 report
11:23:53 that is now marked as Exhibit 7, did you go back
11:23:59 and look at the list of information reviewed
11:24:03 that you prepared and address the 17 items in
11:24:11 Exhibit 10?
11:24:11 A No, I did not.
11:24:14 Q In preparing your 2007 final
11:24:17 report, did you review any documents or
11:24:18 information in preparing your report?
11:24:40 A I would say -- just number ten,
11:24:44 the two decisions.
11:24:49 I'm sorry, was that your question?



(Walsh)
11:24:51 The last question I thought we were talking
11:24:52 about the investigative report, but, yes, number
11:24:55 ten, I would have reviewed the two decisions in
11:24:58 preparing this report.
11:25:02 Q So -- let me then, just so the
11:25:04 record's clear.
11:25:05 The 2007 final report, that's
11:25:08 really the reason we're here, and that's Exhibit
11:25:12 7, what, if any, information did you review to
11:25:17 prepare that report?
11:25:20 A Specifically, I would have
11:25:21 reviewed the two court decisions that are listed
11:25:25 as number ten.
11:25:27 Q And listed as number ten on page 7
11:25:30 of Exhibit 7; correct?
11:25:31 A That's correct.
11:25:33 Q And so the heading on page 7 of 7,
11:25:37 "List of Information Reviewed in Preparing this
11:25:40 Report," is inaccurate because you didn't review
11:25:43 items one through nine; is that correct?
11:25:45 A That's incorrect. I didn't review
11:25:49 them in the time frame of preparing this report,
11:25:50 but I reviewed that information to prepare the
11:25:53 2002 report, which is substantially the same as



(Walsh)
11:25:58 the 2007 report.
11:26:02 So I did not review items one
11:26:04 through nine in the calendar year 2007 in
11:26:08 preparing this report, but I reviewed those
11:26:10 items to prepare -- that formed the basis of the
11:26:17 conclusions in the report.
11:26:21 Q So it's your testimony in
11:26:22 preparing your 2007 final report about damages
11:26:25 allegedly suffered by the government, the only
11:26:29 additional information you reviewed and, as I
11:26:34 said before, cutting and pasting from the 2002
11:26:37 report, were two decisions from the U.S. Court
11:26:40 of Federal Claims; is that correct?
11:26:42 A That's correct.
11:27:03 MR. BEHRE: We've been going for
11:27:05 about an hour, why don't we take a
11:27:06 two-minute break and come back.
11:27:08 THE VIDEOGRAPHER: Sure. It's
11:27:11 11:27. This ends tape number one, and
11:27:14 we're off the record.
11:27:17 (Recess taken)
11:34:20 THE VIDEOGRAPHER: The time is
11:34:21 11:34. This is the beginning of tape
11:34:25 number two, and we're back on the



(Walsh)
11:34:27 record.
11:34:27 BY MR. BEHRE:
11:34:29 Q Mr. Walsh, would you take a look
11:34:30 at Exhibit No. 8, please, the 2002 report that
11:34:34 you testified about earlier.
11:34:45 Do you have that exhibit in front
11:34:46 of you?
11:34:47 A I do.
11:34:47 Q Could you turn to page 17 of 17,
11:34:49 please.
11:34:52 A I have it.
11:34:53 Q That's a list of 17 items or
11:34:56 categories of items that you reviewed and relied
11:34:59 upon in drafting your report; is that correct?
11:35:01 A That's correct.
11:35:02 Q Could you describe for us, with
11:35:04 regard to item number one, "GSA contract files,"
11:35:06 what specifically you reviewed?
11:35:17 A I can't point to the specific --
11:35:19 everything specific that went into the report.
11:35:23 I can tell you that I reviewed the contract
11:35:25 files for Phase I St. Louis, for Phase II St.
11:35:30 Louis, for the Sacramento project and for the
11:35:34 San Francisco project.

(Walsh)
12:09:32 Q The next item is "GSA pay
12:09:34 application files."
12:09:36 Is it safe to say those were the
12:09:38 files -- the official file maintained by GSA
12:09:42 relating to the pay applications?
12:09:44 A Yes.
12:09:45 Q And would that be those files --
12:09:46 were those pay applications in the files as of
12:09:49 sometime in 2002, since that's when your report
12:09:51 was made?
12:09:55 A Yes.
12:09:57 Q Item number five is "CRSS pay
12:10:00 application files."
12:10:01 What does CRSS stand for?
12:10:03 A That is the name of the company
12:10:05 that was our project manager for the St. Louis
12:10:10 project. The company has gone through several
12:10:12 name changes, but CRSS was at least a part of
12:10:18 their name at that time.
12:10:19 Q And by that item; that is, item
12:10:22 number five on page 17 of Exhibit No. 8, does
12:10:25 that item refer to pay applications that CRSS
12:10:29 submitted to the government for payment for its
12:10:31 advisory role, or were those the applications of



(Walsh)
12:10:34 MDI to the government?
12:10:39 A Those were the applications of MDI
12:10:40 to the government.
12:10:41 Q So essentially, then, items three,
12:10:43 four and five were at least to some degree
12:10:46 redundant, in that they were the pay
12:10:48 applications submitted by MDI from three
12:10:51 different sources; right?
12:10:52 A That's correct.
12:10:53 Q How about number six, "CMR," what
12:10:56 does that stand for?
12:10:57 A CMR, again, stands for CMR
12:10:58 Construction. That company, in association with
12:11:02 Morse Diesel.
12:11:05 Q And that was specifically a
12:11:06 contractor for the hazardous waste removal work?
12:11:10 A No, they were a -- they were
12:11:15 MDI's, for lack of a better term, partner for
12:11:20 the Phase I St. Louis courthouse project.
12:11:24 Q And this item would be the pay
12:11:26 applications of CMR to MDI for reimbursement for
12:11:29 its work on the project; correct?
12:11:30 A That's correct.
12:11:31 Q Moving to number seven, it reads,



(Walsh)
12:11:33 "Information provided by the subcontractors
12:11:35 listed in this report."
12:11:39 Which subcontractors would that be
12:11:41 from which you received information?
12:12:03 A Somewhere for all of the
12:12:04 subcontractors listed on pages 6 and 7 there was
12:12:09 contract file documentation from these
12:12:12 subcontractors. The contract file included
12:12:21 documentation from each of these subcontractors.
12:12:24 Q Do any of those subcontractors on
12:12:26 page 6 and 7 of this exhibit relate to your
12:12:32 report regarding damages that was prepared and
12:12:35 finalized in 2007?
12:12:40 A No.
12:12:47 Q Item number eight is "MDI
12:12:49 subcontractor history reports."
12:12:51 Can you explain to us what those
12:12:52 are?
12:12:55 A MDI provided me initially with a
12:13:03 hard copy report that listed each of its
12:13:06 subcontractors and the payments to those
12:13:10 subcontractors, and they called it a
12:13:13 subcontractor history report.
12:13:15 Q So was that a computer-generated



(Walsh)
12:13:18 document that provided a printout --
12:13:21 A Yes.
12:13:21 Q -- of subcontractors?
12:13:23 A (Nodding)
12:13:28 Q With regard to item number nine,
12:13:30 "MDI electronic invoice history reports," can
12:13:33 you explain to us what that item is?
12:13:37 A In -- MDI's project accountant
12:13:39 would generate an invoice in order to have
12:13:44 subcontractors paid. This invoice allowed
12:13:50 checks to be cut, and thereby the subcontractor
12:13:56 could receive their payment.
12:14:00 MDI provided some of these in hard
12:14:02 copy form, and at some point in time provided me
12:14:04 with a CD with electronic forms of these
12:14:11 invoices.
12:14:12 Q And do you know what time period
12:14:14 was covered by those invoice history reports?
12:14:24 A Some invoice history reports that
12:14:25 I had copies of were specific to specific points
12:14:29 in time, a specific month or a specific time in
12:14:34 a year. The electronic copies I believe
12:14:38 contained all of the subcontractor history
12:14:41 reports for the project, but I am not sure what

(Walsh)

date that I was provided with the electronic copy.

Q Item number ten indicates "MDI's correspondence file."

Is that -- does that mean that you obtained MDI's correspondence files, or were they the GSA's files that concerned MDI?

A This would be MDI's correspondence files.

Q And how was it that you came to obtain those files?

A I cannot remember.

Q Isn't it a bit unusual in an auditing situation for the government auditor to obtain correspondence files, at least in any large sense, from the contractor?

A Actually, that's something I perform on a regular basis when performing an audit.

Q So when you perform an audit you obtain from the contractor their entire correspondence file for a contract from the beginning of time?

A I would generally ask for it. It



(Walsh)

is not a standard written step in every audit guide, but I would generally ask for correspondence files.

I believe I would ask for it on all construction projects.

Q And were you given access to that material, or were you given copies of those?

A Generally I would be given access to that material during the time of the audit, and only copy the documents that I felt were relevant.

Q Do you remember who it was at MDI that you interacted with during the course of your audit? And I assume we're talking about the audit relating to the hazardous waste change order.

A There were two primary people I dealt with, and one was Steve Paquette -- he was at the job site -- the other was Ron Estock. He was present when I visited Chicago. I believe he was also present at the job site.

Q Was Mr. Paquette, if I pronounced it right, and Mr. Estock, were they cooperative and forthcoming with you, as best you could



(Walsh)

tell?

A With the exception of bond information, the best of my recollection is they were cooperative.

Q Okay. Your 2007 report relates essentially to the bond issue, so let's talk about that.

You've accepted that from your comments on them. Can you explain the way they conducted themselves with regard to any requests you might have had for information relating to the bond issue?

A At the time I performed the P-3 audit, I asked for support for the bond expense that was included in their proposal. During the time that I performed the audit, I did not get a -- get proper support for that expense, and I had requested that support, and had been provided some information that ended up being not correct information.

Q And do you recall approximately when you were conducting this particular audit that led to your request for the bond information?



(Walsh)

A It would have been in 1995.

Q Can you be more specific? Do you know the month when it occurred?

A I would have made the request -- I know I made the request at least in March of 1995.

Q And that was -- that would have been just about a month or less prior to your reaching a conclusion that the bond costs had been falsified; correct?

A I'm not sure conclusion -- I can't say for sure I reached a conclusion, but I definitely had a suspicion.

Q And it was a strong enough suspicion that you reported it up your chain of command; right?

A That's correct.

Q Item eleven is "GSA's correspondence files."

Do you recall where you obtained those files, and how extensive they were and what time period they covered?

A Those would have been with the contract file. I don't recall how extensive or

(Walsh)

12:19:50 what time periods were involved.

12:19:55 Q Do you maintain copies of all these materials; that is, everything we've talked about, items one through eleven? Do you maintain those in any fashion to the present day?

12:20:13 A I have access to all of these files to the present day. They're all in boxes and in storage in Kansas City.

12:20:24 Q And that's with regard to all of these items?

12:20:31 A I believe so, yes.

12:20:33 Q Didn't you indicate earlier that with regard to at least MDI's correspondence files, and perhaps other files, that you might have obtained access to those hard files at the contractor's facility, and only if something really interested you would you make copies of them? Is that correct?

12:20:51 A That is correct.

12:20:52 Q So it wouldn't be -- for example, looking at item number ten, it wouldn't be the entirety of MDI's correspondence files that you would have retained, it would have been certain



(Walsh)

12:21:01 selected copied documents?

12:21:03 A That is correct.

12:21:07 Q Item number twelve indicates "Federal Acquisition Regulation, laws and various court cases."

12:21:12 Can you tell us which laws, which regulations and which court cases you reviewed?

12:21:23 A Specifically, Federal Acquisition Regulation Part 31 would be important. I'm sure I reviewed laws related to the Prompt Payment Act. Court case Young-Montenay, I reviewed that. There was a court case called Lamb Engineering that I reviewed. I'm sure I reviewed regulations related to bond payments and regulations related to subcontractor payments.

12:22:39 Q Did you retain -- were you finished? I'm sorry.

12:22:42 A That's all that I can remember. There may be more.

12:22:44 Q Did you retain copies of those laws, regulations and court cases in those files you alluded to earlier?

12:23:00 A I believe that that -- many of



(Walsh)

12:23:08 them are in files in Kansas City. I do not know for sure that everything is in files in Kansas City.

12:23:22 Q You've been conducting audits for how many years?

12:23:24 A Nineteen and a half.

12:23:25 Q And during your tenure as an auditor for almost 20 years, do you always request and review court cases that relate to your work?

12:23:38 A Not always, no.

12:23:40 Q And in this case, why were you specifically reviewing the Young-Montenay case?

12:23:47 MR. BEHRE: That's Y-o-u-n -- Y-o-u-n-g, dash, capital M-o-n-t-e-n-a-y.

12:24:01 A I reviewed that case for use in determining the harm that occurred as a result of MDI's actions.

12:24:09 Q Did you select that case on your own, or were you directed to it by someone else?

12:24:17 A I do not remember.

12:24:24 Q You're not a lawyer by training, are you?



(Walsh)

12:24:26 A I'm not.

12:24:27 Q And did you receive any guidance as to how to interpret that legal decision?

12:24:43 A I do not remember.

12:24:44 Q Did the information contained at page 1 of Exhibit 8, in the middle of the page, which references the Young-Montenay case, did you actually write that prose, or did someone else write it for you? And I'm talking about the paragraph that starts, "This analysis is based in part on the Young-Montenay case."

12:25:08 A I actually wrote that.

12:25:20 Q And then just going back to page 17, the list of information reviewed, you indicated at item number 13 you reviewed agreements, plural, between CMR and MDI.

12:25:33 CMR, you testified previously, was a contractor on the job; correct?

12:25:37 A That's correct.

12:25:37 Q And it's in the plural. Do you remember how many contracts there were?

12:25:40 A I believe there were only two, one for the Phase I project and one for the Phase II project.

(Walsh)

Q And do those particular agreements relate to the damages that are sought in your February '07 damage analysis?

A I do not believe so.

Q Item number 14 is" MDI subcontractor files."

Are those the files that MDI maintained that you reviewed, or are they some other party's files about MDI?

A Those would be the files that MDI maintained.

Q And did you review those on-site, or did you receive hard copies or both?

A I believe I reviewed those files on-site, and then had tabbed what I would like to have copied.

Q Item number 15 references "Deposition transcripts and exhibits of witnesses deposed in this case."

Do you recall which particular deposition transcripts you reviewed by witness name, if you recall?

A I reviewed most of the deposition transcripts in this case. It's possible that I



(Walsh)

reviewed them all. Deposition transcripts that come to mind would include Ron Estock, Steve Dollens, Steve Paquette, Graham Harwood, Bill Lyons, David Hoffman, Michael Bardsley, Ronni Brenner, Tony Romano, Richard Ferrucci. And there are others, I can't -- I can't remember the names.

Q That's a pretty impressive list after five years, so -- it's about ten more than I would have thought you would have remembered.

Would you have maintained copies of those transcripts in your file?

A I believe I do have copies of those transcripts, yes.

Q Item number 16 lists "Discussions with MDI, GSA and CRSS personnel."

Could you describe what that line item means in a bit more detail?

A Starting with discussions that I had with MDI officials during the first audit, and GSA and CRSS, I had a lot of discussions with all -- people from all three of those groups, and -- and they continued past the first audit throughout all the audit work that we



(Walsh)

conducted.

Q You don't indicate discussions with the Department of Justice with regard to information that you reviewed or considered for your report.

Why is that?

A Department of Justice was not the source information for anything in my report. That's it, they're not the source of information in my report.

Q But it's fair to say that individuals from the Department of Justice edited and directed this report as it came to be known as a final document; correct?

A That's correct.

Q Can you describe the level of involvement that individuals from the Department of Justice had in reviewing, revising, drafting and finalizing this report?

A They were provided a copy of the draft report, and would make suggestions that were of a nature to -- they would edit grammatically and maybe location of items in the report. They would also provide guidance as to



(Walsh)

the computations in the report, whether they agreed with the computations or I needed to make a change in my methodology for computing.

Q And was there ever a time when you were given direction about how to change a calculation or how to change wording of this that you didn't accept those suggestions?

A I do not -- I do not recall.

Q During your almost 20 years as an auditor, have you been involved in other claims, appeals, court cases about government contracts?

A Yes.

Q Can you tell us approximately how many times?

A In the arena of claims, it becomes much more voluminous. I would say that the number would be at least 15 or more.

Q Okay, let's set aside for a moment claims that stay at the contracting officer level, and let's just focus in on claims that make their way to a Board of Contract Appeals or, in this case, and perhaps others, to a court.

How many court cases or board

Page 97

(Walsh)
12:40:26 Q Would they have been -- some or all of them have been before or after 2002?
12:40:36 A At least half would have been before 2002.
12:41:12 Q So you indicated that you prepared at least five reports in active cases; correct?
12:41:19 A Yes.
12:41:21 Q Yet you say that you've prepared computation of harm calculations in at least seven cases.
12:41:27 What accounts for the difference between those two numbers?
12:41:31 A Many of those cases didn't go to trial.
12:41:43 Q During the course of your preparation of those other -- I believe you said seven instances of preparing a computation of harm for fraud calculation, have you ever cited Young-Montenay in your report?
12:42:09 A One time.
12:42:12 Q And what was the basis for your citation of that particular case in that report? In other words, why did you put it in that and not in others?

Page 98

(Walsh)
12:42:19 A That report dealt with a construction contract. Most of the other reports did not deal with construction contracts.
12:42:35 MR. BEHRE: This is probably a good time to break. Why don't we go off the record.
12:42:38 THE VIDEOGRAPHER: Sure. It's 12:42. This is the end of tape number two, and we're off the record.
12:42:43 (Luncheon recess: 12:42 p.m.)

Page 99

(Walsh)
12:42:43 AFTERNOON SESSION
12:42:43 2:09 p.m.
14:09:31 THE VIDEOGRAPHER: Okay. Right now it is 2:09. This is the beginning of tape number three, and we're back on the record.
14:09:37 JOHN F. WALSH,
14:09:37 having been previously duly sworn, was examined and continued testifying as follows:
14:09:37 EXAMINATION (Continued)
14:09:37 BY MR. BEHRE:
14:09:38 Q Mr. Walsh, during the lunch break, did you discuss your testimony with anyone?
14:09:47 A Counsel advised me to be sure not to disclose any information that is a court hearing that's sealed, or any information that may be in a current ongoing case, that is not public record.
14:10:06 Q Did you have any other discussions with anyone other than that particular discussion?
14:10:09 A. No.
14:10:12 Q Directing your attention to Exhibit 10, which hopefully is in front of

Page 100

(Walsh)
14:10:16 you --
14:10:17 A It is.
14:10:17 Q -- looking at Exhibit 10, it contains certain e-mails, I believe from you to members of the Department of Justice and Mr. Miller.
14:10:52 Is it your understanding that these are all the e-mails that exist by and between yourself, Miss Kirchner, Miss Hilmer and Mr. Miller? And I believe those are the only parties to these.
14:11:11 A I can only say that I don't have any of these -- these e-mail messages. I currently don't have any of these in my possession.
14:11:25 Q Putting aside whether you currently have these e-mails today, although I think every one of them is from just a couple months ago --
14:11:32 A Yes.
14:11:32 Q -- they're all 2007, do you recall whether there are any other e-mails relating to this report that you sent or received from the parties who are otherwise on these e-mails that

Page 101

(Walsh)

14:11:44 are in this exhibit?

14:11:46 A Yes, there were other e-mails than

14:11:49 are in this exhibit.

14:11:52 Q And have you searched for these

14:11:55 that are in Exhibit 10, or any others, that

14:11:58 relate to these issues, including the draft of

14:12:00 the report which is the February '07 report,

14:12:06 which I think is Exhibit 8?

14:12:08 A Yes.

14:12:13 Q And what was the result of your

14:12:15 search?

14:12:16 A I found one possible e-mail that

14:12:19 might have been related to Exhibit 8, and there

14:12:23 were no other e-mails in my e-mail system.

14:12:29 Q And I actually misspoke, I think.

14:12:32 The 2007 report, that's the subject of this

14:12:35 testimony, was actually Exhibit 7.

14:12:37 A Okay.

14:12:38 Q So is your answer the same except

14:12:41 for Exhibit 7?

14:12:43 A The e-mail may have a -- did not

14:12:45 relate to Exhibit 7. It may have related to

14:12:48 Exhibit 8, the one e-mail that I found. That

14:12:53 was in archives.

Page 102

(Walsh)

14:12:54 Q Okay. But just so we're clear,

14:12:56 your e-mails from February of this year are

14:12:58 already archived?

14:12:59 A Our -- many of them are deleted,

14:13:01 so I will not save -- I get so many e-mails,

14:13:05 that it's unmanageable to -- for me to save

14:13:08 e-mails, and I'll delete e-mails that are

14:13:10 unimportant soon after sending them or receiving

14:13:13 them.

14:13:15 Q But is it your policy with regard

14:13:16 to a pending case, where you -- as you put it,

14:13:19 you're serving as an expert, you delete the

14:13:23 e-mails between you and the parties who sought

14:13:26 your assistance?

14:13:27 A I -- if they were unimportant. I

14:13:30 didn't look at those e-mails in relation to

14:13:33 being an expert witness, I just looked at them

14:13:37 as to whether they were important for me to

14:13:38 retain. And they were not -- in my opinion,

14:13:42 they weren't of importance, so I deleted them.

14:13:45 Q Did you receive any instructions

14:13:45 from counsel or from anyone in your office about

14:13:48 retaining e-mails, electronic documents, hard

14:13:52 copy documents, during the pendency of a court

Page 103

(Walsh)

14:13:55 case?

14:14:10 A Not that I can recall.

14:14:11 Q So at the present time, as best

14:14:13 you understand it, you're under no obligation to

14:14:16 retain records, documents, e-mails, electronic

14:14:20 documents or the like relating to this entire

14:14:22 matter?

14:14:34 A Any documents I could not -- we

14:14:37 have files and files that I realized all those

14:14:40 files have to be maintained, but as far as

14:14:52 e-mails go, it's my understanding that that --

14:15:04 I've not been given an instruction to retain any

14:15:07 e-mail messages.

14:15:15 Q What about other electronic

14:15:15 records, spreadsheets, Word documents and the

14:15:19 like?

14:15:21 A I would have to maintain any

14:15:22 documents that I -- any spreadsheets I created,

14:15:25 any documents that I created for use in the

14:15:27 case. I wouldn't keep drafts of those

14:15:35 documents, it becomes a problem with whether I'm

14:15:39 working with the most current version or not.

14:15:40 So when I create a document, I will either save

14:15:42 the new document over the top of the old

Page 104

(Walsh)

14:15:44 document, or, if there was a separate file, I

14:15:48 would delete that file, but my most common

14:15:51 practice would be just to save whatever changes

14:15:53 I made over the current document that is on

14:15:55 file.

14:15:56 Q Do you recall when the last time

14:15:59 you believe you deleted any electronic data

14:16:02 relating to this case, whether it's with regard

14:16:04 to your testimony here today or anything

14:16:07 relating to the case, be it your audits, your

14:16:10 reports, et cetera?

14:16:13 A I would say it would be the most

14:16:15 current date of the e-mails that are in this

14:16:20 packet. It's possible there was an e-mail after

14:16:24 what may be in this packet, I'm not sure, but I

14:16:31 don't recall the last date.

14:16:38 Q Can you give us some idea of the

14:16:39 quantity of e-mails that have been deleted that

14:16:41 are relevant to this case?

14:16:52 A It would be -- I'm not sure.

14:16:58 Q Would it be more than 20?

14:17:07 A I'm just not sure.

14:17:11 Q Take a look through Exhibit 10,

14:17:13 and determine how many of these e-mails you

(Walsh)
14:17:19 believe you sent or received.
14:17:46 (Pause)
14:19:09 A It looks like I sent nine, and I
14:19:15 received one.
14:19:15 Q And do you know whether or not you
14:19:16 have copies of these e-mails, the total of ten,
14:19:21 at your computer?
14:19:23 A I do not. I know that I do not
14:19:27 have copies of them.
14:19:28 Q And how is it you know that?
14:19:29 A I did a search, at Domenique's
14:19:31 request, for any e-mails that I had related.
14:19:36 Q And how many did you come up with?
14:19:40 A I didn't come up with any related
14:19:41 to these reports.
14:19:48 Q Did you find some that related to
14:19:49 the case?
14:19:50 A Yes, I believe there were some
14:19:52 other e-mails that were otherwise related to the
14:19:55 case.
14:19:55 Q And were they in the current time
14:19:57 frame; that is, 2007, or some much earlier time?
14:20:03 A There were definitely some from
14:20:04 the much earlier time. I can't remember if



(Walsh)
14:20:10 there were any current.
14:20:20 Q But it's your testimony here today
14:20:22 that you're under no instruction to retain, not
14:20:26 delete, and not to otherwise save and safeguard
14:20:30 electronic documents relating to the case; is
14:20:33 that correct?
14:20:37 MS. KIRCHNER: Objection,
14:20:37 ambiguous.
14:20:40 A I would say that's my
14:20:41 understanding, that's correct.
14:20:52 Q Looking at Exhibit 10, the first
14:20:54 e-mail that you sent, it looks like the pages
14:21:02 are numbered in the right-hand corner with -- by
14:21:05 hand, I believe by the government. There's a
14:21:10 number one in the lower right-hand corner.
14:21:12 Notwithstanding that fact, it's the second page
14:21:14 of the exhibit.
14:21:16 A Yes.
14:21:25 Q You indicate in your note that
14:21:26 "There are certain items that are not included
14:21:32 and we are not claiming" -- the government is
14:21:33 not claiming -- "in order to expedite the
14:21:36 process."
14:21:36 Can you tell me what you mean by



(Walsh)
14:21:37 the term "in order to expedite the process"?
14:21:40 A That actually isn't -- is trying
14:21:43 to describe how we might want to word this in
14:21:46 the document, not as a cause for -- the subject
14:21:57 is more suggesting a type of wording.
14:22:03 Q But what is the process you're
14:22:04 talking about expediting?
14:22:07 A The process of -- the whole
14:22:11 process of computing harm by limiting it to the
14:22:15 items that were included in the judge's
14:22:17 decision.
14:22:26 Q And why would you want to limit
14:22:28 your discussion of harm to those issues raised
14:22:30 in the government's decision -- or the court's
14:22:32 decision?
14:22:33 A Counsel wanted me to do that. I
14:22:37 wanted to mention that there was more harm than
14:22:40 was in the judge's decision.
14:22:53 Q Okay. So that first e-mail we
14:22:56 looked at was sent at 3:34 p.m. by you, and then
14:23:01 about an hour and four minutes later, if you
14:23:02 look at the bottom, it's cut off a little bit,
14:23:04 but it looks like it's a handwritten seven --
14:23:07 A Yes.



(Walsh)
14:23:08 Q -- about an hour and four minutes
14:23:10 later you forward what appears to be, based on
14:23:14 what you've written, a different draft of the
14:23:19 computation of harm; correct?
14:23:39 A I would say that's correct.
14:23:41 Q And do you know what changed in
14:23:43 that hour and four minutes?
14:23:59 A I'm not sure. It appears that
14:24:04 there may have been some wording changes related
14:24:06 to the kickback section of the report, but I'm
14:24:11 not sure what the changes are.
14:24:13 Q Was it between those two drafts
14:24:16 during that hour and four minute period on
14:24:18 February 6th, 2007 that a kickback damages
14:24:21 section and penalties was added in that wasn't
14:24:24 in the prior draft?
14:24:42 A I'm looking at Exhibit 8 right
14:24:43 now, and there is a section for kickbacks in
14:24:54 Exhibit 8, the 2002 report. So it wouldn't have
14:24:57 added a new section for kickback damages. It
14:25:03 may have restructured what was in Exhibit 8,
14:25:05 presented it differently for Exhibit 7. I'm not
14:25:10 sure what that change was, but it would not have
14:25:16 been a completely new subject from the previous

(Walsh)

14:25:22 2002 report.

14:25:24 Q And the attachment to that e-mail; that is, the 4:38 p.m. e-mail from you on February 6, 2007, follows immediately after that e-mail page of seven. So I believe the attachment is numbers eight through twelve; correct?

14:25:42 A That's --

14:25:43 Q I'm sorry, 13.

14:25:44 A That's correct.

14:25:45 Q And on page 13 you list 17 sources of information from which you obtained information to write this report; correct?

14:25:55 A That's correct.

14:25:55 Q And included in there is number 17, "the report of investigation," number I-95-0509; correct?

14:26:06 A That's correct.

14:26:06 Q And that's Mr. Anderson's report?

14:26:08 A That's correct.

14:26:10 Q Looking at the next e-mail, which is later that same day, that's February 6, it's now a little more than an hour later, at 5:44, where Miss Hilmer's responding to you; correct?



(Walsh)

14:26:26 A That's correct.

14:26:28 Q Indicating that you'll be receiving comments from both of them; that is -- well, perhaps all three of them -- receiving comments from Miss Hilmer and Miss Kirchner; correct?

14:26:43 A That -- I would be receiving some comments, yes. Yes.

14:26:48 Q Then why is it that Mr. Miller is a cc on your e-mails, and then -- I'll only ask you about the ones you sent, but why do you cc Mr. Miller?

14:26:59 A To keep him informed and to obtain any comments that he might have.

14:27:04 Q And do you do that because he's your boss?

14:27:07 A No, he's counsel for the IG office.

14:27:13 Q And is it typical that whenever you testify or appear for a deposition in a case, that counsel accompanies you from the GSA?

14:27:19 A Yes.

14:27:21 Q In every instance?

14:27:26 A I don't know if it's happened in



(Walsh)

14:27:27 every instance.

14:27:33 Q Going to the next e-mail, which is six days later, on Monday, February 12th, at 8:22 a.m., you indicate, "Here is my revised damages calculation based on Tracy's input."

14:27:54 How did you receive Tracy's input? Was it orally or in writing?

14:27:58 A I believe that it was orally. I remember talking to her on the phone. I do not remember receiving any e-mails from her on this.

14:28:13 Q Do you recall what requested changes were made by Miss Hilmer?

14:28:32 A I believe one of them was to ask for a separate line that dealt with the kickback. That was a request of -- from Tracy. A separate line item in the summary sheet on the very first page.

14:28:51 Q Okay. So that's -- within Exhibit 10, that's the page numbered 16?

14:28:56 A Yes.

14:28:57 Q And what's the line item you're referring to?

14:29:02 A A line item to be added that speaks to kickback damages. In Exhibit 7



(Walsh)

14:29:18 there's a line on what's marked as page 1 of 7 that says, "anti-kickback violations," and under each one of the columns it states, "included above."

14:29:32 One of the requests that Tracy made was to add that line item.

14:29:36 Q But shouldn't that change -- and I see that on Exhibit 7, but that change is not reflected in the document that immediately follows the February 12, 8:22 a.m. e-mail.

14:29:49 A Yeah, I'm not sure when she asked for that change, I just remember that as one of the changes that she asked for.

14:29:57 Q Are you certain, sitting here today, that the document that immediately follows the e-mail of February 12th, 8:22 a.m., numbered 15 in the lower right-hand corner, is, in fact, the document you attached?

14:30:14 A I do not know that for sure, no.

14:30:18 Q And looking at that attachment, page 2 of 6, which has a number 17, the false claims amount -- the False Claims Act amount, the bottom third of the page, reads $40,000, and it's bolded.

(Walsh)
14:30:37 A Yes, I see that.
14:30:38 Q Is there a reason why that's bolded?
14:30:42 A That -- I just bolded that to emphasize where the number came from for somebody reading the report.
14:30:48 Q And, similarly, on the next page there are a series of numbers in the lower half of the page, under the heading "Damages and Penalties for Fraudulent Request." There's -- in the first paragraph there's three sets of numbers, but only one which is bolded, which is $688,678.
14:31:10 Same question there, why is that bolded?
14:31:12 A Again, I think I wanted to highlight it because that's the number that I brought forward to the summary chart on the first page so that it would stick out of the page for somebody who was looking to tie the summary chart back to the supporting documentation.
14:31:28 Q And then, finally, on that same page, at the bottom, the amounts of penalties



(Walsh)
14:31:33 for calculation is $10,000, and that's bolded.
14:31:36 Why is that number bolded?
14:31:37 A Again, so somebody reading the report could see that number, it would stick out of the page and tie back to the front summary chart on page 1 of 6.
14:32:03 Q Looking at the next page, at the bottom of the page the number $369,187 is bolded.
14:32:14 Can you tell us why that is bolded?
14:32:30 A This is the amount of total damages related to the kickback portion. It doesn't carry through to the chart on the first page because the kickback damages are already included in amounts that are requested on the first page, but I wanted that bolded so the reader knew the entire amount of the harm that just related to the kickback damages and penalties that are already included in -- on the summary chart on page 1.
14:32:57 Q So do these boldings reflect anything with regard to the most recent changes that were made to the document?



(Walsh)
14:33:04 In other words, this e-mail that attaches this document, or as best as you can tell attaches this document, suggests you've revised the document somehow. Do those bold -- bolded numbers reflect the changes that you made in that last draft?
14:33:24 A No. If -- and correct me if I'm wrong, are you asking that I bolded them so that the people who are reviewing it could review the updated numbers? That was not my intent in bolding these numbers. It was just strictly that in the final report the bolded numbers would be to the independent reader, not to point out where I had made changes in any of the drafts.
14:33:50 Q Okay. So sitting here today, you don't know what changes you made in this draft compared to the prior version; correct?
14:34:01 A That's correct.
14:34:02 Q And finally, on that exhibit, page 6 of 6, which is page number 21 in the lower right-hand corner, you continue to list 17 sources of information, including number 17, "Report of Investigation"; correct?



(Walsh)
14:34:17 A That's correct.
14:34:21 Q Looking at the next e-mail, which is from you to Miss Kirchner, cc Miss Hilmer, dated February 21, which is approximately nine days later, you've indicated in your e-mail to them that this is a revised computation; correct?
14:34:54 A So this is back on the handwritten number 22 page?
14:34:57 Q Yes. So it's the e-mail dated February 21, 2007, from you, at 8:24 a.m.
14:35:05 A Yes.
14:35:06 Q And do you know, sitting here today, what material in this draft of the damages memo has changed from the prior draft?
14:35:27 A It appears that the anti-kickback violation line has been added to the summary chart.
14:35:36 I referred to this document as the computation. So when I say, "here is the revised computation," it would not necessarily mean that any of the numbers themselves were changed, it just means the report was revised.
14:35:54 In addition to that line, there

(Walsh)
14:35:55 may have been other wording changes or
14:35:57 grammatical changes that may have been made, but
14:35:59 I do not know what those are.
14:36:04 Q And so to the extent that changes
14:36:07 were made, grammatical, substantive or
14:36:10 otherwise, were those changes that you made at
14:36:12 your own suggestion, or were they suggested to
14:36:14 you by others?
14:36:20 A Any substantial changes would have
14:36:21 been made by me personally. Many grammatical
14:36:28 errors or wording change errors would have also
14:36:30 been made by me if I read the document and did
14:36:33 not like the way something read.
14:36:35 Some could also be suggested by
14:36:36 counsel. If they saw a typographical error or
14:36:41 they wanted an item put in a different place in
14:36:43 the report, some kind of structuring comment,
14:36:50 that -- that was certainly possible.
14:37:05 Q Directing your attention to the
14:37:07 next e-mail, that's Thursday, February 22, at
14:37:10 4:18 p.m., so that's basically the next day,
14:37:14 you're forwarding a next -- another draft.
14:37:16 Do you know what changes were
14:37:18 incorporated into that draft, in comparison to



(Walsh)
14:37:20 the one prior to it?
14:38:14 (Pause)
14:38:42 A Do you want me to read through and
14:38:43 find specifically where changes were made?
14:38:49 Q That would probably be a pretty
14:38:51 arduous process to do nine times. So sitting
14:38:55 here today, having had a chance to look, but not
14:38:57 do a line-by-line comparison, is there anything
14:39:00 that stands out to you as having changed between
14:39:03 those two drafts?
14:39:04 A The only thing that really jumps
14:39:05 out is the list of information reviewed.
14:39:08 Q Well, that actually changed in the
14:39:10 prior draft, didn't it?
14:39:11 A It did. And then it changed in
14:39:13 this draft as well.
14:39:19 Q So at some point between the draft
14:39:21 you sent on February 12th at 8:22 a.m., and
14:39:23 the draft you sent on February 21st, nine days
14:39:26 later, at 8:24 a.m., you have reduced your list
14:39:31 of information reviewed from 17 items to eleven;
14:39:36 correct?
14:39:37 A It actually went down to ten, then
14:39:40 a new item was added.



(Walsh)
14:39:43 Q And included in the items that
14:39:44 were eliminated from the list is item -- former
14:39:49 item number 17, "report of investigation"; is
14:39:52 that correct?
14:39:53 A That's correct.
14:39:54 Q And that was Mr. Anderson's
14:39:55 report?
14:39:56 A It was.
14:39:56 Q That was directly related to the
14:39:57 allegations that are in the substance of your
14:40:00 2007 report; correct?
14:40:04 MS. KIRCHNER: Objection,
14:40:04 ambiguous.
14:40:10 A His report wasn't related -- my
14:40:14 allegations were not based on any of the
14:40:16 information in his written report. I included
14:40:20 his report in the list originally because many
14:40:23 of the exhibits in that report were exhibits
14:40:28 that I referred to when I prepared the 2002
14:40:31 report. It was an easy spot for me to obtain
14:40:35 some of the information, especially as it
14:40:38 related to projects that were not in -- that
14:40:42 weren't in St. Louis; the projects in San
14:40:46 Francisco and Sacramento.



(Walsh)
14:40:47 So when I list his report, it
14:40:50 really is the exhibits included in his report
14:40:52 that I would use from time to time because that
14:40:53 was the place where I knew I could find them
14:40:57 easiest.
14:40:59 Q But some of these exhibits in
14:41:02 Mr. Anderson's report were relevant to the
14:41:05 bonding issue you were opining on; correct?
14:41:07 A Yes.
14:41:08 Q And is there some reason why that
14:41:10 was deleted from the list of information
14:41:12 reviewed when, in fact, it contained relevant
14:41:15 information that you had relied upon in drafting
14:41:17 the 2002 report?
14:41:36 A I took it out at the request of
14:41:37 counsel.
14:41:38 Q Do you recall who instructed you
14:41:39 to remove it?
14:41:40 A It was Domenique.
14:41:48 Q And what do you understand the
14:41:49 reason to be for that being removed?
14:41:51 A It was basically -- my
14:42:00 understanding is that just -- it was an item
14:42:05 that -- I don't want to -- my understanding is

(Walsh)

14:42:13 that it was an item that it looked like it would
14:42:16 be given more significance than it had in the
14:42:20 compilation of this report.
14:42:26 Q Are you aware of any issues that
14:42:27 were raised within your office regarding the
14:42:30 accuracy of Mr. Anderson's report?
14:42:43 A I'm not aware of any.
14:42:44 Q Are you aware of him -- of an
14:42:45 issue being raised as to whether or not his
14:42:47 report misrepresented certain facts?
14:42:52 A By people in our office?
14:42:53 Q Anywhere.
14:42:55 A I believe Morse Diesel felt that
14:43:00 it misrepresented facts.
14:43:01 Q And did your office look into that
14:43:02 issue?
14:43:08 A Not as a separate investigation.
14:43:15 Q How about in any way, whether it's
14:43:17 a separate investigation or not?
14:43:22 A I do not -- I do not know if
14:43:24 anybody looked into the accuracy of Steve's
14:43:30 report.
14:43:30 Q Are you aware of whether any
14:43:31 employment -- adverse employment action was



(Walsh)

14:43:33 taken against Mr. Anderson, be it a demotion, a
14:43:36 reprimand, what have you, for anything relating
14:43:38 to his report?
14:43:40 A Yes, no adverse action was taken
14:43:42 against Steve.
14:43:44 Q And how do you know that?
14:43:47 A Just from personal knowledge. I
14:43:48 would have known had any action been taken
14:43:50 against him.
14:43:51 Q Well, aren't personnel matters
14:43:54 private and confidential?
14:43:58 A They are, but not something like a
14:44:03 demotion or a suspension or -- I believe I would
14:44:07 know about any of that.
14:44:18 Q Do you recall when Morse Diesel
14:44:19 first raised the issue of the accuracy of his
14:44:23 report?
14:44:24 A No, I don't.
14:44:29 Q But it would have to be,
14:44:30 obviously, after -- after the report was
14:44:34 written; right?
14:44:34 A Yes, yes. It would have had to
14:44:36 have been during discovery at some point.
14:44:40 Q Did your deletion of that item,



(Walsh)

14:44:42 that's item 17, the report of investigation,
14:44:45 have anything to do with the fact that issues
14:44:46 had been raised about the accuracy of the
14:44:49 report?
14:44:50 A No.
14:44:54 Q You've essentially testified that
14:44:55 it was removed at counsel's direction; correct?
14:44:58 A That's correct.
14:45:01 Q But it did, so the record's clear,
14:45:03 contain materials relevant to the bonding issue
14:45:06 that is the substance of your 2007 report;
14:45:09 correct?
14:45:09 A That's correct.
14:45:34 Q The next e-mail is from you to
14:45:36 Miss Kirchner, cc Miss Hilmer, dated February 21
14:45:40 at 1:46 p.m. I ask you the same question that
14:45:42 I've asked you about the others with regard to
14:45:47 changes from one version to the next.
14:45:50 While I understand that you're not
14:45:52 going to do a side-by-side, word-by-word
14:45:58 comparison, could you simply look through that
14:45:59 exhibit and see if anything stands out to you as
14:46:01 being different?
14:46:01 A Which page are we on?



(Walsh)

14:46:03 Q I'm sorry, it's page 38, in the
14:46:04 lower right-hand corner, in handwriting.
14:46:36 (Pause)
14:46:37 A I don't -- I don't know of what
14:46:38 the changes are.
14:46:40 Q Directing your attention to the
14:46:41 last page, page 7 of 7, which is on page 45, the
14:46:44 handwritten number.
14:46:46 A Yes.
14:46:46 Q That's the list of items reviewed?
14:46:50 A Yes.
14:46:50 Q Is that the same as the prior
14:46:52 versions?
14:46:58 A It's the same as 37, the
14:47:05 handwritten page. It is different from the list
14:47:07 on page 29.
14:47:10 Q Okay. So the list on 20 -- page
14:47:14 29, handwritten in the lower right-hand corner,
14:47:17 is different than the list on page 53; correct?
14:47:22 A On page --
14:47:23 Q I'm sorry, did I jump ahead?
14:47:26 A Yeah.
14:47:26 Q What --
14:47:27 A Forty-five.

(Walsh)

14:47:27 Q Forty-five, I'm sorry.
14:47:31 And how is it different?
14:47:32 A The line item for deposition
14:47:33 transcripts and exhibits of witnesses deposed in
14:47:35 this case is taken -- oh, no, that's still in
14:47:38 there. I'm sorry.
14:47:57 The line item for CMR applications
14:47:59 to ACMI for the Phase I St. Louis project was
14:48:05 taken out.
14:48:05 Line item six on page 29 does not
14:48:07 appear on page 45.
14:48:12 Q Going to the next e-mail,
14:48:13 handwritten lower right-hand corner page 46,
14:48:15 your e-mail dated February 26, 2007, 9:51 a.m.,
14:48:19 your note indicates that you're attaching an
14:48:28 updated report.
14:48:30 Is this now the final version of
14:48:31 the report?
14:48:39 A It appears to be. With the
14:48:41 exception of the date, it appears to be the
14:48:44 final version.
14:48:45 Q And the next e-mail -- actually, I
14:48:54 believe there's two more. The next one is on
14:48:56 page -- lower right-hand corner -- 54, dated



(Walsh)

14:49:00 February 26th, 2007 at 12:22 p.m. You've now
14:49:11 attached a document that is called, in the
14:49:12 comments section, "Harm Report.PDF," whereas in
14:49:16 the prior document the document was entitled
14:49:20 "Computation of Harm."
14:49:24 Is that difference simply because
14:49:25 you PDF'd one and the other was sent as a Word
14:49:29 document, or is there some other explanation for
14:49:31 that?
14:49:31 A No, it's just because it's PDF and
14:49:33 the other was a Word.
14:49:34 Q And you didn't want to have to
14:49:35 type in that whole long --
14:49:37 A That's right.
14:49:37 Q -- title? Scan it in.
14:49:49 Again asking you on this one; that
14:49:50 is, the report that starts at handwritten page
14:49:54 55, are there any changes you can identify,
14:49:56 simply by scrolling through this, between this
14:50:02 version and the prior version?
14:50:04 A It appears the date and my
14:50:05 signature.
14:50:11 Q Okay. And then finally, your
14:50:28 e-mail to Miss Kirchner alone on March 28, 2007



(Walsh)

14:50:33 at 2:00 p.m, you say, "Here it is."
14:50:45 Is this your final report?
14:50:46 A It is.
14:50:54 Q Does it contain a correct date?
14:50:55 A It does.
14:50:55 Q And would this document, meaning
14:50:57 pages 63, 64, 65, 66, 67, 68, and then the last
14:51:06 page, which isn't numbered, but logically would
14:51:08 be 70, is that the version of this report that
14:51:14 we should consider to be the final version of
14:51:20 your report?
14:51:21 A Yes.
14:51:23 Q But the only difference between
14:51:24 this and the prior one was the misstated date;
14:51:28 correct?
14:51:28 A I believe so.
14:51:43 MR. BEHRE: I'd note for the
14:51:43 record that because we just received
14:51:45 these in the last 24 hours, we haven't
14:51:48 had a chance to do the line-by-line, and
14:51:50 rather than have the witness do that,
14:51:51 we'll just have to do it at a future
14:51:53 time. And if there's any issues, we'll
14:51:55 raise it with you because I just didn't



(Walsh)

14:51:57 have time, unfortunately.
14:51:58 BY MR. BEHRE:
14:52:15 Q Why don't you leave Exhibit 10 in
14:52:16 front of you, which is the final report at page
14:52:18 63. I'd like you to also take the 2002 report,
14:52:35 which is -- I'd like to ask you a couple
14:52:48 questions about Exhibit 10, page 63 and the
14:52:54 following pages, which is your "final" 2007
14:52:58 report and the issues that are covered in your
14:53:06 2002 report, which is Exhibit 8.
14:53:09 First off, in Exhibit 8 you
14:53:14 describe the False Claims Act potential
14:53:17 penalties as being a range between 5 and
14:53:21 $10,000; is that correct?
14:53:22 A That's correct.
14:53:22 Q In your final report you simply
14:53:26 state that the potential fine is 10,000 apiece;
14:53:31 correct?
14:53:53 A It still says between 5 and
14:53:54 $10,000 in the final report.
14:53:59 Q But despite the fact that it's a
14:54:04 range from between 5 and 10, for purposes of
14:54:06 your calculation on the first page of the final
14:54:10 version of your report in Exhibit 10 you've

(Walsh)

15:23:53 deposition of John F. Walsh. We've used
15:23:55 four videotapes. We're going off the
15:23:58 record, and the time is still 3:23.
15:24:00 (Time noted: 3:23 p.m.)

John F. Walsh
JOHN F. WALSH

Signed and subscribed to before me
this 11 day of June, 2007.
Shelley Fender Vaughn
Notary Public
My commission expires 04/30/08

***ERRATA SHEET***

| PAGE | LINE | CHANGE |
|---|---|---|
| 6 | 2 | Mississippi should be Missouri - Typo |
| 106 | 10-11 | My answer on these lines (10-11) is incorrect. When I gave my answer, I thought the questions referred to e-mail messages and the question actually refers to "electronic documents." The correct answer is - Although I do not remember a specific instruction, I know that I need to save all final electronic documents substantively relating to this case |

John F. Walsh 6/11/07

***ERRATA SHEET***

| PAGE / LINE | CHANGE |
| --- | --- |
| | that I created or |
| | received that directly |
| | relate to my audit |
| | findings and report |
| | conclusions |

John F. Walsh 6/11/07

UNITED STATES COURT OF FEDERAL CLAIMS
Nos. 99-279C, 99-529C, 99-530C
(Senior Judge Smith)
- - - - - - - - - - - - - - - - - - -x
MORSE DIESEL INTERNATIONAL, INC.,
Plaintiff,
vs.
THE UNITED STATES,
Defendant.
- - - - - - - - - - - - - - - - - - -x
1675 Broadway
New York, New York

Arent, Fox
May 31, 2002
10:00 a.m.

DEPOSITION of JOSEPH A. BARSALONA, a nonparty witness in the above-entitled action, held at the above time and place, taken before Barbara P. Goldsmith, a Shorthand Reporter and Notary Public of the State of New York, pursuant to the Federal Rules of Civil Procedure, and stipulations between Counsel.

* * *

26

A. I'd have to confirm that with Philip.
Q. Okay. You can do that also.
Do you have a record of the interview that Philip conducted with Ronni Meltzer?
A. No. That is reflected in our conclusions and we obtained, during that, the document, the systems description that is included as one of our exhibits, which Philip walked through her to gain an understanding of the accounting system.
Q. I'm not following you as to which document you're talking about. Could you clarify that for me?
A. Certainly. The document at tab 8.
Q. And can you read the name of that document for me?
A. Yes. Description of the project accounting system.
Q. So Philip addressed that document with Ronni Meltzer?
A. Correct. The purpose --
Q. Go ahead.

27

A. The purpose of the meeting with Ms. Meltzer was to gain an understanding of the accounting system documentation.
Q. What else was discussed during the interview with Ronni Meltzer?
A. I do not know. The focus was the accounting system, as I understand it.
Q. Are there any notes of the interview with Ronni Meltzer?
A. Not that I'm aware of. After the interview, we -- the knowledge we have is essentially reflected in this report.
Q. Well, do you know whether Philip took notes of the interview with Ronni Meltzer?
A. I'd have to confirm that with Philip.
Q. You could do that also.
A. Certainly.
Q. And you can confirm whether or not he has such notes.
A. Yes.
Q. Now, I think earlier you were telling me that you and Philip did an outline of positions.

28

A. What we did, I used the term outline. We discussed the format of our report. In Exhibit 2, you will notice the way we have set out the sections. That's what I refer to. That we agree that we write a background section discussion of the bond indemnity, etcetera, the layout of the flow of the draft.
Q. Did you also put together a document that was actually an outline of what then would be addressed in the report?
A. No. From that we drafted and prepared the report, proceeded to work the various wording and resulted in this report. As a matter of practice, as we go through, we don't save our drafts. We only maintain the final work product.
Q. So I take it that you have not maintained any drafts leading up to the final report; is that right?
A. That is correct.
Q. That's your usual practice?
A. Yes, it is.

29

Q. Now, did Philip work on a draft of the report?
A. Yes.
Q. And, well, can you explain to me, was he drafting certain portions and you drafting other portions, or was it -- how was this report prepared?
A. I think your summary is a fair one. That certain sections I drafted, certain sections Philip drafted others. I had Philip collect some of the basic information. I proceeded to add or modify it. Obviously, my final edits and my final review and edits are the result in the final report.
Q. Does the report also reflect Philip's final edits?
A. I, as the partner, do the editing. The final report reflects my expert opinion, and as I said earlier, Philip helped me prepare some of the material and did some of the research for me.
Q. Well, did Philip read and review the report before it was issued?
A. Oh, absolutely.

Status Hearing On February 8, 2007

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MORSE DIESEL, | ) | |
| Plaintiff, | ) | Case No.: 99-279C |
| v. | ) | |
| UNITED STATES, | ) | |
| Defendant. | ) | |

Live Tape

(The following transcript was transcribed from a digital recording provided by U.S. Court of Federal Claims to Heritage Reporting Corporation on April 5, 2007.)

Pages: 1 through 44

Place: Washington, D.C.

Date: April 5, 2007

**HERITAGE REPORTING CORPORATION**

*Official Reporters*

1220 L Street, N.W., Suite 600

Washington, D.C. 20005-4018

(202) 628-4888

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MORSE DIESEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 99-279C |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Thursday,
April 5, 2007

Live Tape

(The following transcript was transcribed from a digital recording provided by United States Court of Federal Claims to Heritage Reporting Corporation on April 5, 2007.)

APPEARANCES:

For the Plaintiff:

JAMES WAREHAM, Esquire
KIRBY BEHRE, Esquire
Paul Hastings Jenosky and Walker

For the Defedant:

DOMENIQUE KIRCHNER, Esquire
TRACY HILMER
U.S. Department of Justice

Also Present:

KATHERINE CROWE
General Services Administration

there is no injury.

MS. KIRCHNER: Well, no, Your Honor, they didn't contend that in the affidavit.

THE COURT: Oh, okay.

MS. KIRCHNER: But there is a declaration of Ronny Brenner.

THE COURT: Yes.

MS. KIRCHNER: It begins in the appendix. It's in the Plaintiff's Volume 4, and it begins at page 1049. So I'm assuming that their position on damages is similar to that declaration.

And what I would propose to the Court is that both parties address the damages issues by filing briefs, and if the Court wants to have a hearing after the briefs are filed --

THE COURT: Is this something I can do on summary judgment?

MS. KIRCHNER: We believe so, Your Honor. The big issue on damages is whether the Federal Circuit's decision in Young Mott Naye applies here, construing False Claims Act damages, and so it involves the parties' interpretation, our interpretation of that decision, the Plaintiff's interpretation of that decision, and of course the Court will decide what the appropriate damages are in

view of the law.

So we think that the damages issue and (inaudible) can be addressed through briefs, and so we would ask the Court --

THE COURT: So you want to put together a scheduling proposal for me?

MS. KIRCHNER: Your Honor, what we would propose for the government's brief is that we would file our brief on March 30th. If we could file it sooner, we will file it sooner, but we do want to have conversations with Plaintiff's counsel also on damages before we file that brief. So we would propose March 30th for the government's brief.

MR. BEHRE: I think we're getting a little ahead of ourselves, and we do intend to sit down with the government. We do want to at least attempt to narrow the issues, perhaps even resolve some of them, which would truncate or obviate the need for a hearing.

We need guidance from the Court as to what it meant in its opinion with regard to damages. I think there is a couple of ways you could read that, and I think the government has one view and we have another view.

THE COURT: Well, tell me what the issues

MS. KIRCHNER: Your Honor, as I laid out before, the government provided during the discovery period a report on damages done by the auditor, John Walsh.

THE COURT: Yes.

MS. KIRCHNER: And Mr. Walsh was already deposed on his report on damages.

THE COURT: Right, but how many law firms deposed him, but he's got new counsel. I think under the circumstances and given the amount of time that's gone past if they certainly wanted to depose him again, I would not oppose that.

MS. KIRCHNER: Your Honor, what I was proposing --

THE COURT: I think that's fair.

MS. KIRCHNER: -- is wait and see what we file in our brief on damages --

THE COURT: All right.

MS. KIRCHNER: -- and they will understand what the scope is and what the government is asking for based on the Court's opinion and --

THE COURT: Well, see, this is the issue. If I set down a briefing schedule, it's going to be hard for them to do a deposition in the middle of doing briefing and response to you.

MS. KIRCHNER: Well, Your Honor, I think they can certainly wait for Mr. Walsh's report. I think it's really going to be a matter of calculations.

THE COURT: Well, they have his report, you said.

MS. KIRCHNER: Well, yes. That's true, they did, but the report includes other items that the Court has not addressed in its opinion, so we're going to take that out, so it's a matter of subtracting things and coming up with the number that the government is asking for.

THE COURT: All right.

MS. KIRCHNER: It's not going to be a change in the analysis. It's going to be a change --

THE COURT: Well, wouldn't it be better for you to do that first and then do your briefs?

MS. KIRCHNER: Well, certainly we will. We will. It will be done before March 30th, and we'll file our brief on March 30th.

MR. BEHRE: That would mean then that the discovery regarding that individual would need to take place before the 30th.

MS. KIRCHNER: Well, Your Honor, I guess I really don't understand why you would need to take a

deposition of another computation that's just reformulated and you are minusing out items. We have an extensive damage report that was done, and what we're going to do is minus out items that have to do with subcontractors, have to do with door frames, and just put in the damages that correspond with the Court's rulings.

I think the Plaintiff could wait and see whether they really want to take a deposition and burn up money on arithmetic.

MR. BEHRE: Well, presumably, Your Honor, it's more than just arithmetic because this individual is being proffered as some sort of an expert.

THE COURT: He's the guy from GSA? He's the auditor?

MS. KIRCHNER: He's the auditor from the OIG GSA.

THE COURT: Oh, yes, okay.

MS. KIRCHNER: I think really in the end, Your Honor, it's a legal question for the Court, and you can look at the affidavit that Ms. Brenner put in. That's full of computations.

THE COURT: Right, right. But here's my point. One can make a value judgment about prior counsel for the Plaintiff. Certainly I have made a