**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMEC CONSTRUCTION MANAGEMENT, INC., f/k/a Morse Diesel International, Inc.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Case No. 99-279 and consolidated cases (Judge Braden) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SPOLIATION SANCTIONS**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 2

A. The Government Did Not Issue a Document Preservation Notice Until July 2007, Twelve Years After the Litigation Commenced. ..... 5

B. Critical Government Witness John Walsh Destroyed Relevant Evidence. ..... 9

III. ARGUMENT ..... 13

A. This Court has the Authority to Impose Spoliation Sanctions as a Result of the Government's Failures. ..... 15

B. Adverse Inference Spoliation Sanctions are Appropriate. ..... 17

1. The Government failed to meet its fundamental legal obligations to issue preservation instructions and preserve documents. ..... 18

a. The Government violated its duty to instruct Mr. Walsh to preserve documents as a fact witness. ..... 20

b. The Government violated its duty to preserve expert witness documents. ..... 22

2. The records were destroyed with a culpable state of mind. ..... 26

3. The destroyed evidence was directly relevant. ..... 30

C. The Court Should Draw an Adverse Inference Warranting Reversal of Its Judgments on Liability and Damages; Alternatively, the Court Should Adopt ACMI's Damages Theory. ..... 31

D. ACMI Is Also Entitled to a Monetary Penalty, Attorneys' Fees, and Costs. ..... 37

IV. CONCLUSION ..... 38

## TABLE OF AUTHORITIES

### CASES

*3M Innovative Properties Co. v. Tomar Electronics*,
Civil No. 05-756 (MJD/AJB), 2006 WL 2670038 (D. Minn. Sept. 18, 2006) ............... 33, 34

*AAB Joint Venture v. United States*,
75 Fed. Cl. 432 (2007) ............ 2, 19, 22, 27

*Am. Fed. Bank, FSB v. United States*,
72 Fed. Cl. 586 (2006) ............ 15

*Anderson v. National Railroad Passenger Corp*.,
866 F. Supp. 937 (E.D. Va. 1994) ............ 17

*Armory v. Delamirie*,
1 Strange 505, 93 Eng. Rep. 664 (K.B. 1722) ............ 17

*Brady v. Maryland*,
373 U.S. 83 (1963) ............ 22

*Byrnie v. Town of Cromwell*,
243 F.3d 93 (2d Cir. 2001) ............ 17, 36

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) ............ 15

*DaimlerChrysler Motors v. Bill Davis Racing, Inc.*,
No.Civ. A. 03-72265, 2005 WL 3502172 (E.D. Mich. Dec. 22, 2005) ............ 33

*Doe v. Norwalk Cmty. Coll.*,
No.3:04-CV-1976-JCH, 2007 WL 2066497 (D. Conn. July 16, 2007) ............ 28, 38

*E*Trade Securities LLC v. Deutsche Bank AG*,
230 F.R.D. 582(D. Minn. 2005) ............ 26, 28

*Georgou v. Fritzshall*,
No. 93 C 997, 1996 WL 73592 (N.D. Ill. Feb. 20, 1996) ............ 24

*Google, Inc v. American Blind & Wallpaper Factory, Inc.*,
No. C 03-5340 JF(RS), 2007 WL 1848665 (N.D. Cal. June 27, 2007) ............ 32, 33

*Herman v. Marine Midland Bank*,
207 F.R.D. 26 (W.D.N.Y. 2002) ............ 24

*In re Agent Orange Product Liability Litig.*, 506 F. Supp. 750 (E.D.N.Y. 1980) ............ 19

*In re Napster, Inc. Copyright Litig.*,
462 F. Supp. 2d 1060 (N.D. Cal. 2006) ............ 34

*In re NTL, Inc. Sec. Litig.*,
244 F.R.D. 179 (S.D.N.Y. 2007) ............ 35

*In re Pioneer Hi-Bred Int'l, Inc.*,
238 F.3d 1370, 1375 (Fed. Cir. 2001) ............ 24

*In re Prudential Ins. Co. Sales Practices Litig.*,
169 F.R.D. 598 (D.N.J. 1997) ............ 32, 37

*In re WRT Energy Sec. Litig.*,
Nos. 96 CV 3610 and 96 CV 3611, 2007 WL 2826624 (S.D.N.Y. Sept. 28, 1997) ............ 35

*Jandreau v. Nicholson*,
492 F.3d 1372 (Fed. Cir. 2007) ........ 17, 18, 28

*Jencks v. United States*,
353 U.S. 657 (1957) ........ 22

*Kelley v. United Airlines, Inc.*,
176 F.R.D. 422 (D. Mass. 1997) ........ 28

*Kronisch v. United States*,
150 F.3d 112 (2d Cir. 1998) ........ 36

*Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983) ........ 32

*Nation-Wide Check Corp. v. Forest Hills Distributors, Inc.*,
692 F.2d 214 (1st Cir. 1982) ........ 17

*Precision Specialty Metals, Inc. v. United States*,
315 F.3d 1346 (Fed. Cir. 2003) ........ 15

*Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure and the Federal Rules of Evidence*,
137 F.R.D. 53 (1991) ........ 23

*Pueblo of Laguna v. United States*,
60 Fed. Cl. 133 (2004) ........ 19, 27, 32

*Reg'l Airport Auth. of Louisville v. LFG, LLC*,
460 F.3d 697 (6th Cir. 2006) ........ 24

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
306 F.3d 99 (2d. Cir. 2002) ........ 17, 28

*Rogers v. T.J. Samson Cmty. Hosp.*,
276 F.3d 228 (6th Cir.2002) ........ 28

*Sensonics, Inc. v. Aerosonic Corp.*,
81 F.3d 1566 (Fed. Cir. 1996) ........ 2, 19, 22, 32

*Stevenson v. Union Pac. R.R. Co.*,
354 F.3d 739 (8th Cir. 2004) ........ 26, 28

*Trigon Ins. Co. v. United States*,
204 F.R.D. 277 (E.D. Va. 2001) ........ 23, 24, 32

*United Med. Supply Co., Inc. v. United States*,
77 Fed. Cl. 257 (2007) ........ passim

*United States v. City of Torrance*,
163 F.R.D. 590 (C.D. Cal. 1995) ........ 24

*Welsh v. United States*,
844 F.2d 1239 (6th Cir. 1988) ........ 18

*West v. Goodyear Tire & Rubber Co.*,
167 F.3d 776 (2d Cir. 1999) ........ 15

*Wm. T. Thompson Co. v. General Nutrition Corp.*,
593 F. Supp. 1443 (C.D. Cal. 1984) ........ 19

*Zoltek Corp. v. United States*,
71 Fed. Cl. 160 (2006) ........ 15

*Zubulake v. UBS Warburg LLC*,
220 F.R.D. 212 (S.D.N.Y. 2003) ........ 28

**OTHER AUTHORITIES**

*Black's Law Dictionary* 1401 (6th ed.1990) ........ 15

*Webster's Third New International Dictionary* (1986) ........ 23

**RULES**

Fed. R. Civ. P. 26, 1993 Advisory Committee's Notes........ 23

RCFC 26, Rules Committee Note 2002 Revision ........ 22

RCFC 37 ........ 15

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| AMEC CONSTRUCTION MANAGEMENT, INC., f/k/a Morse Diesel International, Inc.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | Case No. 99-279 and consolidated cases (Judge Braden) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SPOLIATION SANCTIONS**

## I. INTRODUCTION

Plaintiff, AMEC Construction Management, Inc. ("ACMI"), f/k/a Morse Diesel International, Inc., respectfully moves the Court to impose sanctions upon the Government for the Government's abject failure to institute document preservation protocols and issue document preservation notices at any time in the twelve years since the onset of this case and the destruction of documents that resulted from that failure. The Government flagrantly violated its obligations under the rules of this Court. The appropriate sanction for the Government's conduct is an adverse inference that any documents destroyed would have been favorable to ACMI, an award of a monetary penalty, and an award of attorneys' fees and costs in discovering and litigating the spoliation. This Court should apply the adverse inference to vacate and reconsider the July 2005 and January 2007 summary judgment rulings on liability and its October 2007 summary judgment ruling on the damages amount. In the alternative, the adverse inference warrants a ruling on damages that an interest-only calculation should be used to calculate damages.

## II. FACTUAL BACKGROUND

The Government's duty to preserve documents relevant to this litigation first arose in the Spring of 1995, when the Government discovered that an ACMI non-management level employee had falsely stamped invoices as "paid" on the contract for Phase I of the Thomas F. Eagleton Courthouse in St. Louis, Missouri ("St. Louis Phase I Contract"). Deposition of John Walsh 05/04/07 (Walsh Dep. 05/04/07), at 74:7-12 (Excerpts attached as Ex. 1); Deposition of John Walsh 05/16/02 (Walsh Dep. 05/16/02), at 76:11-78:5 (Excerpts attached as Ex. 2).[1] At that time, the Government knew and should have known that there was anticipated litigation, and thus a duty arose to issue a preservation notice to relevant employees to preserve all documents relevant to the litigation. *See AAB Joint Venture v. United States*, 75 Fed. Cl. 432, 440 (2007) (citing *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1573 (Fed. Cir. 1996)). A preservation notice, also referred to as a litigation hold, legal hold, or freeze notice, is "a communication issued as a result of current or anticipated litigation, audit, government investigation or other such matter that suspends the normal disposition or processing of records."[2] John Walsh, the Government's employee who discovered the alleged fraud, one of the main auditors on the project with the GSA's Office of Inspector General ("OIG"), and the Government's designated

---

[1] The Government, contrary to the testimony of its witness who discovered the misconduct, contends it learned of the misconduct in November 1996. To the extent the Court relied on the Government's contention, a finding in favor of the Government on that fact cannot withstand scrutiny in light of the Government's destruction of documents that might have been favorable to ACMI showing that the Government discovered the misconduct in 1995.

[2] *See, e.g., The Sedona Conference Glossary: E-Discovery & Digital Information Management*, definition of "legal hold" at 26, available at http://www.trilantic.co.uk/pdfs/Sedona%20Conference%20Glossary%20May%202005.pdf (May 2005) Attached as Exhibit 3, and *The Sedona Conference Commentary on Legal Holds, The Trigger & The Process*, at 1, available at http://www.thesedonaconference.org/content/miscFiles/publications_html?grp=wgs110 (August 2007) Attached as Exhibit 4.

expert witness, is a prime example of the type of employee who should have received a document preservation notice.

Indeed, numerous events, beginning in 1995, also placed the Government on repeated notice of its duty to preserve relevant documents. In the four-year period following the Spring of 1995, multiple lawsuits were filed, constituting repeated notice to the Government to issue a document preservation notice to all relevant employees and potential witnesses. In September 1995, several months after discovering the misconduct on the St. Louis Phase I Contract, GSA awarded ACMI Contract No. GS06P95GZC0501 to complete construction of the St. Louis Courthouse ("Phase II Contract"). On April 9, 1996, the Government terminated ACMI on the Phase II Contract for convenience. Shortly thereafter, on May 2, 1996, ACMI was reinstated on the Phase II Contract. In 1998, Mr. Walsh was designated to start the development of a counterclaim, according to Government documents produced to ACMI during discovery indicating that activity on the "Phase II - Action Items" list for March 17, 1998. On June 16, 1999, the Government, after allowing ACMI to perform millions of dollars of work on the St. Louis courthouse, terminated ACMI from the Phase II Contract for default without prior notice. ACMI filed its complaint for contract reformation in the Court of Federal Claims on December 4, 1998 (docketed to Case No. 98-908C). On May 5, 1999, ACMI filed its appeal from the final decision of the Contracting Officer denying its claim for equitable adjustment in connection with the Phase II Contract (docketed to Case. No. 99-279 in the Court of Federal Claims).

The Government, however, failed to issue any document preservation notice in 1995, 1996, 1998, or 1999. It was not until approximately July 2007, after ACMI successfully compelled the Government to produce Mr. Walsh for a deposition regarding the Government's

failure to preserve documents that the Government finally issued some type of lengthy preservation instruction:[3]

> Q But sitting here today, is it your testimony that on or before May the 4th, 2007 you never received any instruction to retain e-mails with regard to this case?
> A Yes, I do not recall receiving that specific instruction.
> * * *
> Q And when did you receive those instructions to retain e-mails?
> A I can't remember the exact date. It was recently. I believe it was in July.
> Q And was that instruction in writing or oral?
> A In writing.
> Q And who did you receive it from?
> A From Eric Miller.
> Q And was it a – can you tell us the length of the writing that provided that instruction?
> A I believe it was a three-page document.

Walsh Dep. 08/29/07, at 163:15-20; 165:12-25 (Attached in it's entirety as Ex. 5, including Exhibit 102 to the Deposition). Yet, in 2004, the Government misrepresented to this Court that the "GSA's documents pertaining to the litigation, including the Government's counterclaims, have been preserved." Defendant's Motion to Stay Discovery and for Protective Order, and for an Enlargement of Time dated March 11, 2004, at 13. The Government made this representation in opposition to ACMI's concern that important documents might not be preserved. Now three years later, as Mr. Walsh's testimony makes clear, all of the relevant documents had not been preserved. The Government's issuance of one egregiously belated preservation instruction to *one witness* in July 2007 was far too late to prevent relevant documents generated by critical Government witnesses from being destroyed.

---

[3] The exact contents of the July 2007 preservation instruction are still unknown to ACMI because the Government claimed a privilege for communications related to preservation instructions. Indeed, this Court knows better than ACMI the contents of that instruction from its review of that document *in camera*. The Government's decision to insist on maintaining the tenuous privilege has caused ACMI further prejudice by requiring ACMI to depose Mr. Walsh without the benefit of the July 2007 notice sent to him.

### A. The Government Did Not Issue a Document Preservation Notice Until July 2007, Twelve Years After the Litigation Commenced.

The Government's failure to preserve all documents relevant to this litigation is epitomized by its failure to instruct its critical witness, Mr. Walsh, to preserve documents, the very witness who discovered the misconduct and built the Government's damages claims as its expert. Although Mr. Walsh became involved in the investigation and auditing of ACMI in March 1995, the Government did not issue a single document preservation instruction to Mr. Walsh until approximately twelve years later in July 2007, two months after the document retention issue was raised by ACMI's counsel in Mr. Walsh's May 4, 2007 deposition. Walsh Dep. 08/29/07, at 163:6-20; 165:12-15. Walsh testified:

> Q At any point between 1995 and the present day, did you receive any instructions as to how you were to determine what documents were relevant to any pending litigation that existed between the government and Morse Diesel or ACMI?
> A Aside from the recent instruction I received, I cannot recall.
> Q And by "recent instructions," do you mean instructions you received after your testimony in May of 2007? Correct?
> A That's correct.

Walsh Dep. 08/29/07, at 230:2-12. Logically, if the Government failed to issue a document preservation notice to its most important witness, it quite certainly failed to issue document preservation notices to other relevant employees.[4] Therefore, it is impossible for ACMI to determine the magnitude of the Government's spoliation. What is certain is that the Government failed to issue preservation instructions at no less than *eleven* critical junctures in the litigation:

---

[4] ACMI could only discover whether other witnesses failed to receive document preservation notices if the Court granted ACMI the opportunity to depose other witnesses. Mr. Walsh's testimony, however, is sufficient to demonstrate the widespread document destruction that occurred within the Government relevant to this litigation.

- In March 1995, when Mr. Walsh discovered that ACMI had been submitting falsely stamped invoices in the Phase I project, Mr. Walsh did not receive any instruction to retain documents. Walsh Dep. 08/29/07, at 189:2-8.
- In the Summer of 1995, when Mr. Anderson of GSA-OIG opened a separate investigation, Mr. Walsh did not receive any instruction to retain documents. Walsh Dep. 08/29/07, at 189:9-16.
- In December 1995, when ACMI filed claims related to the Phase I Contract with the GSBCA, Mr. Walsh does not recall receiving any instruction to retain documents. Walsh Dep. 08/29/07, at 189:17-90:2.
- In the Spring of 1996, when Mr. Walsh performed an audit of the Phase II project and determined false invoices had been submitted, Mr. Walsh did not receive any instruction to retain documents. *See* Ex. 10 to Walsh Dep. 08/29/07 (11/08/96 Memorandum of Interview of J. Walsh by S. Anderson); Walsh Dep. 08/29/07, at 230:2-12.
- In December 1997, when ACMI filed another claim with the GSBCA related to the Phase I Contract, Mr. Walsh does not recall receiving any instruction to retain documents. Walsh Dep. 08/29/07, at 190:3-9.
- In December 1998, when ACMI filed a complaint in the Court of Federal Claims regarding the Phase I Contract, Mr. Walsh does not recall receiving any instruction to retain documents. Walsh Dep. 08/29/07, at 190:10-16.
- In February 1999, when Mr. Anderson issued a GSA-OIG investigation report, Mr. Walsh does not recall receiving any instruction to retain documents. Walsh Dep. 08/29/07, at 190P:17-25.
- In May 1999, when ACMI filed its first complaint in the Court of Federal Claims regarding the Phase II Contract, Mr. Walsh does not recall receiving any instruction to retain documents. Walsh Dep. 08/29/07, at 191:2-7.
- In June 1999, when the Government terminated ACMI from the Phase II Contract for default, Mr. Walsh does not recall receiving any instruction to retain documents. Walsh Dep. 08/29/07, at 191:8-17. That same month, the Government had filed a Civil False Claims Act case in the Eastern District of Missouri, Civ. Case No. 4:99-cv-00908-UNA.
- In July 1999, when ACMI filed complaints in both the GSBCA and the Court of Federal Claims, Mr. Walsh does not recall receiving any instruction to retain documents. Walsh Dep. 08/29/07, at 191:18-24.
- In October 1999, when the Government filed counterclaims in the Court of Federal Claims alleging fraud and seeking forfeiture, Mr. Walsh does not recall receiving any instruction to retain documents. Walsh Dep. 08/29/07, at 191:25-192:8.

At some point after the termination for default on the Phase II Contract in June 1999, Domenique Kirchner verbally asked Mr. Walsh to transfer some printed hard-copy documents in his possession to a storage facility in Kansas City. Walsh Dep. 08/29/07, at 192:9-

19. Mr. Walsh does not "remember the specific instruction, but I provided all audit documentation and any papers that I had related to the case at that point in time that they – they were to be transferred." Walsh Dep. 08/29/07, at 192:23-193:3. Mr. Walsh, however, did not send any e-mails to storage in Kansas City, despite the fact that he did send and receive e-mails related to the litigation after 1999:

> Q And at any point following your placing some of your records in storage in Kansas City, did you send or receive any e-mails in any way relating to ACMI, Morse Diesel or its contracts?
> A Yes.
> Q And at any point have you been instructed to retain, safeguard or otherwise not delete any of those e-mails?
> A Aside from recent instruction, I don't recall a specific instruction.
> Q Do you recall a general instruction?
> A Aside from what I received recently, I do not recall a general instruction.
> Q So, then, you received no instruction to safeguard those e-mails; correct?
> A I don't recall.

Walsh Dep. 08/29/07, at 197:22-198:20; 241:6-242:3. Even though some hard copy documents were sent to storage in Kansas in 1999, those documents only contained documents Mr. Walsh retained because he thought they were "important" or "support[ed] the audit findings and conclusions." *See infra* at 11-12. Mr. Walsh further testified that between 1999 and July 2007 he did not receive any instructions to retain documents. Walsh Dep. 08/29/07, at 210:10-16. He testified that for the period 1999 through 2007, "I don't know where e-mails that I sent would be at." Walsh Dep. 08/29/07, at 209:22-210:9.

Indeed, the Government evidently failed to inform Mr. Walsh of the Government's document retention policy in place between 1999 and 2004, which provided that on a weekly basis all e-mails older than 60 days in his inbox, sent mail, trash can, or other folders he created would be deleted:

> Q Are you aware that GSA policy as of December 4th, 1999 was that on a weekly basis -- and, actually, on every weekend -- messages that were older than 60 days that were located in either your in-box, your sent mail, your trash can or any user-created folders you created, were deleted during what is referred to as a weekly mail file cleaning process?
> A I don't believe that happened with any of my messages.
> Q And why do you believe that?
> A We were never instructed that that would happen.

Walsh Dep. 08/29/07, at 230:13-25; *see also* Exhibit 102, at 6. Contrary to the policy's reference that only a user has the ability to take actions to stop the automatic deletion – in other words, the computer did not decide for itself whether to archive e-mails – Mr. Walsh testified that did not take any actions to save any e-mails because he believed the computer automatically archived them. Walsh Dep. 08/29/07, at 231:13-236:7; see also Exhibit 102, at 6 ("All users are encouraged to use the archiving tool to retain any messages that they wish to keep for longer than 60 days. . . . You can set rules to archive all messages or selected messages."). Mr. Walsh's naïve presumption that the computer somehow decided for itself which e-mails he wanted to archive became even more muddled when he testified that "[e]verything that was 60 days old it would have archived," but that "not every [e-mail] that I sent or received" would be automatically archived by his computer, and that "I believe that any e-mail I deleted would not have been archived." Walsh Dep. 08/29/07, at 231:13-236:7.

Notwithstanding the 60-day automatic deletion policy, Mr. Walsh testified repeatedly that he saved and was required to save only those e-mails and documents (electronic and hard copy) that he alone determined "support[ed] [his] audit findings." Walsh Dep. 08/29/07, at 237:16-238:8. The Government's failure to issue document preservation instructions is all the more unmistakable from Mr. Walsh's remarkable testimony, especially as an expert witness and a fact witness involved in investigations that often lead to litigation, that he

is not familiar with the terms "litigation hold" or "freeze notice." Walsh Dep. 08/29/07, at 238:22-239:3.

**B. <u>Critical Government Witness John Walsh Destroyed Relevant Evidence.</u>**

By his own admission, since 1995, Mr. Walsh has been a fact and expert witness for the Government investigating the allegations of misconduct and conducting interviews regarding ACMI's performance on the St. Louis Courthouse Phase I and Phase II projects. Walsh Dep. 08/29/07, at 169:2-170:7. For example, Mr. Walsh interviewed ACMI employees, ACMI's subcontractors, and government officials, including contracting officers responsible for ACMI's contracts and members of the government's project management team at the job site. Walsh Dep. 08/29/07, at 169:13-170:7. Mr. Walsh also participated in Steven Anderson's investigation for the GSA-OIG. Walsh Dep. 5/16/02, at 27:7-29:11. Mr. Anderson's damage calculation report dated February 18, 1999 is critical to this case because it sets forth the Government's initial position on damages adopting only one method of calculating damages – the time-value of money analysis similar to ACMI's position on damages. *See* IG Report, Case File Number I-95-0509, at 7 (Attached as Ex. 6).

Additionally, Mr. Walsh conducted audit work on the Phase I and Phase II Contracts beginning in 1995. Walsh Dep. 05/04/07, at 74:7-12; Walsh Dep. 05/16/02, at 76:11-78:5. In May of 2002 the Government produced Mr. Walsh's May 24, 2002 (Attached as Ex. 7) expert report on damages to ACMI. *See* 10/17/02 Letter from D. Kirchner to ACMI's counsel Arent Fox (Attached as Ex. 8) stating "I am enclosing a correction sheet to John Walsh's May 24, 2002 expert report on damages" and "Correction Sheet to the Expert Report of John Walsh titled 'Computation of Harm for Fraud Committed by Morse Diesel International, Inc.' dated May 24, 2002." The Government also identified Mr. Walsh to this Court as an expert to support

the Government's damages calculations in January 2004. *See* Defendant's Reply in Support of its Summary Judgment Motion on Liability, dated Jan. 16, 2004, at 16 n.9 (identifying Walsh as its "designated damages expert"); Transcript of Status Conference of Hearing, February 8, 2007, at 16:7-12 (Attached as Ex. 9) (Government indicated to the Court and to ACMI that it would be relying on an expert report by GSA-OIG Auditor John Walsh to support its claim of damages). Mr. Walsh understood he was acting as an expert witness on damages in the case. Walsh Dep. 05/04/07, at 95:10-21. Yet, Mr. Walsh astonishingly testified that he did not consider his expert witness status relevant to whether he was required to retain documents:

> Q But is it your policy with regard to a pending case, where you – as you put it, you're serving as an expert, you delete the e-mails between you and the parties who sought your assistance?
> A I—if they were unimportant. I didn't look at those e-mails in relation to being an expert witness, I just looked at them as to whether they were important for me to retain. And they were not – in my opinion, they weren't of importance, so I deleted them.

Walsh Dep. 05/04/07, at 102:11-21. After it was revealed during a May 4, 2007 deposition that Mr. Walsh had been destroying documents related to the litigation, the Government decided to end its more than three-year reliance in this Court on Mr. Walsh as a damages expert.

Mr. Walsh testified that he created the following types of documents related to the case, starting in 1995: "memorandums of discussions, spreadsheet analysis, summaries of findings and conclusions, draft audit reports, reports for counsel. And I'm sure there are some other types of analysis that I've been asked to perform." Walsh Dep. 08/29/07, at 201:3-202:11. Mr. Walsh also sent and received e-mails, and created calendar entries in the form of hard copy

notes.[5] Walsh Dep. 08/29/07, at 201:13-22. Mr. Walsh also took handwritten notes for some, but not all, of the interviews he conducted and used those notes to prepare "the final interview write-ups" or "memos of conversation." Walsh Dep. 08/29/07, at 170:8-17; 171:14-19; 199:11-19. The "final interview write-ups" were included in his audit workpapers and were believed to be retained. Walsh Dep. 08/29/07, at 170:18-23. However, Mr. Walsh did not know whether his handwritten notes had been retained, and he did not know whether the notes contained information or statements that did not make their way into the "memos of conversation." Walsh Dep. 08/29/07, at 171:20-172:5; 199:11-19; 199:24-200:14. Mr. Walsh also testified that he did not know if he had retained notes he took when attending "many depositions" of witnesses in the ACMI litigation. Walsh Dep. 08/29/07, at 239:14-240:5.

Since 1995, Mr. Walsh has applied his own rules, rather than this Court's Rules, the Federal Rules of Civil Procedure, or preservation of evidence rules defined by the Government for him, to determine what documents to save and what documents to destroy because the Government failed for twelve years to instruct Mr. Walsh to retain documents related to the case. Walsh Dep. 08/29/07, at 163:6-20; 165:12-15. Mr. Walsh retained e-mails and documents related to the investigation and litigation if, in his sole opinion, the document was "important" enough for him to save. 8/29/07 Dep. Tr. at 175, 179. Throughout his deposition, Mr. Walsh described the various slapdash and inconsistent formulas he used to determine whether to retain e-mails and documents.

---

[5] Mr. Walsh admitted he did not retain any of these calendar entries. Walsh Dep. 08/29/07, at 15-22. Mr. Walsh did not recall whether he retained "notices that somebody called and I needed to call them back." Walsh Dep. 08/29/07, at 201:23-202:11.

- Mr. Walsh retained document "if they affected any of the audit findings or conclusions," and if they "would have any impact on the case," and were "at all important to the case." Walsh Dep. 08/29/07, at 174:11-175:2.
- Mr. Walsh retained documents if they had "any bearing on any of the findings in this case" (meaning any bearing on "audit conclusions that came from me that may be used in the case") or "reflected on audit issues." Walsh Dep. 08/29/07, at 175:11-25
- Mr. Walsh retained documents if they "related directly to my audit findings or conclusions." Walsh Dep. 08/29/07, at 177:4-17
- Mr. Walsh retained documents if the documents needed to be retained "so that an independent person could come in and determine how we draw our conclusions." Walsh Dep. 08/29/07, at 179:3-19
- Mr. Walsh retained documents using "my judgment to determine what documents are – are important and necessary to support audit conclusions." "If by 'documents' you mean all documents that relate, then, no, I don't have to save all. I have to save anything that's material to the suit or the pending litigation." "I would say that an unimportant document would not be relevant." "I don't think I would draw a distinction between relative to my audit findings or relevant to this case. I would think they – in my mind, they would be one and the same." Walsh Dep. 08/29/07, at 180:15-183:10
- Mr. Walsh retained documents "Only if they had a substantive impact on the case." Walsh Dep. 08/29/07, at 186:4-18
- For e-mails and hard copy documents, Walsh retained only documents that ultimately got into the final set of audit workpapers. Walsh Dep. 08/29/07, at 193:17-196:12
- Mr. Walsh retained documents only if "the document necessary to support the audit findings and conclusions." Walsh Dep. 08/29/07, at 205:15-206:23.
- Mr. Walsh retained "any documents that would be relevant to the case – that – that – that would impact audit findings in any way, that had a material bearing on the case in any way. Not anything that was generally related, but anything that I created or received that had a substantial effect on audit findings or the case." Walsh Dep. 08/29/07, at 210:23-211:17.

In general, therefore, the Government permitted Mr. Walsh to destroy any document or e-mail that Mr. Walsh believed did not support his audit findings and conclusions or did not have a "substantive impact" or "material bearing" on the case. *See* testimony cited above. Mr. Walsh, however, also provided concrete examples of documents he failed to preserve. For example, Mr. Walsh described the types of "administrative e-mail" that he did not believe he was required to retain, including e-mail that directly related to work he did for the litigation:

> Q You indicated that there may have been administrative e-mail that you did not save; is that correct?
> A That's correct.
> Q Can you give us some examples of what you regard as an administrative -- administrative e-mail?
> A An administrative e-mail would be me organizing logistics of a meeting, *me conveying a status of the case to somebody, bringing somebody up to date with where the case is at today, telling somebody if I'm performing any -- if I'm doing any work on the case; anything that dealt with logistics or case status* would be administrative e-mail messages. *Providing somebody a document that they asked for*, I would consider that to be an administrative e-mail. Those are the primary examples that I can think of.

Walsh Dep. 08/29/07, at 249:3-21 (emphasis added). Strikingly, Walsh did not retain emails related to drafts of his expert reports. Walsh Dep. 08/29/07, at 176:2-17.

The exact scope of Mr. Walsh's document destruction over the past 12 years can never be determined because it is impossible to say how many documents and e-mails the Government, thought its recklessness, allowed Mr. Walsh to destroy. In these circumstances, as described below, courts have routinely awarded adverse inferences, monetary penalties, and attorneys' fees and costs to the adverse party.

## III. <u>ARGUMENT</u>

The exact ramifications of the Government's spoliation of evidence can never be fully determined, but it is clear that the evidentiary record in this case is woefully incomplete. Mr. Walsh, a critical fact witness and the Government's damages expert, destroyed documents relevant to the litigation for more than a decade. The record in the litigation has been generated based only on what Mr. Walsh believed was "important" to the litigation or "supported" his audit findings, not on all relevant documents, and not on documents that may have been favorable to ACMI and thus, by definition, did not support his audit findings. The Government in essence

prevented ACMI and this Court from relying on relevant documents that are now destroyed. Thus, ACMI and the Court have been severely prejudiced by Mr. Walsh's document destruction.

The Court of Federal Claims recently stated, in *United Med. Supply Co., Inc. v. United States*, that "[a]side perhaps from perjury, no act serves to threaten the integrity of the judicial process more than the spoliation of evidence. . . . . To guard against this, each party in litigation is solemnly bound to preserve potentially relevant evidence." 77 Fed. Cl. 257, 258-59 (2007) (holding injured party need not demonstrate bad faith for the court to impose spoliation sanctions). The Court noted that "[i]t has long been the rule that spoliators should not benefit from their wrongdoing" and spoliation may result in sanctions. *Id.* at 263.

This Court should impose sanctions on the Government for the spoliation of evidence resulting from its failure to properly issue an instruction to preserve all documents potentially relevant to the litigation. ACMI requests sanctions against the Government, not against Mr. Walsh individually, because it was the Government's responsibility to instruct Mr. Walsh and all other relevant employees to preserve documents.[6] The sanctions should include an adverse inference that the destroyed evidence would be favorable to ACMI on both liability and damages issues, requiring the Court to vacate and reconsider its two summary judgment decisions on liability dated July 15, 2005 (Anti-Kickback Act) and January 26, 2007 (False Claims Act) and its October 31, 2007 summary judgment decision on damages in light of the Government's spoliation. In the alternative, the adverse inference warrants a ruling that an

[6] Accordingly, the Court's statement in its October 31, 2007 decision that it did not rely on Mr. Walsh as a witness on damages is inapposite to the consideration of the instant motion because the Government's pervasive spoliation affects the liability and damages decisions notwithstanding the Court's reliance on Mr. Walsh as a witness on damages. *See* 10/31/07 Opinion, at 12 n. 8.

interest-only calculation should be used to calculate any damages. The Government's actions also warrant a monetary penalty and payment of the attorneys' fees and costs that ACMI incurred in pursuing the document destruction issues, including Mr. Walsh's August 2007 deposition and motion to compel that deposition, and the present motions practice.

### A. **<u>This Court has the Authority to Impose Spoliation Sanctions as a Result of the Government's Failures.</u>**

Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (remanding to district court and citing examples of appropriate adverse inference sanctions and cited in *United Med. Supply*, 77 Fed. Cl. at 263); s*ee generally Black's Law Dictionary* 1401 (6th ed.1990). This Court's authority to impose spoliation sanctions arises from two distinct sources. The Court has the inherent authority to impose sanctions for conduct "to control and specify the standards of lawyers who appear before it," and "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Precision Specialty Metals, Inc. v. United States*, 315 F.3d 1346, 1357-58 (Fed. Cir. 2003) (citing and quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 46-51(1991)); *see also Am. Fed. Bank, FSB v. United States*, 72 Fed. Cl. 586, 627 (2006) (noting that court has authority to impose discovery sanctions under RCFC 37(c) or pursuant to the court's inherent authority). In addition, Rule 37 of the Rules of the Court of Federal Claims ("RCFC"), and its analogue Rule 37 of the Federal Rules of Civil Procedure, provides for sanctions when a party fails to respond to discovery requests or when a party fails to comply with a court order regarding discovery. *Id.* (citing RCFC 37; *Zoltek Corp. v. United States*, 71 Fed. Cl. 160, 167 (2006)). The instant motion seeks sanctions under the Court's inherent authority because there is no discovery order currently at issue in the case.

The Court can impose a broad variety of sanctions on the Government for its spoliation of evidence. "[T]he oldest and most venerable remedy [to spoliation is] an adverse inference, under which the finder of fact may infer that the destroyed evidence would have been favorable to the opposing side." *United Med. Supply*, 77 Fed. Cl. at 263. (citation and internal quotation marks omitted). Whether proceeding under the Court's inherent authority or RCFC 37, the types of sanctions available to the Court include those specifically listed under RCFC 37(b)(2) which include "orders: (i) precluding the introduction of evidence or establishing facts; (ii) dismissing the action or parts thereof; or (iii) entering a default judgment." *Id.* at 267. In *United Medical Supply*, this Court ordered a two-faceted sanction prohibiting defendant from cross-examining plaintiff's expert regarding gaps in the record and ordering defendant to reimburse plaintiff for costs of the motion and additional discovery-related costs. *Id.* at 276. The Court found that sanctions were warranted by the defendant's reckless disregard of its preservation duty over a four-year period. *Id.* at 259-63, 273-74.

Regardless of the source of the authority to impose sanctions, the sanction must be "just and proportionate in light of the circumstances underlying the failure to preserve relevant evidence." *Id.* at 270. Spoliation sanctions are meant to serve "punitive, prophylactic, remedial and institutional purposes." *Id.* In light of these purposes, there are no bright lines to guide what sanction is applicable to what type of spoliation conduct. "Under this flexible standard, repeated acts of gross negligence, particularly if accompanied by inaccurate representations to the court that serve to mask and perpetuate the spoliation, can be met with the same or a more severe sanction than a single act of bad faith." *Id.* at 271. As discussed below, the Government's repeated and persistent failure to issue preservation instructions or implement preservation practices for this litigation warrants the imposition of a serious spoliation sanction.

**B. <u>Adverse Inference Spoliation Sanctions are Appropriate.</u>**

An adverse inference is appropriate because the Government wholly failed to issue timely document preservation instructions. "The [spoliation] inference stems from the 'common sense observation that a party who has notice that [evidence] is relevant to litigation and who proceeds to destroy [evidence] is more likely to have been threatened by [that evidence] than a party in the same position who does not destroy the [evidence].'" *Anderson v. National R.R. Passenger Corp.*, 866 F. Supp. 937, 945 (E.D. Va. 1994) (quoting *Nation-Wide Check Corp. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 218 (1st Cir. 1982)). In *Jandreau v. Nicholson*, the United States Court of Appeals for the Federal Circuit stated:

> The general rules of evidence law create an adverse inference when evidence has been destroyed and "(1) . . . the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) . . . the records were destroyed with a culpable state of mind; and (3) . . . the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."

492 F.3d 1372, 1375 (Fed. Cir. 2007) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d. Cir. 2002)). A party seeking an adverse inference may rely on circumstantial evidence to presumptively establish the contents of the destroyed evidence. *Byrnie v. Town of Cromwell*, 243 F.3d 93, 110 (2d Cir. 2001). Indeed, the principle that an adverse inference can be drawn against a party who has lost or destroyed evidence can be traced to a famous 18th century common law case, in which a chimney sweep who found a jewel ring took it to a jeweler for appraisal, got back the ring minus the jewel and sued the jeweler in trover for loss of the jewel. *Armory v. Delamirie*, 1 Strange 505, 93 Eng. Rep. 664 (K.B. 1722). The chimney sweep was entitled, based on the jeweler's return of the ring without the stone, to an inference that the stone was "of the finest water." *Id*. (cited in *Welsh v. United States*, 844 F.2d

1239, 1246 (6th Cir. 1988) (affirming application of rebuttable presumption of causation against the Government, which the Government failed to rebut, as an adverse inference resulting from destruction of a skull flap in medical malpractice case)).

The Federal Circuit in *Jandreau* recently considered what state of mind is required to order spoliation sanctions. The *Jandreau* court did not decide whether it would find a "culpable state of mind" from a showing that a party was negligent in the destruction of documents, but acknowledged that some circuits had found negligent conduct supported an adverse inference. 429 F.3d at 1375-76 & n.3 (noting circuit split). The Court of Federal Claims recently stated that "an injured party need not demonstrate bad faith in order for the court to impose, under its inherent authority, spoliation sanctions." *United Med. Supply*, 77 Fed. Cl. at 268. The Court noted that the spoliation doctrine "was not designed solely to punish those who consciously destroy inculpatory documents, but also to address the manifest unfairness in the loss of relevant evidence." *Id*. at 268-69.

All three of the factors considered in *Jandreau* are present in this case: (1) the Government had an obligation to preserve all relevant documents, particularly in light of Mr. Walsh's expert witness status; (2) the Government destroyed the documents if not in bad faith, then at least with recklessness or gross negligence over a period of twelve years by wholly failing to instruct Mr. Walsh on his ongoing obligation to preserve relevant documents; and (3) the destroyed evidence was relevant to the litigation.

**1. <u>The Government failed to meet its fundamental legal obligations to issue preservation instructions and preserve documents.</u>**

The Government had a duty to inform Mr. Walsh to preserve documents in his dual roles as a fact witness and as an expert witness, and Mr. Walsh had a duty to retain those

documents. "Federal courts have long recognized a duty of the parties to preserve relevant evidence for litigation." *AAB Joint Venture*, 75 Fed. Cl. at 440 (citing *Sensonics*, 81 F.3d at 1573). The duty to preserve evidence is broad and extends to electronic documents and e-mails. *See, e.g.*, *AAB Joint Venture*, 75 Fed. Cl. at 441 (stating "The scope of the duty to preserve extends to electronic documents, such as e-mails and back-up tapes."); *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 135-36 (2004) (issuing preservation order and recognizing that document destruction hinders the administration of justice). This duty attaches whenever a party knows or should know that evidence may be relevant to anticipated litigation. *AAB Joint Venture*, 75 Fed. Cl. at 440. The Government unquestionably cannot protest that it was unaware of its duty to preserve evidence and to communicate the preservation obligation to employees because discussions of the duty have been in the mainstream of legal decisions years before this case arose in 1995. For decades, federal courts have sanctioned parties for the failure to preserve documents:

> While a litigant is under no duty to keep or retain every document in its possession once a complaint is filed, it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request.

*See, e.g., Wm. T. Thompson Co. v. General Nutrition Corp.,* 593 F. Supp. 1443, 1455 (C.D. Cal. 1984) (ordering default judgment where defendant failed to preserve documents, failed to monitor document destruction, made incorrect representations to the court about whether it had preserved documents, and permitted its employees to destroy documents). *See also In re Agent Orange Product Liability Litig.*, 506 F. Supp. 750, 751 (E.D.N.Y. 1980) (government was obligated to preserve documents requested in motions to produce despite government's document destruction program and general stay of discovery); RCFC 26.

In contrast, Mr. Walsh baldly admitted, in response to the question whether he had to save all documents relating to the litigation: "If by 'documents' you mean all documents that relate, then, no, I don't have to save all. I have to save anything that's *material to* the suit or the pending litigation." Walsh Dep. 08/29/07, at 181:18-25 (emphasis added). As demonstrated by the case law above, case law which is consistent throughout the country, the standard is not to preserve only documents a particular witness believes is important or material to the litigation. The obligation is to preserve everything relevant to the action or reasonably likely to be requested in discovery.

This Court has even suggested that the Government has a heightened duty to preserve documents:

> It is the duty of the United States, no less than any other party before this court, to ensure, through its agents, that documents relevant to a case are preserved. Indeed, while not entering in the calculus here, a good argument can be made that, as the enforcer of the laws, the United States should take this duty more seriously than any other litigant.

*United Med. Supply Co., Inc.*, 77 Fed. Cl. at 274 (emphasis added). The Government's spoliation here, encompassing twelve years worth of relevant documents, is particularly prejudicial in this case, where the Government repeatedly delayed for years bringing claims against ACMI while it simultaneously permitted relevant documents to be destroyed.[7]

**a. The Government violated its duty to instruct Mr. Walsh to preserve documents as a fact witness.**

[7] For example, the Government waited six years before bringing its excess reprocurement claims against ACMI.

The instant case is a clear example of the Government's failure to comply with its duty to preserve evidence relevant to both anticipated and pending litigation. Although Mr. Walsh became involved in the investigation and auditing of ACMI in approximately March 1995, the Government failed to issue any written or oral instructions to Walsh to retain documents relevant to the litigation until approximately twelve years later in July 2007, two months after the document retention issue was raised by ACMI's counsel in Walsh's May 4, 2007 deposition. The Government knew that the evidence Mr. Walsh and Mr. Anderson gathered, beginning in the Spring and Summer of 1995 and in connection with the false bond stamping investigation, would be relevant to anticipated litigation.[8] Mr. Walsh performed his audit in the Spring of 1995. Walsh Dep. 05/04/07, at 74:7-12; Walsh Dep. 05/16/02, at 76:11-78:5. Mr. Walsh then contributed to Mr. Anderson's investigation of ACMI that began in Summer of 1995 and apparently continued for some lengthy period of time. Walsh Dep. 05/16/02, at 27:7-29:11. Mr. Anderson's investigation clearly was conducted in anticipation of litigation as a GSA-authored e-mail from November 2, 1995 states that Mr. Anderson's investigation was referred to, being coordinated with, and being directed by the U.S. Attorney's Office, St. Louis, Missouri. Steve Anderson 9/28/01, Dep., Ex. 9, Nov. 2, 1995 e-mail from Iven

[8] The entire premise of the Government's litigation posture rests on the assumption that the false stamping was an event of such overwhelming significance that it should result in a forfeiture of all of ACMI's claims. If that event was so significant, it is appropriate to conclude that the Government's agents certainly should have begun preservation practices no later than the end of 1995.

Diemler to Karen Coles (Attached as Ex. 10). This November 2, 1995 e-mail indicates that Assistant United States Attorney Jonathan Goldstein was assigned to the investigation. *Id.*[9]

Even if the investigation in the Summer of 1995 had not implicated the duty of preservation, at least ten other events in the investigation and litigation between 1995 and 1999 put the Government on notice that it had to preserve documents. *See supra*, at 5-6. Mr. Walsh's designated role to assist in the development of counterclaims since at least March 1998 also put him personally on notice of the likelihood of litigation. *See* 03/17/98 "Phase II-Action Items" list. Lawyers for the Government, by designating him for that role, had a duty to ensure he understood his preservation obligations. *See AAB Joint Venture*, 75 Fed. Cl. at 440 (citing *Sensonics*, 81 F.3d at 1573).

**b. The Government violated its duty to preserve expert witness documents.**

The Government also failed in its duty to preserve all documents generated related to Mr. Walsh's 2002 and 2007 expert reports pursuant to the rule that parties can seek production of all documents from expert witnesses. Court of Federal Claims Rule 26(a)(2)(B) requires that expert witnesses submit a "report [that] shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information *considered by* the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions." (Emphasis added). Rule 26(a)(2)(B) follows Federal Rule of Civil Procedure 26. *See* RCFC 26, Rules Committee Note 2002 Revision. The reach of that provision

[9] The commencement of Anderson's criminal investigation also raises document preservation concerns implicated by *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963) and *Jencks v. United States*, 353 U.S. 657, 670-71 (1957).

is described in the 1993 Advisory Committee's Notes to Rule 26 of the Federal Rules of Civil Procedure:

> The report is to disclose the data and other information considered by the expert and any exhibits or charts that summarize or support the expert's opinions. Given this obligation of disclosure, litigants should no longer be able to argue that *materials furnished to their experts to be used in forming their opinions—whether or not ultimately relied upon by the expert*—are privileged or otherwise protected from disclosure when such persons are testifying or being deposed.

1993 Advisory Committee's Notes Fed. R. Civ. P. 26 (emphasis added). "The drafters of the new rule clearly contemplated that the term "considered" was something different than the term 'relied,' given that the drafters rejected an earlier draft version []require[ing] the disclosure of only 'data or other information relied upon in forming such opinions.' *Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure and the Federal Rules of Evidence*, 137 F.R.D. 53, 89 (1991) (quoting *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 282 (E.D. Va. 2001) (drawing adverse inference against Government's experts who failed to preserve and destroyed evidence)). As the *Trigon* court noted, "'Considered', which simply means 'to reflect on' or 'to think of: come to view, judge or classify,' clearly invokes a broader spectrum of thought than the phrase 'relied upon,' which requires dependence on the information. Indeed information considered, but not relied upon, can be of great importance in understanding and testing the validity of an expert's opinion." 204 F.R.D. at 282 (citing *Webster's Third New International Dictionary*, at 483, 1919 (1986)).

An "overwhelming majority" of courts have held "Rule 26 creates a bright-line rule mandating disclosure of all documents, including attorney opinion work product, given to testifying experts." *Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 717 (6th Cir.

2006) (citing *Herman v. Marine Midland Bank*, 207 F.R.D. 26, 29 (W.D.N.Y. 2002)). Case law also uniformly holds that documents reviewed (not just relied upon) by an expert must be disclosed. *See, e.g., In re Pioneer Hi-Bred Int'l, Inc.*, 238 F.3d 1370, 1375 (Fed. Cir. 2001) ("documents and information disclosed to a testifying expert in connection with his testimony are discoverable by the opposing party, whether or not the expert relies on the documents and information in preparing his report); *Trigon*, 204 F.R.D. at 282-83; *Georgou v. Fritzshall*, No. 93 C 997, 1996 WL 73592, at * 2 (N.D. Ill. Feb. 20, 1996) (holding materials furnished to experts, whether or not ultimately relied on by the expert, must be disclosed); *United States v. City of Torrance*, 163 F.R.D. 590, 593 (C.D. Cal. 1995) (held that correspondence between government's counsel and its experts must be disclosed because disclosure of all documents considered by an expert is necessary to assure the independence of an expert's opinion).

The Government knew it was designating Mr. Walsh as an expert on damages as early as May 2002, but failed to instruct Mr. Walsh to preserve all documents and e-mail related to the reports and to produce all such documents to ACMI. The Government represented to ACMI in May of 2002 that it was going to rely on Mr. Walsh as a damages expert and again identified Mr. Walsh as an expert in papers filed with this Court in January of 2004. As a potential testifying expert, the Government was obligated to have Mr. Walsh preserve all documents in connection with his numerous expert reports. Mr. Walsh admitted that he did not consider his expert witness status relevant to whether he was required to retain documents:

> Q But is it your policy with regard to a pending case, where you – as you put it, you're serving as an expert, you delete the e-mails between you and the parties who sought your assistance?
> A I—if they were unimportant. I didn't look at those e-mails in relation to being an expert witness, I just looked at them as to whether they were important for me to retain. And they were not – in my opinion, they weren't of importance, so I deleted them.

Walsh Dep. 05/04/07, at 102:11-21. Mr. Walsh further admitted that he destroyed emails related to the drafts of his several expert reports:

> Q Can you give us any specifics of documents, including e-mails, that you did not retain under this formula that you've just identified?
> A I know from this process that there were e-mail messages related to drafts of the expert reports that I prepared that I did not retain.
> Q And were those documents in the --I'm sorry, were you done?
> A I'm finished.
> Q Were those documents in the recent time frame of 2006-2007?
> A I'm not sure. I believe there may have been more from previous time frames as well.

Walsh Dep. 08/29/07, at 176:2-17. Mr. Walsh's admissions that he did not consider his expert status relevant to his obligation to retain documents and that he deleted documents and e-mails related to his two expert reports and are indeed shocking examples of the Government's misfeasance. These destroyed emails,[10] are the exact types of documents that RCFC 26 intends experts to produce in connection with their expert reports.

Accordingly, the Government should have produced to ACMI all correspondence with its expert Mr. Walsh as well as every document he reviewed. Instead, the Government assured those documents were not retained by failing to instruct Mr. Walsh to preserve all documents he received. As Mr. Walsh testified, he destroyed all documents that he did not rely on because they did not "support his audit findings and conclusions." Walsh Dep. 08/29/07, at 177:4-17, 179:3-19; 180:15-183:10, 205:15-206:23, 210:23-211:17. Documents that did not support his audit findings and conclusions logically would have included documents that

[10] Government counsel belatedly located some emails with Mr. Walsh from other sources. This handful of randomly located emails is a poor substitute for the full evidentiary record that the Government was obligated to preserve.

undercut his audit findings and conclusions, and documents that he considered, but did not rely on in rendering his conclusions.

Further, the Government's decision to not rely on Mr. Walsh in support of its motion for summary judgment on damages (filed in May 2007) after the discovery of his destruction of documents suggests that the Government may have been attempting to obscure its failure to issue document preservation instructions. Regardless, over the last twelve years Mr. Walsh, as a key player in the dispute between the GSA and ACMI, and as a person in possession of numerous relevant documents to the litigation, should have been issued document preservation instructions. Government counsel had a duty to preserve the evidentiary record for the Court and the plaintiff.

### 2. <u>The records were destroyed with a culpable state of mind.</u>

The Government's destruction of documents through Mr. Walsh's various haphazard estimations of which documents were important and admitted preservation of only documents that "supported" his audit findings or that he felt were "significant" or "important" constitute a culpable state of mind worthy of sanctions. Courts have held that documents are destroyed in bad faith when parties selectively preserve documents favorable to them, but allow other relevant evidence to be destroyed. *See, e.g. Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 748 (8th Cir. 2004) (railroad destroyed voice tape as part of routine tape retention policy despite knowing it would be relevant in litigation involving an accident; court found conduct to be in bad faith in part because the railroad made an "immediate effort to preserve other types of evidence but not the voice tape."); *E*Trade Securities LLC v. Deutsche Bank AG*, 230 F.R.D. 582, 589-90 (D. Minn. 2005) (stating "Here, as in *Stevenson,* [the defendant] chose to retain

certain documents prior to the destruction of the hard drives. This gives rise to an implication of bad faith on the part of the defendant").

Here, in the absence of any preservation instruction from the Government, Mr. Walsh only retained documents and e-mails if he, as sole arbiter, believed met any one of several criteria that he established for himself at various times – none of which are consistent with the RCFC, the Federal Rules, and governing case law. *See, e.g.*, *Pueblo*, 60 Fed. Cl. at 135-36 (issuing preservation order and recognizing that document destruction hinders the administration of justice); *AAB Joint Venture*, 75 Fed. Cl. at 440-41. Mr. Walsh only retained documents and e-mails if they: "had a substantive impact on the case" (Walsh Dep. 08/29/07, at 186:4-18), if the document was "necessary to support the audit findings and conclusions" (Walsh Dep. 08/29/07, at 205:15-206:23, 210:23-211:17), "related directly to my audit findings or conclusions" (Walsh Dep. 08/29/07, at 177:4-17), if they "would have any impact on the case" or were "at all important to the case." (Walsh Dep. 08/29/07, at 174:11-175:2). Of course, this method is extremely troubling because it suggests that if a document or e-mail did not support his findings, and thus was potentially favorable to ACMI, that document or e-mail was destroyed. That kind of one-sided document retention is exactly what the Federal Rules and case law all over the country is attempting to prevent from happening.

Indeed, Mr. Walsh evidently destroyed every other document and e-mail that did not meet his criteria for what he thought was "important" to the case, including e-mails relating to his work on the case, to which he applies the misnomer "administrative e-mail" (Walsh Dep. 08/29/07, at 249:3-21), e-mails related to drafts of his expert reports (Walsh Dep. 08/29/07, at 176:2-17), and possibly handwritten notes of Mr. Walsh's interviews of Government and ACMI employees and subcontractors and notes taken in attendance at deposition in the case (Walsh

Dep. 08/29/07, at 171:20-172:5, 199:11-19, 199:24-200:14, 239:14-140:5). The haphazard retention method by Mr. Walsh, due to the Government's failure to issue instructions to retain documents, has caused an immeasurable spoliation of documents. The voluminous scope of the Government's document destruction over the past twelve years, therefore, can constitute bad faith under *Stevenson* and *E*Trade Securities*. *Stevenson*, 354 F.3d at 746; *E*Trade Securities*, 230 F.R.D. at 589-90.

Even if this Court views the Government's repeated failures to preserve documents over a twelve-year period to not be in bad faith, the Government's failure to instruct the critical players like Mr. Walsh at the outset of litigation to preserve relevant documents is at a minimum grossly negligent, if not reckless. *See, e.g.*, *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 221 (S.D.N.Y. 2003). Although the Federal Circuit has not ruled on the matter, several circuits have found that spoliation as a result of negligence constitute actions committed with a culpable state of mind and warrant an adverse inference. *Jandreau*, 492 F.3d at 1375-76 & n.3 (noting circuit split); *see, e.g.*, *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d. Cir. 2002) ("The sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence."); *Rogers v. T.J. Samson Cmty. Hosp.*, 276 F.3d 228, 232 (6th Cir.2002) (negligent conduct may warrant imposition of adverse inference); *Kelley v. United Airlines, Inc.*, 176 F.R.D. 422, 428 (D. Mass. 1997) (adverse inference based on negligent destruction of documents). The repeated failure to issue preservation instructions establishes a level of recklessness that merits the imposition of an adverse inference from the resultant spoliation of evidence. *See, e.g., Doe v. Norwalk Cmty. Coll.*, No.3:04-CV-1976-JCH, 2007 WL 2066497, at *5, *8 (D. Conn. July 16, 2007) (unpublished opinion) (holding failure to institute litigation hold

at least grossly negligent, if not reckless and warranted imposition of an adverse inference jury instruction).

Furthermore, this Court recently held that repeated acts of gross negligence may warrant the same sanction as a single act committed in bad faith. *See United Med. Supply*, 77 Fed. Cl. at 270-71. Here, the Government had at least eleven opportunities to issue preservation instructions based on its knowledge of the litigation and yet failed to do so over a twelve-year period. Additionally, the Government apparently failed to suspend its 60-day automatic deletion policy for e-mails. Walsh Dep. 08/29/07, at 230:13-25 and Exhibit 102 to Dep. Such persistent document destruction is more than sufficient to constitute bad faith. *United Med. Supply*, 77 Fed. Cl. at 270-71.

In *United Medical Supply*, this Court awarded sanctions against the Government where the Government failed to issue any instructions to preserve documents for approximately five years after it had knowledge of plaintiff's claims, and one or more government employees destroyed documents as a result of the Government's failure to issue preservation instructions. 77 Fed. Cl. at 271-72. In that case, the Government also made inaccurate representations to this Court that documents were being preserved. *Id*. at 274. This Court stated:

> In the court's view, taking into account all the indicia of fault here, defendant's failure to take effective steps to preserve documents and prevent further spoliation transcends any form of negligence. Rather, the court finds that defendant's overall course of conduct, including the misrepresentations, constituted, at the least, the reckless disregard of its duty to preserve relevant evidence.

*Id*. Likewise, here, the Government represented to this Court that "all the documents relating to the litigation, including the Government's counterclaims, have been preserved." Defendant's Motion to Stay Discovery and for Protective Order, and for an Enlargement of Time dated March

11, 2004, at 13. That misrepresentation was, at best, reckless, and led the Court to postpone a ruling on the stay of discovery because it was misled to believe that all relevant records had been preserved. Order dated April 28, 2004. Thus, as this Court held in *United Medical Supply*, the Government's reckless conduct should be considered acting with a culpable state of mind. *Id.*

**3. <u>The destroyed evidence was directly relevant.</u>**

Throughout his deposition, Walsh used various terms to describe how he made the decision whether he needed to retain documents and e-mails, none of which are adequate to fulfill his or the Government's duty as a litigant, let alone Walsh's duty as an expert. Mr. Walsh testified that he decided that documents "relevant" to the case only meant documents related to his audit findings. Walsh Dep. 08/29/07, at 180:15-183:10. This is precisely the situation that calls for the imposition of sanctions because "when critical documents go missing, judges and litigants alike descend into a world of *ad hocery* and half measures- and our civil justice system suffers." *United Med. Supply*, 77 Fed. Cl. at 259 (emphasis in original).

Mr. Walsh admitted to destroying a wide variety of documents relevant to ACMI's dispute with the GSA regarding the construction of the St. Louis Courthouse. Some of these documents were generated in connection with Mr. Walsh's auditing function, while others related to his investigation of certain allegations of fraud against ACMI. Walsh Dep. 08/29/07, at 169:2-170:7, 201:3-202:11, 199:11-200:14. The documents destroyed by Mr. Walsh are not limited to documents that were generated before the commencement of litigation. Mr. Walsh also admitted to destroying e-mails related to the drafts of his two expert reports. Walsh Dep. 08/29/07, at 176:2-17. Mr. Walsh also does not know whether he retained his handwritten notes taken at the "many depositions" of witnesses he attended in connection with this dispute. Walsh Dep. 08/29/07, at 239:14-240:5.

Mr. Walsh's audits, investigative notes and documents, notes from depositions, and e-mails relating to the case would all have provided insight into the Government's theories of fraud and damages and the facts that support those theories. Further, Mr. Walsh destroyed any document or e-mail that did not "support his audit findings and conclusions." Walsh Dep. 08/29/07, at 177:4-17, 179:3-19; 180:15-183:10, 205:15-206:23, 210:23-211:17. In other words, documents that were likely favorable to ACMI *because they did not support* Mr. Walsh's audit findings and conclusions were routinely destroyed. For example, the reason why Mr. Walsh's 2007 expert report does not contain the time-value of money damages calculation contained in his 2002 expert report is central to ACMI's defense that the time-value of money damages calculation should govern. Mr. Walsh's destruction of the very documents that might show why he was asked to eliminate the time-value of money calculation – e-mails with lawyers for the Government or with other Government auditors – were destroyed. Countless relevant documents to the litigation have been destroyed by the Government for more than a decade. The Government's conduct simply should not be condoned by this Court.

### C. <u>The Court Should Draw an Adverse Inference Warranting Reversal of Its Judgments on Liability and Damages; Alternatively, the Court Should Adopt ACMI's Damages Theory.</u>

The destruction of evidence prejudices the injured party to such an extent that it has a direct impact on the merits of the litigation. A recent spoliation case explained the interrelationship of these concepts:

> [t]he destruction of evidence can lead to manifest unfairness and injustice, for it increases the risk of an erroneous decision on the merits of the underlying cause of action and can increase the costs of litigation as parties attempt to reconstruct the destroyed evidence or to develop other evidence that may be less persuasive, less accessible or both.

*Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 285 (E.D. Va. 2001) (granting adverse inference against Government respecting the substantive testimony and credibility of its expert for intentional failure to preserve expert correspondence and draft reports); *see also In re Prudential Ins. Co. Sales Practices Litig.*, 169 F.R.D. 598, 616 (D.N.J. 1997) ("Document destruction inevitably hinders the administration of justice."); *Pueblo*, 60 Fed. Cl. at 137. Indeed, in patent cases in the Federal Circuit, the court routinely holds that "[w]hen the calculation of damages is impeded by incomplete records of the infringer, adverse inferences are appropriately drawn." *See, e.g.*, *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1572 (Fed. Cir. 1996) (affirming adverse inference that the records defendant destroyed would have been unfavorable to defendant, and sustaining district court's extrapolation damages method) (citing *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983)).

Several cases similar to the circumstances here illustrate the propriety of drawing an adverse inference against the Government. In *Google, Inc v. American Blind & Wallpaper Factory, Inc.*, No. C 03-5340 JF(RS), 2007 WL 1848665, at *5-6 (N.D. Cal. June 27, 2007), the court ordered certain key facts relating to liability judicially established and awarded a $15,000 monetary sanction where the defendant demonstrated a "willful indifference" towards ensuring relevant documents were preserved, collected, and produced. The court found that "[n]o deposed employee or ex-employee of American Blind recalled the existence of any document retention policy, recalled being instructed to preserve relevant documents, or recalled engaging in any preservation efforts before or after the litigation began" and "[a]t least some American Blind employees routinely deleted draft documents." *Id*. at *1-2. Defendant had, however, instructed various employees to print out any e-mail between defendant and plaintiff, but did not preserve

intra-company e-mails. *Id*. at *2. Similarly, here, the Government failed to issue preservation instructions, and Mr. Walsh did not receive any preservation instructions, until July 2007.

In *DaimlerChrysler Motors v. Bill Davis Racing, Inc.*, No.Civ. A. 03-72265, 2005 WL 3502172, at * 2 (E.D. Mich. Dec. 22, 2005), the court drew adverse inferences from the defendant's failure to issue any preservation instructions and the resulting deletion of relevant e-mails. The court found that defendant's actions were negligent and not willful. *Id*.. The court also noted: "It is impossible for plaintiff to identify communications which have been lost, and it would be unfair to insist upon a clear and definite showing of prejudice in light of the fact that Bill Davis Racing and its counsel have clearly failed in their own obligation to take affirmative steps to prevent the loss of evidence." *Id*. The court entered an order allowing plaintiff to present evidence of defendant's failure to preserve evidence to the jury; an instruction to the jury that it may presume, based on the spoliation, that the evidence destroyed would have been favorable to the plaintiff; and an order permitting plaintiff's counsel to argue in favor of the negative inference. *Id*. at *3. The court also awarded attorneys' fees and costs. *Id*. Again, the Government's failure to issue preservation instructions in this case likewise warrants drawing an adverse inference that the documents destroyed would have been favorable to ACMI.

Similarly, in *3M Innovative Properties Co. v. Tomar Electronics*, Civil No. 05-756 (MJD/AJB), 2006 WL 2670038, at *1, *4, *7 (D. Minn. Sept. 18, 2006), the court drew an adverse inference, and awarded attorneys' fees and costs where the defendant failed to issue a litigation hold and failed to inquire whether other employees had potentially relevant material. Employees had continued to delete e-mail and documents after litigation commenced. *Id*. at *7. The court found that the defendant "has exhibited a complete disregard for the authority of this Court and for the rules in which parties before this Court must abide." *Id*. at *8. The court

recommended that the jury instructions include “an adverse inference instruction, with respect to the e-mail and other documents destroyed or withheld by Tomar, that these documents support 3M’s claims and are unfavorable to Tomar’s defenses.” *Id*. at *1. The Government here also exhibited a disregard for the rules and this Court when it failed to preserve documents adequately for twelve years.

In *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1074, 1078 (N.D. Cal. 2006), the court awarded adverse inferences and monetary sanctions where a non-party deleted relevant e-mails and was “grossly deficient” in its attempt to preserve evidence. Despite knowing in June of 2000 that it might be sued in litigation, Hummer failed to issue any preservation instructions to its employees, and permitted personnel to routinely delete e-mails relevant to the litigation under the existing document retention policy, which included deleting e-mails. *Id*. at 1066, 1069-70. The court found that Hummer’s “representations regarding its document retention policy are muddled and inconsistent, and do not suggest an organized effort to maintain Napster-related communications as required.” *Id*. at 1073. The *Napster* court found that Hummer was at best grossly negligent in failing to preserve evidence, which was sufficiently culpable conduct to warrant an adverse inference. *Id*. at 1074, 1078. The court also awarded attorneys’ fees and costs. *Id*. at 1078. Likewise, an adverse inference instruction is appropriate in this case because Mr. Walsh’s representations regarding how he decided to save e-mails and documents denotes a muddled, disorganized, and woefully inadequate effort to save documents.

Indeed, courts have imposed adverse inference sanctions based on significantly less reckless acts than the Government committed here. For example, courts have imposed an adverse inference and costs on a party that issued two document preservation notices, but failed to make certain the relevant employees were regularly reminded of the hold or that the hold was

conveyed to future parties that possessed the documents. *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 182-83, 198, 201 (S.D.N.Y. 2007). If a party that actually implements a document preservation order can be sanctioned with an adverse inference, then the Government's wholesale and repeated failures to issue during a twelve-year period any document preservation order whatsoever certainly warrants sanctions. In *In re WRT Energy Sec. Litig.*, Nos. 96 CV 3610 and 96 CV 3611, 2007 WL 2826624, at *13 (S.D.N.Y. Sept. 28, 1997), the magistrate judge found plaintiffs at least grossly negligent for permitting documents to be destroyed *that had not been previously identified as relevant to the case*. The magistrate judge precluded plaintiffs from challenging at trial certain information presented by the defendants and allowed the defendants to explain to the jury that the plaintiffs were responsible for the loss of evidence. *Id*. at *17. The judge also ordered plaintiffs to pay the defendants' costs and legal fees in connection with the motion for sanctions and to pay any possible additional expenses relating to expert analysis. *Id*. at *18. Thus, even where a party identifies to the opposing party that certain documents are not relevant, the obligation to preserve still attaches. Here, the Government's failure to preserve documents enabled Mr. Walsh to destroy documents that had always been relevant to the litigation.

In sum, adverse inference sanctions are "just and proportionate in light of the circumstances underlying the failure to preserve relevant evidence" in this case. *United Med. Supply*, 77 Fed. Cl. at 270. The Government was at least reckless when it failed to issue preservation instructions to Mr. Walsh until July 2007, twelve years after the Government first became aware of the possibility of litigation. Moreover, the Government's failure to suspend its 60-day automatic deletion policy for e-mails is palpable evidence of recklessness. Walsh Dep. 08/29/07, at 230:13-25 and Exhibit 102 to Dep. The Government's total failure over a twelve-

year period to issue a preservation notice to Mr. Walsh, even after several complaints were filed in multiple courts warranting a preservation notice, demonstrates "repeated acts of [at least] gross negligence [which], particularly if accompanied by inaccurate representations to the court that serve to mask and perpetuate the spoliation, can be met with the same or more severe sanction than a single act of bad faith." *United Med. Supply,* 77 Fed. Cl. at 271. As a result, the Court should draw an adverse inference against the Government that all documents destroyed would have been favorable to ACMI.

The logical effect of the adverse inference from the spoliation is that the Court should vacate and reconsider its decision granting summary judgment on False Claims Act liability as well as on Anti-Kickback Act liability and damages to consider the effect the adverse inference resulting from spoliation would have on summary judgment. Courts have held summary judgment to be inappropriate where spoliation of evidence occurs. "[A]t the margin, where the innocent party has produced some (not insubstantial) evidence in support of his claim, the intentional destruction of relevant evidence by the opposing party may push a claim that might not otherwise survive summary judgment over the line." *Byrnie*, 243 F.3d at 110 (applying adverse inference to deny summary judgment because a jury could reasonably find that the documents defendant destroyed would have been unfavorable to defendant by showing unlawfully discriminatory reasons informed the decision not to hire plaintiff) (quoting *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998) (denying summary judgment due to destruction of documents)). The Court cannot be confident in its rulings in light of Mr. Walsh's admissions that documents related to the litigation have been actively destroyed for more than a decade. To let the rulings stand would be to allow the spoliator to benefit from its violations,

which this court has counseled against. *United Med. Supply,* 77 Fed. Cl. at 263 ("spoliators should not benefit from their wrongdoing").

Alternatively, the Court should apply the adverse inference to adopt ACMI's position on damages that a time-value of money calculation governs the damages decision. Furthermore, the inference that the destroyed evidence would have been favorable to ACMI should be applied in any future decisions the Court makes regarding liability and damages.

**D. <u>ACMI Is Also Entitled to a Monetary Penalty, Attorneys' Fees, and Costs.</u>**

ACMI is also entitled to a monetary penalty, and attorneys' fees and costs that it incurred in uncovering and pursuing the truth about the Government's spoliation of relevant evidence. In *In re Prudential*, the court awarded $1 million dollars as a monetary penalty in order to "inform[] Prudential and the public of the gravity of repeated incidents of document destruction and the need of the Court to preserve and protect its jurisdiction and the integrity of the proceedings before it." 169 F.R.D. at 617. The court found that Prudential's consistent pattern of failing to prevent document destruction was at least grossly negligent, noting that "[a] pattern of wrongdoing may require stiffer sanctions than an isolated incident." *Id*. at 615. The *Prudential* court also drew an adverse inference from Prudential's failure to adequately preserve evidence, even though Prudential had issued several document preservation notices to its employees. *Id*. at 612-15.

A monetary penalty is appropriate in this case because the Government is currently pursuing several other claims against ACMI regarding the St. Louis Phase II contract, including its Ninth Counterclaim for violation of the Contract Disputes Act and its claims for excess reprocurement costs. Mr. Walsh was involved as an investigator and auditor for those

claims. Thus, the Government's document destruction likely extends to documents and e-mails relevant to those claims against ACMI. As a result, the Government must be punished for its past spoliation and deterred from further spoliation of evidence as that litigation proceeds.

Additionally, a sanction awarding the costs and attorneys' fees that ACMI incurred "serves both the punitive and remedial purposes" of preventing spoliation. *United Med. Supply Co., Inc.*, 77 Fed. Cl. at 275-76 & n.34. The Court of Federal claims has recently acknowledged that there is "ample authority" to support the award of such costs and fees. *Id.*; *see, e.g., Doe v. Norwalk Cmty. Coll.*, No.3:04-CV-1976-JCH, 2007 WL 2066497, at *4, *8 (D. Conn. July 16, 2007) (unpublished opinion) (monetary sanctions for costs were appropriate in connection with adverse inference sanction where sanctioned defendant's head of Human Resources testified she had "never heard of the term 'litigation hold,' and she was never told to refrain from destroying documents during the pendency of [the] litigation."). The discovery of the destruction of documents spawned a series of filings and the reopening of the deposition of Mr. Walsh, for which ACMI should be reimbursed by the Government. ACMI will submit an affidavit of fees and costs at the Court's request.

## IV. CONCLUSION

For the foregoing reasons, the Court should draw an adverse inference against the Government that all documents destroyed would have been favorable for ACMI on the issues of liability and damages. Accordingly, the Court should vacate and reconsider its July 2005 and January 2007 decisions on liability and the October 2007 decision on damages in light of the adverse inference. Alternatively, the Court should apply an adverse inference solely to the damages issues and adopt ACMI's damages calculation theory of time-value of money.

Additionally, ACMI requests that the Court impose a monetary penalty of an appropriate deterrent amount on the Government and award ACMI its attorney's fees and costs incurred in uncovering and litigating the spoliation issues.

Respectfully submitted,

s/ James D. Wareham

James D. Wareham
Attorney of Record for Plaintiff
Kirby D. Behre
Danielle W. Pierce
Paul, Hastings, Janofsky & Walker LLP
875 Fifteenth Street, N.W.
Washington, D.C. 20005
Tel: 202-551-1728
Fax: 202-551-0128

Date: November 14, 2007