# EXHIBIT 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------x

MORSE DIESEL INTERNATIONAL, INC., d/b/a
AMEC CONSTRUCTION MANAGEMENT, INC.,

99-279C
Plaintiff, 99-529C
00-530C
-against- 00-531C
00-1537C

UNITED STATES, (Judge Braden)

Defendant.

--------------------x

May 4, 2007
10:26 a.m.

Videotaped deposition of JOHN F. WALSH, taken by attorneys for Plaintiff, pursuant to notice, held at the offices of United States Department of Justice, 1100 L Street N.W., Washington, D.C., before Helen Mitchell, a Shorthand Reporter and Notary Public.

(Walsh)

THE VIDEOGRAPHER: Let's go off the record.

It's 12:03, and we're off the record.

(Recess taken)

THE VIDEOGRAPHER: It's 12:04, and we're back on the record.

BY MR. BEHRE:

Q Mr. Walsh, directing your attention to the second page of this exhibit, which is Bates numbered in the upper right-hand corner 0142, I direct your attention to the heading E, about two-thirds of the way down the page, which says, "MDI's bonding costs are falsified."

Have you seen that material in those paragraphs previously?

A Yes.

Q And did you see that information on or about sometime in 1995?

A Yes.

Q And looking at the last page of the exhibit; that is, Bates number in the upper right-hand corner 0144, your notation in the

(Walsh)

lower right-hand corner, "prepared by," and a date of 4/10/95 suggests that you inserted this exhibit into your workpapers on or about April 10, 1995; correct?

A That's correct.

Q So as of April 10, 1995, you were aware, as was Mr. Anderson, of the specifics, the very specifics, that are enumerated in paragraph E relating to the alleged falsified billing as it relates to bonding costs; correct?

A That's correct.

Q Are you aware whether or not Phase II of the St. Louis courthouse project was awarded to AMEC after that time, as in September of 1995?

A I would have to review the documents to be sure, but I believe that is correct.

Q Did you personally convey your conclusion, which you reached at some point in 1995 -- prior to the award of the Phase II contract, did you convey your concern and your conclusion to any of the contracting officers on the St. Louis projects?

(Walsh)

A I do not remember specifically conveying that to the contracting officers.

Q But you did convey it to the highest levels of the Office of Inspector General in the St. Louis area; correct?

A In our Kansas City office I conveyed it to Steve Anderson, I'm sure of that.

Q And by the "reviewed by" signature, who is that, again, on the last page?

A Ivan Diemler.

Q And you indicated he was a regional --

A Inspector General for investigations.

Q So he was aware because he had this document; correct?

A I believe so, yes.

Q Going back to Exhibit 8, which is the 2002 report, I think we, or more accurately I, digressed and asked you after you had gotten through the first two items and described to the best of your ability what was composed of those materials, I think we left off with number two, so let me ask about number three, you've listed

(Walsh)

and a couple of those had multiple reports. I would estimate at least five reports.

Q And in those approximately five instances, were the reports that you're referring to your routine audit report, or was it some other document?

A I'm referring to routine audit reports. In at least two of the cases there may have been another document, but I can't remember. For sure those -- those five instances are routine audit reports.

Q Now, were those five instances that were limited to routine audit reports, were they before or after 2002?

A They were all before 2002.

Q And so since 2002 you have not been involved in any court case that necessitated the use or the creation of an audit report that became a part of the record on appeal, if you will, before a board or a court; is that correct?

A That's correct.

Q Looking at Government's Exhibit No. 8, as well as Government's Exhibit No. 7, I

(Walsh)

believe, which is the 2007 report, what is your understanding of the reason why you prepared these documents, starting first with the 2002 version that's Exhibit No. 8?

A The reason that I prepared the -- Exhibit 8 was to use expertise to compute a harm number that was related to the activities of MDI.

Q And what was your understanding of how this computation, using your expertise, would be utilized, if any -- if in any way, in the pending court case?

A My understanding was that if the court case were to go to trial on these issues, that this report would represent the government's position on these issues.

Q Was it your understanding that at the appropriate time you would be proffered to the court as some sort of an expert?

A Yes.

Q Have you ever served that role previously, before this case?

A Yes.

Q Can you tell us how many times?

(Walsh)

A Only once in a case that actually went before a judge.

Q And in that case, when you say you served as an expert witness before a judge, did you also play a role in auditing of the case that gave rise to that appearance in court by you?

A Yes.

Q During the course of your almost 20-year career, have you ever prepared a document titled or similarly titled as this; that is, "Computation of Harm for Fraud Committed"?

A Yes.

Q Can you tell us how many times you've done that?

A At least seven times that I can think of. It's probably more.

Q And can you tell us when, approximately, those seven times were? The year involved.

A It's hard to recall the specific years. I just can't put a year to each one of them.

(Walsh)

are in this exhibit?

A Yes, there were other e-mails than are in this exhibit.

Q And have you searched for these that are in Exhibit 10, or any others, that relate to these issues, including the draft of the report which is the February '07 report, which I think is Exhibit 8?

A Yes.

Q And what was the result of your search?

A I found one possible e-mail that might have been related to Exhibit 8, and there were no other e-mails in my e-mail system.

Q And I actually misspoke, I think. The 2007 report, that's the subject of this testimony, was actually Exhibit 7.

A Okay.

Q So is your answer the same except for Exhibit 7?

A The e-mail may have a -- did not relate to Exhibit 7. It may have related to Exhibit 8, the one e-mail that I found. That was in archives.

(Walsh)

Q Okay. But just so we're clear, your e-mails from February of this year are already archived?

A Our -- many of them are deleted, so I will not save -- I get so many e-mails, that it's unmanageable to -- for me to save e-mails, and I'll delete e-mails that are unimportant soon after sending them or receiving them.

Q But is it your policy with regard to a pending case, where you -- as you put it, you're serving as an expert, you delete the e-mails between you and the parties who sought your assistance?

A I -- if they were unimportant. I didn't look at those e-mails in relation to being an expert witness, I just looked at them as to whether they were important for me to retain. And they were not -- in my opinion, they weren't of importance, so I deleted them.

Q Did you receive any instructions from counsel or from anyone in your office about retaining e-mails, electronic documents, hard copy documents, during the pendency of a court

(Walsh)

case?

A Not that I can recall.

Q So at the present time, as best you understand it, you're under no obligation to retain records, documents, e-mails, electronic documents or the like relating to this entire matter?

A Any documents I could not -- we have files and files that I realized all those files have to be maintained, but as far as e-mails go, it's my understanding that that -- I've not been given an instruction to retain any e-mail messages.

Q What about other electronic records, spreadsheets, Word documents and the like?

A I would have to maintain any documents that I -- any spreadsheets I created, any documents that I created for use in the case. I wouldn't keep drafts of those documents, it becomes a problem with whether I'm working with the most current version or not. So when I create a document, I will either save the new document over the top of the old