# EXHIBIT 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MORSE DIESEL, INTERNATIONAL, )
INC., )
)
Plaintiff, )
)
-vs- ) Numbers 99-279-C
) 99-529-C
THE UNITED STATES, ) 99-530-C
) 00-531-C
Defendant. )

VOLUME I

DEPOSITION OF JOHN WALSH,

produced, sworn and examined on Thursday, May 16, 2002, at the offices of the General Services Administration, 1500 Bannister Road, Office of the Inspector General, in Kansas City, Jackson County, Missouri, before:

JAMES A. LEACOCK, RMR

a Notary Public within and for the State of Missouri.

Taken on behalf of the Plaintiff.

APPEARANCES:

For the Plaintiff.

PECKAR & ABRAMSON
By: Mr. Patrick J. Greene, Jr.
70 Grand Avenue
River Edge, New Jersey 07661
(201) 343-3434

For the Defendant:

U.S. DEPARTMENT OF JUSTICE
By: Ms. Domenique Kirchner
Commercial Litigation Branch, Civil Division
1100 L. Street, N.W.
Washington, D.C. 20530

and

(appearances continued)

audits, the findings of audits, any other issues that would be related to the audit work I performed.

Q. Aside from what you have described thus far, do you recall any other activities you performed with respect to the Phase One project?

MS. KIRCHNER: Objection. Objecting to the breadth of the question. He obviously produced a report with the Phase One project.

Q. (By Mr. Greene) Let me limit the time frame of the question.

MS. KIRCHNER: Okay.

Q. (By Mr. Greene) Do you remember any other activities you performed with respect to the Phase One project during its performance?

A. No.

Q. Aside from the various auditors you have named here, Tom Barnard the audit manager, Larry Bateman, Dennis Windsor, and Tony Huddleston. Were there any other employees of the inspector general's office who performed activities with respect to the Phase One project? And obviously you can only answer as to what you know.

A. Yes.

Q. Can you tell me what you know about that?

A. Through the report writing process, the regional inspector general for auditing would have reviewed the report. Another independent auditor is asked to review the report in the work papers. And it is possible that other auditors were asked for some kind of administrative assistance on the project.
Q. Do you know of anybody else who is an employee of the inspector general's office doing anything else with respect to the project?
MS. KIRCHNER: Can you repeat that question. I didn't hear the end of it.
(The pending question was read.)
MS. KIRCHNER: Objection. I am objecting to the breadth of the question.
Q. (By Mr. Greene) You can answer.
A. There also was an investigation of the Phase One project.
Q. Tell me what you know about this investigation?
A. It was conducted by Steve Anderson.
Q. Who is Steve Anderson?
A. He was a special agent with the Office of Inspector General for General Services Administration, in the Kansas City office.
Q. To your knowledge what did this investigation entail?

A. Steve was investigating whether there was fraud committed in the Phase One contract.
Q. Do you know anything more about the details of that investigation?
A. Yes.
Q. Tell me what you know about the details?
A. I have read Steve's report of investigation.
Q. Aside from what is contained in the report of investigation, do you know anything else about the investigation?
MS. KIRCHNER: Object to the breadth of the question.
Q. (By Mr. Greene) You can answer it.
A. Yes.
Q. What else?
A. It is hard to describe everything that I know related to the investigation that is not included in the report.
Q. Why don't you start with what is easy to describe out of that.
A. The report contains certain conclusions that Steve reached, and it doesn't include everything that he looked at or did. I just had conversations with him and dealings with him that I'm sure are not included in the report, but I don't remember specifically

what they are.
Q. Did you participate at all in Mr. Anderson's investigation?
MS. KIRCHNER: Objection, it is not clear what is meant by participation.
Q. (By Mr. Greene) You can answer the question.
A. Yes.
Q. In what way?
A. I provided information to Steve when he asked for it. Or when I uncovered something that I thought would be of interest to him.
Q. Is there any record as to the information that you provided to him as a result of that process?
A. There are some records.
Q. Does that mean that there are pieces of information that you provided to him that aren't in any records?
A. It is possible.
Q. When you say there are some records, what records do you know of?
A. I provided him copies of bond invoices for the Phase One and Phase Two project. I know there is a record of an interview he did with me.
Q. Do you know of any other record relating to information that you provided to Mr. Anderson?

A. I can't think of any others.
Q. Can you tell me, how did this Phase One investigation come about?
A. Steve had been conducting what he called a proactive investigation of courthouse projects. At the time I conducted the audit of P-3, I found what I considered to be irregularities and I referred those over to Steve.
Q. How many courthouse projects were there within the Kansas City region?
A. There was a Kansas City, Kansas courthouse. What time frame?
Q. Well, you said Steve told you he was doing a proactive investigation of courthouse projects. I guess that -- strike that.
That indicates that there were multiple courthouse projects. I am just asking what courthouse projects were there? I don't know what time frame Mr. Anderson was performing his investigation. Do you?
A. He would have started it in 1994, I believe.
Q. Do you know what courthouse projects he was looking at?
A. The only ones I can think of, I don't know all the courthouse projects in the region. The only ones I

inconsistent with MDI's $237,000 for bond because the $118,907 total of the bond policies listed on the Form 25 covered the entire $20 million contract amount."

A. Yes.

Q. "Ron reiterated that only $118,907 for bond insurance cost has been paid by MDI, but stated that the additional money will be paid to Amec Holdings, Inc. when the project is finished." Do you see that?

A. Yes.

Q. Then later in the same note, on the second page it says, it refers to a conversation with Kirwin Ford. In which Kirwin, you relate that "Kirwin did state that MDI has not yet paid Amec and will pay any amounts owed at the end of the contract." Do you see that? It is about three-quarters of the way down.

A. Yes.

Q. Does this relate the contents of a conversation between -- among yourself, Ron Escott and Kirwin Ford?

A. Yes.

Q. That occurred on March 16th, 1995?

A. Yes.

Q. Was this again the subject of the Amec Indemnity?
A. Yes.
Q. We are still talking about that same $118,000 item?
A. Yes.
Q. I want to go to Item B-14 and ask you what that one is. Could you tell me what B-14 is?
A. I believe it is an update in the investigation that Steve Anderson was performing.
Q. Who prepared this document?
A. I believe Steve Anderson did.
Q. I want to go to a couple of little things on here. First of all, on the index sheet that tells you what this is, B-14.
A. Yes.
Q. It says "prepared by," I guess, is that your name; is that your handwriting there, John Walsh?
A. On the right?
Q. Yes.
A. Yes.
Q. Then dated April 10th, 1995.
A. Yes.
Q. That is the date you put this piece of paper in this file?
A. Yes.
Q. Then it is reviewed by somebody's signature, who is

that?

A. Tom Barnard.

Q. He is the -- what is he called?

A. Audit manager.

Q. Audit manager. And his signature is dated May 22nd, 1995?

A. Yes.

Q. Now on this particular document itself, there is handwritten initials up top with March 17th, 1995. Can you tell me what that is?

A. That is Ivan Deimler.

Q. Who is Ivan Deimler?

A. He was the regional inspector general for investigations.

Q. Where did you get this document?

A. Steve Anderson.

Q. There is an Item E on this document that is B-14 of Walsh 1. It talks about "MDI's bonding costs are falsified." Do you see that?

A. Yes.

Q. Are there two separate allegations regarding the bonding costs?

A. My reading of this, I would say yes.

Q. What are they? Put them in your words as to what he is talking about here.

A. One, that the bonds were not paid as of the date of the progress payment. At the cost of 119 -- $118,907. And I guess, also, the other allegation is that the indemnity had not been paid at the time of the payment requests.

Q. I would like to turn to what I guess is -- perhaps you can tell me what this is. Is that C-2?

A. Yes.

Q. It is another document that says "privileged" on it. Is that privilege still asserted?

MS. KIRCHNER: Yes.

MR. GREENE: What is the privilege?

(A short recess was taken.)

(The pending question was read.)

MS. KIRCHNER: This was originally asserted during the Phase One litigation before the board. I would assume that the privilege originally was asserted then based on the investigatory privilege. I have to locate this document first before we go any further in deciding whether we would release it to you if it hasn't already been released. And I cannot locate it readily at this time.

MR. GREENE: I'm not even sure it is of any significance.

MS. KIRCHNER: I don't know about that. But to answer your question, we will have to find it and we can't find it quickly.
Q. (By Mr. Greene) I want to go down to Section D here. In the W.P. index for Section D.
MS. KIRCHNER: D.
Q. (By Mr. Greene) D as in David. It says something, there is an Item D-1 and an Item D-2. And Item D-1 is MDR.
A. Yes.
Q. What is that?
A. Management decision record.
Q. What is a management decision record?
A. It is a document that records whether or not management agrees with the audit findings.
Q. Did they agree or disagree?
A. They agreed with the audit findings.
Q. How can we tell that?
A. Under letter B, Item Number 3, it says, "Agreement/disagreement with monetary recommendations."
Q. I see. That is signed by Anne Anderson on June 19th, 1995?
A. That's correct.
Q. What exactly did Anne Anderson receive?