# EXHIBIT 5

IN THE UNITED STATES COURT OF FEI
---------------------x
MORSE DIESEL INTERNATIONAL, INC.,
AMEC CONSTRUCTION MANAGEMENT,
99-279C
Plaintiff, 99-529C
00-530C
-against- 00-531C
00-1537C
UNITED STATES, (Judge Brac

Defendant.

---------------------x

August 29, 2007
9:37 a.m.

Continued videotaped deposition o JOHN F. WALSH, taken by attorneys for P pursuant to adjournment, held at the office: Paul Hastings Janofsky & Walker, LLP, 87: Street N.W., Washington, D.C., before Hel Mitchell, a Shorthand Reporter and Notary Public.

WINTER REPORTING, INC. (212) 95:



A P P E A R A N C E S :

PAUL HASTINGS JANOFSKY & WAI
Attorneys for Plaintiff
875 15th Street N.W.
Washington, D.C. 20005

BY: KIRBY D. BEHRE, ESQ.
DANIELLE PIERCE, ESQ.

DOMENIQUE KIRCHNER, ESQ.
United States Department of Justice
Commercial Litigation Branch
Civil Division
Attorney for Defendant
1100 L Street N.W.
Eighth Floor
Washington, D.C. 20530

-and-

TRACY HILMER, ESQ.
United States Department of Justice
Commercial Litigation (Frauds)
Civil Division
601 D Street N.W.
Room 9018
Washington, D.C. 20004

-and-

ERIC MILLER, ESQ.
Assistant Counsel
Office of the Inspector General
General Services Administration
230 South Dearborn
Room 408
Chicago, Illinois 60604

ALSO PRESENT:
JAMES M. CHRISTE - Videographer

WINTER REPORTING, INC. (212) 95:



(Walsh - 8/29/07)

(Transcript of May 4, 2007 testimony marked Exhibit 100 for identification.)

(Errata sheet marked Exhibit 101 for identification.)

THE VIDEOGRAPHER: Good mo We're now on the record and recordin

Here begins videotape number on volume two, in the deposition of John Walsh, in the matter of Morse Diesel International, Incorporated, et al., against the United States, in the Unite States Court of Federal Claims.

Today is August 29th, 2007, the time is 9:37 a.m.

This deposition is being taken at 875 15th Street Northwest, in Washington, D.C., and was made at t request of Kirby Behre, of the law offices of Paul Hastings Janofsky & Walker.

The videographer is James Christ and the court reporter is Helen Mitchell.



(Walsh - 8/29/07)

Will counsel all present please state your appearances, including wh they represent, and the witness remai sworn in from May 4th, 2007.

MR. BEHRE: Good morning. Kirl Behre for ACMI.

MS. PIERCE: Danielle Pierce for ACMI.

MS. KIRCHNER: Domenique Kir for the United States.

MS. HILMER: Tracy Hilmer for th United States.

MR. MILLER: Eric Miller for the United States General Services Administration, Office of the Inspector General.

J O H N F. W A L S H,

having been previously duly sworn, was ex and continued testifying as follows:

EXAMINATION (Continued)

BY MR. BEHRE:

Q Mr. Walsh, would you please jus identify yourself for the record?

A John Walsh, Office of Inspector

(Walsh - 8/29/07)
General for General Services Administratic
Q And, Mr. Walsh, you understand I am based on a prior deposition; correct?
A Yes.
Q You were last deposed in this case, I believe on May the 4th, 2007; is tha correct?
A It is.
Q And since that deposition, you have submitted an errata sheet, which is a clarification or a correction or a change to your transcript relating to that May 4th, 200 deposition; is that correct?
A Yes.
Q As we have our session today, if anything I ask is unclear or ambiguous or v have you, just ask me to repeat it. Or you don't understand, feel free to ask me to rep it.
Okay?
A Okay.
Q What I'd like to do is show you first what we've marked as Exhibit 100, wh the transcript of your testimony from May



(Walsh - 8/29/07)
the 4th, 2007.
Could you just glance through tha document and see if you can recognize it.
A I do recognize it.
Q Have you seen this document before, this transcript before?
A Yes.
Q And is this an accurate reproduction or copy of the version or versi that you have seen?
A Yes.
Q Directing your attention to pages 102 through 106 -- and since it's a so-calle minuscript, it's four pages per page, so I'm talking about the actual transcript page of '
Do you see that?
A I do.
Q If you could just review pages 10 through 106, please.
(Pause)
A I finished reading.
Q Okay. Does the material on thos pages accurately reflect what it was you st on May the 4th?



(Walsh - 8/29/07)
A It does.
Q And you've had a chance to fully review it; correct?
A That's correct.
Q And the way that the transcript was typed was accurate; is that correct?
A That's correct.
Q Next, showing you what's been marked as Exhibit 101, I ask you if you car identify that document.
A This is an errata sheet, a copy of an errata sheet that I prepared.
Q And you'll note that there is -- it's a double-sided copy, so it's really four pages. Have you had a chance to look at a four pages?
A Yes.
Q Whose handwriting is this errata sheet, which is the second and -- I'm sorry, third and fourth pages of the exhibit? Who handwriting are those two pages in?
A That's my handwriting.
Q And can you tell us how you carr about to be writing up this errata sheet and



(Walsh - 8/29/07)
making the entries in the sheet that you dic
A I was asked by counsel to review my deposition transcript and make correcti any errors that I found in it.
Q And is every word that is on thes pages your words, or were they the words others?
A Every word is my words.
Q Were there various drafts of this errata sheet that were prepared?
A There were not various drafts of the errata sheet, no.
Q So this is the one and only time that you prepared an errata sheet, as reflec in Exhibit 101?
A That's correct.
Q There were no prior drafts or edits to your errata sheet; is that correct?
A I, as I read through it, may have changed words myself personally, but ther no drafts per se.
Q And when you reviewed your transcript and decided to prepare the errat sheet, did you write up these particular cha

(Walsh - 8/29/07)
on another document, or in another place, you just do it directly to this errata sheet?
A Just directly to this errata sheet.
Q Did anybody provide you with specific answers or general answers or gei information to place on this errata sheet?
A No.
Q Did anyone direct your attention to specific entries contained in the depositi transcript that you should focus on and cor submitting as part of this errata sheet?
A No.
Q Regarding your preparation for your deposition here today, as opposed to other three or four times that you've been deposed, can you tell us what you have do prepare for today only?
A I met with counsel yesterday, I reviewed my deposition transcript from this from the prior deposition and two depositio prior. I reviewed the government's motion protective order, two recent AMEC motions transcripts from two recent status conferen



(Walsh - 8/29/07)
with the judge.
Q And you indicated that yesterday you met with counsel to prepare for today. there any other meetings, either in person phone, relating to the issues that are the subject of this deposition?
A I had telephone discussions with counsel as to when I would be available foi deposition.
Q Other than logistics discussions by phone, were there any substantive disci about your errata or anything to do with yoi prior deposition?
A There was a telephone conversa at the time I prepared the errata sheet. I h: a telephone conversation with counsel, an( had asked whether I had reviewed my dep transcript or not. I hadn't yet. They said I needed to do that right away. I did that, an then faxed it to counsel.
Q Other than the one meeting yesterday, were there any other meetings, whether live, in person or by phone -- or sc other method, I suppose -- relating to your



(Walsh - 8/29/07)
preparation for today's deposition?
A No.
Q And how long did the meeting yesterday last?
A Approximately eight hours.
Q Eight hours. And who was prese for that?
A Domenique Kirchner, Tracy Hilm and Eric Miller.
Q And you're aware that today's deposition is limited to, I believe, three hours; correct?
A Yes.
Q You also indicated that you reviewed a total of three deposition transcripts. So that would be the one that i now marked as Exhibit 100 --
Correct?
A That's correct.
Q -- as well as the two prior depositions that you gave, the transcripts fi the two prior depositions that you gave in tl case?
A Yes.



(Walsh - 8/29/07)
Q As part of your preparation for today's deposition, did you make any effort determine what documents you might have versus which documents you might have d thrown out, destroyed?
A I was asked by counsel, again, tc look at my computer archives for e-mail messages, and I did do another search of t
Q And what were the results of that search?
A I discovered there were some additional e-mail messages in my compute hadn't previously identified.
Q And do you know the approximat time period that those e-mails that you've recently located reflect?
A I believe the time period is from earlier in 2007.
Q And, to the best of your knowledge, have those documents been pi
A Yes.
Q -- by the government to us?
Other than the items that you've listed, which include the three deposition

(Walsh - 8/29/07)
transcripts, the government's motion for protective order, the two AMEC motions re I assume, to the protective order --
A I think so.
Q -- and the two transcripts of court hearings in this case, is there anythin else that you've looked at in preparation fo your testimony here today?
A Just the computer files that I mentioned, and those -- those e-mails that those additional e-mails that were produce
Q And those were all relating to 2007; is that correct?
A That's correct.
Q Regarding Exhibit No. 101, whicl is your errata sheet, when is the first time that you realized that you wanted to correc errors in the transcript in your testimony th: you provided under oath?
A It was the same date as the date on the errata sheet.
Q So between the date of the deposition, which was May the 4th, 2007, ε date of the errata, which is June the 11th,



(Walsh - 8/29/07)
2007, you had no belief or no inkling that y prior testimony had been erroneous; is that correct?
A That's correct.
Q And could you tell us what it was that triggered your belief that your testimor which was accurately reflected in the transcript, you've testified, was in error?
A Counsel's insistence that I read my deposition and correct any errors, if the were any such errors in it.
Q So is it your testimony here today that between the conclusion of the May 4th deposition and June 11th, 2007, you had n discussions or no communications -- and tl would include e-mails -- relating to the issu of whether or not you had preserved docur been told to preserve documents?
A At some point -- yes, I think that's correct. That's correct.
Q Following the conclusion of your May 4th, 2007 deposition, did you engage discussions that day or on subsequent day regarding your testimony on May the 4th?



(Walsh - 8/29/07)
A I don't recall any discussions until preparation for this deposition, and the discussions dealt with the errata sheet.
Q And the discussions that related to the errata sheet occurred on or after, bu not before, June 11th, 2007?
A That's correct.
Q So it all took place on one day, June 11th?
A No. Since then, in preparation for trial, we -- or in preparation for this deposition, I've had discussions.
Q And can you state specifically what it was you read in the transcript itself that triggered your belief that your sworn testimony had been erroneous, other than first entry with regard to Mississippi or Missouri?
A It would be the question on page 106, starting at line 3.
Q And that question, and I'll read it from the transcript, was as follows:
"But it's your testimony here today that you're under no instruction to



(Walsh - 8/29/07)
retain, not delete, and not to otherwise sav and safeguard, electronic documents relati the case; is that correct?"
And your answer to that was, "I would say that's my understanding, that's correct."
In hindsight, on June 11th, 2007 what was it about that question that you realized your answer would change?
A It was the term "electronic documents."
Q And what about that -- that term more specifically?
A It was a broader term than what I'd realized when I answered the question. the time I was in -- thinking of e-mail mess: only, and not the broader group of electron documents.
Q And if that question had been -- let me state it a different way.
Changing that question to state, "But it's your testimony here today that you under no instruction to retain, not delete, aı not to otherwise save and safeguard e-mai

(Walsh - 8/29/07)
relating to the case; is that correct," what would your answer be to that question?
A My answer would be that that is correct.
Q So if I understand, what you're saying in your errata sheet, and what you'r saying here today, is that you received no instruction to retain e-mails; correct?
A On that date, yes.
Q On?
A As of the date of my prior deposition. Since then I have received an instruction to retain e-mail messages.
Q But sitting here today, is it your testimony that on or before May the 4th, 2C you never received any instruction to retair e-mails with regard to this case?
A Yes, I do not recall receiving that specific instruction.
Q Now going back to the original word -- words "electronic documents," do y recall, sitting here today -- regardless of wh your testimony says, do you recall, sitting h today, receiving instructions to retain



(Walsh - 8/29/07)
electronic documents?
A I don't recall a specific instruction, but I knew that I couldn't delete the electronic documents that I had previou prepared.
Q And what did you understand -- a what do you understand today -- the term "electronic documents" to encompass?
A It could encompass spreadsheet from audits that I've performed, write-ups c conversations that may be Word or WordP documents; anything that may have been p in an automated format.
Q Looking back at page 103, the question starts at line 4 and your answer st at line 9.
Would you just review that question and answer.
(Pause)
A Yes.
Q And your errata sheet does not change that answer; is that correct?
A That's correct.
Q And your answer at that time was



(Walsh - 8/29/07)
in part, "I've not been given an instruction t retain any e-mail messages"; is that correc
A That's correct.
Q And that statement in this transcript, which you've now certified as accurate, remains accurate today; is that correct?
A I have since received instruction to retain e-mails. But as of that date, that was correct.
Q And when did you receive those instructions to retain e-mails?
A I can't remember the exact date. It was recently. I believe it was in July.
Q And was that instruction in writing or oral?
A In writing.
Q And who did you receive it from?
A From Eric Miller.
Q And was it a -- can you tell us the length of the writing that provided that instruction?
A I believe it was a three-page document.



(Walsh - 8/29/07)
Q And was that a standard governr form?
A I'm not sure.
Q Did it appear to you to be a generic instruction that could be used in ar case, or was it specific to this case?
MS. KIRCHNER: Objection, aske and answered.
A I think that it was specific to this case.
Q Do you have a copy of that instruction with you today?
A I do not.
MR. BEHRE: Is counsel willing to make a copy of that available?
MS. KIRCHNER: Kirby, this is a document that the judge has already ruled on. The judge ruled that you we not entitled to it.
MR. BEHRE: Oh, that was part o what you submitted to chambers?
MS. KIRCHNER: Yes, yes.
MR. BEHRE: Obviously I didn't s what was submitted to chambers.

(Walsh - 8/29/07)
MS. KIRCHNER: Obviously it's oı the list.
MR. BEHRE: Okay. I don't know why it would be secret, but...
Q So it's your testimony here today that the term "electronic documents" is whạ caused your revelation, when you looked a transcript, that you wanted to change your answer; is that correct?
A That's correct.
Q In your errata sheet you state, in part, and I quote, "Although I do not remen specific instruction, I know that I need to sạ all final electronic documents substantively relating to this case that I created or receiv that directly relate to my audit findings and report conclusions."
Did I read that correctly?
A Yes.
Q I'd like to ask you some question about that specific entry.
You indicate that you need to savı all "final electronic documents." Can you tı us what you mean by that term?



(Walsh - 8/29/07)
A It just means any of the latest versions of electronic documents that were or support audit findings or conclusions.
Q Well, let's assume for purposes ( this deposition that the term "document" frı here on out includes not only hard copy pa documents, but electronic documents, inclı e-mails. Okay?
A Okay.
Q So I don't know if I'll remember to spell out all those terms, but let's assum that that term "document" will encompass everything.
By the term "electronic documents in your errata, do you include e-mails?
A If an e-mail substantively related to an audit finding, then, yes, it would be included.
Q Well, you're limiting in this errata and in your testimony here today yoı retention obligations, it sounds like, to documents that "directly relate to your audi findings"; is that correct?
A That's correct.



(Walsh - 8/29/07)
Q And your role in this case began back in, I believe, March or earlier of 1995 correct?
A That's correct.
Q And your role was far broader thạ simply preparing a final audit report; correc
A That's correct.
Q You were a fact witness, in the sense that you investigated certain allegati correct?
A Yes, I believe that's correct.
Q And as part of that role that you played in this case as a fact witness, you interviewed individuals; correct?
A That's correct.
Q Those individuals included ACMI employees; correct?
A That's correct.
Q Those individuals included some ACMI's subcontractors; is that correct?
A That's correct.
Q Those interviews included certaiı government officials, including contracting officers responsible for ACMI's contracts; iı



(Walsh - 8/29/07)
that correct?
A That's correct.
Q Were there any other interviews that you conducted?
A I spoke with people from our project management team at the job site.
Q And in conjunction with all of those interviews, did you prepare and take handwritten notes from those interviews?
A Some of them I did, I definitely did.
Q And did you utilize those notes tı prepare your final report?
A Yes.
I take that back. To prepare the write-up, the final interview write-up, yes.
Q Were those interview write-ups part of your final report?
MS. KIRCHNER: Objection, ambiguous.
A They were included in the workpapers for the various audits.
Q And would every interview that you --

171

(Walsh - 8/29/07)
MR. BEHRE: Let me not state it i the hypothetical.
Q Was each interview that you conducted as part of your investigation of t case, back in 1995, was each of those inte reflected in the workpapers --
MS. KIRCHNER: Objection.
Q -- through a memo?
MS. KIRCHNER: Objection, ambiguous, compound.
A That would not be my normal process, to write up each interview.
Q Do you have a specific recollection in this case as to whether or nc you wrote up a memo or wrote up a docur reflecting each interview?
A I know that I did not write up a document for each interview.
Q Do you recall, sitting here today, for which witnesses you prepared or took handwritten notes?
MS. KIRCHNER: Objection, ambiguous.
A I do not recall.

172

(Walsh - 8/29/07)
Q And sitting here today, do you know whether or not those handwritten not any of them -- have been retained?
A I do not. I do not know.
Q Have you made any effort in the last two months during the pendency of -- ε your last deposition, and up until the time c your errata sheet, to determine whether or your documents relating to this matter were fact, retained?
A I have not.
Q And so, sitting here today, you don't know whether or not your handwritter were retained?
A I know that if there were any, they would have been produced at the time discovery, and I assume they would all be retained with the rest of the documents tha were produced, but I have done nothing to that.
Q So you're speculating, you don't know one way or the other whether they w produced in discovery, do you?
MS. KIRCHNER: Objection,

173

(Walsh - 8/29/07)
misconstrues testimony, misstates testimony.
A I know at the time of discovery I produced everything that I had.
Q Okay. So by "produced" you're talking about provided to government coun correct?
A That's correct.
Q Not necessarily provided to ACM or its lawyers?
A That's correct.
Q Your errata sheet also indicates that, and I quote, "I know that I need to sav all final electronic documents," and you us term "final."
What distinction are you drawing there?
A In any of my electronic document I may get interrupted during the preparatio may break away, I might get half of a write done one day and finish it the next day, an would normally save the final version of th documents.
Q And, again, we're going to use th

174

(Walsh - 8/29/07)
term "document" in this deposition to incluc e-mails. Let's talk specifically about e-mail
Does your inclusion of the term "final" relate to e-mails?
MS. KIRCHNER: Objection, ambiguous.
A I can't think of -- I don't often save draft e-mail messages, so I would -- I think I only have final copies of e-mails.
Q So using the language in your errata sheet, do you know that you need to all e-mails relating to this case?
A If -- if they affected any of the audit findings or conclusions, I know I woul have to save them.
Q So you're drawing a distinction between what is a final audit finding and, presumably, other areas that are not; is tha correct?
MS. KIRCHNER: Objection, ambiguous.
A I think my distinction is more -- more whether or not something is -- would any impact on the case, whether I felt that

(Walsh - 8/29/07)
was at all important to the case.
Q And so let's put in -- in kind of the negative, that which you've written.
You've indicated that you know yc need to save all final electronic documents relating to this case that you created or received that directly relate to your audit findings and report conclusions. Let me as in the negative.
What is not included in your understanding of what needs to be retaine
A Some examples would be administrative e-mail messages, any genei e-mail correspondence that may pertain to case but may not have any bearing on any findings in this case, messages of a nature don't reflect on audit issues; e-mails of that general nature.
Q And when you say "findings in th case," what are you referring to?
A Any report -- any audit conclusions that may be used in the case. conclusions that came from me that may b in the case.



(Walsh - 8/29/07)
Q Can you give us any specifics of documents, including e-mails, that you did retain under this formula that you've just identified?
A I know from this process that there were e-mail messages related to dra the expert reports that I prepared that I did not retain.
Q And were those documents in th I'm sorry, were you done?
A I'm finished.
Q Were those documents in the rec time frame of 2006-2007?
A I'm not sure. I believe there may have been more from previous time frames well.
Q And are you aware that some of those e-mails that you deleted have subse been produced in this litigation by governn counsel as responsive to outstanding discc requests?
MS. KIRCHNER: Objection, compound, ambiguous.
A I do know that counsel has



(Walsh - 8/29/07)
produced copies of those e-mails from oth sources.
Q So that I understand your understanding of your document retention obligations, is it fair to say that you believe up until very recently, you were under no obligation to save anything -- e-mails, electronic documents, hard copy documen unless they directly related to your audit findings and report conclusions?
MS. KIRCHNER: Objection, ambiguous, compound.
A I would say that -- that that's correct, I was under no obligation to save a e-mail messages unless they related direc my audit findings or conclusions.
Q Putting aside e-mail messages, I about other electronic documents, whether spreadsheets or Word documents or anyth that might be construed as an electronic document?
A All of those documents, to the best of my recollection, have been preserv
Q And what research investigation



(Walsh - 8/29/07)
have you done to make that statement?
A It's just in my experience in the discovery process.
Q And when you make that statem are you referring back beginning in 1995, v you started to be involved in this matter?
A Yes.
Q Directing your attention to page 102 of Exhibit 100, if you could look at the question at line 2 -- that starts on line 2 -- and the answer that starts on line 5.
A Yes, I've read that.
Q And your testimony at the time regarding your e-mails was that:
"Many of them are deleted, so I will not save. I get so many e-mails that it's unmanageable to -- for me to save e-mails I'll delete e-mails that are unimportant soor after sending them or receiving them."
Was that your answer to that question at line 5?
A Yes.
Q Does that answer remain accura today?

(Walsh - 8/29/07)
A Yes.
Q And in terms of what constitutes unimportant e-mails or documents, are yoı sole arbiter of that question as to what's unimportant, or do you consult with anyboc before deleting anything?
A It is just my decision.
Q And is that based upon some government policy or procedure that you eı such a test, in deciding what you can delet
A I would say that it is. Our requirements direct us to use judgment as what's to be retained and what's not to be retained, and create a record that an independent person could come in and det how we draw our conclusions. Based on tl general principle, I would say that I then us my judgment on what to retain or get rid of
Q How many years have you been the government?
A Almost 20 years.
Q And during your almost 20 years there have been numerous situations, I as: that you have been involved in, at least



(Walsh - 8/29/07)
indirectly, that relate to threatened or pend litigation; correct?
A That's correct.
Q And is it fair to say that during your almost 20 years you have received se times requests from government lawyers o personnel for you to retain documents relaı to that threatened or actual litigation?
A I don't remember specific requests, but there's been many times whe saved documentation related to cases that could -- that were involved in litigation or could go to litigation.
Q But is it your understanding that under government rules, regulations or pol within your department, that once litigation commenced, or, in fact, if it's even threater or on the horizon, you, as a government official, have an obligation to preserve recc and documents, as I've used that term previously, relating to the subject matter of that suit or threatened suit?
A Yes, I do have to save document relating to the suit or pending litigation.



(Walsh - 8/29/07)
Q But you have not done that in thε case -- this case; is that correct?
MS. KIRCHNER: Objection, misconstrues testimony already given misstates testimony already given.
A I have saved all relevant documents related to this case.
Q Well, the formula that you appea to be using is that you -- once you determiı that something was "unimportant," you weı deleting it; correct?
MS. KIRCHNER: Objection, ambiguous, compound.
A I use my judgment to determine what documents are -- are important and necessary to support audit conclusions.
Q Well, you've indicated in your testimony that "I do have to save documen relating to the suit or pending litigation"; correct?
A If by "documents" you mean all documents that relate, then, no, I don't hav save all. I have to save anything that's material to the suit or the pending litigation



(Walsh - 8/29/07)
Q The answer you just gave a few moments ago -- well, the question that was to you, "But you have not done that in this case; is that correct?" And your answer wa have saved all relevant documents related this case."
Was that answer accurate?
A Yes.
Q And you previously indicated tha you were saving only those that were "imp to your audit findings; is that correct?
A That's correct.
Q And are you using the term "relevant" to mean the same thing as impo or, as you said in your testimony previousl unimportant?
MS. KIRCHNER: Objection, ambiguous.
A I would say that an unimportant document would not be relevant.
Q And when you use the term "relevant," are you talking about relevant tc this litigation that's been going on for twelv years, or whatever it is, or are you using it

(Walsh - 8/29/07)
refer to relevance as it relates solely to you audit findings?
MS. KIRCHNER: Objection, ambiguous.
A I don't think that I would draw a distinction between relative to my audit findings or relevant to this case. I would think they -- in my mind, they would be one the same.
Q So with regard to the errata shee that you prepared, starting at line 20 of the change, where you state, "I need to save a final electronic documents substantively relating to this case that I created or received," and then you go on, "that directl relate to my audit findings and report conclusions," if what you just said is your current testimony, then we don't even neec last three lines of that errata change, do wε
MS. KIRCHNER: Objection, misstates testimony given already, ambiguous, confusing.
A I think the last three lines might add some clarification, but I think that lines



(Walsh - 8/29/07)
20, 21 and 22 also provide a broad summa understanding.
Q So is it your belief, sitting here today, that you need to save all final electronic documents substantively relatinç this case?
A "Substantively" meaning not that the substance of the document relates to tl case, but that the substance of the docume would have an impact on the case.
For example, if I had an e-mail message that said my flight for this deposit will get in at 11 p.m., I don't believe that that document would substantively relate to case, but the content of the document wou But, no, I would not think I would have to s that e-mail message.
Q But I guess what I am confused l and what I find ambiguous in your errata sl change, is that you say, on the first page o this document; that is, Exhibit 101, at line 2 that "I need to save all final electronic documents substantively relating to this ca Yet, on the second page, which is the fourt



(Walsh - 8/29/07)
page of Exhibit 101, you seem to narrow th scope of what you believe you have to reta saying that it only -- your retention obligatic only relates to those documents that "direc relate to my audit findings and report conclusions."
MS. KIRCHNER: Objection, argumentative, restates testimony already given, repetitive, ambiguous.
MR. BEHRE: That's the witness' own words, so I'm not sure -- I'm not sure how I can be doing any of that --
MS. KIRCHNER: Sure it is.
Q So notwithstanding that objectior about your wording, are you attempting thr this errata to limit your obligation to retain only those issues that relate to -- directly relate to your audit findings and report?
MS. KIRCHNER: Objection, ambiguous, asked and answered.
A I am not, but I can't think of any substantive documents that would not relat my audit report findings and conclusions.
So the purpose of this errata



(Walsh - 8/29/07)
sheet was not to try to limit, somehow, the documents that I must retain.
Q So it's your understanding, sitting here today, that you have had an obligation, since at some point in 1995, to retain all electronic documents, including e-mails, relating to the ACMI case; is that correct?
MS. KIRCHNER: Objection, misstates testimony already given.
A Only if they had a substantive impact on the case.
Q And who determines whether a particular document has a substantive imp a case?
A As it relates to any audit work, that is my responsibility.
Q Have you ever, since 1995, received a written request that you retain, r destroy, and otherwise safeguard, records/ documents relating to this case?
A I do not recall receiving written instruction to that effect.
Q You indicated that recently, in

(Walsh - 8/29/07)
the last couple of months, you had receive an instruction; correct?
A That's correct.
Q Putting that one aside, were ther any other instances during the last twelve years, during the pendency of your investigation, all the litigation relating to ACMI, is it your testimony you've never rec a written instruction to retain documents?
A I do not recall receiving a written instruction to retain.
Q And let me just make sure, when say "written instruction," I'm including in th e-mails. Maybe I should just ask it that wa
Have you ever received an e-mail that instructed you to retain documents sin 1995?
A Other than the recent instruction, I do not recall receiving an e-mail.
Q Since 1995, have you ever recei oral instructions with regard to retaining, safeguarding and not deleting or destroyin records relevant to this case?
A At some point in the discovery



(Walsh - 8/29/07)
process we were instructed by AMEC cour tab documents, and not remove document any documents that we wanted copied. Sc remember having to go through that proce reviewing a lot of documents that were pro by AMEC, or Morse Diesel.
Q Putting aside those documents tl were produced by Morse Diesel in this cas focusing solely on those documents that w government documents in the government' possession, did you ever receive oral instructions at any point since 1995 to safeguard or retain those documents; that government documents relating to these c
A At some point in time I was instructed to place all documents into a ce storage room that had been arranged for ir Kansas City, and at that point I transferred documents into that storage room.
Q Do you recall the date when you received that oral instruction?
A I do not.
Q Do you recall the year?
A I don't.



(Walsh - 8/29/07)
Q In the spring of 1995, your agenc believed that ACMI had been submitting fa stamped invoices.
Did you receive an oral instruction at that point to safeguard, and n otherwise delete or destroy, relevant recor
A No, not in March of 1995.
Q In the summer of 1995, Steve Anderson opened an investigation into the stamping issue.
Did you receive written or oral instructions at that point to safeguard documents?
A I did not receive any instructions in the summer of 1995 to retain documents
Q In December of '95, ACMI filed notices of appeal with the GSBCA relating St. Louis Phase I contract.
At that point, did you receive any instructions, written or oral, regarding document preservation?
A I do not recall.
Q Is there anything that you could look at that would refresh your recollection



(Walsh - 8/29/07)
A I don't know.
Q In December of 1997, ACMI filed another complaint before the GSBCA relat Phase I.
At that point did you receive any written or oral preservation requests from within the government?
A I don't recall.
Q In December of 1998, ACMI filed complaint in the Court of Federal Claims regarding the Phase I project.
At that point did you receive any sort of document preservation requests fro within the federal government?
A I do not recall.
Q In February 1999, Steven Ander issued a report relating to his investigation his office's investigation.
Same question, at that point did you receive any requests from within the fe government to retain relevant records?
A I don't recall, but I don't believe at that point anybody would have g me that instruction.

(Walsh - 8/29/07)
Q In May of 1999, ACMI filed its first complaint in the Court of Federal Clain regarding Phase II.
At that point did you receive any instructions to retain relevant records?
A I do not recall.
Q In June of 1999 the government terminated the Phase II contract for default
At that point, did you receive any instructions, written or oral, to preserve records relating to that particular matter?
MS. KIRCHNER: Objection, ambiguous.
A I do not recall specifically, but I do not believe I would have at that point i time.
Q In July of 1999, ACMI filed complaints in both the GSBCA and the Co Federal Claims relating to Phase II. And a that point did you receive any instructions, written or oral, to preserve records relating ACMI, its contracts, or any pending litigatic
A I do not recall.
Q In October of '99, the governmen



(Walsh - 8/29/07)
filed counterclaims in the Court of Federal Claims alleging fraud and seeking forfeitur
At that point in time, did you receive any instructions, oral or written, fro within the federal government to retain rele records?
A I do not recall.
Q Do you have any recollection of when it was you were asked to transfer the documents that you did have to the storag facility -- and I forget where you said that was.
A In Kansas City.
It was sometime after the termination for default.
Q And the termination for default was in or about June of 1999; is that corre
A That's correct.
Q And what specifically were you instructed to provide so that it could be safeguarded in storage?
A I don't remember the specific instruction, but I provided all audit documentation and any papers that I had r



(Walsh - 8/29/07)
to the case at the point in time that the -- they were to be transferred.
Q And at that point in time, had yo been applying the standard that you enunc earlier, and that is that for "unimportant documents," that you determined were, in unimportant, you were deleting and not ret them?
MS. KIRCHNER: Objection, ambiguous, compound.
A A standard of what to include or not include in the workpapers I would have applied throughout all the audits, so I woul have applied that same standard from the start in 1995.
Q So is it fair to say that since the inception of your involvement with any the contracts relating to Morse Diesel, or A that you were deleting and not retaining ce documents relating to ACMI or the contrac
MS. KIRCHNER: Objection, ambiguous, compound.
MR. BEHRE: Would you like to ju have a standing objection to that so y



(Walsh - 8/29/07)
don't have to say it every time?
MS. KIRCHNER: No, thank you.
MR. BEHRE: Okay.
A Since 1995, I would have been required to use judgment to determine wh workpapers were necessary to include in t files to support my audit conclusions, and I would have to apply that standard all the ti so that only relevant workpapers are incluc the eventual files. That's the standard that have to -- have to apply at all times.
Q But it's not the standard you hav to apply at all times, is it? Because once litigation is threatened or commences, you under an obligation to retain documents; correct?
MS. KIRCHNER: Objection, argumentative.
A Some documents, yes. It would literally impossible for me to maintain a co of an electronic document that I was in the middle of editing. There is any number of things that could cause me to have a brea the period of time that I'm creating the

(Walsh - 8/29/07)
document, and I would not save the first cc and then what I added to the next copy, an what I added. I would only save what my f work product was.
Q But putting aside documents thai you create on a computer screen and revis putting those aside, what about, for examp hard copy, paper documents? Did you apr same test, "that which is unimportant I won retain," to those hard copy documents?
MS. KIRCHNER: Objection, ambiguous, compound.
A If, during the course of an audit, I asked for financial statements for a three-year period, but then we agreed to us financial statements for only a one-year pe the other two sets of financial statements n likely I would not retain. If I did retain them, they would not get into the final set c audit workpapers.
So hard copy documents, I would still have to apply that same judgment as t whether the documents related to the actu audit procedures and findings.



(Walsh - 8/29/07)
Q And so is it your testimony here today that in this case you did apply that sa judgment starting in 1995, and as a result y did discard documents relating to the case'
MS. KIRCHNER: Objection, ambiguous, compound.
A I would have used judgment to determine which documents should go intc files. I don't remember specifically deleting any files, but I would have applied that sam judgment throughout any audit.
Q Am I correct that the documents you sent to storage in St. Louis were only y audit workpapers?
MS. KIRCHNER: Objection, misstates testimony already given.
A I believe it was everything that I had, and that there were some -- there was additional documentation that may not hav in the workpapers that was also included.
Q And do you know what those additional documents that were -- were not included in the workpapers are, sitting here today?



(Walsh - 8/29/07)
A In a general sense, there may ha been additional documentation provided by Diesel or subcontractors that ended up not used in a specific audit that I may have kep case I needed it in a future audit, and -- bu they may have never made it into audit workpapers.
Q Putting aside documents that we provided by Morse Diesel, how about with to any government documents that you rec were those included in what was submittec storage even if they weren't a part of the workpapers?
A My belief is, with the exception of my personal -- if a -- e-mail messages, a government documents are included over t
Any documents that I would have used in the case, whether they be contract the contract itself, I believe would all be in the room with the rest of the documents.
Q So -- I'm not sure I understand your answer, so let me put it another way.
Is there anything that you received or created in conjunction with you



(Walsh - 8/29/07)
audit investigation, that commenced in 199 that was not sent to storage for safeguardi Remembering how we defined "document" beginning of this deposition.
MS. KIRCHNER: Objection, ambiguous, confusing.
A There would -- there would be e-mails that were not sent that -- that -- e-mails that I either received or created tha were not sent to storage. There are no documents relevant that would affect any c audit findings or conclusions, or have any impact on the case, that would not be in storage.
Q And when you say "wouldn't hav any impact on the case," that is based upo sole determination of what has an impact c case; correct?
A That's correct.
Q How about your handwritten note were they included in what you sent to stor
A I don't recall.
Q When's the last time you looked see what was in storage that related to you

(Walsh - 8/29/07)
files?
A I can't recall.
Q Have you ever gone back to look what you provided to be stored?
A The only time would have been w I provided it for storage. Since then, I woul have gone back to find specific documents needed, but not to conduct any inventory o review the entirety of what was included.
Q So do you know whether or not y handwritten notes, which you've testified y( taken during the course of interviews, have retained or whether they've been destroye( are otherwise unavailable?
A I know that my handwritten notes would have been transcribed onto memos conversation. But whether the notes them: were then retained, I do not know.
Q So you don't recall one way or another whether you retained your handwr notes?
A I do not.
Q And just so I'm clear, the memos of conversation that you just referred to, we



(Walsh - 8/29/07)
they just verbatim typewritten versions of y handwritten notes, or were those memos s more than just a verbatim transcript of you handwritten notes?
A They would be more than a verb transcript.
Q And it's possible that the handwritten notes contained information or statements that didn't make their way into t memos; correct?
MS. KIRCHNER: Objection, ambiguous, calling for speculation.
A I don't know.
MR. BEHRE: Why don't we take couple-minute break.
THE VIDEOGRAPHER: Sure. It's 10:42. This is the end of tape number one, and we're off the record.
(Recess taken)
THE VIDEOGRAPHER: Okay, nc 10:56 a.m., and we're beginning tape number two, and we're back on the record.



(Walsh - 8/29/07)
BY MR. BEHRE:
Q Mr. Walsh, would you please list for me in a general way the types of docum and records that you created relating to thi: case, starting in 1995?
A I would have created memorandu of discussions, spreadsheet analysis, sum of findings and conclusions, draft audit reports, reports for counsel. And I'm sure there are some other types of analysis that been asked to perform.
Q Did you create e-mails?
A I did create e-mails.
Q Did you create any calendar entries?
A Not in electronic form. If I had a meeting or a trip, I may write on a calend at my desk a note.
Q Have those calendars been retained?
A I do not believe so.
Q What about phone records?
A I'm not aware of any phone records.



(Walsh - 8/29/07)
Q Did you receive any so-called bu slips, phone notices that --
A Oh, oh.
Q -- at least used to be used?
A I don't recall any specifically, but I'm sure I would have received notices somebody called and I needed to call then
Q And were those retained since 1995?
A I don't recall.
Q Putting aside those documents tl you've created, you've previously testified t you received certain documents, e-mails a like, relating to this case, or these cases, I guess I should say.
Is that correct?
A That's correct.
Q And could you describe for us in general way, similar to the way you just dic the types of records that you received relat to the case since 1995?
A I've received documents from Mc Diesel and the subcontractors, documents the government's construction manager, ot

(Walsh - 8/29/07)
government documents, e-mails, written correspondence, and various analysis perf either by Morse Diesel or on behalf of Mors Diesel.
Q And, to the best of your recollection, were any of the documents th: you've just identified relating to or received from any federal prosecutor?
A I'm not sure. I know for sure I did receive some e-mails from a federal prosecutor in California.
Q And do you recall the name of th individual?
A His name was Mark Krotoski.
Q Could you spell that last name?
A K-r-o-t-o-s-k-i.
Q And do you recall what you received from him?
MS. KIRCHNER: You can answe general sense, not to the content of the...
A I don't recall specifically.
Q Do you recall when you received this document or documents?



(Walsh - 8/29/07)
A It would have been around the tir frame of the pleading in the California case right in that time frame.
Q Who requested, back in 1999, th you provide documents that could be sent storage in Kansas City?
A I believe it was at Domenique's instruction.
Q Was she the individual who specifically requested that you do this?
A I'm not a hundred percent sure, but I believe it was.
Q And do you recall what precise instructions you were given?
A I do not.
Q As a result of that instruction, did you sort through and review what docu you then had in your possession?
A I don't recall.
Q And as of the date of the request -- you don't remember when specit that request was made, do you?
A No, I do not.
Q Is it fair to say you believe it



(Walsh - 8/29/07)
was sometime in 1999?
A I'm just not sure.
Q And as of the date of the request -- understanding you're not sure w was given -- did you then in turn provide everything you had as of that date for stora to Kansas City?
A I believe I did.
Q So you didn't sort through those materials and provide some for storage an provide others?
A To the best of my recollection, I did not. I provided everything.
Q Of course, by that time, 1999, yo had been working on this matter for about years; correct?
MS. KIRCHNER: Objection, ambiguous.
A That's correct.
Q And during those four years, you've previously testified that you would periodically delete or not retain certain records you deemed unimportant; correct?
A Not periodically, just in the



(Walsh - 8/29/07)
performance of my reviews I would only re the documents necessary to support the a findings and conclusions.
Q So the documents that you turne over in 1999 at Miss Kirschner's request w not have included everything relating to the case, because previous to that request yo not retained everything; correct?
MS. KIRCHNER: Objection, ambiguous.
A That would be incorrect. I retained everything that was needed to be retained.
Q As determined by you and you alone; correct?
A Yes. As required for me to do. But it would have been -- well, and other p who worked on the various projects, I woul gathered whatever information they had as to be put in storage. But for the projects th I participated on, it would have been basec my judgment in performing the audits.
Q But between 1995 and the reque Miss Kirschner made to you in 1999 to pro

(Walsh - 8/29/07)
documents to be sent to Kansas City, you (
or otherwise did not retain certain documer
that related to the Morse Diesel contracts;
correct?
MS. KIRCHNER: Objection,
ambiguous.
A There were many documents tha
reviewed that I didn't even take a copy of, a
I'm sure there were documents that were p
for me that ended up not being documents
to support audit findings.
I don't know exactly -- obviously,
if I just read something and didn't take a cc
of it, there wasn't anything that I saved the
For other documents that may have been p
to me, I don't remember exactly what was
retained, but anything that wasn't in the
workpapers at that time was also provided.
Q But is it fair to say that prior
to receiving Miss Kirschner's request some
in 1999 that you provide documents to be s
storage, that you, in fact, deleted e-mails
relating to your audit and investigation of
Morse Diesel?



(Walsh - 8/29/07)
A I don't know if there were any
e-mails back then or if I did delete any
e-mails.
Q Did you have e-mail capabilities
at the government back in 1995?
A I don't recall.
Q How about 1996?
A Again, I don't recall.
Q How about 1997?
A I do not recall.
Q How about 1998?
A I don't recall.
Q How about 1999?
A I don't recall.
Q So it's your testimony here today
that you don't recall whether between 1995
1999 you, in your position with the governr
had access to or utilized e-mails?
A I can't remember when we first
started using e-mails. And as I sit here, I
can't recall specific e-mails from any of tho
time periods.
Q Your testimony is at some point i
1999 you were requested to, and did in fac



(Walsh - 8/29/07)
provide certain documents to someone in t
government to store in Kansas City; is that
correct?
A I'm not sure if it was 1999, but
at some point after the termination for defa
we were requested to place all of our docu
into a storage room.
Q And did you personally bring thos
documents that you had to the storage roo
did you provide them to some other party?
A No, I personally took them over
there.
Q After that had been -- that task
had been completed; in other words, after y
had put those documents in storage, were
any subsequent requests that you retain or
safeguard any records that you created be
1999 and 2007?
A Aside from the most recent
request, I don't recall any others.
Q So where would the records be tl
were created, generated or otherwise rece
you between 1999 and 2007?
MS. KIRCHNER: Objection,



(Walsh - 8/29/07)
ambiguous, compound.
A Analysis that I prepared, I would
maintain copies of those electronic docume
I don't know where e-mails that I sent woul
at, and I can't think of other documents tha
created. I received things, such as copies
transcripts, different claims or productions
AMEC; a lot of paperwork related to the ca
Q When Miss Kirschner requested
you provide all documents you had at som
perhaps 1999, perhaps later, were you als
instructed to continue to safeguard anythin
that you generated after that date that you
provided those records for storage?
A I don't recall that instruction.
Q Does that mean that you did not
receive such an instruction?
MS. KIRCHNER: Objection,
argumentative.
A I just can't recall if I did or I
did not.
Q Putting aside what instruction yo
may or may not have received, did you, in
after that date in 1999 or 2000, or wheneve

(Walsh - 8/29/07)
was, did you take efforts to safeguard, reta and otherwise make sure that you had ava all records/documents that you created or received relating to Morse Diesel and its contracts?
A I saved any documents that woul be relevant to the case --
Q But you just testified -- I'm sorry, go ahead.
A -- that -- that -- that would impact audit findings in any way, that had ε material bearing on the case in any way. N anything that was generally related, but anything that I created or received that hac substantial effect on audit findings or the case.
Q You just indicated a few moment ago that you are not sure where even toda' sent e-mails are from 19 -- since 1999; is tl correct?
A By the people who received therr I'm not sure what they may have done with
Q But putting aside what the recipient may or may not have done with y(



(Walsh - 8/29/07)
e-mails, you would have had a copy of the e-mails you sent in your sent box; correct?
A That's correct.
Q And I understood your answer a minutes ago to be you don't know where th would be.
A No, if I had any sent e-mail messages, that they would be something tl would retain.
Q And do you still retain those to the present day?
A I retain -- I have some archived e-mail messages, both on my computer an separate disk.
Q In what fashion are those e-mails and perhaps other electronic records, orga on your archived feature in your computer · your -- did you say floppy disk?
A Yeah, a CD-ROM.
Q Okay.
A Any e-mails that I have are accessible only through the Lotus Notes sc that we use, and they would just be someti could access through that software. Any o



(Walsh - 8/29/07)
electronic documents are stored on my poı our server in Kansas City.
Q So it sounds as though you've identified three possible sources for your e-mails post-1999, or whatever year you w requested to provide documents and place storage in Kansas City. Your computer, government issued computer; correct?
A That's correct.
Q And you've had the same compu since 1999?
A No, since 2004, February of 2004
Q So you had one computer from '§ through February of 2004?
A I don't recall specifically. It's possible there would have been two. I just don't remember when we got the computeı previous to the computer I currently have.
Q And what happened when you received a new computer in 2004? What h to the old one?
A Our technology people archived · saved all of the archives from the previous e-mail to a disk.



(Walsh - 8/29/07)
Q And who has that disk now?
A I have that disk.
Q When is the last time you review the contents of that disk?
A I pulled a copy of that disk up this morning before coming here.
Q For what purpose?
A To determine when the earliest e-mail on that disk was.
Q And did your review of that -- the contents of that disk refresh your recollecti as to what the first e-mail was on that?
A The first e-mail on that disk was from January of 2002.
Q And you indicated that your recollection was that you switched comput February of '0 --
A 2004.
Q 2004.
So is it your testimony that on that disk, which contained at least some of documents on your old computer; that is, tl computer that was replaced sometime in 2 it your testimony that there are no documeı

(Walsh - 8/29/07)
from 1999, or e-mails, from 1999 to 2002?
A There are no -- yes, there are no e-mails, but that disk has only e-mails on it
Q And it's fair to say that between 1999 and 2002 you wrote and received nu e-mails about Morse Diesel, its contracts, i litigation, and other matters relating to Mor Diesel; correct?
MS. KIRCHNER: Objection, ambiguous, compound.
A I don't recall, but we did not do a lot of audit work between 1999 and 2002 don't recall how many that there may have
Q But there would have been some right? There wasn't a three-year hiatus?
MS. KIRCHNER: Objection, argumentative.
A I believe there would have been some.
Q At any point between 1995 and t present time, did you have a function or a program on your computer that automatica deleted anything you sent, received, what I you?



(Walsh - 8/29/07)
A I don't recall specifically.
I don't believe there was a program that did that. I believe that our programs only saved e-mail messages, an believe it was after they were 60 days old, would save them to archives automatically not a hundred percent sure.
Q And is that automatic archiving function that you've testified to, did that apply -- or does that apply equally to sent e-mails as well as received e-mails?
A I believe it does.
Q And when you say they're automatically archived, where are they arc
A Our archives, I believe, are on the hard drive of the -- of our computers.
Q And how do you know that?
A At the time we got new computer they had to print off -- they had to save the old archives, and I believe they got it from t old computer, and then I believe that they - that the current e-mails are something that stored in my current -- are archived to the current computer.



(Walsh - 8/29/07)
Q And your testimony is that this automatic archiving that takes place is, in fact, automatic, it's done every 60 days, an then it's done to your hard drive?
A I believe so.
Q Does a technician have to come and do that for you, or is it done just by the computer operating itself?
A I believe it's set up in the computer to operate itself.
Q You indicated that in preparation for your testimony here today you reviewe CD that contained e-mails; is that correct?
A That's correct.
Q And you indicated that your revie of those e-mails refreshed your recollectior to when at least the first one was dated; is that correct?
A Yes, I know when the first e-mail on the disk is dated.
MR. BEHRE: In light of that testimony, Domenique, I'd ask that th be produced for our review.
MS. KIRCHNER: It has privilegec



(Walsh - 8/29/07)
documents on it also. We might -- I'll have to deal with that. That's a substantial --
MR. BEHRE: Okay. Do you wan take a break?
MS. KIRCHNER: Whatever's on t CD is substantial.
MR. BEHRE: Should we take a b so you can look at that?
MS. KIRCHNER: No. No, I'm not going to look at it. I'm not going to look at it.
MR. BEHRE: We don't want to ha him come back again, do we?
MS. KIRCHNER: I guess you will you take it to the judge.
MR. BEHRE: The witness has testified that -- maybe we shouldn't dc this in front of the witness.
MS. KIRCHNER: You can send tl witness out if you like. It's up to you.
MR. BEHRE: Why don't we go of the record.

(Walsh - 8/29/07)
THE VIDEOGRAPHER: Sure. Okay, it's 11:22, and we're off the record.
(Witness leaves the deposition room, and the following took place outside the presence of the witness, a not videotaped, until indicated.)
MR. BEHRE: The witness has testified his memory is refreshed by reviewing the document, and you're saying I'm not entitled to look at that document?
MS. HILMER: You're not entitled to look at the whole CD.
MR. BEHRE: Who said the whole
MS. HILMER: Isn't that what you said? You wanted the whole docume
MS. KIRCHNER: You asked for t CD.
MR. BEHRE: Is it a document? I: it just one document?
MS. HILMER: Well, what is a document under the federal rules?
MS. KIRCHNER: Let me just dea



(Walsh - 8/29/07)
with this, Tracy, please.
He testified that what was on the CD was e-mails, e-mails from the old computer, okay. They're on the CD.
What we can do is, after the deposition is completed, I can have hi at some point print out that particular e-mail, the oldest e-mail, for you. Assuming it's not privileged, there's nothing wrong with it, we can give you that one e-mail off of the CD. But, I mean, there's -- there could be all sorts of stuff on that CD that -- and, actually, I don't think we have the capability, but he could print it in Kansas City.
I don't have Lotus, but we can get you -- assuming that that particular e-mail is not a privileged e-mail, or if it is, maybe we redact it --
MR. BEHRE: Right.
MS. KIRCHNER: -- what's ever privileged from it, we can get you a printed copy of his earliest e-mail on



(Walsh - 8/29/07)
the disk. And we'll provide that in either redacted form or total if I think there's nothing --
MR. BEHRE: Well, does he have computer with him? I don't need a ha copy.
MS. KIRCHNER: No, no, he does have his computer with him, and -- so I mean, I don't know what you're goin at. He's testified that he looked at it, the date of it was January 2002. What do you want to know?
MR. BEHRE: I just want to see whatever it is that refreshed his recollection.
MS. KIRCHNER: Well, he'll --
MR. BEHRE: I mean, that's --
MS. KIRCHNER: He'll give you a printout of that particular document from the CD, anything in it not privileged. I'll check it to make sure there's nothing privileged in there --
MR. BEHRE: Yes, I understand.
MS. KIRCHNER: -- I have no ide



(Walsh - 8/29/07)
what's in this document, and we'll give it to you and you'll have it.
MR. BEHRE: I think I'm entitled to it during the pendency of the exam.
MS. KIRCHNER: Well, I'm not go to break the deposition. I'm not going to -- you know, it's in Lotus Notes. He doesn't have his computer here, that's that.
MR. BEHRE: Okay. So you're refusing to go back and provide that?
MS. KIRCHNER: Right I'm refusi it. I have a meeting after this, you have to conclude this on time so I can be at my meeting --
MR. BEHRE: Okay --
MS. KIRCHNER: -- absolutely.
MR. BEHRE: -- I just want the record to be clear you're refusing to provide it.
MS. KIRCHNER: I'm refusing to provide it right at this moment. I've already said on the record --
MR. BEHRE: But you'll provide it

(Walsh - 8/29/07)
after the deposition's over?
MS. KIRCHNER: Sure, sure. I mean, if you want to see the date on this document that he looked at on a ( you know, we'll get you that date for sure. And if it's nothing privileged, then he can print out the whole thing - he can print out the whole thing, we'll give you the whole thing, no redactior if there's nothing privileged in it. I don't know what the nature of the e-m is.
Can we just get going so I can get to my meeting?
MR. BEHRE: Yes.
MS. KIRCHNER: Thank you.
(Witness reenters the deposition room)
THE VIDEOGRAPHER: Here we Okay, now it is 11:27, and we're back on the record.
BY MR. BEHRE:
Q Going back to the CD that you mentioned you reviewed this morning --



(Walsh - 8/29/07)
A Yes.
Q -- you indicated that there was at least one document that provided you with sense as to what the oldest document was CD; correct?
A That's correct.
Q Are there any other CDs besides that one that you're aware of that would co old e-mails?
A I'm not aware of any.
Q In preparation for your testimony here today, besides that one e-mail with th earliest date, I believe you said, of '90 --
A 2002.
Q 2002?
Putting that document aside, were there any other documents that you review preparation for your testimony?
MS. KIRCHNER: Other than he's already testified about?
Q On the CD.
MR. BEHRE: Yes.
A No.
Q So the only thing you looked at,



(Walsh - 8/29/07)
then, was the one document with a date of is that correct?
A Other than going through all of the documents to pull out any documents t related to this case at all, and provide thos to counsel.
Q And, to the best of your knowledge, have those been produced in t case?
A I'm not sure.
Q But they were just provided to government counsel today?
A No, no, previously when I went tc search for any e-mails that I had.
Q In preparation for your testimony here today, did you review any other docur besides that one on that CD?
A There was one other document o the CD that I did look at yesterday, I did no read.
Q And did your looking at that document refresh your recollection with re to anything you're testifying about here tod
A No.



(Walsh - 8/29/07)
Q Referring you back to Exhibit No 101, your errata sheet, sitting here today, i there anything that you believe is inaccurat your errata sheet?
A No.
Q Is there anything in your errata sheet that you would like to change or alte
A No.
Q Is there anything, other than wha is included in the errata sheet, that you wo like to change or alter in Exhibit No. 100? That's the transcript of your May 4th, 2007 testimony in this case.
MS. KIRCHNER: Objection, compound.
A Yes.
Q And can you give us a page and line number?
A On page 105, line number 6, the question is, "And do you know whether or have copies of these e-mails, the total of te at your computer?
"I do not. I know that I do not have copies of them.

(Walsh - 8/29/07)
"How do you know -- and how is it you know that?
"I did a search at Domenique's request for any e-mails that I had related."
This whole section of questioning, since that time I've gone and done another review, and I was able to find some docum that were stored in the archives on my com that I believe may have been duplicates of of the documents from the last deposition.
Q Looking at Exhibit No. 101, the second page of that document, you signed certified the transcript as of June 11th.
Did this discovery occur after June 11th?
A It did.
Q And in light of that new information, how, if at all, would you alter your answer at page 105, line 9 and line 1
A I believe that some of the e-mails that we discussed were in my computer, a my previous search had not found these, a would alter my answer to say that I do hav least some of those e-mail messages.



(Walsh - 8/29/07)
Q You just stated "at least some." But you can't be certain you have all of the correct?
A I have not done a comparison of all of them.
Q Other than those two questions c page 105, is there any other answer that y provided in the course of your testimony or the 4th, 2007 that's contained in this transcript that you believe is inaccurate?
MS. KIRCHNER: Objection, compound.
(Pause)
A I'm not a hundred percent sure. If there is anything in my testimony that sp to the previous search that I did for e-mail messages, I would need to modify that for e-mails I found prior to this deposition. I can't recall another section of the -- the deposition that speaks to the e-mails like t section we just discussed, but I can go thr and do a look everywhere e-mails are refe if you'd like me to.
Q Are you preparing an additional



(Walsh - 8/29/07)
errata sheet for this transcript?
A I had not planned to. That has not been discussed.
Q So it's your testimony here today that the May 4th, 2007 transcript of your testimony, coupled with your errata sheet c June 11, 2007, do not encompass all of the inaccuracies that you believe exist in your prior testimony; is that correct?
A I believe in my prior testimony that -- since my prior testimony, I found additional e-mail messages that modify so the testimony given at the time of my prior deposition, specifically the section we just spoke about on page 105.
Q Other than the recent discovery e-mails that would perhaps change your a at certain places in your transcript, are the any other inaccuracies that you're aware o are not reflected in your errata sheet of June 11, 2007?
MS. KIRCHNER: Objection, compound.
A No.



(Walsh - 8/29/07)
Q At any point between 1995 and t present day, did you receive any instructio to how you were to determine what docum relevant to any pending litigation that exist between the government and Morse Diese
A Aside from the recent instruction I received, I cannot recall.
Q And by "recent instructions," do you mean instructions you received after y testimony in May of 2007? Correct?
A That's correct.
Q Are you aware that GSA policy a of December 4th, 1999 was that on a week basis -- and, actually, on every weekend -- messages that were older than 60 days th located in either your in-box, your sent mai your trash can or any user-created folders created, were deleted during what is referr as a weekly mail file cleaning process?
A I don't believe that happened wit any of my messages.
Q And why do you believe that?
A We were never instructed that th would happen.

(Walsh - 8/29/07)
MR. BEHRE: Can you just mark t as 102, please.
(Document retention policies marked Exhibit 102 for identification.)
MR. BEHRE: Let me just show th to counsel before you give it to the witness (handing).
MS. KIRCHNER: Thank you.
(Pause)
MR. BEHRE: Thank you.
BY MR. BEHRE:
Q Mr. Walsh, showing you what's b marked as Exhibit 102, could you take a lo that document and see if you recognize it.
(Pause)
A I recognize it, yes.
Q And what is that exhibit?
A It is pages of -- pages that were recently provided to me that relate to -- tha appear to relate to document retention issu
Q Directing your attention to the sixth page of the exhibit -- the pages are unnumbered -- that has the heading at the the page "E-mail Policies."



(Walsh - 8/29/07)
Have you had a chance to review that section that's entitled "60-Day Deletior Policy"?
(Pause)
A Yes, I've had a chance to review that page.
Q And are you familiar with the policy that's described in this particular pag of the document?
A No, I'm not.
Q Were you aware back in 1999, u until the time you first reviewed this policy, that documents were automatically deleted 60 days unless certain actions were taken user?
A I don't remember going back to 1999. And as of the current time period, I believe all of my messages are sent to e-m or sent to archive after 60 days.
Q Have you ever personally used archiving software that permits you, as the user, to archive e-mail messages you belie warrant retention?
A I believe that my computer uses



(Walsh - 8/29/07)
that software. I don't recall a specific instance of me actually performing tasks w the software to archive e-mail messages.
Q And in the e-mail policy page that's entitled "60-Day Deletion Policy," ab halfway down that first paragraph it describ the software as being that "allows users to easily archive mail messages"; correct?
A It does.
Q And it gives -- which suggests, does it not, that it's up to the user to perfor the archiving function to save whatever it is they want to save from deletion after 60 da
MS. KIRCHNER: Objection. He testified he's not familiar with this policy.
A I'm not sure who -- what group this policy is directed at.
Q So sitting here today, even today you're not sure if this policy applied to you your department?
A I do not believe that it did.
Q And why do you believe that?
A I believe that my computer



(Walsh - 8/29/07)
archives all messages after 60 days.
Q All messages, without regard to the sender, topic or size?
A Yes.
Q And what's the basis for your belief that that's occurring, or did occur?
A A review of my archived files, an some general memory of archiving issues new computers were given to us.
Q So is it your belief, then, that everything on your computer was archived therefore, saved from the 60-day deletion r between 1999 and 2004, when you got you computer?
MS. KIRCHNER: Objection, ambiguous, compound.
A I can't remember for sure what w going on during that time period. I believe prior to 2004 my computer also automatica archived messages that were 60 days old, don't know when that may have started or long that may have been going on.
Q And assuming that's correct, the every e-mail that you sent or received duri

(Walsh - 8/29/07)
those years would have been archived; co
MS. KIRCHNER: Objection, ambiguous.
A Not every one that I sent or received, no.
Q Well, how would the computer kr automatically not to include something as t archived after 60 days?
A Everything that was 60 days old i would have archived.
Q So then, for example, let's take the year 2000. Every e-mail you sent or received would have been archived?
A Every e-mail that was 60 days ol would have been archived.
Q But the -- is that archiving done on a daily, weekly, monthly basis, if you kn
A I'm not sure.
Q And what would happen to e-mai that you personally deleted on your compu would they be archived as well?
A I don't believe so.
Q And so those e-mails that you described as relating to Morse Diesel's



(Walsh - 8/29/07)
contracts, but being unimportant that you deleted, would not be archived; correct?
MS. KIRCHNER: Objection, ambiguous, misstates testimony.
A I believe that any e-mail I deleted would not have been archived.
Q In preparation for your testimony here today, have you discussed with anyor policies that pertain to your government ag with regard to document retention?
A There was some discussion abo identifying document retention policies.
Q And during the course of your preparation for today's testimony, did you review any document retention policies?
A Last week sometime I reviewed s of what I believe was produced as docume retention policies.
Q And do you know how many poli you reviewed?
A I do not.
Q Do you know what time period th policies covered? In other words, what ye years they covered.



(Walsh - 8/29/07)
A Some of the policies -- and, actually, I did review some yesterday as w and some of them went back as far as 199
Q And did your review of those policies refresh your recollection as to wha government policy was with regard to docu retention?
A It reinforced my belief in what government policy was for document reten
Q So your review of those docume reminded you or refreshed you as to what policy was; correct?
A They confirmed what I believed t policy was.
Q And based upon your review of those documents, what is your belief, sittin here today, as to what those policies are, c were?
A In the --
MS. KIRCHNER: Objection, compound.
A That in the conduct of any audit, the auditor has to use judgment as to what documents are included in the audit workp



(Walsh - 8/29/07)
files. And in the performance of any audit-related task, the auditor is required to use judgment as to what is important to ke support their audit findings and -- so that a independent third-party auditor can determ how the conclusions were reached and wh basis of the conclusions were.
Q Putting aside the specific requirements with regard to retaining audit-related workpapers and the like, have ever, during your almost 20 years with the government, been instructed or informed a how and what to retain as it relates to threatened or pending litigation?
MS. KIRCHNER: Objection, aske and answered, and compound.
A I don't recall a specific instruction, but I have a general knowledge the documents that must be retained for litigation purposes.
Q Are you familiar with the term "litigation hold"?
A I am not.
Q Are you familiar with the term

(Walsh - 8/29/07)
"freeze notice"?
A I am not.
MR. BEHRE: Why don't we take a brief break.
THE VIDEOGRAPHER: Sure.
It is 11:56, and we're off the record.
(Recess taken)
THE VIDEOGRAPHER: Okay, it's 12:05, we're starting tape number thre and we're back on the record.
BY MR. BEHRE:
Q Mr. Walsh, after the point in time where you placed some of your records pe to this matter in storage in Kansas City, dic you attend any depositions in any of the proceedings involving Morse Diesel or ACI
A I don't know specifically if it was after putting those records in, but, yes attended many depositions.
Q And during the course of those depositions, did you take notes?
A I believe that I did.
Q And where would those notes be



(Walsh - 8/29/07)
located?
A I don't know.
Q Have you retained those notes?
A I'm not sure.
Q In preparation for those depositions that you attended, did you atte any sessions where the witness who was testifying was prepared?
A I don't believe I did.
Q Putting aside any depositions yo attended, after you placed some of your re in storage in Kansas City, did you conduct interviews with anyone regarding Morse Di ACMI?
A I remember one interview with Ronni Brenner, formerly Ronni Meltzer. I c know what time frame that was.
Q And during the course of that interview, did you take notes?
A I do not recall.
Q And at any point following your placing some of your records in storage in Kansas City, did you take any notes in any relating to ACMI, Morse Diesel and its



(Walsh - 8/29/07)
contracts?
MS. KIRCHNER: Objection, ambiguous.
A I do not recall.
Q And at any point following your placing some of your records in storage in Kansas City, did you send or receive any e in any way relating to ACMI, Morse Diesel contracts?
MS. KIRCHNER: Objection, ambiguous.
A Yes.
Q And at any point have you been instructed to retain, safeguard or otherwise delete any of those e-mails?
A Aside from recent instruction, I don't recall a specific instruction.
Q Do you recall a general instruction?
A Aside from what I received recently, I do not recall a general instructio
Q So, then, you received no instruction to safeguard those e-mails; corr
MS. KIRCHNER: Objection,



(Walsh - 8/29/07)
misstates testimony, asked and answ
A I don't recall.
MR. BEHRE: I have nothing further. Thank you very much.
MS. KIRCHNER: Okay, I have sc questions for the witness.
And I would like you to mark something for me, I don't know what number you're on.
THE COURT REPORTER: 103 w the next.
MR. BEHRE: Didn't we just mark that -- oh, I'm sorry, 102.
MS. KIRCHNER: Can you repeat number, please?
THE COURT REPORTER: 103.
MS. KIRCHNER: Here you go, yc can mark that 103.
Kirby, I'm sure you have this.
So that goes to the -- that will go to the witness, right. So then I do have an extra copy.
(Printout of e-mails marked Exhibit 103 for identification.)

(Walsh - 8/29/07)
EXAMINATION
BY MS. KIRCHNER:
Q Mr. Walsh, I want to ask you sor questions before you look at the document you can put the document down. Keep it ir of you.
You testified about getting a new computer.
A That's correct.
Q Okay. Approximately when was that?
A Approximately February of 2004.
Q And you also talked about a disk --
A That's correct.
Q -- that you obtained, that you still have; is that correct?
A That's correct.
Q And generally what's on that disk
A Only e-mail messages from the archive of the old computer.
Q Okay. Now, could you take a loo at what you have in front of you as Exhibit
And do you see that the documen



(Walsh - 8/29/07)
at the bottom are Bates stamped in the low right-hand corner? Do you see that?
A Yes, I see that.
Q Do you see that's JW 1?
Now, you see the document JW 1 with the Bates stamp. What's the date of tl document?
A It is February 6th of 2002.
Q Okay. So where did you obtain this e-mail dated February 6th of 2002?
A That was from the disk of the archived e-mails.
Q Okay. Now, could you turn to JW 11, in the lower right-hand corner.
A Yes.
Q What is the date of that e-mail?
A September 19th, 2002.
Q Where did you obtain that e-mail
A That came from the disk of archived e-mails.
Q Could you turn to the page with the Bates number JW 015.
A Yes.
Q And what is the date of that



(Walsh - 8/29/07)
e-mail?
A September 19th, 2002.
Q Where did you obtain that e-mail
A From the disk of archived e-mail messages.
Q Okay. Could you turn to the pag JW 24, Bates stamp.
A Yes.
Q And what is the date of that e-mail?
A It is July 8th, 2004.
Q Where did you obtain -- how did you obtain this e-mail, July 8th, 2004?
A That was from the archives on m current computer.
Q So your current computer has e-mail from at least July 8th, 2004; is that correct?
A That's correct.
Q Have you performed audits of Mo Diesel?
A Yes.
Q What issues have you addressed your audits of Morse Diesel?



(Walsh - 8/29/07)
MR. BEHRE: Objection, beyond t scope.
MS. KIRCHNER: Go ahead, you answer.
A Change order costs, overhead ar indirect rates, claim costs, subcontractor costs.
Q During what period of time did yc conduct these audits of Morse Diesel?
A From 1995 through 1997.
Q Have you preserved the workpap that you prepared in conducting these audi
A Yes.
Q Have you thrown any of your workpapers out?
A No.
Q Did you place your workpapers ir storage?
A Yes.
Q Have you destroyed any of the documents you placed in storage in Kansa
A No.
Q During the course of conducting these audits of Morse Diesel, did you creat

(Walsh - 8/29/07)
electronic documents?
A Yes.
Q And how did you go about creati
these electronic documents?
A If I had a conversation to write up, I would create a Word or WordPerfect document. If I did an analysis, I would cre an Excel or 1-2-3 spreadsheet, and I woul create those documents and print out hard for the workpapers.
Q Have you deleted any of the electronic documents that you've created i conducting the audits of Morse Diesel?
A During the performance of the audits there may have been electronic doc that were created that I either overwrote or deleted. Since the performance of those -- completion of those audits, I have deleted files related to the audits at all.
Q The electronic versions of the memos of conversation that you prepared the course of the audits, have you deleted electronic files?
A I have not.



(Walsh - 8/29/07)
Q Your draft reports that you prepared during the course of the audits, h you deleted those electronic files?
A Again, during the performance of the audit it's possible that there was a draf report that I either overwrote or deleted.
Since the completion of those projects, I have not deleted any draft repor
Q During the course of an audit, do you prepare a draft report that is reviewed your supervisor?
A During the course of those audits I did, yes.
Q And those draft reports that you provided -- that you created during the cou of the audit -- the drafts that were reviewe your supervisor during the course of the audit -- have you maintained -- have you d those electronic documents?
A I have not.
Q When you placed the documents storage in Kansas City, did you place docu in addition to the workpapers themselves i storage?



(Walsh - 8/29/07)
A I believe that I did, yes.
Q You indicated that there may hav been administrative e-mail that you did not save; is that correct?
A That's correct.
Q Can you give us some examples what you regard as an administrative -- administrative e-mail?
A An administrative e-mail would b me organizing logistics of a meeting, me conveying a status of the case to somebod bringing somebody up to date with where t is at today, telling somebody if I'm performi any -- if I'm doing any work on the case; anything that dealt with logistics or case status would be administrative e-mail mess Providing somebody a document that they for, I would consider that to be an administrative e-mail. Those are the prima examples that I can think of.
MS. KIRCHNER: No further questions.



(Walsh - 8/29/07)
EXAMINATION (Continued)
BY MR. BEHRE:
Q Mr. Walsh, directing your attention to Exhibit 103, the document that Kirschner showed you, and specifically dir your attention to page JW 15 --
A Yes.
Q -- you previously testified that this was a document that was contained o CD, I believe it was; correct?
A That's correct.
Q Doesn't the top of this document indicate that this came off of Miss Kirschne computer?
A No, it indicates that she created the document, and sent it to me.
Q But, in fact, she didn't create the document, you did, and she was replyi you?
A That's correct. So she created the reply.
Q Taking a look at page JW 13 --
A Yes.
Q -- that e-mail appears to be in a

(Walsh - 8/29/07)
different format than the one at JW 15; cor
A You mean as far as font and...
Q But even more substantively.
The -- for example, the "from" line just says
your name, and Miss Kirschner's e-mail ad
is different than on JW 15.
Correct?
A I don't -- where her e-mail
address is different --
Q On JW 13 Miss Kirschner's e-ma
address is -- at the end it has @gsaexterna
and on JW 15 there is no such suffix.
A That's true. That's true.
Q And, similarly, your e-mail
address in JW 13 is simply your name, wh
JW 15 it's your full, I assume, valid GSA e-
address of johnfwalsh@gsa.gov; correct?
A That's correct.
Q Was the document at JW 13 obta
from your CD?
A Yes.
Q Then what explains the two
different formats, including font?
A I'm not sure, but it's not at all



(Walsh - 8/29/07)
uncommon. It could be a difference betwe
e-mail systems, but I don't know for sure.
Q And at the bottom of JW 13 there
is a fax line; correct?
A That's correct.
Q And does that provide you with a
information as to where you might have ob
that document?
A No.
Q Miss Kirschner asked you, and I
quote, "Have you deleted any of the electro
documents that you've created in conducti
audits of Morse Diesel"; is that correct?
Do you recall that question?
A I do. I do.
Q And you provided an answer, an
want to ask you, what did you understand t
term "electronic documents" to include?
A What was the question
specifically?
Q Miss Kirschner's question was, a
I quote, "Have you deleted any of the elect
documents that you've created in conducti
audits of Morse Diesel"?



(Walsh - 8/29/07)
A And how did I answer that?
Q Your answer was, and I quote,
"During the performance of the audits there
have been electronic documents that were
that I either overwrote or deleted. Since th
performance of those -- the completion of t
audits, I have deleted no files relating to th
audits at all."
A So my understanding of "electron
documents" in the context of that question
have been any documents -- any spreadsh
Word documents or other electronic data a
files related to the audit.
Q And you would not include in tha
question and answer e-mails as being an
electronic document; is that correct?
A Yes, that's correct.
Q And so taking Miss Kirschner's
question and replacing the words -- or the
"e-mail" with the words "electronic docume
how would you answer the following questi
Have you deleted any e-mails that
you've created in conducting the audits of I
Diesel?



(Walsh - 8/29/07)
A I do not recall.
Q And how would you answer the
question have you deleted any e-mails that
you've received in conducting the audits of
Morse Diesel?
A I do not recall.
Q You previously testified that you
did, in fact, delete e-mails that you deemed
be unimportant; isn't that correct?
A Yes, I have -- I have deleted
e-mails I deemed to be unimportant.
Q So why is your answer you don't
recall?
A That question related to the
audits that were performed during 1995 to
Q And so Miss Kirschner's questior
at least some of them, related only to that
narrow time window and that narrow subje
matter, and didn't relate more generally, di
they not, to all issues relating to Morse Die
and ACMI?
MS. KIRCHNER: Objection, the
questions have been asked and answ
argumentative.

(Walsh - 8/29/07)
A I understood her question to relate only to the audit work that was perfo in the 1995 to 1997 time frame.
MR. BEHRE: That's all I have. Thank you.
MS. KIRCHNER: Okay.
THE VIDEOGRAPHER: All right, this concludes volume two, the deposition of John Walsh. We used tl videotapes. We're going off the recor and the time is 12:29 p.m.
(Time noted: 12:29 p.m.)

________________________
JOHN F. WALSH

Signed and subscribed to before me this_____day of______________, 2007.

________________________________
Notary Public



C E R T I F I C A T E

I, HELEN MITCHELL, a Shorthan Reporter and Notary Public, do hereb certify:

I reported the proceedings in the within-entitled matter, and that the within transcript is a true record of such proceedings.

I further certify that I am not related, by blood or marriage, to any ( the parties in this matter and that I am in no way interested in the outcome o this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this__________ of________________, 2007.

________________________
HELEN MITCHELL



August 29th, 2007

I N D E X

| WITNESS | EXAMINATION BY | |
|---|---|---|
| JOHN WALSH | Mr. Behre | 15 |
| | Ms. Kirchner | 243 |
| | Mr. Behre | 250 |

E X H I B I T S

| FOR IDENTIFICATION | | PA |
|---|---|---|
| 100 | Transcript of May 4, 2007 testimony | 149 |
| 101 | Errata sheet | 149 |
| 102 | Document retention policies | 231 |
| 103 | Printout of e-mails | 242 |

REQUEST FOR PRODUCTION

| PAGE | LINE |
|---|---|
| 217 | 22 |



***ERRATA SHEET***

| PAGE / LINE | | CHANGE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Not sent Return to requesting agency after agreement.

**03**

AUDIT AND INVESTIGATION RECORDS

***See subcategory***

See subcategory See subcategory

**03A000**

AUDIT AND INVESTIGATIONS PROGRAM RECORDS

***See subcategory***

See subcategory See subcategory

**03A001**

Audit guidance

***After Event***

Not sent 3 years after cutoff

**03A010**

Audit summaries

***End FY***

Not sent 3 years after cutoff

**03A015**

Audit planning

***End FY***

2 years after cutoff 5 years after cutoff

**03A020**

Audit report chronological file

***End FY***

2 years after cutoff 10 years after cutoff

**03A025**

Audit case files

EXHIBIT
#102 ID
8/29/07

*See subcategory*

See subcategory See subcategory

Next

| Category | Record Type |
|---|---|
| 03A025a | Audit Case Files - Temporary |
| 03A025b | Audit Case Files - Electronic version |
| 03A040 | Area audit office inspections |
| 03A045 | Audit administrative subject files |
| 03A050 | Semiannual report to the Congress |
| 03A050a | |

Semiannual report to the Congress: R

03A050b

Semiannual report to the Congress: D

03A055

| Category | Record Type | Cutoff | FRC |
|---|---|---|---|
| 03A055 | Subpoenas | *End FY* | Not sent |
| 03A056 | Investigative case files. | *See subcategory* | See subcateg |
| 03A056a | Investigative case files: Nonspecific information | *After Event* | Not sent |
| 03A056b | Investigative case files: All other case files. | *After Event* | 2 years after |
| 03A056c | Investigative case files - Eletronic version | | |

*None*

Not sent

**03B000**

AUDIT RESOLUTION PROGRAM RECORDS

***See subcategory***

See subcateg

**03B001**

Contract audit resolution case files

***See subcategory***

See subcateg

**03B001a**

Contract audit resolution case files: Record Copies

**03B001b**

Contract audit resolution case files: CO Service and Regional files.

*After Event*

Not sent 2 years after cutoff

**03B005**

Internal audit resolution case files

***See subcategory***

See subcategory See subcategory

**03B005a**

Internal audit resolution case files: Record Copies

*After Event*

1 year after cutoff 5 years after cutoff

**03B005b**

Internal audit resolution case files: Service and Regional Copies.

*After Event*

| | |
|---|---|
| Not sent | 2 years after cutoff |

**03B010**

GAO audit reports

***See subcategory***

| | |
|---|---|
| See subcategory | See subcategory |

**03B010a**

GAO Audit reports: Record Copy

***After Event***

| | |
|---|---|
| 1 year after cutoff | 5 years after cutoff |

**03B010b**

GAO Audit reports: SSO and Regional copies.

***After Event***

# E-Mail Policies

**60-Day Deletion Policy**

When GSA moved to a centrally managed mail system (Notes Mail), a management oversight group (with representatives from all services and many regions) was created to deal with mail migration issues and establish agency-wide e-mail policies and procedures. The most significant issue addressed by the group was message retention policy. The presence of large numbers of mail messages in inboxes and folders can significantly reduce the performance of our e-mail servers. This can be controlled by setting absolute size limits on employee mail files and/or by setting timeframes for cleanup of old messages. The mail oversight group concluded we could best balance the needs of users and system resources by setting a 60-day retention policy and providing software that allows users to easily archive mail messages. The group decided not to impose absolute size limits on employee mail files. While this issue was addressed early on, the actual implementation of the mail cleanup policy was delayed until the majority of users were migrated. The cleanup policy is as follows: As of **December 4, 1999** and every weekend thereafter, messages **older than 60 days** that are located in the following areas will be deleted during the weekly mail file cleaning process:

- Inbox
- Sent
- Trash
- Any user-created folders

The following areas of the mail file **will not** be affected by the 60-day deletion policy:

- Calendar entries
- "To Do" items
- DraftsStationary
- Archives

All users are encouraged to use the archiving tool to retain any messages that they wish to keep for longer than 60 days.

**Note:** The mail archiving software mentioned above makes it easy to permanently save messages. You can set rules to archive all messages or selected messages (e.g. messages in specific folders) well before the 60-day limit. The archiving software was installed on most users' desktops during migration from cc:Mail. If it is not already on your desktop, contact your LAN Administrator for help with installation. Your LAN administrator can also help you make best use of the archiving software.

**Internet Mail Policies**

The management oversight group also set policies to balance user requirements with the need to maintain fast and reliable mail messaging to and from the Internet. These policies are for all mail messages sent to and received from the Internet. They **do not** include e-mail sent between users within GSA.

- All messages sent to and from the Internet will be scanned for viruses. Messages containing viruses will be cleaned and forwarded to their intended recipients. Messages unable to be cleaned, will be quarantined. If quarantined messages cannot be cleaned through further action they will be deleted. In either case, a notification will be sent to the sender and/or recipient of any messages affected by a virus.

- The following types of messages sent to and from the Internet will be deleted: messages confirmed as junk mail from unsolicited sources - so called "spam" (an example would be an unsolicited message asking the recipient to purchase something); messages from a known source that is sending inappropriate material (e.g., known offensive material); messages from a known "mass mailing" of non-business related material that will negatively impact the flow of mail traffic (e.g., chain letters, christmastree.exe attachments).

  **Note:** Employees are authorized to subscribe to work-related mail lists. Messages from such lists will not be deleted.

- Messages coming into GSA from the Internet that are larger than 5MB will be deferred for delivery until after normal business hours (8:00 p.m. eastern time). Notification will be sent to the recipient stating why delivery has been delayed. The notification will provide a point of contact to call if there is an urgent business need to forward the message immediately.

- Messages going to the Internet from GSA that are larger than 10MB will be deferred for delivery until after normal business hours (8:00 p.m. eastern time). Notification will be sent to the recipient stating why delivery has been delayed and provide a point of contact to call to release urgent messages.

The reason for the message size deferral policy is that GSA receives and sends tremendous amounts of e-mail daily. Large messages slow down and sometimes stop the processing of all e-mail. Deferring large messages until non-business hours allows for faster, more reliable service. Following are typical sizes for a variety of documents. Only the last two documents would be delayed until after business hours:

**Word Documents:**

- Memo with GSA seal graphic header and 2 pages of text 80KB
- 35 page text document with half a dozen small graphics 400KB
- 3 page document composed primarily of screen shots 3MB

**Excel Spreadsheets:**

- Workbook containing 12, 1-2 page sheets 150KB
- Workbook containing 12, large sheets with numerous macros 1.5MB

**PowerPoint Presentations:**

- 12 slides with plain background, moderate use of graphics 1MB
- 9 slides, with colorful background and heavy use of graphics

8MB

- 36 slides with heavy graphics, voice, and video clip 58MB

Our goal is to provide GSA with a fast and reliable messaging system. These polices will keep excessive mail traffic from negatively impacting GSA's day-to-day business operations.

**Other Related Policies**

Below are a list of other policies relating to e-mail use within the agency. Please familiarize yourself with them.

- GSA Order CIO 2160.2, GSA Electronic Messaging Policy
- GSA Order ADM 7800.11, Personal Use of Agency Office Equipment