# EXHIBIT 6

FOR OFFICIAL USE ONLY

ADMINISTRATIVE DATA PAGE

| | |
|---|---|
| Character of Case: | FRAUD AGAINST THE GOVERNMENT |
| Subjects: | MORSE DIESEL INTERNATIONAL, INC.<br>125 South Wacker Drive, Suite 200<br>Chicago, Illinois 60606<br><br>CMR CONSTRUCTION, INC.<br>8500 Eager Road<br>Saint Louis, Missouri 63149 |
| Case File Number: | I-95-0509 |
| Related Case File Numbers: | None |
| Date of Report: | February 18, 1999 |
| Prepared By: | Steven D. Anderson<br>Special Agent |
| Reviewed By: | John H. Nelson<br>Assistant Regional Inspector General for Investigations |
| Approved By: | Harvey Florian<br>Regional Inspector General for Investigations<br>Chicago Field Investigations Office |

OFFICE OF INVESTIGATIONS
OFFICE OF INSPECTOR GENERAL
U.S. GENERAL SERVICES ADMINISTRATION

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

TABLE OF CONTENTS


| | Page Number |
|---|---|
| BASIS FOR INVESTIGATION | 1 |
| SYNOPSIS | 2 |
| DETAILS OF INVESTIGATION | 3 |
| LIST OF WITNESSES | 25 |
| LIST OF EXHIBITS | 28 |

BASIS FOR INVESTIGATION

This investigation was initiated based upon suspected violations developed during proactive investigation V950502. Allegations were made that MORSE DIESEL INTERNATIONAL, INC. and CMR CONSTRUCTION, INC. were double billing for performance and payment bonds. It was also alleged that THEY had inflated change order costs and had falsified progress payment requests.

FOR OFFICIAL USE ONLY

## SYNOPSIS

Documentation and testimony developed during this investigation disclosed that MORSE DIESEL INTERNATIONAL, INC., (MDI), in conjunction with CMR CONSTRUCTION, INC., (CMR), conducted a scheme to illegally receive payments from the General Services Administration (GSA). MDI provided falsified documents to GSA contracting personnel on three separate construction projects. The false documents allowed MDI to receive payments for work that had not been accomplished. THEY also provided false certifications concerning payments to subcontractors and suppliers that had not and in some cases, would not be made. MDI front-loaded over $2 Million in contract value using falsified invoices, false documents and false statements. MDI illegally held retention on ITS subcontractors, but certified in each monthly progress payment request that no retention was being held. MDI and CMR forced subcontractors and suppliers to accept lower amounts for invoiced materials and labor after THEY had already invoiced GSA for the full amount. MDI maintains a system within ITS accounting department to track advanced payments. Documents obtained from an IG Subpoena revealed that MDI management personnel discussed different avenues to increase advanced billings. The documents also showed that MDI conspired with RODIO/ICOS personnel to front-load costs, which were later invoiced for by MDI.

MDI has submitted falsified claims for equitable adjustments for money that THEY claim is owed to THEM and THEIR subcontractors due to GSA caused delays. Correspondence obtained via IG Subpoena revealed that MDI and CMR blamed the same subcontractors for the delays THEY also claim that GSA caused. Audits of the claims revealed that the amounts certified to are generally without basis and no backup documentation could be provided.

MDI knowingly ordered the installation of defective doorframes in the St. Louis Courthouse. MDI managers ordered THEIR installation contractor to continue installing doorframes after MDI was made aware that the doorframes did not meet contract specifications. MDI managers instructed that GSA or its representatives should not be made aware of a report that detailed the extent of defective doorframes.

FOR OFFICIAL USE ONLY

DETAILS OF INVESTIGATION

MDI was awarded four contracts that are referenced in this Report of Investigation. Contract GS06P94GYC0037 is for Phase I of the Thomas F. Eagleton Federal Courthouse, St. Louis, Missouri. It was awarded on July 5, 1994, for $20,343,186 for the excavation of the building site and construction of the foundation and core wall. Contract GS06P95GZC0501 is for Phase II of the Courthouse. It was awarded on September 28, 1995, for $165,102,792 for the completion of the Courthouse. CMR was in a joint venture with MDI for Phase I and II.

Contract GS09P95KTC0032 is for the construction of the U.S. Courthouse and Federal Building, Sacramento, California. It was awarded on June 1, 1995, for $92,609,000 for the completion of the core and shell of the building. Contract GS09P95KTC0010 is for the U.S. Customs House, San Francisco, California. It was awarded on February 15, 1995, for $12,220,188 for the seismic and electrical upgrade of the building. CRSS Constructors, Inc. (CRSS) was the construction management firm responsible for overseeing Phase I and II of the St. Louis Courthouse.

On July 22, 1994, a facsimile message concerning bonds for Contract GS06P94GYC0037 was sent to Graham Harwood, Vice President, MDI, from Kirwin Ford, Risk Manager, MDI. Ford requested that Harwood notify him when payment was received from GSA for bond costs, so that MDI could pay the invoice. (Exhibit 1)

Roger Haddock, Project Manager, CRSS, stated that Steve Paquette, Project Manager, MDI, submitted Progress Payment Voucher Number One on August 9, 1994, for payment. A total bonding cost of $237,814 was claimed in the voucher. Haddock explained that the original package contained invoices for bonds, but none were marked paid. Paquette was informed that the invoices must be marked paid, before GSA would make payment. Paquette asked if the amount for bonds could be split and bill for half of the total cost. Haddock stated that he explained to MDI that no invoices would be paid until the bonds were settled. Haddock related that on August 24, 1994, he received a faxed copy of an invoice marked "Paid 8/19/94, DHOB, EVP." He was told by Paquette that the original was sent by over night mail to Anne Anderson, GSA Contracting Officer, Kansas City, MO.

Haddock stated Progress Payment Voucher Number Two also contained a claim for bonding costs. An original invoice marked paid was to be sent by over night mail to Anne Anderson. Haddock explained that he gave approval for the additional bonding based on the claim by Paquette that another paid invoice was being provided. He did not see a copy of the invoice, but took Paquette's word that it existed and would be sent. Haddock reviewed a letter in the Progress Payment Voucher dated August 24, 1994. The letter was from AMEC Holdings, Inc., (AMEC), Princeton, NJ and addressed to MDI. The letter confirmed that payment for surety, totaling $118,907.00, had been paid to AMEC from MDI. Haddock stated he would not accept this letter as a paid invoice. Based on the comments made by Paquette, Haddock wrote a letter, dated September 16, 1995, to Anne Anderson. In the letter, Haddock stated that a stamped paid bond invoice was being sent directly to her. (Exhibit 2)

## DETAILS OF INVESTIGATION

On August 22, 1994, a facsimile was sent from Ron Estock, Accounting Manager, MDI, to Steve Paquette in response to a message that was sent on August 20, 1994. A copy of the August 20, 1994, message was attached to the facsimile cover sheet. In the message, Paquette asks Estock if there has been any sign of the "paid receipts" for bonds. In response Estock notes that he anticipates documentation for bonds to be received today or tomorrow. (Exhibit 3)

A pay request dated August 16, 1994, was sent to Ann Anderson for MDI's Progress Payment Voucher Number One. Attached to the request is an invoice from Willis Corroon Construction Services Corporation (Willis Corroon) to MDI for performance and payment bonds on Contract Number GS06P94GYC0037. The Invoice Number 0219908, dated July 14, 1994, is for a total of $118,907.00 and is used as support for MDI's claim of progress. A Cost Control Activity Report dated August 16, 1994, is also attached. In the report, MDI has a claimed bond cost of $237,814.00 for this period. After negotiations with Haddock, Paquette changed the amount to $118,907.00 on August 22, 1994. Also included was a Certification of Progress Payments, GSA Form 2419, dated August 16, 1994, signed by William T. Lyons, Vice President, MDI. An Application and Certification for Payment, AIA Document G702, dated August 16, 1994, signed by Lyons was also included. On both of the certificates it is stated that payments received as part of this request have been made or will be made timely. (Exhibit 4)

A letter dated August 25, 1994, was received by Ann Anderson from Graham Harwood. In the letter, Harwood references an attached invoice from Willis Corroon Number 0219908, dated July 14, 1994, has an original "paid" stamp and is being submitted in support of the current billing. (Exhibit 5)

Dennis O'Brien, Executive Vice President, Willis Corroon, stated that he was familiar with Invoice Number 0219908, dated July 14, 1994. O'Brien confirmed that he put the stamp and initials on the invoice. O'Brien stated that Kirwin Ford requested that he stamp the invoice and date it for 8/19/94. O'Brien stated that Ford told him that the invoice was going to be included in a request for payment. O'Brien stated that no payments were made on the bond invoice until November 30, 1994, when it was paid in full, for $118,907.00. O'Brien stated that his office does not put an official "PAID" stamp on invoices. (Exhibit 6)

A copy of Invoice Number 0219908 was provided to OIG Auditor John Walsh during an audit of MDI records by Kirwin Ford. The invoice was provided to Walsh as proof of bonding costs. Someone had written on the invoice "OK KLF 11/16/94, please pay ASAP." (Exhibit 7)

Beverly Chin, GSA Contracting Officer on Contract GS09P95KTC0032, Sacramento Courthouse, stated that the bond expense claimed by MDI was $1,087,262. Chin stated that she questioned Anthony Cooney, Senior Vice President, MDI, about the bond amount and if he had proof that MDI had actually made the $1,087,262 payment. Chin related that Cooney acted surprised that she asked about the bond amount. Chin stated that she received a copy of a letter dated September 5, 1995, from AMEC, 1633 Broadway, 24th Floor, New York, NY 10019.

DETAILS OF INVESTIGATION

The letter was addressed to Cooney and signed by Norman Critchlow. The letter notes that $517,491 is for the cost of the bonds, but an additional $569,771 is for the indemnity rendered to the sureties by AMEC. Chin stated that she authorized payment of the bonding portion of the progress request based on the letter. (Exhibit 8)

A copy of a memorandum dated June 16, 1995, was obtained from MDI files via IG Subpoena. The subject of the memorandum was the Sacramento Courthouse. In the memorandum, Ron Estock and Ronni Meltzer, Accountants for MDI, are directed to assist in developing a cash flow schedule that maximizes the advance cash payments received by MDI. They are also instructed to consider holding retention on subcontractors, with the result being positive cash flow. In the memorandum it is stated "More important is scheduling cash draws from the owner that have the maximum amount of justifiable costs front end loaded as possible." (Exhibit 9)

A copy of a confidential memorandum dated August 31, 1995, was obtained from MDI files via IG Subpoena. The subject of the memorandum is the Sacramento Courthouse. In the memorandum it is noted that "MDI will begin to accumulate advance billings with the first requisition of approximately $2.0 million." Included in the amount was $600,000 in extra bond fee. (Exhibit 10)

MDI's first progress payment request dated September 25, 1995, was for $4,190,808 and covered the period from August 1, 1995 to August 31, 1995. This amount included $1,087,262 for bond premiums. Included with the pay application is a GSA Form 2419, Certification of Progress Payments under Fixed-Price Construction Contracts. The certification is signed by Bennett Reinholtz, Vice President, MDI, and dated September 21, 1995. Item two of the certification requires that timely payments will be made to subcontractors and suppliers from the payments received from GSA. (Exhibit 11)

Documents obtained from MDI files via IG Subpoena included a copy of a form that MDI uses to calculate advance billings. Attached to the form was a project requisition report dated September 18, 1995. The report shows that $2,018,980.81 is currently in advanced billings for general conditions. (Exhibit 12)

Constance Russell, GSA Contracting Officer on Contract GS09P95KTC0010, San Francisco Customs House, stated that bonding costs claimed by MDI were $75,246. Invoice Number 0222719, dated February 23, 1995, from Willis Corroon was included in the pay request. The invoice is stamped "Paid 5/12/95 Dennis M. O'Brien, EVP" and was used by MDI to provide proof THEY had paid for the bonds. Russell stated that she would not pay for bonds if she knew that MDI had not paid for them. She stated that according to Federal Acquisition Regulation 52.232-5(g), contractors will be reimbursed for the cost of bonds <u>only after</u> full payment has been made to the surety. (Exhibit 13)

A copy of Invoice Number 0222719 obtained from MDI's files via IG Subpoena was not stamped paid. On the invoice is noted "OK KLF 7/14/95, Please pay

DETAILS OF INVESTIGATION

ASAP." Attached to the invoice is copy of a check dated July 20, 1995. It is made out to Willis Corroon. The attached stub indicates the check is to pay for Invoice Number 222719, dated 2/3/95, for $75,246. (Exhibit 14)

Dennis O'Brien stated that Invoice Number 0222719, dated February 23, 1995, was paid in full on July 31, 1995. The progress payment request that included the bonds was approved for payment on May 24, 1995.

O'Brien also provided information on the bonds for Contract GS09P95KTC0032 Sacramento Courthouse. The bonds were issued on July 21, 1995, with a total value of $517,491. O'Brien stated that as of November 1, 1995, no payment had been made on those bonds. MDI submitted a progress payment request on September 22, 1995, which included the bonds. It was approved for payment on September 25, 1995. (Exhibit 15)

Documents obtained from MDI files via IG Subpoena included a facsimile dated September 6, 1996, from Kirwin Ford to Ben Reinholtz. On the cover sheet it is noted that backup for bond premiums paid is attached. A copy of a MDI check dated November 21, 1995, made out to Willis Corroon was attached. Information on the stub indicates that the several invoices are being paid with the check. Invoice Number 223838, dated July 27, 1995, for $517,491.00 is included in the check for payment. Attached to the check is a copy of that invoice. On the invoice is noted "OK KLF Please pay ASAP 11/14/95 Kirwin L. Ford." (Exhibit 16)

Anne Anderson provided a copy of the initial pay request, dated November 28, 1995, submitted by MDI for work completed on Contract GS06P95GZC0501, Phase II, St. Louis Courthouse. It includes MDI's claimed costs for the required performance and payment bonds. MDI previously submitted a proposed pay request on November 3, 1995. The total costs were $1,440,146.00. This included invoices totaling $923,900.00 for the bonds. The invoices were not marked paid and were rejected by Roger Haddock. Other costs included $353,792.00 for six months of insurance premiums. The insurance costs and other miscellaneous expenses were questioned by contracting personnel. MDI was informed that they must provide proof of the expenses and a complete cost breakdown. On the revised pay request, MDI only requested $9,934.00, which represents the amount THEY are allowed to charge to this project.

The November 28, 1995, pay request totaled $1,003,352.65. The difference in the pay requests is $456,793.35. The only category of expenses that was <u>not</u> reduced was the bonds. As required, MDI provided copies of invoices that were stamped paid. The paid date on the invoices is November 21, 1995. Therefore, the bonds were not paid for when the initial pay request was sent in on November 3, 1995. MDI did not submit a request for reimbursement of indemnity to surety for AMEC, THEIR parent company. (Exhibit 17)

OIG Auditor John Walsh stated that he requested bonding information from Graham Harwood, acting as MDI's Audit Coordinator, on November 7, 1996, for Contract GS06P95GZC0501. On November 8, 1996, Walsh related that he received a facsimile from Kirwin Ford in response to his request. Walsh stated that he received two invoices for bonds that totaled the amount claimed by MDI for

DETAILS OF INVESTIGATION

bonding the project. It is indicated on the invoices for the bonds to "Please pay ASAP, OK KLF 1/31/96." Walsh stated that bonds that he had seen previously were marked as being paid in 1995, and were included in the MDI's first pay application for Phase II. Walsh obtained copies of the previously submitted invoices from the contract file. The invoices are for the same policy numbers and have the same effective and expiration dates. However, the invoices are stamped "PAID NOV 21, 1995 ROLLINS HUDIG HALL" and have initials written over the stamp. There are minor differences in the invoices, indicating that two sets of invoices were created. (Exhibit 18)

MDI's used falsified invoices and false certifications to obtain payments for bonds. MDI was required to pay for the bonds prior to billing GSA. THEY also did not make an effort to pay for the bonds immediately after receiving payment from GSA. MDI also billed for alleged surety cost to AMEC. No payments to AMEC were made, thus MDI front-loaded the entire amount. MDI used this ruse to obtain contract funds prior to the completion of the contract. The damage to GSA is the loss of use of the funds and interest on the funds. The interest loss of $141,118.00 can be broken down as follows:

Contract GS06P94GYC0037, MDI received payment of $118,907 for bonds on September 24, 1994. MDI paid Willis Corroon for the bonds on November 30, 1994. The simple interest on $118,907 for two months and six days is $1,290 using an interest rate of six percent. MDI received payment of $118,907 that was allegedly to be paid to AMEC on October 3, 1994. That contract is still open and MDI has not been completely paid for the total contract amount. The last substantial payment was approved on February 20, 1997. The simple interest on $118,907 for two years four months and 17 days is $16,944.

Contract GS06P95GZC0501, MDI received payment of $923,900 for bonds on December 18, 1995. MDI paid for the bonds on about February 5, 1996. The simple interest on $923,900 for 47 days is $7,138.

Contract GS09P95KTC0032, MDI received payment of $517,491 for bonds on October 4, 1995. MDI paid for the bonds on November 21, 1995. The simple interest on $517,491 for 47 days is $3,998. MDI received payment of $569,771 that was claimed to have been paid to AMEC on October 4, 1995. The contract is still open with work continuing. At this point MDI would not be entitled to the money. The simple interest on $517,491 for three years and four months is $111,105.

Contract GS09P95KTC0010, MDI received payment of $75,246 for bonds on June 9, 1995. MDI paid for the bonds on July 31, 1995. The simple interest on $75,246 for 52 days is $643.

A review of MDI's privilege log for documents in THEIR Chicago office was conducted. MDI's attorneys released documents numbered 49 and 50 along with other documents. Documents 49 and 50 were addressed to Bill Lyons from Stephen Paquette. The documents dated April 12, 1995, detail MDI's cash position on the project. The documents are essentially the same except for attachments and a handwritten note from Bill Lyons to Gerald Parham, Vice President, MDI, on the face of document 49. In the letters, it is detailed

DETAILS OF INVESTIGATION

how MDI and Rodio/Icos, 180 Canal Street, Boston, MA 02114, MDI's subcontractor, intentionally front-loaded the cost schedule. Paquette states in the letter "it appears that RIJV has front loaded their schedule of values different from our initial direction." RIJV is Rodio/Icos Joint Venture. Paquette further states that "We know a large part of this is due to them front loading their job supervision cost of $300,000. Due to the fact that our cost information was being closely scrutinized by CRSS and they were aware of our unit prices, we had to increase our cost loading in the later activities such as tiebacks, which had no unit price to validate." Document number 50 also had an attachment labeled "U.S. COURTHOUSE - ST. LOUIS, BILLING SUMMARY THRU MARCH 1995." The document details MDI's actual costs for scheduled contract work and change orders in comparison to the amounts MDI billed. This document is apparently computer generated by MDI and kept on file. During the various site visits conducted to review MDI files, documents of this type were not made available for review. Computer information of this type was subject to the IG Subpoena and Court Order. (Exhibit 19)

An internal memorandum dated August 12, 1994, was sent from Graham Harwood to Len Kessler, Attorney, MDI. The memorandum was obtained from MDI files via IG Subpoena. On page two of the memorandum is a hand written note that states "Do we want this, does it reduce our ability to advance bill?" The question apparently is directed to item eight, which deals with a contract requirement to have a cost loaded schedule for determining payments. Also attached to the memorandum are contract provisions that address the requirement for MDI to pay subcontractors and suppliers within seven days after receiving payment from GSA. (Exhibit 20)

Terry Page, Scheduler, CRSS, was interviewed concerning the business practices of MDI and CMR on Contract GS06P94GYC0037, St. Louis Courthouse. Page stated he makes payments to MDI based upon the amount claimed on THEIR progress payment requests. Page stated that MDI is not allowed to hold retainage on any subcontractors without notifying GSA. Page stated that MDI has not notified him of any subcontractors that have retainage that is being held, except Rodio/Icos.

Page stated that Chris Weigand, Scheduler, CMR, related to him that Steve Paquette, has directed him to inflate time delays on change orders. Page explained that Weigand is a CMR employee, but works under the direction of Steve Paquette. Page also related that Rhonda Unger, Secretary, CMR, has related to him that Steve Paquette has lied on documents that are sent to GSA. (Exhibit 21)

Page stated that he usually checks with Wiegand prior to submitting scheduling plans for change order negotiations. Page stated that on change order number P-19, Wiegand said that he would be submitting a request for a ten day time extension. At the actual meeting, Wiegand submitted a claim for an 18 day time extension. Page stated that Wiegand admitted to him that Paquette told him to add the extra eight days. Page stated that circumstances similar to this happened on change order numbers P-13, P-16, and P-27. During each change order negotiation, the time requested by MDI

DETAILS OF INVESTIGATION

was higher than originally discussed between Page and Wiegand. Page stated that Wiegand would claim each time that Paquette told him to increase the number of days requested. (Exhibit 22)

A letter dated September 12, 1995, sent from Wiegand to Paquette was obtained from MDI files via IG Subpoena. The subject of the letter is time extension negotiations for change orders. In the letter, Wiegand notes the possible time extensions for change orders and what MDI's stance should be. On the letter a hand written note states "Chris says he can produce a fragnet to support 114 days if needed." A fragnet is an abbreviated time schedule that is used to add time from change orders to the overall job schedule and critical path. (Exhibit 23)

Barry Carter, Former Assistant Project Manager, CMR, stated he was on the project from August 8, 1994 to April 30, 1996. He held the title of Site Safety Officer, Environmental Engineer, and Assistant Project Manager. He assisted Steve Paquette for most of the activities on the project.

Carter related that Chris Weigand worked closely with Paquette on time and money issues. Carter stated that he did not become involved with this part of the project. Carter recalled hearing Jerry Parham comment that MDI must tell GSA if THEY are going to withhold retainage money from Rodio/Icos. Carter stated that money was withheld from suppliers and subcontractors, because their paperwork was not completed properly. Carter admitted there were instances when nothing was wrong with the papers, it was just used as an excuse to hold the money. (Exhibit 24)

Christopher Wiegand stated that he started work for CMR on August 8, 1994, as a scheduler. He was assigned to work at the job site under the direction of MDI personnel. Wiegand stated that Bill Lyons and Gerald Parham from MDI's Chicago, Illinois office ran the project. Steve Paquette was the Project Manager on the job site, but all of the management decisions were made primarily by Lyons and occasionally by Parham. Paquette was responsible for implementing their orders. Wiegand described Paquette as "being in over his head" in relationship to understanding contracting. It seemed to him that Paquette was primarily a financial manager.

Wiegand stated that one of his duties was to prepare schedule changes for change order negotiations. The change orders were usually completed by the time the negotiations would take place. Wiegand stated the he would personally observe the change order work being performed. Therefore, he knew exactly how much extra time was needed for the change order work. Wiegand related that he would prepare the time extension requests with this information. The information would be sent up through Paquette for Lyons' approval. Wiegand stated that on each change order, he was told to put additional time on the request, making it appear that the change order work had actually taken longer. Wiegand stated that Bill Lyons made these demands without any type of explanation being provided.

Wiegand stated that meetings were held in the St. Louis office when Lyons and/or Parham were in town. The meetings consisted of Paquette, Lyons, and

DETAILS OF INVESTIGATION

Parham. Mike Jones, Vice President, CMR, occasionally would attend the meetings. Jack Raff, General Superintendent, MDI, was brought in later by MDI to oversee the project and he would attend the meetings. Wiegand stated that he and Barry Carter would only present the information that they had and would leave the meetings. They were not briefed on the information that was discussed during these sessions. However, it was usually after these meetings when changes were made to time and cost elements of pending change orders.

Wiegand related that prior to leaving CMR, he was reviewing a claim that was being filed by MDI. Wiegand stated that in his opinion the time extension claimed was two months longer than it should have been. Wiegand stated that Larry Schor, Attorney, MDI instructed him, to not discuss the areas that would be negative for MDI, but to emphasize the delays caused by the Government. Wiegand stated that the Government did cause some the delays on the job. However, MDI was responsible for a number of the delays. Wiegand stated that he made suggestions to MDI managers on how to save time on the project. His ideas were dismissed without explanation, usually by Bill Lyons. (Exhibit 25)

Ken Gross, Credit Manager, Carlisle Construction Co., Inc. (Carlisle), stated that Carlisle had a contract with MDI for the crane rental. Their crane has been removed from the construction site. The payments for the crane rental were late each month. The majority of invoices were paid at least 90 days late. Gross explained that he complained about the late payments to CMR and MDI. However, MDI threatened Carlisle with back charges for delays their crane allegedly caused on the project. Gross stated that MDI did not give him a listing of the back charges in writing. Gross provided copies of the invoices sent to MDI and the checks received from CMR and MDI. For example MDI paid Carlisle Invoice Number 119995 dated November 2, 1995, and Invoice Number 119139 dated October 2, 1995, with a check dated January 25, 1996. This is over three months and four months respectively after MDI was invoiced for the crane rental. (Exhibit 26)

Michael S. Collins, Vice President, and G. Bruce Gilman, Sales Representative, Collins & Hermann, Inc., were interviewed concerning their business relationship with MDI and CMR. Their contract was with CMR, but they also dealt with Steve Paquette. Gilman stated that CMR has been very slow to pay invoiced amounts. On April 16, 1996, they had $1,454.47 in accounts receivable owed by CMR. Gilman had invoiced CMR on April 30, 1995 and May 12, 1995 for the owed amount. Collins stated that on another occasion they billed for work completed on November 31, 1994. They received a check on March 29, 1995, but the check was dated January 4, 1995. While conducting this interview, Gilman received a telephone call from Bruce Walden, Comptroller, CMR. Gilman related that Walden wanted to settle CMR's account with them. Gilman was told that a check would be available on April 17, 1996. Collins provided copies of invoices sent to CMR and checks received from CMR. A review of the invoices and checks revealed that CMR is usually 90 days or more late paying for invoiced amounts. (Exhibit 27)

FOR OFFICIAL USE ONLY

DETAILS OF INVESTIGATION

Vincent Irwin, President, Irwin Products, Inc., stated that he provided an invoice to CMR for material that was unloaded at the job site. Steve Paquette pre-approved the prices for the material, on March 27, 1995. The material had been approved, per the contract specifications, for the project by Hellmuth, Obata & Kassabaum, Inc., GSA's Architectural and Engineering Contractor. The invoice dated April 27, 1995, was for $114,848.90 and matches the amount agreed to on the price list signed by Steve Paquette. The invoice does not include an amount for sales tax. Irwin stated that he was originally told this project is tax exempt.

Irwin stated he waited to receive payment for the materials based on the invoice. Irwin related that CMR officials told him that his invoice did not include sales tax and is incorrect. Irwin would not be paid until a correct invoice was submitted. Irwin stated that he was also told to give an additional five percent discount off of the price for the materials. Irwin agreed to the discount in order to receive timely payment for the materials. A purchase order from CMR to Irwin dated June 14, 1995, detailed the reduced price, plus the correct taxes. The purchase order is signed by Michael Jones on June 14, 1995, and Irwin on June 21, 1995. Irwin prepared a revised invoice for the amounts on the purchase order and provided it to CMR. Irwin stated that on August 15, 1995, he picked up a check from CMR for $75,078.42 and signed a lien waiver for that amount. Irwin provided a copy of the lien waiver and the check stub, which is dated June 28, 1995.

Irwin stated that he had continual conflicts with CMR over how and when to deliver materials to the job site. Irwin explained that he was threatened with delay of job claims if he did not have materials on the job as required by CMR. Irwin provided copies of correspondence that pertains to CMR's delay of job claims. Irwin also provided a letter from CMR that had listing of the delay of job back charges, totaling $61,291.34. The costs included on this listing are for the same items that are being claimed by MDI as delays caused by GSA.

Irwin stated that he has had additional problems with invoiced amounts to CMR. CMR challenged each invoice that THEY received from Irwin. Irwin provided an invoice dated February 7, 1996, for $67,824.00. Irwin stated that he was actually only paid $64,000.00. Irwin explained that this was common practice, he would be forced to agree to the smaller amount just to receive payment of any amount. (Exhibit 28)

George Juenger, Sr., President, Majestic Iron Works, Inc. (Majestic), stated that Majestic's contract is with MDI and CMR. Invoices are sent to MDI and checks are received from MDI. Juenger stated that MDI has been very slow to pay in the past, but have caught up on THEIR bills lately. Juenger provided the following information concerning his billings and payments from MDI:

| Date Invoiced | Amount Invoiced | Date Paid |
|---|---|---|
| May 31, 1995 | $58,131.50 | October 13, 1995 |
| August 21, 1995 | $17,050.00 | January 3, 1996 |
| October 19, 1995 | $20,100.00 | January 3, 1996 |
| November 20, 1995 | $62,956.00 | March 1, 1996 |

FOR OFFICIAL USE ONLY

DETAILS OF INVESTIGATION

| | | |
|---|---|---|
| December 20, 1995 | $91,203.00 | March 11, 1996 |
| January 18, 1996 | $55,000.00 | April 1, 1996 |
| February 16, 1996 | $59,761:00 | not paid as of April 19, 1996 |
| March 30, 1996 | $30,000.00 | not paid as of April 19, 1996 |

Juenger stated that MDI explained the late payments by claiming that Majestic's invoices were wrong and problems existed with their bonds. Juenger explained that the only problem was with the lien waivers he used. MDI demanded that Juenger must use the lien waivers prepared by MDI. (Exhibit 29)

Harvey French, Sales Representative, Millar Elevator Service Co., stated that he was contacted by Larry Tolliver, Former Project Superintendent, CMR, to provide a qualified elevator installation crew. The first request for service was on January 27, 1996. French explained that he does not have a contract with CMR or MDI for work performed on this project. He charged the standard company rate for the work requested, which is $388.00 per hour for a crew of two men. Millar is only providing labor on the project.

French stated that Steve Paquette, contacted him concerning the prices for the work, after invoices had been received by CMR and MDI. Paquette requested a reduced price for the hourly rate. French related that he agreed to a reduced price of $240.00 per hour, if Millar would receive a contract for all the elevator maintenance work. Paquette allegedly agreed to provide a written agreement to French. Paquette also asked that the hourly rate on previously submitted invoices be reduced to the $240.00 rate. French agreed to the reduction, contingent on receiving a written agreement.

French stated that recently, Paquette informed him that MDI would not be providing a written agreement. Paquette also wanted French to lower the hourly rate previously agreed upon and to provide justification for the amounts charged.

French provided copies of invoices and billing records indicating that as of April 18, 1996 no payments had been made by MDI or CMR for work completed. The amount invoiced for was $46,524.32. (Exhibit 30)

Mike Regal, Sales Representative, Morrow Equipment Company (Morrow), stated that Morrow's contract was initially with CMR. Invoices were sent to CMR, but the checks came from MDI. The payments have been very slow. Regal related that Morrow sent in their first invoice September 1995, but did not receive a check until March 1996. Regal stated that a CMR accountant (NFI) told him that MDI could not get money for the tower crane approved during monthly payment requests. Regal explained that rental for the tower crane is $22,138.00 per month and the material hoist is $8,964.10 per month. Copies of invoices and checks were provided by Morrow. Regal stated that invoices sent to CMR from September 1995 to January 1996, were paid by check on April 1, 1996, totaling $111,734.40. Invoice Number 119526201 dated November 29, 1995, was paid in part by check from MDI dated March 7, 1996. Invoices from February 1996, had not been paid as of May 1, 1996. (Exhibit 31)

## DETAILS OF INVESTIGATION

MDI billed for and received contract monies as part of THEIR progress payment requests starting in September, 1995. In each progress payment request MDI certifies that payments have been or will be made to subcontractors or suppliers in a timely manner. Payments made by GSA to MDI for tower crane mobilization and operation are broken down as follows:

| Amount Billed | Date Paid |
|---|---|
| $26,000 | September 27, 1995 |
| $208,000 | January 4, 1996 |
| $78,274 | January 26, 1996 |
| $52,274 | February 28, 1996 |
| $32,205 | March 20, 1996 |
| $26,137 | April 19, 1996 |
| $33,978 | May 20, 1996 |
| $31,365 | June 21, 1996 |

Edward Aaron, District Manager, Professional Services Industries, Inc. (PSI), stated that PSI is under contract with MDI to perform testing of concrete. Aaron explained PSI sends its invoices to MDI and they are paid by MDI. He primarily deals with MDI personnel, such as, Steve Paquette, Jerry Parham, and Jack Raff. Aaron stated that PSI was brought into the contract for the St. Louis Courthouse after it started. The initial testing company, City Design, did not have the necessary expertise to handle a project of this size and complexity. PSI reviews all testing completed by City Design and conducts independent test when necessary. The test reports are forwarded to Steve Paquette at the construction site. Aaron stated that payments from MDI are very late. PSI has been sending invoices to MDI each month since August 1995. MDI finally paid for all invoices up though January 1996, for a total of $85,407.30. PSI picked up Check Number 03000403, dated March 28, 1996, on April 2, 1996, after signing a lien waiver. Aaron provided copies of the check, lien waiver, and corresponding invoices. (Exhibit 32)

Dennis Ahal, President, Ahal Contracting Co. Inc., (Ahal Inc.), stated that Ahal Inc. has a contract with MDI and CMR. Ahal has another company, Place-Crete Service, operating as a subsidiary to Ahal Inc. Place-Crete Service was contracted by CMR for concrete pumping services. Ahal provided the accounting information for Place-Crete Service showing that $130,297.63 has been billed to CMR, but only $74,515.60 had been paid. That left a balance of $55,782.03. Ahal provided records of invoices that were sent to CMR, which reflect that invoices, from May 5, 1995 to April 17, 1996 had not been paid. Ahal stated that CMR pressured him to give CMR a credit of $3,150.00 for employee overtime charges and $4,000.00 for rental on a concrete pump.

Ahal stated that MDI is withholding a 10 percent retainage on invoices sent in by Ahal Inc. Ahal agreed to this prior to starting the contract. According to records provided by Ahal, $74,170.00 in retainage has been withheld. The amounts being withheld by MDI as retainage have not been reported on the MDI's progress payment requests, which are certified to by MDI personnel each month. (Exhibit 33)

DETAILS OF INVESTIGATION

Larry Tolliver stated he was on the project from the beginning. He started working for CMR during 1987. He was on the project until March 22, 1996, when he quit. Tolliver explained he left the job because of constant conflicts with Jack Raff. Tolliver stated that he did not attend all meetings held by CMR and MDI officials. He did recall meetings that included Paquette, Raff, and Ray Whorley, Operating Officer, MDI. During the meetings, it was discussed how to inflate costs on change orders. Tolliver could not recall any specific instances, but he remembers that it happened on several occasions. He stated that he was not privy to all the meetings that were conducted.

Tolliver explained that the forming system rented from Pacific Form Corporation (PAFCO) was for the core wall construction. The forming system took several weeks to put together and get in working order. CMR was not satisfied with how long it took to put the forms together. Tolliver stated that MDI and CMR did not have a tower crane on the job or other sufficient crane equipment to assemble the forms. Tolliver stated that Raff, Whorley, and Mike Rallo, President, CMR, made the decision not to pay PAFCO.

Tolliver stated that Raff also made the decision not to run the de-watering pumps as necessary. Tolliver admitted that the pumping schedule was not adequate to handle the excess water on the job. A majority of the water was leaking into the site from holes around the tiebacks and from under the wall. Some of the water was seeping in from the bedrock. Raff did not want to run the pumps at night or place additional pumps. Any added pumps would have required hiring an operator from the union to run the pumps. To run the pumps at night would have also required hiring someone to stay on the job site to monitor them. (Exhibit 34)

A letter dated August 18, 1994, was provided to Michael Jones from PAFCO to provide a core wall forming system. The total rent was estimated to be $386,672.00, with a $10,000/month additional rent if the project lasted past 12 months. Payment of 25 percent or $96,668.00 was expected after approval of the drawings, with the balance of $290,004.00 due 30 days after delivery. (Exhibit 35)

A second letter dated November 2, 1994, from Jones to PAFCO confirmed the rental price of $386,672.00 for the forming system. (Exhibit 36)

A letter dated November 10, 1994, was addressed to Bill Lyons, Steve Paquette, Michael Rallo and John Caito, Comptroller, CMR, from Michael Jones. In the letter, Jones details the upcoming expenses involved with the forming system and that the amount needs to be anticipated in upcoming billings. He specifically writes "This is approximately $430,000 in cost that needs to be front loaded and collected by April in order to not front this money out of our pockets." (Exhibit 37)

PAFCO Invoice Number 0594, dated January 10, 1995, was sent to CMR for the agreed upon 25 percent of the rent or $96,668.00. A hand written note on the invoice notes that "this was billed by CMR in Dec's application." (Exhibit 38)

DETAILS OF INVESTIGATION

A letter dated October 20, 1995, addressed to Roger Haddock was sent by Steve Paquette requesting a reallocation of costs for the forming system. Paquette claimed that MDI was currently out of pocket for the costs. Paquette attached a copy of the approved cost schedule and a proposed revised cost schedule. The change would move $570,852.00 to beginning of the cost schedule and reduce the remaining activities later in the cost schedule to compensate for the change. (Exhibit 39)

Haddock stated that based upon the information provided by Paquette that $376,806.00 was allocated for the forming system. Haddock stated that this amount was billed for and paid in the November 1995 pay request. Haddock provided a copy of PAFCO Invoice Number 0736, dated August 1, 1995. On the invoice, Paquette indicates that $341,670.00 has been paid to PAFCO to date, with a balance remaining of $45,000.00. (Exhibit 40)

Robert Herron, Construction Engineer, GSA, stated that during a meeting with Paquette, he was shown some documents that came from PAFCO indicating that MDI had already paid them. Herron also stated that MDI had included claims for additional money in change orders. The claims were for delays MDI blamed on GSA, thus costing THEM additional rental costs for the forming system. (Exhibit 41)

Tamra Miller, Office Manager, PAFCO, stated that invoices were sent to CMR for payment. Invoice Number 736, dated August 1, 1996, was modified at the request of a female from CMR (NFI). Miller stated that she changed the invoice information concerning when previous amounts had been invoiced. The account balance was not changed. Miller provided a copy of the payment history, which revealed that the $145,002.00 invoiced for on Invoice Number 736 was never paid. A partial payment was made as the result of settlement payment made in lieu of lawsuit between PAFCO and CMR. The settlement payments were made April 10, 1996 and April 23, 1996, totaling $125,000.00. (Exhibit 42)

T.R. Monson, Sales Representative, PAFCO, stated that PAFCO's contract is with CMR. Payments have been received directly from CMR and MDI in association with CMR. Monson explained that the usual billing arrangement consists of 25 percent due when the order is made, 25 percent due on the initial delivery, and the remaining 50 percent due on last shipment of materials. Monson stated that the original contract amount was $386,672.00, with an additional amount of $47,254.40 for additional equipment, labor, and expenses. A total of $433,926.40 was billed to CMR. Monson provided copies of invoices, checks, and support documents. According to the records, no payments were made by CMR from September 13, 1995 to April 10, 1996, which was the first of two payments made in the lawsuit settlement. This left $192,256.40 unpaid for amounts invoiced from June 8, 1995 to January 23, 1996. The lawsuit settlement resulted in payments from CMR that paid all that was owed, except for $67,256.40. (Exhibit 43)

Jerry Cody, President, PAFCO, stated CMR was going to start using the forms June 1994. However, delays on the job stopped PAFCO from shipping the forms

DETAILS OF INVESTIGATION

until January 1995. CMR refused to pay rent on the forms for the delay. The agreement with CMR included one year of rent, after May 1, 1996, an additional $10,000.00 per month was to be paid by CMR.

Cody stated that CMR stopped paying invoiced amounts. THEY threatened to bill PAFCO for back charges totaling $60,000.00. Cody stated that he started invoicing CMR for all the costs his company was incurring on the job. He eventually had to file a lawsuit against CMR. Mike Rallo dealt with him concerning the amount owed. Cody stated that he settled with CMR for $67,256.40 less than the invoiced amounts. He also had to agree not to bill for additional form rental starting May 1, 1996. Cody stated that after the agreement was made with Mike Rallo, CMR still delayed paying PAFCO. Cody related that he just wanted to get some money out the project. The money lost in the agreement represented an actual loss, not profit. Cody agreed to the loss, because the legal fees and company time to sue CMR for the invoiced amounts would have exceeded the $67,256.40 loss. (Exhibit 44)

A review of Progress Payment Voucher Number 16, approved on November 13, 1995, for $859,774.10, revealed that $376,806.00 was paid for the core wall system as Haddock indicated. Progress Payment Voucher Number 16 included a certification signed by Lyons and dated November 2, 1995, that required prompt payment to subcontractors from payments received from GSA. (Exhibit 45)

MDI provided false documents in order to receive payments for expenses that they had not incurred and did not intend to pay within the seven days allowed. This was an orchestrated effort as revealed in CMR's letter on November 10, 1994. This in effect front-loaded $135,136.00 to MDI and CMR.

The Kansas City Field Audit Office issued Audit Report A71820/P/6/X97194 dated July 31, 1997, on a claim for increased costs by MDI on Contract GS06P94GYC0037. The audit was in response to a $13,329,355.00 claim submitted by MDI for alleged increased costs. The audit determined that MDI's entire claimed amount was not supported by accounting records or allowable under contract provisions. The basis for much of the claim is that GSA caused delays that prevented MDI from making progress and that unforeseen site conditions have caused delays that should be the responsibility of GSA. The auditors also noted that much of MDI's claim is for charges that have been paid for under change orders. For example, MDI claimed $55,711 additional costs for a Concrete Superintendent. Auditors determined that at least $4,990 of the cost was paid under prior change orders. MDI also did not adjust the claimed amount for costs for delays by subcontractors that were not the responsibility of GSA. MDI's own records show that the amount claimed in total for a Concrete Superintendent is overstated.

Another example is MDI's claimed amount of $18,000 for additional concrete pump costs. MDI claimed to have paid an additional three months rental for a concrete pump at $4,000 per month and an estimated additional $6,000 for another one and one-half months. The audit determined that the invoice submitted by MDI as proof of payment for three months rental was not paid by MDI and did not reflect actual cost paid. (Exhibit 46)

DETAILS OF INVESTIGATION

Part of MDI's claim was made up of smaller claims made by subcontractors. The Kansas City Field Audit Office issued Audit Report A71811/P/6/X97177 dated June 27, 1997, on a $933,980 portion of MDI's claim for five subcontractors on Contract GS06P94GYC0037. The basis for their claim was that contract performance was delayed and disrupted due to differing site conditions, change order work, acceleration directives from GSA, and design issues. The audit did not allow any of the claimed costs because the claimed items were overstated, unsupported, and unallowable per the contract provisions. (Exhibit 47)

The subcontractors involved in this portion of the claim were Ahal Contracting, Ceco Concrete, DeLuca Plumbing, Guarantee Electrical, and Hausman Corporation. Letters obtained from MDI files via IG Subpoena dated March 5, 1996, detail an offer from MDI and CMR to consolidate any claims that the subcontractors have against MDI and CMR. The consolidated claims would then be submitted as part of a larger claim to be filed against GSA. However, the subcontractors must first agree to seek recovery for delay costs only from GSA. (Exhibit 48)

Liquidating Agreements dated June 14, 1996, were obtained from MDI files. The Liquidating Agreements were with Guarantee Electrical and Ceco Concrete. In the agreements the subcontractors and agree to claim damages for delays against GSA, not MDI and CMR. In exchange MDI and CMR agree not to backcharge the subcontractors for delays they caused. (Exhibit 49)

The Kansas City Field Audit Office issued Audit Report A71804/P/6/X97185 dated June 22, 1997, on a $6,261,792 portion of MDI's $13,984,473 claim. This part of the claim was for Rodio/Icos. Rodio/Icos signed a contract for $6,492,000 with MDI on May 1, 1995. Rodio/Icos' claim is for additional costs associated with delays caused by GSA and differing site conditions. The audit determined that the entire amount claimed by Rodio/Icos is not supported by appropriate accounting records or allowable under the contract provisions. They also attempted to recover amounts that had been paid for under separate change orders. (Exhibit 50)

A letter dated March 5, 1996, obtained from MDI files details an offer from MDI and CMR to Rodio/Icos to consolidate all of their claims into one larger claim against GSA. (Exhibit 51)

A standstill agreement dated June 14, 1996, was obtained from MDI files. This agreement is essentially the same agreement MDI and CMR executed with Guarantee Electrical and Ceco Concrete. Each party agrees to hold the other harmless and to pursue all claims possible against GSA. (Exhibit 52)

A large part of the Rodio/Icos claim and the consolidated MDI claim is delays that were allegedly caused by GSA. These delays are allegedly the result of excessive ground water, defective design specifications, and differing site conditions. However, correspondence written by MDI and aimed at ITS subcontractors, including Rodio/Icos, blames them for delays.

## DETAILS OF INVESTIGATION

A letter dated May 9, 1995, from MDI to Rodio/Icos blamed them for excess ground water and stated that they would be liable for delays related to the situation. (Exhibit 53)

A letter dated June 15, 1995, from MDI to Rodio/Icos states that numerous problems they have caused is severely impacting MDI's schedule. MDI blames Rodio/Icos for a 60 day delay so far. MDI notifies them that they will be held liable for all costs and impacts suffered by MDI and CMR including damages that consist of liquidated damages, delays costs, acceleration costs, and all cost impacts to complete other trade work. (Exhibit 54)

A letter dated June 16, 1995, Steve Paquette to Bill Lyons stated that Rodio/Icos was notified of their liability for delays and damages. This includes liability for liquidated damages and other costs suffered as a result of a projected 60 day delay. (Exhibit 55)

A letter dated June 29, 1995, from MDI to Rodio/Icos continues to outline MDI's assertion that Rodio/Icos is responsible for a minimum of 60 days of delay costs. This is due to lack of progress, late submittals, lack of equipment, and poor water management. (Exhibit 56)

On a facsimile cover sheet that was sent from Rodio/Icos to MDI dated September 21, 1995, is a hand written note. The note appears to have been written by Gerald Parham and directed to Lyons. The note refers to the attached letter from Rodio/Icos that disputes amounts that MDI has withheld from them and their intention to file a claim for the money under the Miller Act. In the note it states that "If RIJV files under the Miller Act we're going to draw GSA into the middle of this dispute. We're legal but don't need GSA knowledgeable about our delay dispute with RIJV." (Exhibit 57)

A facsimile dated October 3, 1995, from Gerald Parham to Steve Paquette details the delay costs that MDI is assigning to Rodio/Icos. On page five, the delay and impact costs are broken down by subcontractor, with a total of $452,000 in potential backcharges being noted. (Exhibit 58)

A document dated November 30, 1995, obtained from MDI files details MDI's anticipated cost recoveries from Rodio/Icos and GSA as the result of future claims. Under trade costs, item (h), it is noted "We have assumed a recovery from RIJV of $100,000 for impact due to their schedule delays." Under general conditions costs, $124,000 was added for liquidated damages. MDI assumes 50 percent will be recoverable from Rodio/Icos due to the delays caused by them. (Exhibit 59)

On February 26, 1996, MDI issued a change order to Rodio/Icos reducing their subcontract amount by $155,021. MDI charged them for 90 percent of the dewatering costs incurred on the project. (Exhibit 60)

A letter dated March 22, 1996, from Larry Schor, Attorney, MDI; to Parham discusses costs that are the responsibility of Rodio/Icos and the future claim to be filed against GSA. In the letter it is noted that "MDI fully intends to pursue all of ITS rights in this matter against GSA and that, to

the extent we are successful, to obtain recovery which will include costs incurred by Rodio/Icos." (Exhibit 61)

A letter dated January 11, 1996, from Mike Jones to Barry Carter and Chris Wiegand discussed future correspondence involving the St. Louis Courthouse. It states that "In an effort to protect our position on our claim with the GSA due to hazardous waste, differing site conditions, etc., we need to be very cautious in any correspondence to our subcontractors that would put blame for delay on the subcontractor that could fall in the hands of GSA by discovery." It is also noted that MDI personnel are aware of the policy and will act accordingly. (Exhibit 62)

A letter dated January 11, 1996, from Mike Jones to Larry Tolliver directs him to note anything that could be causing delays on his daily reports. Jones notes that each day a copy of the daily report will be sent to him and that the reports can not be released to GSA without his approval. (Exhibit 63)

The Kansas City Field Audit Office issued Audit Report A71803/P/6/X97181 dated July 11, 1997, on a claim for increased costs by Nicholson Construction Company on Contract GS06P94GYC0037. The claimed amount of $1,643,168 is a portion of the $6,261,792 claim made by Rodio/Icos. The audit determined that Nicholson's entire claimed amount is not supported by appropriate accounting records or allowable under contract provisions. The basis for much of the claim is for delays caused by GSA due to the removal hazardous waste from the project site. However, Nicholson did not execute a subcontract agreement with Rodio/Icos until after the hazardous waste was removed from the project site and they would have been fully aware of the site situation. The audit also notes correspondence between Nicholson and Rodio/Icos that places the blame for delays and lack of progress on each other and not on GSA. (Exhibit 64)

The San Francisco Field Audit Office issued Audit Report A72450/P/9/X97120 dated April 3, 1997, on a claim for increased costs by Azteca Construction, Inc., subcontractor to MDI on Contract GS09P95KTC0032. The audit was in response to a $1,042,955 claim for increased costs submitted by MDI on behalf of Azteca. The audit determined that the Azteca's claim was overstated by $608,623. Much of the claimed amounts are attributed to delays that are allegedly the fault of GSA. However, the audit found that Azteca could not provide supporting documentation to valid the claims. MDI forwarded this claim to GSA for payment. MDI would benefit financially from any amounts paid to Azteca. (Exhibit 65)

MDI also submitted a claim of $1,007,454 for increased costs on Contract GS09P95KTC0032. The San Francisco Field Audit Office issued Audit Report A72445/P/9/X97173 dated June 25, 1997, on the claim. The audit found that MDI was not entitled to $575,286 of the claimed amount. The remaining $432,168 is subject to legal, technical, and entitlement decisions. The audit notes that MDI claims the delays are the fault of GSA. However, the auditors found correspondence in MDI files that attribute the delays to THEIR subcontractors, to include Azteca. (Exhibit 66)

DETAILS OF INVESTIGATION

MDI also claims delays and additional costs as a result of upwelling ground water on the job site. THEY consider this to an unforeseen site condition. For MDI's claim to be successful, THEY must show that conditions such as an artesian or pressurized spring was present, but not shown on the site surveys provided by GSA. A memorandum obtain from MDI files via IG Subpoena, dated February 13, 1996, discusses MDI's ground water claim. The memorandum is from John Onnembo, Attorney, MDI, to Tony Cooney. Onnembo states that "We need to hire a qualified groundwater hydrologist who will issue a report stating that we have encountered artesian conditions." Onnembo also directs hiring a company to do an investigation for THEM, but do not hire them under MDI's name so that correspondence and draft reports will be privileged and non-discoverable during litigation. (Exhibit 67)

In a facsimile transmittal sent to Azteca from MDI on February 27, 1996, obtained from MDI files via IG Subpoena, Azteca is reminded that their delays are impacting the progress of other subcontractors. (Exhibit 68)

In letters from Azteca to MDI dated November 1, 1996 and November 20, 1996, Rafeal Martin, President, Azteca, requests information from MDI as to why they were being back charged for issues involving other subcontractors. Also it is noted that MDI is withholding funds from Azteca that MDI has already billed for and received payment from GSA. (Exhibits 69 & 70)

A letter dated May 2, 1996, was obtained from MDI files via IG Subpoena that was sent from John Cavanagh, President, MDI, to all territory managers. The subject is prompt payment to subcontractors on federal projects. In the letter, Cavanagh reminds everyone that payments must be made within seven days of receipt of payment from GSA. Also if any amounts are withheld from a subcontractor, prior written notice must have been provided to GSA. A memo note dated July 13, 1996 was attached to the letter. It states "Ben - Perhaps we should discuss the decision to hold 10% on the subs. We did not give prior written notice. Susan," at the bottom of the note is written, "Pay the retention except for Apex, Darragh, Artistic." (Exhibit 71)

MDI's Progress Payment Voucher dated July 19, 1996, for work completed on Contract GS09P95KTC0032, Sacramento Courthouse, has a list of retainage being held. According to the narrative, MDI has requested $10,743 be retained due to non-compliance of THEIR concrete subcontractor, Hansen Concrete. There are no other references to retainage from subcontractors. Included in the Progress Payment Voucher is a GSA Form 2419, Certification of Progress Payment under Fixed-Price Construction Contracts. The certificate is dated July 16, 1996, and signed by Bennett Reinholtz. Item two of the certification requires prompt payment to be made to subcontractors. Item three states that "This request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract." (Exhibit 72)

MDI's Progress Payment Voucher dated August 13, 1996, for work completed on Contract GS09P95KTC0032, Sacramento Courthouse. MDI requested an additional

DETAILS OF INVESTIGATION

$10,270 be withheld on behalf of Hansen Concrete. Again there are no other notices or mention of retainage being held on any other subcontractors or suppliers. Another certification dated August 6, 1996, was signed by Reinholtz. (Exhibit 73)

A letter dated October 14, 1996, obtained from MDI files, was sent from Reinholtz to Susan Borghi, Accountant, MDI. In the letter, amounts that are to be withheld from three subcontractors are listed. (Exhibit 74)

An inter-office memorandum dated December 16, 1996, obtained from MDI files, was sent from Reinholtz to Borghi. The subject of the memorandum is prompt payments. Listed are nine subcontractors that apparently have retainage being held against them. Next to the names are directions on which company to notify GSA about the retainage being held and which ones have no change in status. (Exhibit 75)

A facsimile dated October 28, 1996, obtained from MDI files via IG Subpoena included several internal MDI letters. One letter dated October 25, 1996, from David Hoffman to John Cavanagh, President, MDI, improving the financial position of the Sacramento Courthouse. The letter lists several pending change orders and how the amounts received would increase profits. Item three on the letter notes that staff costs will be chargeable to claims and change orders with a benefit of $172,000. This letter was an apparent response to another attached letter dated October 8, 1996, from John Cavanagh to David Hoffman. In the letter, Cavanagh notes that the project is currently in a negative contingency of $2,436,000. He notes that "We must recover as much as we can through claims to the GSA. Please furnish a list of possibilities for these claims as soon as possible." (Exhibit 76)

The San Francisco Field Audit Office issued Audit Report A82441/P/9/X98100 dated June 17, 1998, on a claim for increased costs on Contract GS09P95KTC0010 submitted by MDI for $1,633,093. MDI's claim is for increased direct and indirect costs associated with alleged defective drawings, differing site conditions, contract changes and delays. The audit found that $1,230,088 of the claimed amount was for attempted cost duplications, monies previously reimbursed on change orders, inflated overhead rate, and non-time related costs. MDI also assumed that all job impact costs were the responsibility of GSA without any consideration for delays or inefficiencies caused by ITS own workforce and subcontractors. (Exhibit 77)

MDI knowingly installed and attempted to conceal defective doorframes in the St. Louis Courthouse. THEY ordered THEIR installation subcontractor, JMAC Construction Company (JMAC), to continue installing defective doorframes. Lisa Baker, Operations Manager, JMAC, was interviewed concerning her allegations that defective doorframes are being installed in the Thomas F. Eagleton Federal Courthouse, St. Louis, MO. Gina Grimm and Pat McCorkell were present during the interview and provided information as needed. Grimm and McCorkell are part owners of JMAC and both actively involved in the daily operation of the business. Mike Steinbach, Site Supervisor, JMAC, was also present.

DETAILS OF INVESTIGATION

Baker stated that in her opinion defective doorframes are being installed at the Courthouse. Baker based her opinion on conversations that she had with other JMAC employees. Baker related that she had discussed the defective doorframes with Mike Swann, Site Supervisor, MDI, several times during the past two weeks. Baker had previously provided a copy of a report dated June 8, 1998, which was sent to Swann.

The report details some of the defects that JMAC had noted involving the doorframes. The defects include deficient welds, missing mounting clips, and hinges that are too small. Baker stated that she has discussed this report with Swann and he has acknowledged the defects noted by JMAC. Baker stated that Swann told her that JMAC should continue to install the doorframes. Baker stated that she asked Swann if the report should be sent to GSA. Swann replied that he did not want the report sent to GSA because of possible fines.

Mike Steinbach stated that he conducted the doorframe inspection that is the basis for the report. Steinbach estimated that the manufacturer of the doorframes was saving at least 30 percent on fabrication and material costs. The manufacturer of the doorframes is BRS Products, Inc., Hoboken, NJ. Steinbach stated that he discussed the defects and how the doorframes do not meet contract specifications with Swann. Steinbach stated that Swann told him to continue installing the doorframes. Steinbach related that he has asked Swann on different occasions about installing the defective doorframes and each time Swann has told him to keep installing. Steinbach stated he asked Swann if MDI wanted a copy of the report sent to GSA. Steinbach stated that Swann replied, "Don't send the report to GSA, MDI would be fined."

Baker stated that another incident involving raised floors had occurred a few months ago. The doorframes for the raised floor should have stilts on them. Approximately 33 doorframes were received without the proper stilts. In order to avoid delaying the job, MDI directed JMAC to mount the doorframes by suspending them within the wall. There is no support directly under the doorframes. Steinbach confirmed that the doorframes were installed in this manner. He stated that the doors would eventually sag and not close properly. In order to avoid delays, Jim Roosa, Site Supervisor, MDI, directed JMAC to install the doorframes this way. Swann was also aware of how they were installed. Baker provided copies of daily logs dated October 21-22, 1997, and a copy of the internal change order between MDI and JMAC. Roosa signed the change order, on October 16, 1997, directing the installation of the doorframes without stilts. MDI paid JMAC an additional $149.66 to install each doorframe using the unapproved design.

Baker related that JMAC has also had difficulty receiving payments from MDI. Baker stated that MDI is withholding retainage and is paying them twice a month. MDI is required to pay JMAC within seven days after MDI receives payment from GSA. Baker stated it appears that MDI is holding half of their monthly progress payment for two weeks. (Exhibit 78)

On June 17, 1998, a conversation between Lisa Baker and Graham Harwood was consensually monitored by the Reporting Agent. At about 3:49 PM Baker was

DETAILS OF INVESTIGATION

connected to Harwood at his MDI office in St. Louis, MO. During the conversation, Baker stated that the doorframes were defective and wanted to know what Harwood wanted to do about them. Harwood acknowledged that he had heard that some of the doorframes were defective. Baker again questioned Harwood about what he intended to do. Harwood stated that it would be a heavy expenditure to replace them, but nothing would be done until he had a chance to talk to Jim Roosa and Paul Laskowske. Roosa and Laskowske are MDI Construction Supervisors. Harwood stated the decision may go higher than him. He explained that MDI could not afford to find another supplier due to the delay it would cause and the costs involved. Baker asked Harwood if JMAC should continue installing the doorframes. He stated that he did not think they had a choice at this point. (Exhibit 79)

On June 17, 1998, a conversation between Lisa Baker and Mike Swann, Site Supervisor, MDI, was overheard by the Reporting Agent. Baker had received a telephone call from Swann. She placed the call on speakerphone mode, which allowed everyone in the office area to hear both sides of their conversation. Baker was aware of the Reporting Agent's presence in the room. Baker asked Swann about the report that JMAC had provided to MDI concerning the defective doorframes. Swann acknowledged receiving the report. He stated that the report indicated that the doorframes were defective. Baker stated that JMAC was concerned about installing the defective doorframes. Swann stated that JMAC should continue doing the installations. Baker continued to express concerns about installing defective doorframes. Swann stated that if JMAC won't install the doorframes, MDI would find someone that will. He stated that MDI couldn't afford the delay that would be caused by fixing the doors or changing suppliers. Baker asked Swann if GSA knew about the report. Swann stated that GSA doesn't know about the report or the defective doorframes and that is the way MDI wanted it to stay for now.

Swann stated that a meeting with people from WBH was to be held on Friday at 11:00 am. WBH, Arlington, TX is a company hired by MDI to provide the doorframes for the project. Swann stated that he wanted JMAC to be represented at the meeting. He explained that the purpose of the meeting was to discuss the doorframes, look at the defects, and determine the nature of the problem. Swann stated that if the problem can be blamed on the Government specifications, MDI would notify the Government in an attempt to collect delay costs. If not, THEY would fix up what was visible and attempt to get the Government Inspectors to accept them. Baker stated that JMAC employees would be at the meeting. (Attachment 80)

A copy of Field Observation Notice (FON), Number A-347 was received via facsimile from Roger Haddock. The FON pertains to an inspection on hollow metal doorframes that were to be installed at the Thomas F. Eagleton Federal Courthouse, St. Louis, MO. The FON was sent to MDI in order to notify THEM of observed deficiencies. David D'Eagle, CRSS Quality Assurance Inspector, performed the inspection that was the basis for the FON. Approximately 286 doorframes were inspected that had not been installed. The noted deficiencies include frame profiles that are not straight, welds that are not continuous or poor quality, rusting, and missing mounting clips. Welds that are poor quality or not continuous were noted on 79 percent of the doorframes

DETAILS OF INVESTIGATION

inspected. The contract specification pertaining to doorframes was attached to the FON. The specification dictates to fabricate frames of full-welded unit construction, with corners mitered, reinforced, continuously welded full depth and width of frame. The 286 doorframes are not considered to be in compliance with the contract specifications or shop drawings. This is due to the welding problems and the other deficiencies. (Attachment 81)

A copy of FON Number A-378 was received via facsimile from Roger Haddock. The FON pertains to an inspection on hollow metal doorframes with extensions that were installed in the Thomas F. Eagleton Federal Courthouse, St. Louis, MO. David D'Eagle performed the inspection that was the basis for the FON. Approximately 33 doorframes were installed that required extensions on the bottom of the doorframe because they were installed on elevated floors. The inspection revealed that the doorframes did not have the proper extensions, instead they were installed using 20-gauge metal stud track. According to the contract specifications, a minimum of 14-gauge galvanized sheet steel is to be used for floor anchors. The 33 doorframes are not considered to be in compliance with the contract specifications or shop drawings. It is noted on the FON that all of the doorframes that do not meet contract specifications must be replaced. (Exhibit 82)

FOR OFFICIAL USE ONLY

LIST OF WITNESSES

Case File No. I950509

| WITNESS | EXHIBIT |
| --- | --- |
| Aaron, Edward<br>District Manager, Profession Services Industries<br>8669 Olive Boulevard<br>St. Louis, MO 63132<br>(314) 432-8073 | 32 |
| Ahal, Dennis<br>President, Ahal Contracting<br>3746 Pennridge Drive<br>Bridgeton, MO 63044<br>(314) 739-1142 | 33 |
| Anderson, Anne<br>Contracting Officer, GSA<br>1500 E. Bannister Road<br>Kansas City, MO 64131<br>(816) 926-7431 | 17 |
| Anderson, Steven D.<br>Special Agent, GSA/OIG<br>Kansas City, MO 64131<br>(816) 926-7214 | 17,19,79,80,81,82 |
| Baker, Lisa<br>Operations Manager, JMAC<br>9424 Guthrie Avenue<br>St. Louis, MO 63134<br>(314) 427-2853 | 78 |
| Carter, Barry<br>Former Employee, CMR<br>2535 Bluff View<br>Fenton, MO 63127<br>(314) 343-5096 | 24 |
| Chin, Beverly<br>Contracting Officer, GSA<br>525 Market Street, 5th Floor<br>San Francisco, CA 94105<br>(415) 744-5665 | 8 |
| Cody, Jerry<br>President, PAFCO<br>6500 NW Whitney Road<br>Vancouver, WA 98665<br>(360) 695-2411 | 44 |

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

LIST OF WITNESSES

Case File No. I950509

| WITNESS | EXHIBIT |
|---|---|
| Collins, Michael<br>Vice President, Collins & Hermann<br>1215 Dunn Road<br>St. Louis, MO 63138<br>(314) 869-8000 | 27 |
| French, Harvey<br>Sales Representative, Millar Elevator Service<br>1735 Delmar<br>St. Louis, MO 63103<br>(314) 421-3845 | 30 |
| Gross, Ken<br>Credit Manager, Carlisle<br>840 Licking Pike<br>Wilder, KY 41076<br>(606) 441-7400 | 26 |
| Haddock, Roger<br>Project Manager, CRSS<br>901 Clark Street<br>St. Louis, MO 63102<br>(314) 241-5823 | 2,40 |
| Herron, Robert<br>Construction Engineer, GSA<br>901 Clark Street<br>St. Louis, MO 63102<br>(314) 425-4013 | 41 |
| Irwin, Vincent<br>President, Irwin Product<br>11554 Bowling Green<br>St. Louis, MO 63146<br>(314) 991-0464 | 28 |
| Juenger, George<br>President, Majestic Iron Works<br>3423 Big Bend Boulevard<br>Maplewood, MO 63143<br>(314) 781-0130 | 29 |
| Miller, Tamra<br>Office Manager, PAFCO<br>6500 NW Whitney Road<br>Vancouver, WA 98665<br>(360) 695-2411 | 42 |

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

LIST OF WITNESSES

Case File No. I950509

| WITNESS | EXHIBIT |
|---|---|
| Monson, T. R.<br>Sales Representative, PAFCO<br>2700 Cherry Spring Court<br>Las Vegas, NV 89117<br>(702) 233-0320 | 43 |
| O'Brien, Dennis<br>Executive Vice President, Willis Corroon<br>7 Hanover Square, Floor 12<br>New York, NY 10004<br>(212) 344-8888 | 6,15 |
| Page, Terry<br>Scheduler, CRSS<br>901 Clark Street<br>St. Louis, MO 63102<br>(314) 241-5823 | 21,22 |
| Regal, Mike<br>Sales Representative, Morrow Equipment Company<br>621 Long Lake Drive<br>Round Lake, IL 60073<br>(847) 546-0090 | 31 |
| Russell, Constance<br>Contracting Officer, GSA<br>525 Market Street, 5th Floor<br>San Francisco, CA 94105<br>(415) 744-5576 | 13 |
| Tolliver, Larry<br>Former Project Superintendent, CMR<br>2645 Towne Oaks Drive<br>Mehlville, MO 63129<br>(314) 846-1948 | 34 |
| Walsh, John<br>Auditor, GSA/OIG<br>Kansas City, MO 64131<br>(816) 926-7052 | 18 |
| Wiegand, Christopher<br>Former Scheduler, CMR<br>614 Brinkman Street<br>Edwardsville, IL 62025<br>(618) 692-4420 | 25 |

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

LIST OF EXHIBITS

Case File No. I950509

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 1. | Photocopy of facsimile, dated July 22, 1994, from Ford to Harwood concerning bonds. |
| 2. | Memorandum of Interview of Haddock, dated August 16, 1995, with attachments. |
| 3. | Photocopy of facsimile, dated August 22, 1994, from Paquette to Estock. |
| 4. | Photocopy of MDI progress payment application, dated August 16, 1994. |
| 5. | Photocopy of letter from Harwood to Anne Anderson, dated August 25, 1994. |
| 6. | Memorandum of Interview of O'Brien, dated September 11, 1995, with attachments. |
| 7. | Photocopy of Willis Corroon Invoice Number 0219908, dated July 14, 1994. |
| 8. | Memorandum of Interview of Chin, dated October 31, 1995, with attachments. |
| 9. | Photocopy of memorandum from Fornella to Estock and Meltzer, dated June 16, 1995. |
| 10. | Photocopy of memorandum from Fornella to Piser, dated August 31, 1995. |
| 11. | Photocopy of MDI progress payment application, dated September 25, 1995. |
| 12. | Photocopy of advanced billing analysis used by MDI, with attachments. |
| 13. | Memorandum of Interview of Russell, dated November 1, 1995, with attachments. |
| 14. | Photocopy of Willis Corroon Invoice Number 0222719, dated February 23, 1995, with attached check from MDI. |
| 15. | Memorandum of Interview of O'Brien, dated November 1, 1995, with attachments. |
| 16. | Photocopy of facsimile, dated September 6, 1996, from Ford to Reinholtz. |
| 17. | Memorandum of Activity of SA Steven D. Anderson on December 4, 1995, with attachments. |

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

LIST OF EXHIBITS

Case File No. I950509

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 18. | Memorandum of Interview of Walsh, dated November 8, 1996, with attachments. |
| 19. | Memorandum of Activity of SA Steven D. Anderson on June 10, 1997, with attachments. |
| 20. | Photocopy of memorandum from Harwood to Kessler, dated August 12, 1994. |
| 21. | Memorandum of Interview of Page, dated April 3, 1996. |
| 22. | Memorandum of Interview of Page, dated July 17, 1996. |
| 23. | Photocopy of letter from Wiegand to Paquette, dated September 12, 1995. |
| 24. | Memorandum of Interview of Carter, dated July 19, 1996. |
| 25. | Memorandum of Interview of Wiegand, dated May 14, 1997. |
| 26. | Memorandum of Interview of Gross, dated May 1, 1996, with attachments. |
| 27. | Memorandum of Interview of Collins, dated April 16, 1996, with attachments. |
| 28. | Memorandum of Interview of Irwin, dated March 27, 1996, with attachments. |
| 29. | Memorandum of Interview of Juenger, dated April 5, 1996, with attachments. |
| 30. | Memorandum of Interview of French, dated April 18, 1996, with attachments. |
| 31. | Memorandum of Interview of Regal, dated May 1, 1996, with attachments. |
| 32. | Memorandum of Interview of Aaron, dated April 5, 1996, with attachments. |
| 33. | Memorandum of Interview of Ahal, dated April 17, 1996, with attachments. |
| 34. | Memorandum of Interview of Tolliver, dated July 16, 1996. |
| 35. | Photocopy of letter, dated August 18, 1994, from Monson to Jones. |
| 36. | Photocopy of letter, dated November 2, 1994, from Jones to Coday. |
| 37. | Photocopy of memorandum, dated November 10, 1994, from Jones to MDI. |
| 38. | Photocopy of PAFCO Invoice Number 594, dated January 10, 1995. |

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

LIST OF EXHIBITS

Case File No. I950509

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 39. | Photocopy of MDI letter, dated October 20, 1995, to Haddock. |
| 40. | Memorandum of Interview of Haddock, dated May 7, 1996, with attachments. |
| 41. | Memorandum of Interview of Herron, dated May 7, 1996. |
| 42. | Memorandum of Interview of Miller, dated May 7, 1996, with attachments. |
| 43. | Memorandum of Interview of Monson, dated May 1, 1996, with attachments. |
| 44. | Memorandum of Interview of Cody, dated May 7, 1996. |
| 45. | Photocopy of MDI Progress Payment Voucher, dated November 13, 1995. |
| 46. | Audit Report A71820/P/6/X97194, dated July 31, 1997. |
| 47. | Audit Report A71811/P/6/X97177, dated June 27, 1997. |
| 48. | Photocopies of MDI letters, dated March 5, 1996, to Guarantee Electric, Deluca Plumbing, Ceco Concrete, and Ahal Contracting. |
| 49. | Photocopies of Liquidating Agreements, dated June 14, 1996, to Guarantee Electric and Ceco Concrete. |
| 50. | Audit Report A71804/P/6/X97185, dated July 22, 1997. |
| 51. | Photocopy of MDI letter, dated March 5, 1996, to Rodio/Icos. |
| 52. | Photocopy of Standstill Agreement, dated June 14, 1996, to Rodio/Icos. |
| 53. | Photocopy of MDI letter, dated May 9, 1995, to Rodio/Icos. |
| 54. | Photocopy of MDI letter, dated June 15, 1995, to Rodio/Icos. |
| 55. | Photocopy of memorandum, dated June 16, 1995, from Paquette to Lyons. |
| 56. | Photocopy of MDI letter, dated June 29, 1995, to Rodio/Icos. |
| 57. | Photocopy of facsimile, dated September 21, 1995, from Rodio/Icos to Parham. |
| 58. | Photocopy of facsimile, dated October 3, 1995, from Parham to Paquette. |
| 59. | Photocopy of MDI's project profile, dated November 30, 1995. |
| 60. | Photocopy of MDI Change Order, dated February 26, 1996, to Rodio/Icos. |

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

LIST OF EXHIBITS

Case File No. I950509

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 61. | Photocopy of memorandum, dated March 22, 1996, from Schor to Parham. |
| 62. | Photocopy of CMR letter, dated January 11, 1996, from Jones to Carter and Wiegand. |
| 63. | Photocopy of CMR letter, dated January 11, 1996, from Jones to Tolliver. |
| 64. | Audit Report A71803/P/6/X97181, dated July 11, 1997. |
| 65. | Audit Report A72450/P/9/X97120, dated April 3, 1997. |
| 66. | Audit Report A72445/P/9/X97173, dated June 25, 1997. |
| 67. | Photocopy of memorandum, dated February 13, 1996, from Onnembo to Cooney. |
| 68. | Photocopy of facsimile, dated February 27, 1996, from MDI to Azteca. |
| 69. | Photocopy of letter, dated November 1, 1996, to Reinholtz from Azteca. |
| 70. | Photocopy of letter, dated November 20, 1996, to Reinholtz from Azteca. |
| 71. | Photocopy of memorandum, dated May 2, 1996, from Cavanagh to all Territory Managers. |
| 72. | Photocopy of MDI Progress Payment Voucher, dated July 19, 1996. |
| 73. | Photocopy of MDI Progress Payment Voucher, dated August 13, 1996. |
| 74. | Photocopy of memorandum, dated October 14, 1996, from Reinholtz to Borghi. |
| 75. | Photocopy of memorandum, dated December 16, 1996, from Reinholtz to Borghi. |
| 76. | Photocopy of facsimile, dated October 28, 1996, from Hoffman to Cavanagh. |
| 77. | Audit Report A82441/P/9/X98100, dated June 17, 1998. |
| 78. | Memorandum of Interview of Baker, dated June 17, 1998, with attachments. |
| 79. | Memorandum of Activity of SA Steven D. Anderson on June 17, 1998, consensual monitoring of Harwood. |
| 80. | Memorandum of Activity of SA Steven D. Anderson on June 17, 1998, documentation of Swann's telephone call. |

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

LIST OF EXHIBITS

Case File No. I950509

| EXHIBIT NO. | DESCRIPTION |
| --- | --- |
| 81. | Memorandum of Activity of SA Steven D. Anderson on June 25, 1998, analysis of FON Number A-347, with attachments. |
| 82. | Memorandum of Activity of SA Steven D. Anderson on June 25, 1998, analysis of FON Number A-378, with attachments. |

FOR OFFICIAL USE ONLY