# Table of Contents of Appendix

Excerpts from Oct. 4, 2007 deposition of James Brogan ........ 1

Excerpt from Brogan Dep. Ex. 14, Aug. 27, 2001 ACMI claim ........ 7

Brogan Dep. Ex. 19, Aug. 28, 2003 declaration of Mr. Brogan ........ 13

Excerpt from Brogan Dep. Ex. 21, Feb. 19, 2004 declaration of Mr. Brogan ........ 16

Transcript of November 14, 2007 Status Conference, UNDER SEAL ........ 22

UNITED STATES COURT OF FEDERAL CLAIMS

MORSE DIESEL INTERNATIONAL, )
INC., )
Plaintiff, )
v. ) Nos. 99-279C
THE UNITED STATES OF AMERICA, ) et al.
Defendant. ) (Judge Braden)

\- - - - - - - - - - -

DEPOSITION OF JAMES J. BROGAN

Thursday, October 4, 2007

Reported by: Lori G. Mackenzie, RPR
Job No: 183438

A 1

The deposition of JAMES J. BROGAN was convened on Thursday, October 4, 2007, commencing at 9:38 a.m., at the offices of the United States Department of Justice, Civil Division, 1100 L Street, N.W., Room 12046, Washington, D.C., before Lori Goodin Mackenzie, Registered Professional Reporter, Realtime Reporter, and Notary Public for the District of Columbia.



APPEARANCES

For Plaintiff Morse Diesel International/AMEC Construction Management, Inc.:

JAMES E. ANKLAM, Esquire
DANIELLE PIERCE, Esquire
Paul Hastings, Janofsky & Walker
875 15th Street, N.W.
Washington, D.C. 20005
202-551-1733
202-551-0133 (fax)
jamesanklam@paulhastings.com
daniellepierce@paulhastings.com

For Defendant:

DOMENIQUE KIRCHNER, Esquire
TRACY HILMER, Esquire
JOHN WALSH, Esquire
United States Department of Justice,
Civil Division
1100 L Street, N.W., Room 12046
Washington, D.C. 20004
202-307-1111
tracy.hilmer@usdoj.gov



CONTENTS


| EXAMINATION BY | PAGE |
|---|---|
| Ms. Kirchner | 7 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Subpoena for Mr. Brogan | 20 |
| 2A-2B | Termination for Convenience Settlement Proposal prepared by Beck Steel in connection with the St. Louis Phase II Contract | 31 |
| 3 | October 3, 2007 letter from Paul Hastings to Stephanie Rosenthal with ACMI Privileged Documents Log, Ninth Production | 40 |
| 4 | Beck Steel Termination for Convenience Settlement Proposal | 50 |
| 5 | Document | 54 |
| 6 | Letter by Mr. Brogan and sent to Linda Derby | 60 |
| 7 | Reinstatement Agreement | 63 |




EXHIBITS (Continued)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 8 | Letter from Linda Derby to Mr. Brogan dated, August 7, 1997 | 65 |
| 9 | Copy of the May 4th, 1999 letter by Mr. Harwood to Karen Poole | 67 |
| 10 | Beck Steel Settlement with Morse Diesel regarding termination clause | 88 |
| 11 | Copy of the Beck Steel Settlement without lines running through it | 90 |
| 12 | Copy of a check to Beck Steel from Morse Diesel dated August 11, 1999 | 90 |
| 13 | Clearer copy of Exhibit 12 | 91 |
| 14 | September 2001 REA | 98 |
| 15 | Copy of the September 1, 2000 Complaint of Morse Diesel in the Court of Federal Claims, Case Number 00-531 | 120 |
| 16 | Copy of the Contracting Officer's Final Decision | 126 |




A 2

EXHIBITS (Continued)



| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 17 | AMEC Complaint 6/2003 Court of Federal Claims appealing 6/24/02 final decision on 8/01 claim | 129 |
| 18 | Settlement Agreement and Mutual Release between Sachs Electric Company and Morse Diesel/AMEC | 138 |
| 19 | Mr. Brogan's declaration of August 28, 2003 | 143 |
| 20 | Document | 149 |
| 21 | Mr. Brogan's Supplemental Declaration submitted February 19, 2004 | 154 |
| 22 | Document and Revised Assessment of Beck Steel Replacement Subcontractor Costs | 165 |
| 23 | Subhistory Phase II document | 167 |
| 24 | Government's Counterclaim | 181 |
| 25 | Memo pertaining to August 27 REA with supporting Warner Report, Morse Diesel Certification and transmittal of documents to the government | 183 |





PROCEEDINGS

JAMES J. BROGAN,

a witness called for examination, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MS. KIRCHNER:

Q. Mr. Brogan, my name is Domenique Kirchner and I'm going to be taking your deposition today.

If I ask any question that you do not understand, please let me know and I will rephrase the question.

The water is for you, so please help yourself.

If you need to take a break please let me know and I will accommodate you? If there is a pending question I ask that you give your response to the pending question.

Where are you currently employed?

A. Facchina-McGaughan, LLC.

Q. How long have you been working for



that company?

A. Since July 2003.

Q. When did you start working for Morse Diesel International?

A. November 1996.

Q. In what capacity were you employed at that time?

A. As a -- when I became employed, as a vice president and commercial director.

Q. Was that your position in November 1996?

A. Yes.

Q. Were you employed for Morse Diesel International prior to November 1996 in any capacity?

A. No.

Q. What were your duties and responsibilities as a vice president, commercial director?

A. I was responsible to promote a commercial management program within the company, which primarily focused on identifying and



managing risks in contracts, and sound contract and subcontract management, and the management of changes within the contract.

Q. Who did you report to as vice president, commercial director?

A. John Cavanaugh, the chief operating officer.

Q. Who did you supervise as vice president, commercial director?

A. Initially I did not have anyone that I supervised. Ultimately we had commercial managers in some of the offices who I supervised.

Q. So, at that time, who then did you supervise?

A. No one.

Q. I thought you were indicating that later on in your duties you supervised someone?

A. Oh, I thought you meant at that time as of November of '96.

Q. Right. I understand.

But, at a later point in time, after November 1996, did you supervise personnel?

then the balance of it was MDI markup.
Q. Okay. All right. So, just what page are you on?
A. Page 178, Bates stamped, of Exhibit 14.
Q. Okay. So, it's your understanding that the Settlement Agreement, Exhibit 18, resolved the Sachs portion of the Sachs High-Risk Factor Claim; is that correct?
A. Yes. I believe that Sachs was paid for this claim and it resolved the claim as part of the settlement.
Q. And it was paid through the checks attached to, that are the last two pages in Exhibit 18?
A. Yes. Yes.
Q. Okay.
THE WITNESS: I wouldn't mind a break some time in the next few minutes.
MR. ANKLAM: Well, it's one o'clock. So why don't we do lunch?
MS. KIRCHNER: Off the record.



(Lunch recess -- 12:56-1:57 p.m.)
(Brogan Exhibit Number 19 marked for identification.)
BY MS. KIRCHNER:
Q. Can you take a look at what we've marked as Exhibit 19 and identify it, please?
A. This is my declaration of August 28th, 2003.
Q. Who prepared this document?
A. It was a collaboratively prepared by myself, and counsel with Arent Fox, Craig King and Richard Webber.
Q. Other than Craig King and Richard Webber, did you have communications with anyone else with regard to preparation of Exhibit 19?
A. Possibly a conversation with John Onnembo, or conversations with John Onnembo.
Q. Other than those three individuals, Mr. King, Mr. Webber and Mr. Onnembo, did you have any conversations or communications with anyone else are regard to preparation of Exhibit 19?



A. No.
Q. Directing your attention to Paragraph Number 3 in your affidavit, which crosses over from Page 1 to Page 2 of the document, you see there -- let me know when you are ready.
You probably want to read that paragraph.
A. Okay. Okay.
Q. Okay. In Paragraph 3 you state, in the third sentence: "Those claims have been appealed to the General Services Board of Contract Appeals where they are currently stayed.
"The claims consist of amounts due for delay and impact of $12,297,013, a Claim for Reformation of the Contract with Nonduplicative Costs, Overhead and Profit of $2,157,227 and withheld liquidated damages in the amount of $229,400."
Do you see that?
A. Yes.
Q. How did you determine that the claim



for delay and impact was in the amount of $12,297,013?
A. That would have -- you mean, how did I determine with respect to the preparation of my declaration, right?
Q. Yes. Yes.
A. Not how I determined -- not how the claim is assembled, but how was the declaration assembled?
Q. Yes.
A. From the records that I had available to me.
Q. What records did you have available to you with regard to that number, the 12 million number?
A. I don't recall what they were.
Q. Well, before you signed the declaration on August 28th, 2003, had you reviewed documents with regard to the Phase I contract?
A. Yes.
Q. And did you --

Page 146

MR. ANKLAM: I'm going to insert an objection here about any questions on the Phase I contract at this point on specific issues.

This is the Ninth Counterclaim that has to do with the Beck Steel Claim, which is the second Phase II contract. That's the only thing left open for discovery here.

The claims and defenses related to that is all that's supposed to be in discovery. We're not supposed to be getting into a lot of other new claims or claims that previously had discovery rights.

So I'm going to object to general -- enter a general objection to the relevance of any of this.

I'll let the witness answer the question, but I will, if this goes on and on and on, I'll get to a point where I'm going to say we've got to stop, because this is supposed to be about the Ninth Counterclaim and that's it.

That's all that's left in this case for discovery.

Page 147

BY MS. KIRCHNER:
Q. Okay. Did you review documents regarding the Phase I Contract in preparation to signing this affidavit?
A. Yes. I did.
Q. Do you recall at this time what those documents were?
A. No. I don't.
Q. Do you recall how you determined that the Claim for Reformation of the Contract with Nonduplicative Costs, Overhead and Profit was in the amount of $2,157,227, as stated in your affidavit?
MR. ANKLAM: Same objection.
THE WITNESS: Generally I do.
BY MS. KIRCHNER:
Q. How did you determine that?
A. Well, I compared the Claim for Reformation against the Delay and Impact Claim and identified elements of the Reformation Claim that were included within the Delay and Impact claim.

Page 148

And, then the remaining or residual amounts, the nonduplicative amounts totaled to 2,157,227.
Q. And when did you do that comparison?
A. I don't remember specifically when, but, prior to signing the declaration.
Q. Did you do that comparison in order to be able to sign this declaration dated August 28th, 2003?
A. I believe I did, yes. I'm sure I did. I'm sure I did.
Q. And in that same paragraph you mention that Morse Diesel had an unpaid contract balance of 103,400 -- excuse me -- $103,456.88.
How did you get that number?
A. From Morse Diesel's accounting records.
Q. So did you review any accounting records in order to be able to sign the affidavit dated August 2003?
A. As to Phase I or the entirety.
Q. As to Phase I.

Page 149

A. I would, any accounting records that I would have reviewed were limited to the accounts receivable records.
(Brogan Exhibit Number 20 marked for identification.)
BY MS. KIRCHNER:
Q. Please take a look at Exhibit 20, please.
A. Okay. I've looked at it.
Q. Do you recognize Exhibit 20?
A. I don't have a recollection of having seen it.
Q. Can I point your attention to Page 3 of the exhibit?
MR. ANKLAM: Continuing objection to Phase I questions.
BY MS. KIRCHNER:
Q. Okay. You see here on the page it has "Cost Summary" on the top?
A. Yes.
Q. Okay. Do you recognize the third page of the exhibit?



A 5

A. The second figure.

Q. Before you move, just let me ask you this to save some time there, on the bottom is that 131, I see on that same Page 27, under "Work Completed," toward the bottom you I see $131 below a business tax, and I wonder whether that's your 131 for Paragraph 3?

A. Yes.

Q. Okay. All right. Go ahead with what you were going to tell me about the 18 million.

A. Okay. 18,741,507, it's -- okay, that's going to be -- there is some figures we have to reference.

Q. Okay. Can you just tell me what page you're on?

A. Page 13. Total General Conditions of minus -- Work Completed of negative 1,027,735, okay.

That needs to be offset by a figure that appears on Page 12 of Advanced Billings, negative Advanced Billings of 19,769,242.



So, negative 1,027 minus a negative 19,769 -- I don't have my calculator but that should equal the 18,741.

Q. Okay. I follow you.

A. Okay.

Q. Okay. And if we could -- if you could look at Page 27 of Exhibit 3 to your declaration, which is Exhibit 21, and you see at the top I see "Beck Steel."

Do you see that?

A. Yes.

Q. And if I look across under the column "Original," I see 240,000 and then under the column "Adjusted," I see 240,000, under "Work Completed," I see 240,000.

Do you see that?

A. Yes.

Q. And is that 240,000 the amount of the settlement between Morse Diesel and Beck Steel?

A. That's the amount paid pursuant to the settlement between Morse Diesel and Beck



Steel.

Q. So, does this Exhibit 3 also indicate that there was a payment in the amount of 240,000 from AMEC to Beck Steel?

A. Or Morse Diesel, yes.

Q. Yes.

A. Yes. It does.

Q. Could we go back to Exhibit 14?

MR. ANKLAM: Is he going to need this other exhibit in front of him at the same time or no?

MS. KIRCHNER: I don't think so.

MR. ANKLAM: Okay.

BY MS. KIRCHNER:

Q. And if you could turn to Pages I -- Roman Numeral I-3, Roman Numeral I-4, which is Bates Numbers 172 to 173.

Do you see that's the section regarding the Reinstatement Claim?

A. Correct.

Q. And then you have the Reinstatement Cost Summary on that page with the Bates



Number 173.

A. Correct.

Q. What number should have been included in place of the 1,257,270 figure on Page Bates Number 173?

A. That would be as referenced in Exhibit Number 21.

Q. I point you to Paragraph 16.

A. Okay.

Q. If that will help you.

A. It would be 1,166,618.33.

Q. And you're referring to your Exhibit 21, your declaration?

A. Correct.

MR. ANKLAM: And Paragraph 16 therein?

THE WITNESS: Correct.

(Brogan Exhibit Number 22 marked for identification.)

BY MS. KIRCHNER:

Q. Please take a look at what's been marked as Exhibit 22 to your deposition.

amec

# Request for Equitable Adjustment
# Part I

## *Unresolved Extra Work, Time Impact Costs and Relief from Liquidated Damages*

***for the***

## Phase II
## THOMAS F. EAGLETON UNITED STATES COURTHOUSE

**St. Louis, Missouri**

**August 27, 2001**

A 7

CONFIDENTIAL

EXHIBIT 14
WIT: Brogan
DATE: 10/4/07
LGM

ACMI 9th 000150

amec

August 30, 2001

Ms. Karen Poole
Contracting Officer
General Services Administration
Property Development Enterprise
Public Buildings Service (6PCA)
1500 E. Bannister Road
Room 2135
Kansas City, MO 64131-3088

Re: Thomas F. Eagleton U.S. Courthouse – Phae II
Project No. NM037113-GS06P95GZC0501

Dear Ms. Poole:

Amec Construction Management, Inc. ("AMEC") (f/k/a Morse Diesel International, Inc.("MDI") hereby submits its Request for Equitable Adjustment Part 1 (the "REA") in the total sum of $18,587,292, adjusted downward for the reason stated in the following paragraph hereof to a certified amount of $18,572,292.

It has come to the attention of AMEC that the United States Department of Justice contends that it is not appropriate for MDI to charge the full amount of its additional bond premium resulting from contract price increases to the General Services Administration because of certain financial transactions between the broker responsible for obtaining performance and payment bonds for MDI and AMEC plc. While AMEC does not agree with the Justice Department's position, it has reduced its REA by a factor intended to comply with that position, resulting in a reduction of the REA by the sum of $15,000 to a certified sum of $18,572,292. This adjustment is not intended as an admission that the Justice Department's position is correct nor as a waiver of AMEC's right to charge the full amount of the additional premium in other contexts. Rather the adjustment is made to avoid an unnecessary protracted dispute over a relatively minor issue.

Yours truly,
AMEC CONSTRUCTION MANAGEMENT, INC.

James J. Brogan
Sr. Vice President
Commercial Director

cc: File

AMEC Construction Management, Inc.
1633 Broadway, 24th Floor
New York, NY 10019-6708
Tel 212-484-0512
Fax 212-484-0585
www.amec.com

**CERTIFICATION**

I make the following certification on behalf of AMEC.

I hereby certify that the REA in the adjusted amount of $18,572,292 with respect to the project known as Phase II of the Thomas F. Eagleton United States Courthouse in St. Louis, Missouri, is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which AMEC believes the government is liable, and that I am duly authorized to certify the claim on behalf of AMEC.

James J. Brogan
Senior Vice-President
Amec Construction Management, Inc.

D:\AMEC\CHICAGO\ST. LOUIS FCH 2\REA\AMEC CERTIFICATION.doc

**Thomas F. Eagleton U.S. Courthouse, Phase II**
**St. Louis, MO**

**TABLE OF CONTENTS**


**Section I – UNRESOLVED EXTRA WORK** ........ I -

1.1 Introduction ........ 1
1.2 Existing Claims ........ 3
1.2.1 Reinstatement Claim ........ 3
1.2.2 11th Floor Partial Termination ........ 4
1.2.3 Utility Reimbursement ........ 5
1.2.4 Wood Blocking to Courtrooms ........ 6
1.2.5 Sachs High Rise Factor ........ 7
1.2.6 Existing Claims Cost Summary ........ 10
1.3 Unresolved Directed Extra Work ........ 11

- P-13 Precast Connection Revisions ........ 11
- P-16 Miscellaneous Structure Revisions ........ 12
- P-25 Level 8 Shall Be Similar to Level 6 ........ 12
- P-51 Mechanical Revisions ........ 14
- P-52 11th Street Security Revisions ........ 14
- P-75 Level 18 Tenant Fit-Out ........ 15
- P-76 Level B2, B3, and B4 Tenant Fit-Out ........ 16
- P-77 GSA Review of Steel Connection ........ 16
- P-78 Level B1 Tenant Fit-Out ........ 17
- P-82 Level 1, 1M, 2 Tenant Fit-Out ........ 17
- P-85 Insulation VECP ........ 18
- P-90 Tenant Fit-Out Levels 3, 4 and 5 ........ 18
- P-91 Fan and Equipment ........ 19
- P-92 Pattern Options and Stone Pattern Revisions ........ 19
- P-98 Levels 6, 9, 11 and 19 Tenant Fit-Out ........ 19
- P-102 Levels 20, 21, and 22 Tenant Fit-Out ........ 20
- P-108 Architectural Changes Due to TFO ........ 21
- P-111 Levels 23 and 24 Tenant Fit-Out ........ 21
- P-119 Delete Telephone Enclosures ........ 22
- P-124 Special Proceedings ........ 22
- P-127 Courtroom Millwork Revisions Time Extension ........ 23
- P-138 Base Building Revisions Due to Tenant Fit-Out ........ 23
- P-146 Base Building Revisions Due to TFO Levels 3,4,5 ........ 24
- P-149 Levels 25 and 26 Tenant Fit-Out ........ 25
- P-150 Base Building Revisions, TFO Levels 6,9,11,19 ........ 25
- P-151 Health / Fitness Area Changes ........ 26
- P-152 Base Building Revisions TFO Level 25, 26 ........ 26
- P-155 Chamber Changes ........ 27
- P-156 Base Building Revisions, TFO Levels 20, 21, 22 ........ 27

**1.2 Existing Claims**

**Section 1.2** of the Request for Equitable Adjustment summarizes the existing General Services Board of Contract Appeals (GSBCA) and Federal claims. The existing claims are not being resubmitted for further ruling, but to establish the overall contract amount. MDI has established an equitable value of each outstanding claim for which the GSA has failed to provide proper compensation.

**1.2.1 Reinstatement Claim**

On September 28, 1995, the GSA awarded a Contract to MDI for the construction of the Thomas F. Eagleton U.S. Courthouse, St. Louis, Missouri. Prior to Notice-to-Proceed, on April 10, 1996, the GSA terminated MDI for convenience. The parties, however, met and an agreement was reached to reinstate MDI. Under Paragraph 4 of the Reinstatement Agreement dated May 2, 1996, the GSA agreed to reimburse MDI a total of $1,423,800, subject to audit.

To date, the GSA has only paid MDI a total of **$811,897.00**. The amount paid compensated MDI for the additional cost incurred to replace the miscellaneous metalwork subcontractor. The GSA has yet to compensate MDI for the following:

- Beck Steel termination costs
- MDI General Condition costs for the 22 (work or calendar) days of contract shut down
- Buyout escalation costs due to the termination
- Added Overhead expense
- Interest

On May 4, 1999[1], MDI forwarded a letter to the GSA requesting a Contracting Officer's final Decision with respect to the Reinstatement Payment Claim. The GSA issued a final decision on September 9, 1999[2] denying MDI's request for compensation.

On September 1, 2000[3], MDI appealed the decision of the contracting officer denying its claim for reimbursement of the full $1,423,800.00 set forth in paragraph 4 of the May 2, 1996 agreement between MDI and GSA reinstating Contract No. GS06P95GZC0501. Furthermore, MDI seeks an additional $645,367 in damages, for a total of **$2,069,167.00**. Accordingly, MDI is entitled to recover an additional **$1,257,279.00** for the unresolved extra work.

---

[1] Exhibit 460 MDI letter to GSA dated 5/4/99
[2] Exhibit 461 GSA letter to MDI dated 9/9/99
[3] Exhibit 462 MDI Appeal dated 9/1/00

**Reinstatement Cost Summary**

| | | |
|---|---|---|
| Reinstatement Claim Case #00-5316 | $ | 2,069,167 |
| GSA Payment | $ | 811,897 |
| Unresolved Amount | **$** | **1,257,270** |

### 1.2.2 11th Floor Partial Termination Claim

On September 28, 1995, the GSA awarded a contract to MDI for the construction of the Thomas F. Eagleton US Courthouse, St. Louis, Missouri, Bid Package 2. The work scope was defined and the building designed by the GSA. The Invitation to Bid included Option 8, the build out of Level 11 and MDI bid Option 8 with a separate price of **$1,900,000.00**. Upon award of the contract to MDI, the Option 8 work became a fully integrated part of the work. Option 8 was the build out of Level 11, and this was designed to be a Courtroom level.

In June 1996 (nine months after the contract award), the GSA informed MDI that it was going to issue a proposed request to delete the courtroom build-out of level 11 from the Contract because the GSA no longer needed the two courtrooms on that level. However, the GSA always intended that there would be a full build out and alternative usage for the Level 11 space, which would not be built out as courtrooms. The GSA also intended that MDI would do the Level 11 construction per the revised plans.

In July 1996, the GSA issued Request for Change Proposal P-24 and a Price to be Determined Later Notice for P-24 in the amount of zero dollars (**$0.00**) in connection with the deletion of the courtroom build out work on Level 11. The GSA's position was that the Contract price should be reduced by $1,900,000, (the MDI bid price for Option 8) and that the reduction should be pursuant to a partial termination for convenience of the Government.

On February 13, 1997, the GSA issued a Notice of Partial Termination with respect to the Level 11 build-out and proposed a **$1,900,000.00** deduction from the contract price.

On July 28, 1997, the GSA issued Change Proposal P-98 that added back tenant fit-out work for Level 11. In issuing P-98, the GSA required that MDI perform build-out work for the same areas on Level 11, initially designed as courtrooms. The replacement design was for a different configuration than originally required and MDI submitted a proposed price for the revised work.

By letter dated January 30, 1998, MDI again informed the GSA that the deletion of the Level 11 – courtroom configuration and replacement thereof with tenant fit-out work was a "change", not a "partial termination".

To date, the GSA has deducted <**$1,900,000.00**> from MDI billings. MDI has certified a claim for **$467,649.00** and is entitled to a change order for a credit of <**$1,432,351.00**> representing the cost of the "change" on the 11th floor.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MORSE DIESEL INTERNATIONAL, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Nos. 99-279C, 99-529C, 99-530C, 00-531C, 03-1537C (Judge Braden) |

EXHIBIT 19
WIT: Brogan
DATE: 10/4/07
LGM

## DECLARATION OF JAMES BROGAN

I, James Brogan, for my declaration in the above case, state as follows:

1. I am employed by AMEC Construction Management, Inc. (formerly, Morse Diesel International, Inc.) ("Morse Diesel") in the position of Executive Vice President and Commercial Director. In that position, I have responsibility for overseeing the preparation of claims where Morse Diesel's costs have been increased as a result of changes to the work or other action by the owner.

2. I have been involved, and continue to be involved, with the preparation and submission of claims to the General Services Administration arising out of four projects that Morse Diesel constructed in the mid- to late 1990s: the St. Louis Courthouse Phase I, the St. Louis Courthouse Phase II, the Sacramento Courthouse and the San Francisco Customs House.

**St. Louis Phase I**

3. On this project Morse Diesel has claims against GSA in the total amount of $14,683,640.00 The claims have been certified to the contracting officer and denied by final decision. Those claims have been appealed to the General Services Board of Contract Appeals,

where they are currently stayed. The claims consist of amounts due for delay and impact of $12,297,013, a claim for reformation of the contract with non-duplicative costs, overhead and profit of $2,157,227, and withheld liquidated damages of $229,400. GSA also owes Morse Diesel an unpaid contract balance of $103,456.88, for an overall total of $14,787,096.88.

**St. Louis Phase II**

4. Morse Diesel has brought several claims under the contract that are already before the Court as numbers 99-279C, 99-529C, 99-530C, 00-531C, and 03-1537C. Three of these claims are for increased costs relating to specific events: the reinstatement of the Phase II contract ($1,257,270), the eleventh floor partial termination ($467,649), and utility reimbursement ($196,254). In addition, Morse Diesel has before this Court its challenge to the default termination of the Phase II contract and its claim to convert that default termination to a termination for convenience. Docket No. 03-1537C is an appeal from the contracting officer's denial of Morse Diesel's claim to establish a total contract price for Phase II performance, as the first step in determining convenience termination costs.

5. Additional Morse Diesel claims have not yet been submitted to the contracting officer for final decision. These claims include time impact costs of $8,214,173, unresolved extra work claims of $284,648, and contract balances of $5,773,142.98.[1]

6. In addition, Morse Diesel has settled subcontractor claims for $8,500,000: $7,200,000 for Sachs Electric and $1,300,000 for ICS/NCS. The entire $8,500,000 is not attributable to the actions of GSA, and, because substantial work remains to be done to identify with precision the amounts attributable to GSA's actions, I can only give my best approximation here for what that number will ultimately be. My best approximation is $6,000,000. The

---

1 The $5,773,142.98 sum includes $3,456,906 for Morse Diesel's unpaid May 1999 payment application, and $2,316,236.63 for retention and improperly withheld liquidated damages. The combined $5,773,142.98 amount is subject to reduction to the extent that GSA has made direct payments to subcontractors after the default termination for pre-termination work performed or retention withheld.

estimated total of all amounts GSA owes to Morse Diesel – claims and contract balances – is thus $22,193,136.98.

7. As soon as the subcontractor claims are fully calculated, Morse Diesel will submit an overall request for equitable adjustment to the contracting officer for final decision. The request is anticipated to be before the contracting officer by October 24, 2003.

**Sacramento Courthouse**

8. Morse Diesel also has major claims arising out of the Sacramento Courthouse contract. Morse Diesel has already submitted certified claims to the contracting officer for project delay and impact, including claims of affected subcontractors, in the amount of $26,402,359.84. Also pending are Morse Diesel's requests for equitable adjustment (REAs) in the amount of $4,297,502 and change orders in the amount of $1,234,784. All claims have been stayed as a result of the Government's fraud and forfeiture assertions. In addition to these claims are contract balances, including improperly withheld liquidated damages, in the amount of $3,119,812. Thus, GSA owes Morse Diesel a total of $35,054,457.84 for this project.

**San Francisco Customs House**

9. Morse Diesel submitted a certified claim for increased costs for the San Francisco Customs House project. The parties negotiated a settlement amount of $624,000. Before that amount could be processed for payment, however, the Government's claims for fraud have prevented payment of the settlement amount.

I declare under penalty of perjury that the foregoing is true and correct.

August 28, 2003

James J. Brogan

James Brogan

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MORSE DIESEL INTERNATIONAL, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Nos. 99-279C, 99-529C, 99-530C, 00-531C, 03-1537C (Judge Braden) |

**SUPPLEMENTAL DECLARATION OF JAMES BROGAN**

I, James Brogan, for my supplemental declaration in the above case, state as follows:

1. This Declaration supplements my previous Declaration, executed on August 28, 2003, previously filed in this action in support of the opposition of Plaintiff Morse Diesel International, Inc. ("Morse Diesel") to Defendant's Motion for Partial Summary Judgment. I submit this Declaration in response to the comment at footnote 9 (page 16) of the Government's Reply Brief dated January 16, 2004 in this matter, which alleges that my earlier declaration was "conclusory." I attempted to be quite specific in my August 28, 2003 Declaration, but in order to avoid any question I wish to supplement my prior Declaration here.

2. I am employed by AMEC Construction Management, Inc. (formerly, Morse Diesel) as Executive Vice President. It was my responsibility to oversee the preparation of claims where Morse Diesel's costs increased as a result of changes to the work or other actions by the owner.

3. I have been involved, and continue to be involved, with the preparation and submission of claims to the GSA arising out of four projects that Morse Diesel constructed in the



EXHIBIT 21
WIT: Brogan
DATE: 10/4/07
LGM

mid- to late 1990s: the St. Louis Courthouse Phase I, the St. Louis Courthouse Phase II, the Sacramento Courthouse and the San Francisco Customs House.

4. As in the case of my Declaration dated August 28, 2003, I make this Declaration on personal knowledge.

5. Throughout this Supplemental Declaration I refer to a number of Requests for Equitable Adjustment ("REA") as well as certified claims that Morse Diesel submitted to the General Services Administration ("GSA"). Those documents are voluminous, making a stack several feet high plus enough additional documents on CD-ROM media to make another stack. My purpose here is to summarize Morse Diesel's REAs and certified claims. Although assembling and duplicating the hundreds or thousands of pages that comprise these documents would be possible, I understand from our counsel that, in the interest of conserving paper and the Court's time, counsel will simply have the most important of these documents available for the Court at the motion hearing presently scheduled for Friday, February 20, 2004. Should the Court desire copies of any or all of our REAs or certified claims or the supporting data, we will gladly furnish them.

**St. Louis Phase I**

6. With respect to St. Louis Phase I, as noted in my August 28, 2003 Declaration, Morse Diesel has claims against GSA in the total amount of $14,683,640.00. These claims have been certified to the Contracting Officer. Those claims were then appealed to the General Services Board of Contract Appeals ("GSBCA"), where they were docketed as GSBCA Nos. 13486, 13491, 13492 and 14372. Those appeals are currently stayed. The following paragraphs elaborate on the nature, content, and present status of Morse Diesel's claims on St. Louis Phase I that are pending in the GSBCA.

7. The first claim amount seeks payment for delay and impact damages in the amount of $12,297,013, plus remission of $229,400 in liquidated damages. Originally submitted

to GSA as an REA on August 2, 1996, this claim sought an equitable adjustment for differing site conditions and defective specifications. The claim related to hazardous materials found in the soils at the site and, in addition, to a deficient design for the slurry wall system that today serves as the foundation for the Eagleton Courthouse. The claim was denied by the Contracting Officer in a final decision dated September 26, 1997.

8. In addition, Morse Diesel has submitted a claim for reformation of the contract that contains additional costs, overhead and profit. Those items set forth in the Phase I Contract reformation claim that do not duplicate costs previously submitted in the claim for delay and impact damages (referred to the preceding paragraph) total $2,157,227. The Phase I Contract reformation claim was submitted originally on February 6, 1998. Ultimately, suit was filed in this Court on the reformation claim under Docket No. 98-908C. The Court then transferred that matter to the GSBCA by Order dated October 27, 1999. It remains pending in the GSBCA today, where, as noted, proceedings have been stayed.

9. GSA also owes Morse Diesel an unpaid contract balance of $103,456.88 on the Phase I Contract.

10. All claim items discussed for Phase I in the preceding paragraphs total $14,787,096.88.

**St. Louis Phase II**

11. As stated in my Declaration dated August 28, 2003, Morse Diesel has already filed several actions in this Court regarding the claims that it has against GSA under the Phase II Contract for construction of the Eagleton Courthouse. Those actions now pending before the Court include Docket Nos. 99-279C, 99-529C, 99-530C, 00-531C, and 03-1537C.

12. Based upon calculations that were done in preparation for my August 28, 2003 Declaration, I stated in that Declaration that the Government is liable to Morse Diesel for at least $22,193,136.98. Since making my August 28, 2003 Declaration I have been made aware of one

downward adjustment, relating to the "Reinstatement" claim described in the next paragraph. Based upon present calculations, the adjustment described below would reduce the total amount for Phase II by approximately $90,661.67, to a new figure of $22,102,476.33. As discussed later in this Supplemental Declaration, however, under an alternative method of calculating the amount due from GSA, the Government would actually owe Morse Diesel slightly more than the $22,193,136.98 referred to in my previous Declaration. I will explain the makeup of our claims and my reasoning in the following paragraphs.

13. Three of the claims for the St. Louis Phase II Contract referred to above seek to recover increased costs relating to specific events: the reinstatement of the Phase II Contract after it was initially terminated for convenience (original amount: $1,257,270 – No. 00-531C), the eleventh floor partial termination ($467,649 – No. 99-279C), and utility reimbursement ($196,254 – No. 99-530C). In addition, Morse Diesel has before this Court its challenge to the default termination of the Phase II contract and its request that this Court convert that default termination to a termination for convenience (No. 99-529C). Finally, Docket No. 03-1537C in this Court represents an appeal from the Contracting Officer's denial of Morse Diesel's certified claim to establish a total contract price for the Phase II Contract. Morse Diesel submitted this claim as the first step in determining the quantum of its entitlement to payment of a termination for convenience settlement.

14. On August 30, 2001, Morse Diesel submitted a formal REA to the GSA Contracting Officer seeking to re-establish the Contract Price, and certified its REA as a formal claim under the Contract Disputes Act. This was not a claim for payment of money by GSA, however. Rather, it was an intermediate, but necessary, step to the ultimate establishment of termination convenience costs.

15. The REA, first, incorporated the $1,257,270, previously claimed in No. 00-531C, resulting from GSA's initial termination of the Phase II Contract for convenience on April 10, 1996, followed by its subsequent reinstatement pursuant to an agreement dated May 2, 1996.

A 19

Morse Diesel's REA included the relevant cost and price detail. The amount claimed represented the difference between (a) the amount agreed to in the May 2, 1996 Reinstatement Agreement ($1,423,800) plus Morse Diesel's damages of $635,367, and (b) the $811,897 paid by GSA to date. The Contracting Officer denied the Reinstatement Claim on September 9, 1999, and MDI timely filed suit in this Court as an appeal from that decision on September 1, 2000.

16. Upon review of the Reinstatement Claim, a reduction is in order. A significant element of the claim as originally computed was a subcontractor's claim, by Beck Steel, Inc. in the original amount of $321,065. Morse Diesel was able to settle that claim for $240,000, however, $81,075 less than originally asserted. Applying the appropriate markup factors to this reduction results in a total reduction in the claim of $90,660.67. The revised amount for the Reinstatement Claim, on that basis, would be $1,166,618.33.

17. The REA, further, incorporated the proposed price adjustment of $467,649 related to GSA's partial termination of the work on 11th Floor of the Eagleton Courthouse (No. 99-279C). Option 8 in the Contract, as originally awarded, set forth a separately priced item of $1,900,000 for the build-out of two courtrooms on that level. When GSA decided not to build the two courtrooms, it issued a "Notice of Partial Termination" deleting the full $1,900,000 from the Contract Price. The 11th floor space had to be built out in an alternative configuration, however, leading to the issuance of Change Proposal 98. Morse Diesel submitted a certified claim for $467,649, representing the difference between the full credit of $1,900,000 claimed by the Government, and a credit of $1,432,351 proposed by Morse Diesel to reflect the fact that the 11th floor work had been changed, not terminated. That claim is now pending in this Court and, if allowed, would increase the Phase II Contract Price by $467,649.

18. The REA further incorporated $196,254 for utility costs between April 1, 1998 and October 12, 1998 that Morse Diesel paid (No. 99-530C). Morse Diesel contends that this cost should be reflected in an equitable price adjustment because the specifications state: "The

A 20

41. In addition, change order proposals in the aggregate amount of $1,234,784 have been submitted. The amount represents the combined proposed equitable adjustment for more than 100 change orders, some actual and some constructive changes. GSA has not resolved these changes.

42. In addition to these claims are contract balances, including improperly withheld liquidated damages, in the amount of $3,216,310. This amount includes $96,498 incorrectly omitted from the amount set forth in my August 28, 2003.

43. Thus, GSA owes Morse Diesel a total of $35,086,161 for this project.

**San Francisco Customs House**

44. On July 18, 1997, Morse Diesel submitted an REA requesting and equitable adjustment on the San Francisco Customs House. In February, 1998 Morse Diesel revised its claim, and an audit followed. Based upon the audit comments, a revised claim and Contract Disputes Act certification were submitted on September 28 and 29, 1998, respectively.

45. During November and December, 1998, the parties exchanged settlement offers. On or about December 22, 1998, I personally reached agreement with Contracting Officer Constance Russell to settle Morse Diesel's claim in the amount of $624,000.

46. To date, GSA has refused to pay the agreed amount.

I declare under penalty of perjury that the foregoing is true and correct.

February 19, 2004

James J. Brogan [signature]

James Brogan

A 21